ORIGINAL



1   ROBERT L. FALK (SBN 142007)
    ROBIN S. STAFFORD (SBN 200950)
2   SARAH B. SCHINDLER (SBN 236414)
    MORRISON & FOERSTER LLP
3   425 Market Street
    San Francisco, California  94105-2482
    Telephone:  (415) 268-7000
4   Facsimile:  (415) 268-7522
    Email: RFalk@mofo.com
5   Email: RStafford@mofo.com
    Email: SSchindler@mofo.com

6   JOEL R. REYNOLDS (SBN 85276)
    CARA HOROWITZ (SBN 220701)
7   NATURAL RESOURCES DEFENSE COUNCIL, INC.
    1314 Second Street
8   Santa Monica, California 90401
    Telephone:  (310) 434-2300
    Facsimile:  (310) 434-2399

9
    Attorneys for Plaintiffs
    NATURAL RESOURCES DEFENSE COUNCIL,
10  INC.; THE HUMANE SOCIETY OF THE UNITED
    STATES; INTERNATIONAL FUND FOR ANIMAL
11  WELFARE; CETACEAN SOCIETY
    INTERNATIONAL; LEAGUE FOR COASTAL
12  PROTECTION; OCEAN FUTURES SOCIETY;
    JEAN-MICHEL COUSTEAU

13

14                  UNITED STATES DISTRICT COURT

15                 NORTHERN DISTRICT OF CALIFORNIA

16  NATURAL RESOURCES DEFENSE COUNCIL,        Case No.
    INC.; INTERNATIONAL FUND FOR ANIMAL
17  WELFARE; THE HUMANE SOCIETY OF THE
    UNITED STATES; CETACEAN SOCIETY           **COMPLAINT FOR DECLARATORY**
18  INTERNATIONAL; LEAGUE FOR COASTAL         **AND INJUNCTIVE RELIEF FOR**
    PROTECTION; OCEAN FUTURES SOCIETY;        **VIOLATION OF THE MARINE**
19  JEAN-MICHEL COUSTEAU                      **MAMMAL PROTECTION ACT,**
                                              **NATIONAL ENVIRONMENTAL**
20                    Plaintiffs,             **POLICY ACT, ENDANGERED**
                                              **SPECIES ACT, AND**
         v.                                   **ADMINISTRATIVE PROCEDURE**
21  CARLOS M. GUTIERREZ, SECRETARY OF THE     **ACT**
    UNITED STATES DEPARTMENT OF COMMERCE;
22  NATIONAL MARINE FISHERIES SERVICE;
    WILLIAM HOGARTH, ASSISTANT
23  ADMINISTRATOR FOR FISHERIES OF THE
    NATIONAL OCEANOGRAPHIC AND
24  ATMOSPHERIC ADMINISTRATION; VICE
    ADMIRAL CONRAD C. LAUTENBACHER, JR.,
25  ADMINISTRATOR OF THE NATIONAL
    OCEANOGRAPHIC AND ATMOSPHERIC
26  ADMINISTRATION; UNITED STATES
    DEPARTMENT OF THE NAVY; DONALD C.
27  WINTER, SECRETARY OF THE UNITED STATES
    DEPARTMENT OF THE NAVY; ADMIRAL MIKE
28  MULLEN, CHIEF OF NAVAL OPERATIONS

                      Defendants.

FILED

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SBA

1        **INTRODUCTION**

2        1.      This action challenges the United States National Marine Fisheries Service's

3    ("NMFS") 2007 decision to reauthorize and the United States Department of the Navy's

4    ("Navy") decision to expand its deployment of Surveillance Towed Array Sensor System

5    ("SURTASS") Low Frequency Active Sonar ("LFA"), a powerful and highly-controversial

6    global sonar system that will broadcast extraordinarily intense sound waves through as much as

7    75% of the world's oceans.[1]

8        2.      Disregarding the principles set forth by this Court in closely-related litigation

9    regarding the Navy's previous deployment of LFA, Defendants have now approved LFA for

10   training, testing and routine military operations – without sufficient mitigation – for another five

11   years.  This approval comes in spite of new evidence that LFA risks widespread injury and

12   disturbance of countless marine species and their habitat, through impacts that range from

13   significant disruptions in critical behaviors like breeding, nursing, and foraging, to physical

14   effects such as hearing loss, internal hemorrhaging, stranding, and death.  Remarkably,

15   Defendants' new five-year authorization rejects all of the mitigation measures previously

16   required by this Court, including, most critically, its injunction to avoid important habitat for

17   endangered and vulnerable species.

18       3.      Because a single LFA source is capable of flooding thousands of square miles of

19   ocean with intense levels of sound, even the Navy and NMFS have conceded that deployment of

20   the system around the world will harm many thousands of marine mammals, including

21   significant numbers of endangered species such as blue whales, humpback whales, sperm

22   whales, and other species whose numbers are already depleted.

23       4.      In reviewing Defendants' previous deployment of LFA, in 2003, this Court found

24   it "undisputed that marine mammals, many of whom depend on sensitive hearing for essential

25

26   _____

         [1] The National Marine Fisheries Service, Assistant Administrator for Fisheries,
27   Administrator of the National Oceanographic and Atmospheric Administration, Secretary of
     Commerce, United States Navy, Secretary of the Navy, and Chief of Naval Operations are
28   referred collectively herein as "Defendants."

1    activities like finding food and mates and avoiding predators, and some of whom are endangered

2    species, will at a minimum be harassed by the extremely loud and far traveling LFA sonar." *See*

3    *Natural Res. Def. Council, Inc. v. Evans*, 279 F. Supp. 2d 1129, 1188 (N.D. Cal. 2003) ("District

4    Court Opinion"). The Court ruled in that case that Defendants had violated multiple provisions

5    of the Marine Mammal Protection Act ("MMPA"), National Environmental Policy Act

6    ("NEPA"), and Endangered Species Act ("ESA") in deciding to deploy the system and authorize

7    its impacts without additional mitigation. At the Court's request, the parties negotiated

8    appropriate mitigation measures, ultimately set forth in a carefully tailored injunction whereby

9    the Navy could continue to train with LFA in a variety of ocean conditions while also taking

10    necessary and feasible steps to protect marine mammals and endangered species, particularly by

11    restricting LFA's use in vulnerable habitat.

12         5.     On August 14, 2007, after ignoring Congressional requests for an extension and

13    conducting a public comment period of almost unprecedented brevity, NMFS issued a new

14    permit under the MMPA covering the next five years of routine testing and training with the

15    system. Ostensibly that permit, like the new Supplemental Environmental Impact Statement

16    ("SEIS") produced by the Navy, was prepared in response to the Court's 2003 ruling:

17    specifically, to address the Court's concerns "in relation to compliance with the National

18    Environmental Policy Act (NEPA), Endangered Species Act (ESA), and Marine Mammal

19    Protection Act (MMPA)." SEIS at P-1. In fact, the latest permit, the Navy's SEIS, and the

20    Biological Opinions prepared by NMFS under ESA fail to respond to the Court's concerns, most

21    pointedly in their consideration of mitigation measures to protect marine life.

22         6.     Defendants, in these new documents, decline each and every additional mitigation

23    measure urged by the Court. They flatly refuse to even include an alternative in their SEIS that

24    would restrict the Navy's training to areas with reduced risk of harm to marine life, despite the

25    Court's prior holding on this point. Instead, the Navy resubmits the *identical* operational area

26    map that it previously proposed – literally referring to the map included in the original EIS –

27    which opens more than 70% of the world's oceans to training with the system. Moreover,

28    Defendants propose to retreat from many of the mitigation measures that have been in place

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.
sf-2388965

2

1   since 2002. They would allow training to occur in virtually *any* location, regardless of its

2   importance to endangered and vulnerable species of marine life; would shrink the existing

3   coastal exclusion from at least 30 nautical miles (60 nautical miles or more in some cases); and

4   would discard the restriction on higher frequencies that NMFS had prescribed in 2002 in part to

5   narrow the range of species that LFA broadcasts might affect. All of this would occur along with

6   a doubling of the number of LFA ships (from two to four) and of the number of hours of active

7   transmissions per year.[2]

8       7.      Defendants would eliminate these mitigation measures without any new

9   information indicating that LFA would not harm marine mammals. Indeed, the Navy's long-

10  term research program depends on a monitoring system whose efficacy remains unproven and

11  whose coverage includes only a small part of LFA's impact area; it provides no basis for

12  estimating the number of animals taken at the Navy's training sites, let alone assessing the

13  degree to which populations have been impacted. By contrast, since the Navy's original EIS was

14  issued in 2001, the scientific record documenting impacts of high-intensity noise on marine

15  mammals has grown substantially. In particular, Defendants discount the potential for injury and

16  mortality in beaked whales, despite abundant new evidence indicating their acute vulnerability to

17  sound and casting considerable doubt on the Navy's ability to effectively detect them in the

18  water.

19      8.      In issuing a permit of worldwide scope and without adequate mitigation, NMFS

20  has once again violated the Marine Mammal Protection Act, 16 U.S.C. §§ 1361-1421. The

21  agency has failed to ensure – in again allowing annual take of up to 12 percent of *any* marine

22  mammal species or population – that the Navy's activity will have no more than a negligible

23  impact on marine mammals; and it has failed to prescribe measures achieving the "least

24  practicable impact" on protected species and to set forth sufficient requirements for the

25  monitoring and reporting of impacts. In addition, despite the concerns expressed in the public

26  comment process by both plaintiffs and the U.S. Marine Mammal Commission, NMFS has

27

28          [2] The Navy's long-term plans for expanding the system are unclear.

1    illegally attempted to defer its site-specific analysis of impacts and mitigation – within the areas

2    the Navy will actually be using – downstream, to an annual closed-door process, in violation of

3    the MMPA's express requirement for public notice and comment.

4    9.    Defendants have also once again violated the National Environmental Policy Act,

5    40 U.S.C. §§ 4321-4370, by failing to identify and consider all reasonably available alternatives,

6    such as focusing training in areas with reduced risk; to identify and analyze all feasible

7    mitigation measures; and to adequately analyze all reasonably foreseeable impacts, particularly

8    given the significant new information that has emerged over the last five years. The Navy's own

9    modeling indicates that large numbers of marine mammals would be taken – yet Defendants, in

10    their SEIS, fail to properly account for the cumulative effects of their activities, particularly in

11    areas exposed repeatedly to LFA over multiple years and during exercises that also involve the

12    use of other dangerous Navy acoustics.

13    10.    These failures apply with equal force to NMFS' application of the Endangered

14    Species Act, 16 U.S.C. §§ 1531-1544, and, more specifically, to its adoption of two new

15    Biological Opinions (issued August 14 and 17, 2007), which conclude that the LFA system is not

16    likely to jeopardize the continued existence of any species or result in the destruction or adverse

17    modification of designated critical habitat. Using the Navy's own estimates of the percentages

18    of listed species that will be taken, NMFS fails to consider the best available science on the

19    impact of LFA training on threatened and endangered marine mammals, fish, and sea turtles.

20    Additionally, the agency's Incidental Take Statements are arbitrary and capricious and unlawful,

21    and run contrary to the requirements of ESA and its implementing regulations.

22    11.    To remedy these violations of law, plaintiffs NRDC, The Humane Society of the

23    United States ("HSUS"), the International Fund for Animal Welfare ("IFAW"), Cetacean

24    Society International ("CSI"), League for Coastal Protection ("LCP"), and Ocean Futures

25    Society ("Ocean Futures") and its founder, Jean-Michel Cousteau (collectively "Plaintiffs") seek:

26    (1) a declaration that the United States, and each of its named subdivisions and officials, are

27    violating federal law in the respects set forth herein; and (2) an injunction prohibiting the United

28    States and its subdivisions, officials, agents, and contractors from proceeding with the proposed

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.                                                                    4
sf-2388965

1  five-year deployment unless and until adequate mitigation (such as that previously ordered by

2  this Court) is put into place and these violations are corrected.

3      12.    Unless this Court compels the Navy to comply with federal law consistent with

4  the principles previously identified by this Court, marine species and important marine habitat

5  risk suffering irreparable damage in ways that may not be understood for generations to come.

6                          **JURISDICTION AND PARTIES**

7      13.    This Court has subject matter jurisdiction over the claims set forth in this

8  Complaint pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction), 5 U.S.C. § 702

9  (Administrative Procedure Act, "APA"), and 28 U.S.C. § 1361 (Mandamus). The relief sought

10  is authorized by 28 U.S.C. § 2201 (Declaratory Relief) and 28 U.S.C. § 2202 (Injunctive Relief).

11     14.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (e) as this

12  civil action is brought against agencies of the United States and officers and employees of the

13  United States acting in their official capacities and under the color of legal authority, and at least

14  one Plaintiff resides in the Northern District of California. No real property is involved in this

15  action.

16     15.    An actual and substantial controversy presently exists between Plaintiffs and

17  Defendants. Plaintiffs assert that Defendants are violating federal law. Plaintiffs have notified

18  Defendants of these violations, but Defendants have not corrected them.

19     16.    Plaintiffs have no plain, speedy, or adequate remedy in the ordinary course of law.

20  Unless this Court grants the relief requested, Defendants' actions will result in irreparable harm

21  to marine mammals, other species, and the marine environment generally, to the interests of

22  Plaintiffs and their members, and to the public in violation of federal law and contrary to the

23  public interest. No monetary damages or other legal remedy could adequately compensate

24  Plaintiffs, their members, or the public for this harm.

25     17.    Plaintiffs and their members are persons adversely affected and aggrieved by

26  federal agency action and are entitled to judicial review of that action under the APA. As more

27  fully alleged herein, the interests of Plaintiffs and their members are being directly and

28

1    significantly harmed by the illegal actions of Defendants. The relief requested will redress those

2    injuries.

3    **A.    Plaintiffs**

4        18.    Plaintiff NRDC is a not-for-profit membership corporation organized under the

5    laws of the State of New York. It has offices in San Francisco, Los Angeles, New York, and

6    Washington, D.C. and, since 2003, has established offices in Chicago and Beijing. NRDC

7    currently has more than 421,500 members throughout the United States, with more than

8    79,400 individual members in the State of California and more than 29,300 within this judicial

9    district. On behalf of its members NRDC is dedicated to the preservation, protection, and

10   defense of the environment, its wildlife, and natural resources.

11       19.    Plaintiff HSUS is a not-for-profit corporation organized under the laws of the

12   Commonwealth of Delaware, with its main office in Washington, D.C. HSUS is the largest

13   animal-protection organization in the United States, with over 9 million members and

14   constituents. HSUS has 7 regional offices, including an office in Sacramento, California, and

15   extensive programs dedicated to the protection of wildlife, including marine mammals.

16       20.    Plaintiff IFAW is a non-profit, non-governmental organization that works to

17   improve the welfare of wild and domestic animals throughout the world by reducing commercial

18   exploitation of animals, protecting wildlife habitats, and assisting animals in distress. It seeks to

19   motivate the public to prevent cruelty to animals and to promote animal welfare and conservation

20   policies that advance the well-being of both animals and people. IFAW has two million

21   members worldwide and fourteen offices around the world, with its headquarters located on

22   Cape Cod, Massachusetts. Over the past two decades, IFAW has made significant contributions

23   to marine conservation and science and has campaigned for measures to protect cetaceans and

24   other marine life from threats such as ocean noise pollution.

25       21.    Plaintiff CSI is a not-for-profit corporation organized under the laws of the state

26   of Connecticut. Headquartered in the United States, it is currently represented in 21 countries

27   and maintains an international membership that includes professionals from the scientific and

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.                                                                                    6
sf-2388965

1   conservation communities. CSI is dedicated to the benefit of whales, dolphins, porpoises, and

2   the marine environment generally through conservation, education, and research.

3   22. Plaintiff LCP is a not-for-profit corporation organized under the laws of the State

4   of California. LCP and its members are committed, through advocacy and education, to the

5   protection of the state's sensitive coastal resources and to the enforcement of the California

6   Coastal Act.

7   23. Plaintiff Ocean Futures is a not-for-profit corporation organized under the laws of

8   the State of California. On behalf of itself and its members, the mission of Ocean Futures is to

9   explore our global ocean, inspiring and educating people throughout the world to act responsibly

10   for its protection, documenting the critical connection between humanity and nature, and

11   celebrating the ocean's vital importance to the survival of all life on our planet.

12   24. Plaintiff Jean-Michel Cousteau is an explorer, environmentalist, educator, and

13   film-maker. He is also President of Ocean Futures, a not-for-profit marine conservation and

14   education organization. He has produced over 70 films, and continues to produce

15   environmentally oriented programs and television specials, public service announcements, multi-

16   media programs for schools, web-based marine content, books, articles for magazines and

17   newspaper columns, and public lectures.

18   25. Plaintiffs and Plaintiffs' members and constituents regularly use, enjoy, and

19   benefit from the marine environment, including U.S. waters within the Northern District of

20   California and beyond, and the presence of healthy marine animals within that environment for

21   recreational, aesthetic, commercial, scientific, and environmental purposes, including whale-

22   watching, scientific study, boat touring, underwater diving, deep-sea fishing, photography, and

23   film-making. The ability of Plaintiffs and Plaintiffs' members to pursue these interests hinges

24   not only on the well-being of marine animals that live, migrate, feed, and breed in areas affected

25   by the Navy's proposed activities, but also on the health of the marine ecosystem on which these

26   animals depend.

27   26. To protect the interests of Plaintiffs and the public, Plaintiffs testified and

28   submitted extensive comments to Defendants within the periods allowed by law, which

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.                                                                                      7
sf-2388965

1    comments expressed numerous, significant concerns about the proposed continued deployment

2    of LFA. Because Defendants have prepared inadequate "incidental take" regulations, Letter of

3    Authorizations ("LOAs"), SEIS, and Biological Opinions – ones that repeat violations identified

4    by the District Court in 2003 and which do not provide adequate mitigation – and because these

5    documents authorize immediate worldwide deployment of LFA and a downstream LOA issuance

6    process shielded from public participation and oversight, the interests of Plaintiffs' members and

7    the public have been, are being, and will be adversely affected by Defendants' violations of

8    federal law, as described herein.

9    **B.    Defendants**

10        27.    Defendant Secretary of Commerce Carlos M. Gutierrez is the head of the United

11    States Department of Commerce and is responsible for ensuring compliance with NEPA and

12    other applicable federal laws. Secretary Gutierrez is sued in his official capacity.

13        28.    Defendant NMFS is an agency of the United States and is a subdivision of the

14    National Oceanic and Atmospheric Administration ("NOAA") within the Department of

15    Commerce. NMFS is responsible for enforcement of the MMPA and ESA, and is the agency

16    that issued the Final Rule, LOAs, and Biological Opinion challenged here. As a federal agency,

17    NMFS is also responsible for ensuring compliance with NEPA.

18        29.    Defendant Assistant Administrator for Fisheries William Hogarth is the highest-

19    ranking official within NMFS, and is responsible for reviewing applications for the "incidental"

20    take of marine mammals under the MMPA. Assistant Administrator Hogarth approved the Final

21    Rule and LOAs challenged here. Assistant Administrator Hogarth is sued in his official

22    capacity.

23        30.    Defendant NOAA Administrator Vice Admiral Conrad C. Lautenbaucher, Jr. is

24    head of NOAA, an agency of the United States Government that encompasses NMFS and is

25    itself a sub-division of the Department of Commerce. Administrator Lautenbacher is responsible

26    for ensuring compliance with the MMPA, ESA, and NEPA. Administrator Lautenbacher is sued

27    in his official capacity.

28

1    31.    Defendant Navy is one of the armed services of the United States Government.

2  As reflected in its August 15, 2007 Record of Decision, the Navy is proposing to deploy and

3  operate the LFA system that is the focus of this action.  As a federal agency, the Navy is

4  responsible for ensuring its compliance with NEPA, the MMPA, ESA, and other applicable

5  federal laws.

6    32.    Defendant Secretary of the Navy Donald C. Winter is the highest-ranking official

7  within the Navy.  The Secretary administers and implements the LFA Program and is responsible

8  for ensuring its compliance with NEPA and other applicable federal laws.  Secretary Winter is

9  sued in his official capacity.

10    33.    Defendant Chief of Naval Operations Admiral Mike Mullen is an officer of the

11  Navy.  The Chief of Naval Operations is responsible for the LFA system's compliance with

12  NEPA and other applicable federal laws.  Chief Mullen is sued in his official capacity.

13                        **STATUTORY BACKGROUND**

14    **A.    The Marine Mammal Protection Act**

15    34.    The MMPA was enacted in 1972 pursuant to congressional findings that "certain

16  species and population stocks of marine mammals are, or may be, in danger of extinction or

17  depletion as a result of man's activities," and, further, that "[t]here is inadequate knowledge of

18  the ecology and population dynamics of such marine mammals . . . ."  16 U.S.C. § 1361(l), (3).

19  In order to protect against further depletion and extinction, the MMPA established a

20  "moratorium on the taking . . . of marine mammals . . . ."  *Id.* § 1371.

21    35.    Under the MMPA, the term "take" means "to harass, hunt, capture, or kill, or

22  attempt to harass, hunt, capture, or kill any marine mammal."  *Id.* § 1362(13).  "Harass" is

23  further defined to include acts of "torment" or "annoyance" that have the potential to injure a

24  marine mammal or marine mammal stock in the wild or have the potential to "disturb" them "by

25  causing disruption of behavioral patterns, including, but not limited to, migration, breathing,

26  nursing, breeding, feeding, or sheltering."  *Id.* § 1362(18).

27    36.    All takings of marine mammals (except for certain specified activities such as

28  subsistence hunting or commercial fishing) are prohibited under the MMPA unless first

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.                                                                                                9
sf-2388965

1    authorized by the Secretary of Commerce through the issuance of either an "incidental take"

2    permit or an "incidental harassment" authorization. 16 U.S.C. § 1371(a); 50 C.F.R. § 216.107.

3    The MMPA and its accompanying regulations set forth standards and procedures that must be

4    satisfied before either an incidental take permit or incidental harassment authorization may issue.

5    16 U.S.C. § 1371(a); 50 C.F.R. § 216.107.

6        37.    Section 101 of the MMPA allows the Secretary of Commerce, through his

7    agencies, including NOAA and NMFS, to grant a take permit only on the condition that, *inter*

8    *alia*: (i) the Secretary first provides adequate notice in the Federal Register and an opportunity

9    for public comment; (ii) the takings the permit authorizes have no more than a "negligible

10   impact" on marine mammal species and stocks; (iii) the permit provides for the monitoring and

11   reporting of such takings; and (iv) the permit prescribes methods and means of effecting the

12   "least practicable adverse impact" on species and stock and their habitat. 16 U.S.C.

13   § 1371(a)(5)(A). Each of these requirements is mandatory and cannot be skirted by claims of

14   insufficient information. Under NMFS' regulations, the issuance of a Letter of Authorization by

15   NMFS is a necessary precondition to taking action under the take permit.

16       38.    In another protective measure designed to ensure the scientific soundness of

17   decisions under the MMPA, Congress established the United States Marine Mammal

18   Commission and charged it to make recommendations on specific matters before the Secretary of

19   Commerce. The MMPA requires that any deviation from such recommendations must be

20   explained in detail, a level of deference unprecedented for an advisory panel at the time that the

21   MMPA was adopted. 16 U.S.C. § 1402(d).

22       **B.    The National Environmental Policy Act**

23       39.    NEPA is "our basic national charter for protection of the environment."

24   40 C.F.R. § 1500.1(a). It was enacted in 1970 to put in place procedures to insure that, before

25   irreversibly committing resources to a project or program, federal agencies "encourage

26   productive and enjoyable harmony between man and his environment," "promote efforts which

27   will prevent or eliminate damage to the environment," and "enrich the understanding of the

28   ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.
sf-2388965

10

1    40.    To further this goal, Section 102(2)(c) of NEPA requires federal agencies to

2    prepare, consider, and approve an adequate EIS for any "major Federal action significantly

3    affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To assure the

4    transparency and thoroughness of these deliberations, agencies also must "to the fullest extent

5    possible . . . [e]ncourage and facilitate public involvement" in decision-making. 40 C.F.R.

6    § 1500.2(d).

7    41.    In order to satisfy NEPA, an EIS must include a "full and fair discussion of

8    significant environmental impacts." 40 C.F.R. § 1502.1. This discussion may not consider a

9    proposed action in isolation, but rather must consider cumulative impacts, including the "impact

10   on the environment which results from the incremental impact of the action when added to other

11   past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.

12   42.    An adequate EIS must consider both direct and indirect environmental impacts of

13   the proposed action. 40 C.F.R. § 1508.8. Direct effects are caused by the action and occur at the

14   same time and place. 40 C.F.R. § 1508.8(a). Indirect effects are caused by the action and are

15   later in time or farther removed in distance, but are still reasonably foreseeable. *See* 40 C.F.R

16   § 1508.8(b). Both include "effects on natural resources and on the components, structures, and

17   functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social, or

18   health [effects]." *Id.* The EIS must also consider the cumulative effects of the activity together

19   with other reasonably foreseeable future actions. 40 C.F.R. § 1508.7.

20   43.    An agency must make every attempt to obtain and disclose data necessary to its

21   analysis. Where information relevant to a reasonably foreseeable significant adverse impact is

22   essential to a reasoned choice among alternatives, and may be obtained at a less than exorbitant

23   cost, the agency must include that information in its EIS. 40 C.F.R. § 1502.22(a). Where the

24   costs of obtaining missing data are exorbitant or the means to obtain it are unknown, the agency

25   must (i) identify the missing information, (ii) assess its relevance in evaluating reasonably

26   foreseeable significant adverse impacts, (iii) summarize existing credible scientific evidence on

27   the subject, and (iv) demonstrate that the agency's evaluation of such impacts is "based upon

28   theoretical approaches or research methods generally accepted in the scientific community."

1   40 C.F.R. § 1502.22(b)(4).  Throughout the document, the agency is required to "insure the

2   professional integrity, including scientific integrity," of its discussions and analyses.  40 C.F.R.

3   § 1502.24.

4        44.    An EIS must also "inform decisionmakers and the public of the reasonable

5   alternatives which would avoid or minimize adverse impacts or enhance the quality of the human

6   environment."  40 C.F.R. § 1502.1.  This requirement represents "the heart of the environmental

7   impact statement."  40 C.F.R. § 1502.14.  The agency must therefore "[r]igorously explore and

8   objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from

9   detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R.

10  § 1502.14(a).  The agency must also consider and analyze mitigation measures not already

11  included in the proposed action or alternatives.  40 C.F.R. §§ 1502.14(f), 1508.20.

12       45.    If, after the completion of the EIS, the agency becomes aware of "significant new

13  circumstances or information relevant to environmental concerns and bearing on the proposed

14  action or its impacts," it must prepare a supplemental EIS.  40 C.F.R. § 1502.9(c)(1)(ii).  Except

15  for scoping, the process by which the scope of an EIS is initially defined, this supplemental

16  statement must be prepared in the same fashion as the original EIS.  *See id.*

17       **C.     The Endangered Species Act**

18       46.    Congress passed ESA in 1973 in response to growing concern over the extinction

19  of fish, wildlife, and plants stemming from human activities "untempered by adequate concern

20  and conservation."  16 U.S.C. § 1531(a)(1).  Recognizing the aesthetic, ecological, educational,

21  historical, recreational, and scientific value of these species, Congress enacted ESA with the

22  express purpose of "provid[ing] a means whereby the ecosystems upon which endangered

23  species and threatened species depend may be conserved, [and] . . . provid[ing] a program for the

24  conservation of such endangered species and threatened species."  *Id.* § 1531(b).

25       47.    The U.S. Fish and Wildlife Service ("FWS") and NMFS share responsibility for

26  administering ESA.  50 C.F.R. § 402.01(b).

27       48.    ESA prohibits any person from "taking" species listed as endangered, and

28  empowers FWS and NMFS to promulgate regulations prohibiting the taking of any species listed

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.                                                                                                     12
sf-2388965

1    as threatened. 16 U.S.C. §§ 1533, 1538(a)(1)(A)-(B), (G). "Take" is defined by ESA as "to

2    harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in

3    any such conduct." 16 U.S.C. § 1532(19).

4        49.    Section 7 of ESA requires each federal agency, in consultation with NMFS or

5    FWS, to "insure that any action authorized, funded, or carried out by [a federal] agency. . . is not

6    likely to jeopardize the continued existence of any endangered species or threatened species or

7    result in the destruction or adverse modification of habitat of such species which is determined

8    by the Secretary [of the Interior or of Commerce] . . . to be critical." 16 U.S.C. § 1536(a)(2).

9        50.    Consultation pursuant to Section 7 can take place in two forms: informal

10   consultation and formal consultation. Formal consultation is defined as "a process between

11   [NMFS and/or FWS] and the Federal agency that commences with the Federal agency's written

12   request for consultation under section 7(a)(2) of the Act and concludes with the . . . issuance of

13   the biological opinion under section 7(b)(3)." 50 C.F.R. §§ 402.02, 402.14; *see also* 16 U.S.C.

14   § 1536(b)(3). Following formal consultation, NMFS and/or FWS issues a "biological opinion"

15   indicating "whether or not the Federal action is likely to jeopardize the continued existence of

16   listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R.

17   § 402.02.

18       51.    Additionally, in those cases where a biological opinion includes the taking of

19   marine mammals, NMFS must provide a statement concerning the incidental take that:

20   (i) specifies the "amount or extent" of such take on the species; (ii) specifies those reasonable

21   and prudent measures necessary to minimize such impact; (iii) specifies those measures

22   necessary to comply with section 101(a)(5) of the MMPA; (iv) sets forth terms and conditions

23   that must be complied with by the federal agency to implement those reasonable and prudent

24   measures and conditions; and (v) specifies the procedures to be used to handle or dispose of any

25   individuals of a species actually taken. 50 C.F.R. § 402.14(i).

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.                                                                                        13
sf-2388965

**FACTUAL BACKGROUND**

A.     **Overview of the LFA System**

52.     SURTASS LFA is an active sonar system that identifies and locates enemy vessels by bombarding the ocean with sound waves.

53.     The active component of LFA is an array of eighteen loudspeakers lowered several hundred feet from a ship's hull into the ocean. The speakers are synchronized through electrical lines running the length of a central cable; sounding in tandem, they combine a few hundred meters from the source, creating zones of focalized sound in patterns that extend hundreds of miles in all directions. In coastal and near-coastal waters, virtually the entire water column is ensonified. According to the Navy, each speaker has a maximum output of 215 decibels; but for purposes of calculating the intensity of the signal beyond a few hundred meters (where the vast majority of environmental impacts are expected to occur), the speakers are treated as though they constituted one enormous source generating as much as 240 decibels of sound.

54.     During the next proposed 5-year period of LFA deployment, the Navy plans to introduce three lighter-weight versions of the system, known as Compact LFA, or "CLFA"; but the operational characteristics of the two systems are reportedly comparable, with the newer system tending to use a slightly higher portion of the same frequency band.

55.     Low-frequency sound waves travel very efficiently in seawater, and it is this property that accounts for the system's extraordinary geographic reach and the extensive diversity of habitat it affects. Sound waves generated during one test of the LFA system were calculated by the Navy to reach approximately 140 decibels – an intensity over 100 times greater than the level known to disturb gray whales – more than 300 miles from the source. During LFA tests off the coast of California, its signals were clearly audible at sites across the entire North Pacific. According to NMFS, sound levels of 165 decibels – at which level Defendants predict that 50 percent of marine mammals would undergo significant change in a biologically important behavior – can extend more than 35 miles from the LFA vessel.

1    56.    Under the Final Rule, the Navy would double the number of ships operating the

2    system, from two to four, over the next five years.

3    **B.    Environmental Impacts of Active Sonar**

4    57.    Sound is a mechanical vibration that causes changes in pressure in a medium such

5    as water or air.  High-intensity sounds have been recognized to pose a unique danger to marine

6    mammals and other aquatic species, in part because of the important role that acoustics play in

7    marine ecology and in part because of the great distances and diverse range of habitat over which

8    intense sound can propagate underwater.  LFA poses a particular threat to the marine

9    environment because of the extraordinary distance that low-frequency sound can travel.

10    According to the Marine Mammal Commission, "[i]f the LFA sonar system is made available for

11    world-wide employment as proposed, all species and populations of marine mammals could

12    possibly be affected."

13    58.    Scientists agree, and the publicly available literature reflects, that intense sound

14    generated by active sonar can induce a range of adverse effects in whales, dolphins, and other

15    marine wildlife, including but not limited to:

- mortality or serious injury caused by hemorrhaging of tissues in lungs, air cavities, or other structures of the body, which may lead animals to strand or to die at sea;

- joint pain, disorientation, visual and auditory dysfunction, and other central nervous system deficits, which likewise may result in serious injury or death;

- stranding in shallow water or beaching caused by these or other effects;

- temporary or permanent loss of hearing, which impairs an animal's ability to communicate, avoid predators, detect and capture prey, and engage in other behaviors essential to its survival;

- avoidance behavior, which can lead to abandonment of habitat or migratory pathways;

- disruption of biologically essential behaviors such as mating, feeding, nursing, or migration, or loss of efficiency in conducting those behaviors;

- aggressive behavior, which can result in injury;

- chronic stress, which compromises breeding and may leave animals vulnerable to disease, parasitism, and other environmental harms;

1      • habituation, causing animals to remain near damaging levels of sound,
          or sensitization, exacerbating other behavioral effects;

2
       • masking of biologically meaningful sounds, such as the call of
3         predators or potential mates that occur at the same frequency; and

4      • declines in the availability and viability of prey species, such as fish
          and shrimp.
5

6      59.     Since the publication, in 2001, of the Navy's first EIS for LFA deployment, a

7  consensus has developed within the scientific community associating the use of military active

8  sonar with strandings and mortalities of beaked whales and other marine mammals.  That

9  consensus is reflected in the publication of numerous papers in peer-reviewed journals, in reports

10 by inter-governmental bodies such as the Scientific Committee of the International Whaling

11 Commission ("IWC"), and in evidence compiled from a growing number of mortalities

12 associated with sonar.  Associated strandings have occurred in Greece, during the trial of a

13 NATO sonar system; on the islands of Madeira and Porto Santo, during a NATO event involving

14 subs and surface ships; in the Bahamas, the Canaries, Japan, Hawaii, Alaska, Spain, and other

15 areas around the world.  On several occasions, bodies have been recovered in time to give

16 evidence of internal trauma.

17     60.     In 2004, the IWC's Scientific Committee – comprising more than 100 leading

18 whale biologists from around the world – reported that the accumulated evidence associating

19 sonar with beaked whale strandings was "very convincing and appears overwhelming."  A group

20 of scientists hired by the Navy to examine the impacts of active sonar on cetaceans came to the

21 same conclusion, writing in their 2004 report to the Navy as follows: "We would like to state at

22 the outset that the evidence of sonar causation is, in our opinion, completely convincing and that

23 there is serious issue of how best to avoid/minimize future beaching events."

24     61.     Naval exercises and other activities using high-intensity sound have caused or

25 been associated with multiple mortality events of whales and other marine mammals, including

26 but not limited to:

27     • Between 1985 and 1989, at least three separate mass strandings of
          beaked whales occurred in the Canary Islands, as reported in *Nature*.
28        Thirteen beaked whales of two species were killed in the February 1985

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.                                                                                    16
sf-2388965

1    strandings, six whales of three species stranded in November 1988, and
     some twenty-four whales of three species stranded in October 1989 –
2    all while naval vessels were conducting exercises off shore. An
     additional stranding of Cuvier's beaked whales, also coinciding with a
3    naval exercise, occurred in 1991;

4    • In 1996, twelve Cuvier's beaked whales stranded along 35 kilometers
       on the west coast of Greece. The strandings were correlated, by an
5      analysis published in *Nature*, with the test of a low- and mid-frequency
       active sonar system operated by NATO. A subsequent NATO
6      investigation found the strandings to be closely timed with the
       movements of the sonar vessel, and ruled out all other physical
7      environmental factors as a cause;

8    • In 1997, nine additional Cuvier's beaked whales stranded off Greece,
       again coinciding with naval activity;
9
     • In October 1999, four beaked whales stranded in the U.S. Virgin
10     Islands as the Navy began an offshore exercise. A wildlife official
       from the Islands reported the presence of "loud naval sonar." When
11     NMFS asked the Navy for more information about its exercise, the
       Department's response was to end the consultation it had begun for
12     related activities under the Endangered Species Act;

13   • In May, 2000, three Cuvier's beaked whales stranded at Madeira
       Island, Portugal, coincident to a NATO exercise using surface vessels
14     and submarines; analysis showed hemorrhaging and lesions consistent
       with results from Bahamas strandings in March of that year;
15
     • In September, 2002, a stranding of fourteen beaked whales of three
16     different species (Blainville's beaked whales, Cuvier's beaked whales
       and Gervais' beaked whales) off the Canary Islands coincided with
17     Navy exercises in the region. Necropsies of these animals revealed
       emboli in their organ tissue as well as other symptoms suggestive of the
18     "bends," or decompression sickness;

19   • In May, 2003, an abnormally high number of harbor porpoises (as
       many as eleven) were found beached off Puget Sound, Washington, the
20     region in which a U.S. Navy vessel was conducting mid-frequency
       sonar exercises while passing through the nearby Haro Strait. During
21     one exercise, researchers in the area reported observing dozens of
       porpoises fleeing the sonar;
22
     • In June, 2004, six beaked whales were found stranded along the Gulf of
23     Alaska, coinciding with a naval exercise referred to as "Northern
       Edge";
24
     • In July, 2004, four Cuvier's beaked whales stranded around the coasts
25     of the Canary Islands, within one week of a NATO sonar exercise.
       Although the three bodies that were necropsied were too decomposed
26     to allow detection of gas embolisms, systematic fat embolisms were
       found in these animals. The probability that the whales did not strand
27     but died at sea is extremely high;

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.                                                                    17
sf-2388965

- In July, 2004, in an event never before seen in the Hawaiian Islands, a pod of approximately 200 normally deep-water melon-headed whales crowded into the shallow waters off Kauai, as Japanese and U.S. Navy ships conducted a Rim of the Pacific sonar exercise offshore. According to NMFS, naval sonar was a "possible, if not likely" factor in the strandings;

- In January 2005, during and just after a series of sonar exercises off North Carolina, at least thirty-seven whales of three different species stranded and died along North Carolina's Outer Banks, including numerous pilot whales (six of which were pregnant), one newborn minke whale, and two dwarf sperm whales. NMFS concluded that sonar was a possible cause of the strandings and also ruled out the most common other potential causes, including viral, bacterial, and protozoal infection, direct blunt trauma, and fishery interactions; and

- In January 2006, four Cuvier's beaked whales stranded on the Almerian coast of southern Spain, with the same suite of bends-like pathologies seen in the whales that stranded in the Canary Islands in 2002 and 2004. Investigators are confirming the use of mid-frequency sonar in the area.

62.    Reports of whales that strand due to Navy sonar are likely to underestimate the scale of the problem. Many whales may be affected far from shore yet remain undiscovered, as most dead whales sink. NMFS recognized this point in its recent stock assessments for Pacific populations of beaked whales, stating that "unknown levels of injuries and mortalities of Cuvier's beaked whales may occur as a result of anthropogenic noise, such as military sonars (U.S. Dept. of Commerce and Secretary of the Navy 2001) or other commercial and scientific activities involving the use of air guns. Such injuries or mortalities would rarely be documented, due to the remote nature of many of these activities and the low probability that an injured or dead beaked whale would strand."

63.    While, to date, investigation into beaked whale mortalities has focused primarily on mid-frequency sonar, the available evidence suggests that low-frequency sources could have similar effects. At least one beaked whale stranding event has been associated with the use of airguns, a source whose energy is predominantly concentrated in the low frequencies, and at least one other event is associated with an experimental naval sonar system that produced both low- and mid-frequency sounds; further, a published experiment reported strong behavioral responses in a beaked whale exposed to relatively low levels of shipping noise, another source whose

1   energy is predominantly low-frequency. Considering this evidence, the published literature

2   explicitly recognizes the potential for low-frequency sources to produce strandings, injuries, and

3   mortalities of beaked whales. Because the use of LFA sonar has, to date, been far less

4   widespread than the use of mid-frequency sonar, and restricted to waters far offshore and

5   generally remote from well-established stranding networks, the lack of observed strandings

6   known to be associated with LFA sonar does not contradict this potential.

7       64.     The record developed since 2001 indicates that debilitating, severe, and

8   potentially lethal injuries are occurring in whales exposed to sonar at sea, only some of which

9   may then strand. As first reported in the journal *Nature*, animals that came ashore during sonar

10  exercises off the Canary Islands, in September 2002, had developed large emboli in their organ

11  tissue and suffered from symptoms resembling those of severe decompression sickness, or "the

12  bends"; investigation of other stranding events has confirmed this finding. Regardless of the

13  mechanism, some of the pathologies observed in previous stranding events, including

14  hemorrhaging around the brain, are now recognized to be evidence of injuries suffered

15  independent from those caused by the act of stranding itself.

16      65.     Studies from a variety of regions, including the Mediterranean, the northwest

17  Atlantic, and the Hawaiian Islands, now indicate that at least some beaked whale populations are

18  highly structured and may be small, isolated, and genetically discrete. Such populations would

19  be highly vulnerable to population-level effects from mass strandings or mortalities.

20      66.     Mortalities and strandings represent only some of the LFA system's potential

21  impacts. Marine mammals depend on sound to navigate, find food, locate mates, avoid

22  predators, and communicate with each other; flooding their habitat with anthropogenic noise

23  interferes with these and other functions and can reduce the fitness of animals. Since

24  Defendants' EIS was issued in 2001, the scientific record on the behavioral impacts of ocean

25  noise has expanded significantly. Research has provided further evidence of habitat

26  displacement, cessations and other changes in vocalization patterns, disruptions in foraging

27  activity, and other impacts from a variety of low-frequency (and other) anthropogenic sources,

28  including shipping noise, boat traffic, and airgun arrays.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.                                                                                        19
sf-2388965

67.    Marine mammals are not the only species affected by undersea noise. Impacts on fish are of increasing concern due to several recent studies demonstrating hearing loss and widespread behavioral disruption in commercial species of fish and reports, both experimental and anecdotal, of catch rates falling dramatically in the vicinity of intense low- and mid-frequency noise sources. Sea turtles, most of which are considered threatened or endangered under federal law, have been shown to engage in escape behavior and to experience heightened stress in response to noise. It is clear that intense sources of noise are capable of affecting a wide class of ocean life.

## C.    Procedural History (LFA I)

68.    Although the Navy was aware of its obligations under NEPA as early as 1988, and under the MMPA no later than 1990, it deployed LFA sonar – without preparing environmental assessments or obtaining permits – in more than 20 separate tests or training exercises in the late 1980s and 1990s. It was not until 1996, after the LFA project came under public pressure from the environmental and scientific communities, that the Navy agreed to prepare an environmental impact statement under NEPA, apply for a small take authorization under the MMPA, or consult with NMFS under ESA regarding its program.

69.    In 1999, the Navy filed an application with NMFS for an incidental take permit pursuant to section 101(a)(5) of the MMPA, requesting authorization to "take" (*i.e.*, kill, injure, harass, and disturb) marine mammals on a worldwide basis, incidental to deployment of the Navy's LFA system during training, testing, and routine military operations over a five-year period. Two years later, NMFS published proposed regulations authorizing the "incidental" take requested by the Navy. 66 Fed. Reg. 15375 (Mar. 19, 2001). The Navy's proposal, and NMFS' willingness to abide it, aroused an extraordinary degree of public concern given the high percentages of predicted takes, the breadth of the authorization, and the lack of adequate mitigation. In addition to those submitted by Plaintiffs, NMFS received over 10,000 comments on the Proposed Rule, including comments from scientists, Members of Congress and other elected representatives, and thousands of private citizens and organizations, all alerting the agencies to the deficiencies in their plan. The Navy released its FEIS in January 2001.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.
sf-2388965

20

1    70.    On May 30, 2002, NMFS issued a Biological Opinion, concluding that the

2    deployment of LFA would not jeopardize the continued existence of any species listed as

3    endangered or threatened under ESA or result in the adverse modification of any listed species'

4    designated critical habitat. The agency declined, however, to estimate the amount of extent of

5    incidental take over the 5-year period, stating that it would include take estimates in its annual

6    LOAs. Two months later, in July, the Navy issued a Record of Decision, implementing the

7    preferred alternative identified in its 2001 FEIS, which allowed the deployment of LFA with

8    limited geographic restrictions and monitoring mitigation. 67 Fed. Reg. 48145, 48153 (July 23,

9    2002). Also in July, NMFS issued its Final Rule for the Navy's use of LFA sonar, and adopted

10   in its entirety the EIS prepared by the Navy for the system. 67 Fed. Reg. 46712, 46775 (July 16,

11   2002).

12    71.    Recognizing the clear flaws in the Navy's 2001 FEIS and in NMFS' approval of

13   the Navy's proposed plan of deployment, NRDC, together with plaintiffs HSUS, LCP, CSI,

14   Ocean Futures and Jean Michel Cousteau, filed suit in this Court in 2002, alleging multiple

15   violations of NEPA, ESA, and the MMPA. Plaintiffs alleged, *inter alia*, that NMFS violated the

16   MMPA by issuing a small take authorization which did not meet that statute's requirements; that

17   NMFS and the Navy violated NEPA by finalizing an EIS that failed to analyze adequately the

18   environmental impacts of LFA; and that NMFS and the Navy violated ESA by ignoring the best

19   available science on the impacts of LFA on listed species and by issuing inadequate (or no)

20   incidental take statements.

21    72.    On October 31, 2002, the Court ruled in favor of NRDC on preliminary

22   injunction. Ten months later, on August 26, 2003, it ruled again in favor of NRDC on summary

23   judgment, finding that defendants had violated multiple provisions of NEPA, the MMPA, and

24   ESA. *See Natural Res. Def. Council, Inc. v. Evans*, 279 F. Supp. 2d 1129 (N.D. Cal. 2003).

25   Among other things, the Court held that:

26        •    NMFS violated the MMPA by issuing an incidental take authorization
            that was not limited to a "specified geographic region" (*id*. at 1146-47);

27

28

1   • NMFS violated the MMPA by issuing a small take authorization authorizing take of more than "small numbers" of marine mammals, in
2   some cases up to 12% each year of any species or stock (*id*. at 1152-53);

3   • NMFS violated the MMPA by issuing an incidental take authorization that failed to require adequate mitigation and monitoring of impacts to
4   marine mammals (*id*. at 1159, 1163-64);

5   • NMFS and the Navy violated NEPA by failing to consider a full set of reasonable alternatives in their EIS (*id*. at 1166-67);

6
7   • NMFS and the Navy violated NEPA by failing to take a hard look at the impacts to fish species in their EIS, among other things, ignoring the only direct study of low-frequency sonar on fish (*id*. at 1171-72);

8
9   • NMFS violated ESA by failing to consider the "best available science," and the Navy violated ESA by withholding from NMFS the most relevant study on impacts to fish (*id*. at 1179-80).

10
11   • NMFS violated ESA by failing to issue an incidental take statement in association with its May Biological Opinion (*id.* at 1184-85); and

12   • NMFS violated ESA by failing to specify the amount or extent of take for all species for which take was authorized in the incidental take statement
13   accompanying its August Biological Opinion (*id.* at 1188).

14   73.     In holding that NMFS' 2002 Final Rule did not go far enough in imposing

15   mitigation measures on the Navy's use of LFA, the Court specifically noted that "defendants

16   acted arbitrarily and capriciously in failing to: (1) extend the coastal exclusion zones in all areas

17   except for those few coastal areas where close to shore training is necessary, (2) use aerial

18   surveys or observational vessels for LFA sonar missions operated close to shore, and

19   (3) designate additional off-limit areas or seasons and OBIAs [Offshore Biologically Important

20   Areas]." *Id*. at 1164.  Indeed, the Court found these measures necessary *not only* to satisfy the

21   MMPA's mitigation provision but also to ensure that impacts are negligible. *Id*. at 1159.  In

22   holding that Defendants' EIS failed to analyze all reasonable alternatives to its proposed action,

23   the Court found that the Navy should have considered training in areas that present a lower risk

24   of harm to the marine environment and should have considered extending its shutdown protocol

25   to sea turtles and schools of fish. *Id*. at 1166.

26   74.     Rather than impose a complete ban on peacetime use of LFA, the Court, in

27   balancing the hardships, decided to issue a carefully tailored injunction that would accommodate

28   both the Navy's interest in continued training with LFA and Plaintiffs' interest in protecting

1    global natural resources. In response, on October 8, 2003, the parties filed a joint stipulation (the

2    "2003 Stipulation") that restricted the Navy's training to an area of the western Pacific Ocean,

3    with a wide coastal exclusion zone of at least 30 nautical miles around coasts and islands

4    (60 nautical miles or more in some cases) and additional offshore exclusion zones for the

5    protection of important habitat. On October 14, 2003, the Court incorporated the terms of the

6    2003 Stipulation into an Order, attached hereto as Exhibit 1.

7    75.    In fall 2003, Congress amended the MMPA to alter requirements applicable to

8    "military readiness activities," such as training with LFA. Over objections by many in the

9    Senate, the amendments had been placed in a "must-pass" bill, the annual National Defense

10    Authorization Act ("NDAA"). *See* Nat'l Defense Authorization Act for Fiscal Year 2004, Pub.

11    L. No. 108-136 §. 319 (Nov. 24, 2003). First, *inter alia*, the amended law clarified the standard

12    for "harassment" of marine mammals pursuant to military readiness activities. 16 U.S.C.

13    § 1362(18). Second, the amended law required that a determination of "least practicable

14    impact" include, for military readiness activities, consideration of "personnel safety, practicality

15    of implementation, and impact on the effectiveness of the military readiness activity." 16

16    U.S.C. § 1371(a)(5)(A)(ii). Third, the amended law exempted military readiness activities from

17    the general requirement that take permits be issued only for activities "within a specified

18    geographic region" that affect "small numbers" of animals. 16 U.S.C. § 1371(a)(5)(F).

19    76.    Based on these changes to the law, the Court amended its judgment to make clear

20    that "Plaintiff's claims based on the 'small numbers' and 'specified geographic region'

21    provisions of the MMPA no longer constitute a basis for the October 14, 2003 permanent

22    injunction, and are dismissed." *Natural Res. Def. Council v. Evans*, No. C-02-03805, Order

23    Granting Defendants' Rule 60(b) Motion at 2-3 (N.D. Cal. Dec. 1, 2004). The Court declined,

24    however, to vacate or amend any portion of its original Opinion, *id.*, and the amendments leave

25    intact several of the Court's holdings under the MMPA, including its holdings regarding

26    additional required mitigation measures, as well as its NEPA and ESA holdings in their entirety.

27    77.    On December 19, 2003, Defendants filed an appeal with the Ninth Circuit Court

28    of Appeals, challenging this Court's ruling, under the Endangered Species Act, that NMFS had

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.
sf-2388965

23

1   illegally failed to estimate takes of listed species in the Incidental Take Statement accompanying

2   its five-year permit.  On July 24, 2006, the panel dismissed Defendants' appeal for lack of

3   standing.

4       78.     Following further negotiations of the parties, this Court modified its 2003 Order

5   in 2005.  The Order as modified is attached hereto as Exhibit 2.

6       79.     The Court's Orders collectively governed the Navy's use of LFA and assured

7   adequate mitigation for a period of five years, but expired on August 16, 2007.[3]

8   **D.     The Navy's New Proposal and NMFS' Final Rule**

9       80.     On May 12, 2006, the Navy submitted an application to NMFS under the Marine

10  Mammal Protection Act, requesting it to authorize the taking of marine mammals during

11  deployment of LFA for the five-year period beginning on August 16, 2007, the date on which

12  NMFS first incidental take permit expired.  The Navy initiated formal consultation under Section 7

13  of ESA on June 9, 2006.

14      81.     The Navy's new proposal doubles the number of LFA systems and the number of

15  authorized transmission hours.  Three of the new systems, known as Compact LFA, or "CLFA,"

16  are smaller and of lighter weight than the original, but generate source levels that are roughly

17  comparable in power.  In conducting these transmissions, the Navy seeks to use virtually the

18  *identical* operational map that was previously proposed, which in effect would open more than

19  70% of the world's oceans to LFA exercises.

20      82.     On November 10, 2005, the Navy issued a draft SEIS for public comment.

21  According to the Navy, the SEIS is expressly intended to address concerns of the Court "in its

22

23  —————————————

24  [3] Defendants have stipulated that, until the time that the Court issues its decision on a
    motion for preliminary injunction, but no later than January 8, 2008, they will continue to operate
25  SURTASS LFA under the constraints specified in the 2003 permanent injunction, as amended in
    2005, with the exception that they may operate the LFA system within the coastal exclusion
26  zones set forth in that injunction only when necessary to continue tracking an existing underwater
    contact detected outside the exclusion zone or when operationally necessary to detect a new
27  underwater contact that would place LFA within the coastal exclusion zone to maximize
    opportunities for detection.  This exception does not apply to any routine testing or training
28  activities.  Under no circumstances will Defendants operate LFA closer than the 12nm coastal
    exclusion zone specified in the new Final Rule.

1    26 August 2003 Opinion and Order in relation to compliance with the National Environmental

2    Policy Act (NEPA), Endangered Species Act (ESA), and Marine Mammal Protection Act

3    (MMPA)." SEIS at P-1. In spite of the Court's specific concerns over the lack of adequate

4    mitigation measures in the original EIS and take regulation, both the draft and final SEIS

5    insufficiently consider and reject each and every additional measure urged by the Court. The

6    SEIS declines to restrict the system's use in offshore areas rich in marine life, extend the Navy's

7    coastal exclusion zones, employ shut-down procedures for fish, or use additional monitoring

8    methods for missions close to shore.

9        83.    Moreover, although the scientific literature on the effects of high-intensity noise

10    on marine mammals has grown substantially since 2001, the Navy has failed to meet its

11    obligation under NEPA to consider and take account of these new findings. For example, the

12    SEIS has discounted abundant new evidence (including that set forth in Paragraph 61 above)

13    indicating the potential for injury and mortality in beaked whales, given their acute vulnerability

14    to sound.

15        84.    Plaintiffs offered extensive comments on the draft SEIS, noting, *inter alia*, that

16    Navy Defendants had failed to identify and analyze sufficiently all reasonably available

17    alternatives, such as focusing training in areas with reduced risk; failed to identify and analyze

18    sufficiently all feasible mitigation measures; failed to adequately assess the system's cumulative

19    impacts, such as in areas that the Navy repeatedly uses for training and in conjunction with other

20    naval acoustics; and failed to adequately analyze all reasonably foreseeable impacts, particularly

21    given the significant new information on beaked whales and other species that has emerged over

22    the last five years. The Navy issued its Final SEIS on May 4, 2007, leaving its alternatives and

23    identified mitigation measures substantially unchanged.

24        85.    Meanwhile, on June 9, 2007, NMFS issued a Proposed Rule under the MMPA

25    that, like the rule it adopted in 2002, incorporated the Navy's analysis and accepted the

26    mitigation and monitoring set forth in the Navy's SEIS. In its rule, NMFS once again proposed

27    to allow the annual taking of as much as 12 percent of any marine mammal species or stock; and

28    once again it limited takes to significant behavioral impacts and non-serious injury, despite

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.                                                                                          25
sf-2388965

1   considerable new information associating injury and mortality of beaked whales with intense
2   sources of undersea noise. Further, it relied again on the Navy's claims of a close to 100 percent
3   detection rate of marine mammals in the immediate vicinity of the LFA vessel, despite the lack
4   of any meaningful new data on the efficacy of the monitoring system.

5        86.     Following on the Navy's SEIS, NMFS' proposal also failed to adopt or
6   shortchanged each of the mitigation measures previously urged by the Court, and also failed to
7   consider additional mitigation measures that would mitigate LFA's impact on marine species.
8   For example, notwithstanding the Court's recognition of the importance of shielding important
9   habitat from exposure to LFA, NMFS proposed adding only two locations (including one
10  National Marine Sanctuary) to its list of offshore exclusion areas. Remarkably, no exclusion
11  areas would be established in the area of the western Pacific where the Navy has been operating
12  for the last five years and, under the first annual LOA, continues to train; and, once again, the
13  public would be left to petition NMFS to preserve additional habitat. Similarly, NMFS failed to
14  extend the Navy's coastal exclusion zone, instead disputing the premise that greater coastal
15  exclusion zones would be beneficial to marine species.

16       87.     Concurrent with the issuance of the Proposed Rule, NMFS published a request for
17  public comment. Although the comment period on five-year take permits customarily extends at
18  least thirty to forty-five days, NMFS allowed a remarkably brief comment period of fifteen days.
19  NMFS' burdensome schedule for public comment spurred written objections not only from
20  Plaintiffs, but from more than 30 members of Congress, the scientific community, and from tens
21  of thousands of citizens.

22       88.     On August 21, 2007, NMFS published its Final Rule authorizing the Navy to
23  conduct LFA transmissions over 70-75 percent of the world's oceans for a five-year period,
24  beginning August 16, 2007. The Final Rule was substantially unchanged from NMFS' proposal
25  the month before. Its supporting Biological Opinion under ESA was issued August 14, 2007.

26       89.     Over the concerns of Plaintiffs and the Marine Mammal Commission, the agency
27  once again deferred much of its substantive analysis of impacts and mitigation to its annual
28  LOA authorization process, a downstream, closed door procedure that will in effect deprive the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.                                                                          26
sf-2388965

1   public of any opportunity for comment, which is contrary to the express provisions of the

2   MMPA.[4]

### FIRST CLAIM FOR RELIEF
#### Unlawful Issuance of Regulations in Violation of the
#### Marine Mammal Protection Act and Administrative Procedure Act

5   90.    Plaintiffs reallege and incorporate herein by reference the allegations contained in

6   Paragraphs 1 through 89 of this Complaint.

7   91.    Before NMFS was authorized by statute to issue an incidental take authorization

8   for LFA pursuant to section 101(a)(5) and the Administrative Procedure Act, it was required to

9   (1) provide adequate notice and an opportunity for public comment; (2) determine and ensure

10  that the Navy's activity will have no more than a negligible impact on the species or population

11  stocks at issue; (3) set forth sufficient methods to ensure the least practicable adverse impact on

12  each species or stock and its habitat, paying particular attention to areas of special significance;

13  and (4) set forth sufficient requirements for the monitoring and reporting of impacts on marine

14  mammals. *See* 16 U.S.C. § 1371(a)(5)(D); 50 C.F.R. § 216.107.

15  92.    NMFS failed to comply with these mandatory requirements and to make the

16  requisite findings in a manner supported by the record, and therefore the Final Rule issued on

17  August 14, 2007, as well as the LOAs issued on August 15, 2007 in reliance upon the Final Rule,

18  are not legally adequate under the MMPA.

19  93.    NMFS' plans to issue LOAs on an annual basis in future years based on the Final

20  Rule and without providing opportunity for public comment further violate the MMPA and APA.

21  94.    NMFS' issuance of an invalid Final Rule and LOAs and the Navy's reliance on

22  that rule and LOAs without providing adequate mitigation such as that previously ordered by this

23  Court will result in the unlawful taking of a large and unknown number of marine mammals.

24  Because the authorization is invalid, the Navy's incidental take of marine mammals is prohibited

25  by the MMPA. *See* 16 U.S.C. § 1372(a).

26  _____

27  [4] NMFS issued its LOAs for the first year of the new permit period on August 15, 2007.
    Its Supplemental Biological Opinion, covering the first year's authorization, was issued two days

28  later, on August 17, 2007.

1    95.    NMFS' issuance of regulations and an initial LOA authorizing the take of marine

2    mammals incidental to the operation of the LFA system, and the Navy's imminent take of marine

3    mammals pursuant to those regulations, constitute final agency action that adversely affects and

4    aggrieves Plaintiffs.

5    96.    Thus, under the Administrative Procedure Act, NMFS' and the Navy's violation

6    of the MMPA as alleged herein is "arbitrary and capricious," an "abuse of discretion," "not in

7    accordance with the law," and "without observance of procedure required by law."  5 U.S.C.

8    § 706(2)(A),(D).

9                                **SECOND CLAIM FOR RELIEF**

10   **Failure to Prepare an Adequate Environmental Impact Statement as Required under the
     National Environmental Act and Administrative Procedure Act**

11   97.    Plaintiffs reallege and incorporate herein by reference the allegations contained in

12   Paragraphs 1 through 89 of this Complaint.

13   98.    Defendants constitute "agencies of the Federal Government" within the meaning

14   of NEPA, and are bound by regulations adopted by the Council on Environmental Quality.

15   40 C.F.R. § 1500.3.

16   99.    The actions of Defendants set forth above are "major federal actions significantly

17   affecting the quality of the human environment" within the meaning of NEPA.  Grounds for a

18   finding of "significance" include, but are not limited to:  the intensity of the action; the

19   ecological importance of the marine environment; the controversial nature of the LFA system;

20   the uncertainty of LFA's effects on the food web and other aspects of the marine ecosystem; the

21   precedential nature of its world-wide scope of action; the cumulative impacts of the action

22   considered together with other human activities generating noise in the marine environment; its

23   adverse effects on endangered and threatened species or their critical habitat; and its violation of

24   the MMPA and other Federal, State, and local environmental laws.  40 C.F.R. § 1508.27

25   100.   Defendants have violated NEPA by preparing an EIS that fails adequately to

26   describe the substantial and wide-ranging impacts of LFA, both individually and cumulatively,

27   upon all marine species potentially affected by operation of the system; to consider and analyze

28   sufficiently all reasonable alternatives; and to identify and analyze sufficiently all feasible

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.                                                                                          28
sf-2388965

1    mitigation measures. By ignoring or failing adequately to consider LFA's physical, behavioral,

2    and ecological impacts on the marine environment, Defendants' EIS failed to satisfy their

3    obligation under NEPA to provide "full and fair discussion of significant environmental

4    impacts." 40 C.F.R. § 1502.1.

5        101.    Defendants failed to consider adequately the cumulative effects of the proposed

6    action, including, but not limited to, the addition of LFA to mid-frequency sonar training and the

7    repeated use of the system in the same habitat over multiple years. 40 C.F.R. § 1508.7.

8        102.    Defendants have failed to adequately consider the program's reasonably

9    foreseeable environmental impacts, as, for example, by dismissing the potential for strandings

10   and mortalities of beaked whales. 40 C.F.R. § 1508.8. Defendants have failed to identify

11   relevant gaps in the data they used to support their conclusions regarding reasonably foreseeable

12   significant environmental impacts, failed to deal properly with the data gaps that they do

13   identify, and failed to ensure the professional integrity, including the scientific integrity, of their

14   analysis. 40 C.F.R. §§ 1502.22, 1502.24.

15       103.    Defendants failed to consider and analyze all reasonable alternatives to the

16   proposed action, such as focusing training with LFA in areas of reduced risk, and to study,

17   develop, and describe appropriate alternatives to their recommended courses of action in a

18   proposal that involves unresolved conflicts concerning alternative uses of available resources.

19   42 U.S.C. § 4332(2)(E); 40 C.F.R. §§ 1502.1, 1502.14.

20       104.    Defendants failed to consider and analyze sufficiently all feasible mitigation,

21   including, but not limited to, mitigation measures urged by this Court in its 2003 Opinion and

22   provided for in the Court's 2003 and 2005 Orders, such as the meaningful designation of

23   offshore exclusion zones to protect vulnerable species and habitat; the adoption of a coastal

24   exclusion zone greater than twelve nautical miles from shore; and the use of additional means to

25   detect the presence of marine mammals within areas of activity. 40 C.F.R. §§ 1502.14(f),

26   1508.20.

27       105.    Navy Defendants' issuance of an SEIS and Record of Decision, NMFS

28   Defendants' issuance of incidental take regulations, an LOA, a Biological Opinion, and an

1    Incidental Take Statement without complying with NEPA and the regulations promulgated

2    thereunder, and the Navy's imminent use of the LFA system in reliance on those documents,

3    constitute final agency action that adversely affects and aggrieves Plaintiffs.

4        106.    Thus, under the Administrative Procedure Act, Defendants' violation of NEPA

5    and the regulations promulgated thereunder in failing to prepare an adequate EIS or SEIS for the

6    LFA system is "arbitrary and capricious," an "abuse of discretion," "not in accordance with

7    law," and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

8                        **THIRD CLAIM FOR RELIEF**
                **Failure to Prepare a Legally Adequate Biological Opinion**
9        **under the Endangered Species Act and Administrative Procedure Act**

10       107.    Plaintiffs reallege and incorporate herein by reference the allegations contained in

11   Paragraphs 1 through 89 of this Complaint.

12       108.    The challenged Navy exercises are actions "authorized, funded, or carried out" by

13   a federal agency within the meaning of 16 U.S.C. § 1536(a)(2). Both NMFS Defendants and

14   Navy Defendants are therefore required to ensure that these exercises are "not likely to

15   jeopardize the continued existence of any endangered species or threatened species" or result in

16   the "destruction or adverse modification" of a listed species' designated critical habitat.

17   16 U.S.C. § 1536(a)(2). In fulfilling this requirement, NMFS Defendants are required to "use the

18   best scientific and commercial data available." *Id.*

19       109.    The Biological Opinion and Supplemental Biological Opinion issued by NMFS

20   Defendants are legally deficient for reasons that include, but are not limited to, the following:

21   the Biological Opinions' conclusions are premised upon, and illegally apply, NMFS regulations

22   that are arbitrary and capricious and contrary to the plain meaning of ESA; the Biological

23   Opinions' Incidental Take Statements are incomplete, arbitrary and capricious, and contrary to

24   law; the Biological Opinions fail to adequately consider the best available scientific information;

25   and the Biological Opinions' conclusions are contrary to NMFS' findings, are not based on the

26   evidence, and are arbitrary and capricious.

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.
sf-2388965                                                              30

1    110.    NMFS' issuance of a Biological Opinion, Supplemental Biological Opinion, and
2    Incidental Take Statements constitutes final agency action that adversely affects and aggrieves
3    Plaintiffs.

4    111.    Thus, under the Administrative Procedure Act, NMFS' violation of ESA as
5    alleged herein is "arbitrary and capricious," an "abuse of discretion," "not in accordance with the
6    law," and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A),(D).

7                                **PRAYER FOR RELIEF**

8    Plaintiffs respectfully request that this Court:

9    1.    Adjudge and declare that Defendants and each of them are in violation of the
10   Marine Mammal Protection Act and its implementing regulations, and order that the subject
11   Final Rule and LOA be vacated, set aside and/or rescinded;

12   2.    Adjudge and declare that Defendants and each of them are in violation of the
13   National Environmental Policy Act and its implementing regulations, and order that the subject
14   Final Rule, LOA, and Record of Decision be vacated, set aside, and/or rescinded;

15   3.    Adjudge and declare that Defendants and each of them are in violation of the
16   Endangered Species Act and order that the subject regulations, LOA, and Biological Opinion be
17   vacated, set aside and/or rescinded;

18   4.    Adjudge and declare that Defendants and each of them are in violation of the
19   Administrative Procedure Act;

20   5.    Issue a preliminary and permanent injunction restraining and enjoining Defendants
21   and each of them and their officers, employees, subdivisions and/or agents from authorizing or
22   proceeding with the proposed SURTASS LFA program, or any portion thereof, unless and until
23   adequate mitigation (such as that previously ordered by this Court) is put into place and the
24   violations of federal law set forth herein have been corrected;

25   6.    Award Plaintiffs their costs of suit and attorneys fees; and

26   7.    Grant Plaintiffs such other and further relief as the Court deems just and
27   appropriate under the circumstances.

28

Dated: September 17, 2007

ROBERT L. FALK
ROBIN S. STAFFORD
SARAH B. SCHINDLER
MORRISON & FOERSTER LLP

JOEL R. REYNOLDS
CARA HOROWITZ
NATURAL RESOURCES DEFENSE
COUNCIL, INC.

By: _____
       Robert L. Falk

Attorneys for Plaintiffs
NATURAL RESOURCES DEFENSE
COUNCIL, INC., THE HUMANE SOCIETY
OF THE UNITED STATES,
INTERNATIONAL FUND FOR ANIMAL
WELFARE, CETACEAN SOCIETY
INTERNATIONAL, LEAGUE FOR
COASTAL PROTECTION, OCEAN
FUTURES SOCIETY, and JEAN-MICHEL
COUSTEAU