ROBERT L. FALK (SBN 142007)
ROBIN S. STAFFORD (SBN 200950)
SARAH SCHINDLER (SBN 236414)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
Email: RFalk@mofo.com
Email: RStafford@mofo.com
Email: SSchindler@mofo.com

JOEL R. REYNOLDS (SBN 85276)
CARA A. HOROWITZ (SBN 220701)
NATURAL RESOURCES DEFENSE COUNCIL, INC.
1314 Second Street
Santa Monica, California 90401
Telephone: (310) 434-2300
Facsimile: (310) 434-2399

Attorneys for Plaintiffs
NATURAL RESOURCES DEFENSE COUNCIL, INC.; INTERNATIONAL FUND FOR
ANIMAL WELFARE; THE HUMANE SOCIETY OF THE UNITED STATES; CETACEAN
SOCIETY INTERNATIONAL; LEAGUE FOR COASTAL PROTECTION; OCEAN
FUTURES SOCIETY; JEAN-MICHEL COUSTEAU

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC.; INTERNATIONAL FUND FOR ANIMAL WELFARE; THE HUMANE SOCIETY OF THE UNITED STATES; CETACEAN SOCIETY INTERNATIONAL; LEAGUE FOR COASTAL PROTECTION; OCEAN FUTURES SOCIETY; JEAN-MICHEL COUSTEAU<br><br>Plaintiffs,<br><br>v.<br><br>CARLOS M. GUTIERREZ, SECRETARY OF THE UNITED STATES DEPARTMENT OF COMMERCE; NATIONAL MARINE FISHERIES SERVICE; WILLIAM HOGARTH, ASSISTANT ADMINISTRATOR FOR FISHERIES OF THE NATIONAL OCEANOGRAPHIC AND ATMOSPHERIC ADMINISTRATION; VICE ADMIRAL CONRAD C. LAUTENBACHER, JR., ADMINISTRATOR OF THE NATIONAL OCEANOGRAPHIC AND ATMOSPHERIC ADMINISTRATION; UNITED STATES DEPARTMENT OF THE NAVY; DONALD C. WINTER, SECRETARY OF THE UNITED STATES DEPARTMENT OF THE NAVY; ADMIRAL MIKE MULLEN, CHIEF OF NAVAL OPERATIONS<br><br>Defendants. | Civil Action No. CV-07-4771-EDL<br><br>**NOTICE OF MOTION, AND MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Judge:** **Hon. Elizabeth Laporte**<br>**Ctrm:** **E**<br>**Hearing Date: December 18, 2007**<br>**Time: 9 a.m.** |

1

**TABLE OF CONTENTS**

2

Page

3   MEMORANDUM OF POINTS AND AUTHORITIES .................................................................. 1

4   INTRODUCTION ........................................................................................................................ 1

    STATEMENT OF FACTS AND PROCEDURE ........................................................................ 3

5   I.      IMPACTS OF ACTIVE SONAR ON MARINE LIFE ................................................... 3

6   II.     THE COURT'S 2003 ORDER AND THE FIRST FIVE YEARS OF
            DEPLOYMENT ............................................................................................................ 6

7   III.    THE NAVY'S NEW PROPOSAL AND NMFS'S 2007 FINAL RULE ........................ 7

8   ARGUMENT ............................................................................................................................... 9

9   I.      STANDARD OF REVIEW FOR PRELIMINARY INJUNCTIVE
            RELIEF ......................................................................................................................... 9

10  II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................. 9

11          A.      NMFS Has Failed to Comply with the Marine Mammal Protection
                    Act .................................................................................................................... 9

12                 1.      NMFS Has Failed to Prescribe Mitigation and Monitoring
                           Measures to Effect the "Least Practicable Impact" on
13                         Marine Mammals ................................................................................. 10

14                         a.      Geographic Restrictions ........................................................... 10

                           b.      Coastal Exclusion Zone ........................................................... 12

15                         c.      Monitoring Requirements ........................................................ 13

16                 2.      NMFS Has Failed to Ensure that the Impacts of LFA Will
                           Be "Negligible." ................................................................................. 15

17                 3.      NMFS Failed to Authorize the Lethal Take of Marine
                           Mammals Despite the Potential for Such Effects ................................ 16
18
                   4.      NMFS Violated the MMPA by Refusing to Submit Critical
19                         Information for Public Review ............................................................ 18

            B.      Plaintiffs are Likely to Succeed on Their NEPA Claims ................................ 20
20
                   1.      The SEIS Fails to Consider All Reasonable Alternatives to
21                         the Proposed Deployment of LFA ....................................................... 20

22                 2.      The SEIS Fails to Address or Inappropriately Rejects
                           Mitigation Measures ........................................................................... 23

23                 3.      The SEIS Fails to Adequately Consider All Reasonably
                           Foreseeable Individual and Cumulative Impacts of LFA ..................... 24
24
            C.      NMFS Has Violated the Endangered Species Act ........................................... 26
25
                   1.      The 2007 Biological Opinions' Incidental Take Statement
                           Fails To Specify the Amount or Extent of Take of
26                         Endangered and Threatened Species .................................................... 26

27                 2.      NMFS's Biological Opinions Are Arbitrary and Capricious ................ 27

    III.    DEPLOYMENT OF LFA WITHOUT ADEQUATE MITIGATION
28          WILL CAUSE IRREPARABLE INJURY ................................................................... 27

1

**TABLE OF CONTENTS**
(continued)

2
Page

3    IV.    PLAINTIFFS RAISE SERIOUS QUESTIONS AND THE BALANCE
            OF HARM TIPS SHARPLY IN PLAINTIFFS' FAVOR ............................................ 29

4    CONCLUSION ............................................................................................................ 30

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

## CASES

Page(s)

3

4

*Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife,*
    273 F.3d 1229 (9th Cir. 2001) ............................................................................................27

5

*Churchill County v. Norton,*
    276 F.3d 1060 (9th Cir. 2001) ............................................................................................21

6

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
    422 F. Supp. 2d 1115 (N.D. Cal. 2006) ..............................................................................22

7

8

*Earth Island Inst. v. U.S. Forest Serv.,*
    442 F.3d 1147 (9th Cir. 2006) .......................................................................................27, 29

9

*Greenpeace Action v. Franklin,*
    14 F.3d 1324 (9th Cir. 1992) ..............................................................................................20

10

11

*Idaho Farm Bureau Fed'n v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995) ........................................................................................20, 29

12

*Idaho Sporting Congress, Inc. v. Alexander,*
    222 F.3d 562 (9th Cir. 2000) ................................................................................................9

13

14

*Kokechik Fishermen's Ass'n v. Fed'n of Japan Salmon Fisheries Coop. Ass'n,*
    839 F.2d 795 (D.C. Cir. 1988) .......................................................................................16, 17

15

*Lands Council v. Martin,*
    479 F.3d 636 (9th Cir. 2007) ................................................................................................9

16

17

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren,*
    309 F.3d 1181 (9th Cir. 2002) ............................................................................................24

18

*Makua v. Rumsfeld,*
    163 F. Supp. 2d 1202 (D. Haw. 2001) ..........................................................................29, 30

19

20

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
    241 F.3d 722 (9th Cir. 2001) ..............................................................................................28

21

*Nat'l Wildlife Fed'n v. Burlington N. R.R.,*
    23 F.3d 1508 (9th Cir. 1994) ................................................................................................9

22

23

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
    137 F.3d 1372 (9th Cir. 1998) ............................................................................................23

24

*NRDC v. Evans,*
    279 F. Supp. 2d 1129 (N.D. Cal. 2003) ........................................................................*passim*

25

26

*NRDC v. U.S. Dep't of the Navy,*
    857 F. Supp. 734 (C.D. Cal. 1994),
    *vacated by consent decree,*
    1994 U.S. Dist. LEXIS 21630 (C.D. Cal. May 5, 1994) ..........................................10, 12, 13

27

28

*NRDC v. U.S. Forest Serv.*,
  421 F.3d 797 (9th Cir. 2005)......................................................................21

*NRDC v. Winter*,
  No. 8:07-cv-00335-FMC-FMOx,
  2007 U.S. Dist. LEXIS 57909 (C.D. Cal. Aug. 7, 2007) ........................18

*NRDC v. Winter*,
  No. 07-56157, 2007 U.S. App. LEXIS 20965 (9th Cir. Aug. 31, 2007)....................30

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
  426 F.3d 1082 (9th Cir. 2005)..................................................................19

*Republic of the Philippines v. Marcos*,
  862 F.2d 1355 (9th Cir. 1988)..................................................................28

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)............................................................................23, 24

*San Luis Obispo Mothers for Peace v. NRC*,
  449 F.3d 1016 (9th Cir. 2006)..................................................................30

*Sierra Club v. U.S. Forest Serv.*,
  843 F.2d 1190 (9th Cir. 1988)..................................................................27

**FEDERAL STATUTES AND RULES**

16 U.S.C.
  §§ 1361-1421........................................................................................2
  § 1361(1)..............................................................................................9
  § 1361(3)..............................................................................................9
  § 1362(13)............................................................................................9
  § 1371(a)............................................................................................16
  § 1371(a)(5)..................................................................................*passim*
  §§ 1531-1544........................................................................................3
  § 1533................................................................................................26
  § 1536(a)(2)........................................................................................26
  § 1538(a)(1)........................................................................................26

42 U.S.C.
  §§ 4321-4370........................................................................................3

40 C.F.R.
  § 1500.1..............................................................................................20
  § 1502.1........................................................................................20, 22
  § 1502.14............................................................................................20
  § 1502.14(a)........................................................................................20
  § 1502.14(f)..............................................................................20, 21, 26
  § 1502.16(h)........................................................................................20
  § 1502 16(i)........................................................................................20
  § 1502.22(b)..................................................................................21, 25
  § 1508.7..............................................................................................25
  § 1508.8(b)..........................................................................................20

50 C.F.R.
 § 216.184(e)(3)-(4) ........................................................................................ 10
 § 402.14(i) ...................................................................................................... 26

67 Fed. Reg. 46,712 (July 16, 2002) ...................................................................... 11

71 Fed. Reg. 56,968 (Sept. 28, 2006) ...................................................................... 8

72 Fed. Reg. 37,404 (July 9, 2007) ........................................................................ 19

72 Fed. Reg. 46,846 (Aug. 21, 2007) ...............................................................*passim*

Local Civil Rule 7-2 ................................................................................................ 1

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 92-707 (1971),
 *reprinted in* 1972 U.S.C.C.A.N. 4144 ............................................................ 19

1

## NOTICE OF MOTION FOR PRELIMINARY INJUNCTION

Please take notice that, in accordance with Civil Local Rule 7-2, Plaintiffs' motion for preliminary injunction is set for hearing at 9:00 a.m. on Tuesday, December 18, 2007, before the Honorable Elizabeth D. Laporte.

Plaintiffs seek to enjoin defendants Carlos M. Gutierrez, Secretary of the United States Department of Commerce; National Marine Fisheries Service ("NMFS"); William Hogarth, Assistant Administrator for Fisheries of the National Oceanographic and Atmospheric Administration ("NOAA"); Vice Admiral Conrad C. Lautenbacher, Jr., Administrator of NOAA; United States Department of the Navy, Donald C. Winter, Secretary of the United States Department of the Navy ("Navy"); and Admiral Mike Mullen, Chief of Naval Operations (collectively "Defendants") from deployment or use of the Surveillance Towed Array Sensor System Low Frequency Active Sonar during the pendency of this action.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

While supported by extensive evidence, this Motion is actually quite simple.  Plaintiffs seek an order ensuring that the reasonable and balanced mitigation measures that have governed the Navy's Surveillance Towed Array Sensor System ("SURTASS") Low Frequency Active Sonar ("LFA") for several years are maintained until Plaintiffs' claims in this action are resolved.  As this Court determined in 2003, the well-documented harms prevented by such measures outweigh any hardship imposed by mitigation requirements to which the Navy agreed and under which it is currently operating.[1]  Because, as set forth below, Plaintiffs are once more likely to prevail on the merits, this Motion should be granted.

This action challenges NMFS's reauthorization of the LFA system in a rulemaking that looks startlingly similar to the one struck down by the Court in 2003 after nearly a year of litiga-

---

[1] In the interest of avoiding unnecessary litigation, the parties stipulated to allow operation of LFA pursuant to most of the terms of this Court's 2003 injunction, as modified in 2005 (the "Injunction"), through January 8, 2008, to allow this Motion to be heard.  Plaintiffs seek an order from this Court restoring the Injunction pending full adjudication of the violations of law described herein.

1

1   tion over this same system.  In stunning disregard of prior rulings of this Court in that litigation,

2   NMFS has once again approved five years of near-worldwide deployment of LFA for training,

3   testing, and routine military operations in violation of federal law, and abandonment of common-

4   sense mitigation measures *previously required by this Court*—measures necessary to reduce the

5   risk of harm on a staggering geographic scale to marine species and their environment.  And,

6   despite an extraordinary level of public concern about the Navy's proposed use of this system,

7   NMFS shut down public comment after only 15 days, thereafter issuing a rule that essentially

8   ignored tens of thousands of comments to the agency from scientists, members of Congress and

9   other elected officials, government agencies, and members of the public, including Plaintiffs.

10       As this Court learned in earlier proceedings, and as set forth in more detail below, a

11  single LFA source is capable of flooding hundreds of thousands of square miles of ocean with

12  intense levels of sound.  Thus, even the Navy has conceded that deployment of this system

13  around the world will harm many thousands of marine mammals, including significant numbers

14  of endangered species such as blue whales, humpback whales, sperm whales, and other species

15  whose numbers are already depleted.

16       Likely impacts range from significant disruptions in marine mammals' critical behaviors,

17  including breeding, nursing, communicating, and foraging, to physical effects such as hearing

18  loss, internal hemorrhaging, stranding, and death.  Although this Court and other federal courts

19  have consistently acknowledged the overwhelming scientific consensus of potential harm, the

20  new five-year authorization rejects virtually *all* of the mitigation measures previously required

21  by this Court to reduce the risk of harm, including avoidance of important habitat for endangered

22  and vulnerable species, and violates numerous provisions of federal environmental law.

23       *Once again*, NMFS violated the Marine Mammal Protection Act ("MMPA"), 16 U.S.C.

24  §§ 1361–1421, and disregarded the principles outlined in the Court's prior order by issuing a

25  take permit authorizing near-global deployment that (1) fails to require mitigation, monitoring,

26  and reporting needed to ensure "the least practicable impact" on marine mammals, (2) fails to

27  ensure that the authorized take will have only a "negligible impact" on species or populations,

28  (3) fails to prevent lethal takes in the face of evidence that they will likely occur, and (4) fails to

include its analysis critical undisclosed information, which was, consequently, not subject to public review and comment.[2]

Once again, NMFS and the Navy violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370, by adopting a supplemental environmental impact statement ("SEIS") that (1) fails to consider or sufficiently analyze appropriate mitigation measures (and goes so far as to abandon mitigation ordered by this Court in its prior permanent injunction), (2) fails to describe impartially and objectively the significant and foreseeable environmental impacts of LFA's deployment, and (3) fails to objectively evaluate all reasonable alternatives.[3]

Once again, NMFS violated the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, by (1) issuing a permit without first accurately assessing the numbers of affected animals and the consequences for their habitat, and (2) arbitrarily and capriciously concluding in the Biological Opinions ("BiOps") that LFA will not jeopardize the continued existence of endangered or threatened species.[4] The Navy's current ESA violations are, in short, repetitions of deficiencies in their previous BiOps, which this Court expressly cited as violations requiring remand.

## STATEMENT OF FACTS AND PROCEDURE

### I.    IMPACTS OF ACTIVE SONAR ON MARINE LIFE

The active component of LFA is an array of eighteen loudspeakers lowered through a ship's hull into the ocean; sounding in tandem, they produce zones of focalized sound that can extend

---

[2] Under the terms of the Final Rule, the overwhelming majority of animals and habitat acknowledged even by the Navy as potentially affected by LFA's operation will go unmitigated, unmonitored, and unregulated. 72 Fed. Reg. 46,846 (Aug. 21, 2007) (Ex. 14). This regulatory failure violates the MMPA's explicit requirement that incidental take permits be supported by (1) mitigation "effecting the least practicable impact" on marine mammals, and (2) requirements for "monitoring and reporting" of any take that does occur.

[3] As detailed infra, the SEIS repeatedly acknowledges, and then ignores, the pervasive lack of scientific support for the assumptions and extrapolations underlying its ultimate conclusion of "no significant impact." Further, the SEIS fails to provide a meaningful discussion of additional Offshore Biologically Important Areas or extended coastal exclusion zones, despite this Court's specific prior directive to the Navy to consider these additions.

[4] Defendants' ESA violations are discussed in more detail below.

1  hundreds of miles in all directions.  Exs. 10 at 2-3, 4.2-33; 12 at B10, B19–20.[5]  Each speaker has a

2  maximum output of 215 dB, but for purposes of calculating the intensity of the signal beyond a few

3  hundred meters, where the vast majority of environmental impacts are expected to occur, the

4  system is understood to function as one enormous acoustic source that produces as much as 240 dB

5  of sound.  *See* Ex. 10 at B-7; 52 at 4–5.[6]  The energy this represents is prodigious: according to data

6  cited by the Navy, a single LFA unit generates as much acoustic energy through its six annual

7  missions as 500 supertankers operating for 300 days apiece.  *See* SEIS at 4-63 (Ex. 13); Ex. 48 at

8  111; Parsons Decl. ¶ 6.

9  Marine mammals and other marine species depend on sound to navigate, find food, locate

10  mates, avoid predators, and communicate.  Ex. 48 at 101–02.  As the Navy has acknowledged,

11  flooding their habitat with man-made, high-intensity noise can interfere with these and other

12  critical biological activities.  Ex. 11 at 1.  These effects range from mortality or serious injury

13  caused by internal hemorrhaging (which may lead animals to strand or die at sea), to

14  disorientation, stranding, temporary and permanent hearing loss, habitat abandonment, panic,

15  chronic stress (which compromises breeding and can leave animals vulnerable to disease and

16  other harms), and disruption and impairment of biologically essential activities, such as mating,

17  nursing, and foraging.  Exs. 27; 50; 51 (summarizing effects from variety of sources).  Although

18  the Navy's research into the immediately observable impacts of its LFA technology on large

19  whales was extremely limited in duration, scope, and exposure level (*see*, *e.g.*, Exs. 10 at O-054;

20  54 at 2), it nonetheless demonstrated the system's ability to interfere with whale communication

21  and breeding behavior, even at moderate intensities.  Exs. 52; 53.

22  New studies conducted in the period since the parties were last before this Court confirm

23  that a variety of low- and mid-frequency sounds impact a wide range of protected species at levels

24  well below 150 dB.  *E.g.*, Exs. 55–58; 60; 61; 62 (studies of noise impacts from ships, airguns,

25

26  [5] Citations to exhibits to the Declaration of Sarah Schindler are identified by number only (*e.g.*, "Ex. 3").  All other declarations are identified by last name of the declarant.

27  [6] Decibels ("dB") are a logarithmic measurement, such that an increase of 10 decibels is equivalent to a tenfold increase in acoustic intensity.  Ex. 10 at B-6.

28

1  and alarms).  Indeed, certain species, such as harbor porpoises, appear to respond dramatically to

2  some signals not far above the threshold of their hearing.  Ex. 58.  In addition, a number of recent

3  studies have suggested or documented how even subtle changes in behavior can result in

4  cumulative, wide-scale effects on foraging and other essential activities.  *E.g.*, Exs. 56; 59; 62; 63.

5  The Navy estimates that levels of 165 dB will cause a "significant change in . . . biologically

6  important behavior" in half of the animals exposed to LFA sonar—levels that may occur as far as

7  35 miles from the source.  72 Fed. Reg. at 46,850.  This extraordinary reach has raised serious

8  concerns in the international scientific community.  Ex. 49 at 1 ("Statement of Concern" signed by

9  internationally prominent scientists).

10      Since 2003, scientific consensus has confirmed the link between mid-frequency sonar and

11  mortalities of beaked whales and other deep-diving species not studied in the Navy's 1997

12  Scientific Research Program despite concerns expressed at the time.  *See* Ex. 54 at 2.  Mass

13  strandings and mortalities of whales have now been documented in the Bahamas, the Canary

14  Islands, Hawaii, Spain, Greece, Alaska, Madeira, the U.S. Virgin Islands, and other coastal areas.

15  Exs. 27–38; 41.  Such incidents led the Scientific Committee of the International Whaling

16  Commission—representing more than 100 of the world's leading whale biologists—to conclude

17  that evidence associating mid-frequency sonar with beaked whale strandings is "very convincing

18  and appears overwhelming."  Ex. 27, Annex K at 9.  Low-frequency sources have been

19  implicated in two stranding events, and NMFS scientists have expressed strong concern that low-

20  frequency sources may produce effects similar to those caused by mid-frequency sounds.

21  Exs. 35–37; 48 at 121; 47.

22      The published evidence also shows that sonar causes severe, debilitating, and potentially

23  lethal injuries at sea.  Exs. 31 at 453–54; 43 at 182 (conclusion of Marine Mammal Commission

24  expert panel).  Beaked whales in sonar-related strandings suffer physical trauma, including

25  hemorrhaging around the brain, ears, and other tissues and organs: an array of symptoms

26  resembling those of severe decompression sickness, or "the bends."  Exs. 28 at 11–16; 31 at 446–

27  55; 32 at 575; 38 at 22–28; 41 at 27–29.  Such injuries would harm marine mammals regardless of

28  whether they strand and are discovered (Exs. 31 at 453–54; 43 at 182), meaning, as NMFS has

1    conceded, that injuries and mortalities would only rarely be documented. Exs. 87 at 142, 146, 151;

2    27, Annex K at 7. In the Bahamas, the best available evidence indicates that beaked whales are

3    likely to have been exposed to 150–60 dB of sound, for roughly 1 to 2.5 minutes. Ex. 48 at 120.

4    Acknowledging the heightened concern, NMFS (together with the Navy), despite allowing LFA

5    deployment without significant mitigation, began a multi-year study on the behavioral impacts of

6    both mid-frequency sonar and LFA on beaked whales. 72 Fed. Reg. at 46,861, 46,865.

7

8    **II.    THE COURT'S 2003 ORDER AND THE FIRST FIVE YEARS OF
         DEPLOYMENT**

9         In 2002, Plaintiffs filed suit in this Court alleging that both the Navy and NMFS had

10   violated NEPA, ESA, and the MMPA in approving deployment of the LFA system. On

11   October 31, 2002, on a motion for preliminary injunction, and again on August 26, 2003, on a

12   motion for summary judgment, the Court ruled that Defendants had violated multiple provisions

13   of each statute. *NRDC v. Evans*, 279 F. Supp. 2d 1129 (N.D. Cal. 2003). Among other things,

14   the Court held that (1) NMFS violated the MMPA by authorizing take of more than "small

15   numbers" of marine mammals, by permitting an activity that was not limited to a "specified

16   geographic region," and by failing to require adequate mitigation and monitoring of impacts,

17   (2) both NMFS and the Navy violated NEPA by failing to consider a full set of reasonable

18   alternatives in their Environmental Impact Statement ("EIS") and by failing to take a hard look at

19   impacts on fish, and (3) NMFS violated ESA by failing to consider the "best available science,"

20   and by failing to specify the extent of species "take" in its supplemental BiOp. *Id.* at 1146–47,

21   1152–53, 1179–80. Additional mitigation was found by the Court to be necessary under the

22   MMPA not only to satisfy the Act's mitigation provision, but also to ensure that impacts on

23   protected species were "negligible." *Id.* at 1159.

24        Rather than impose a complete ban on LFA training, the Court, on balancing the harms,

25   decided to issue a carefully tailored injunction that would restrict LFA's use in areas particularly

26   rich in marine life, while allowing the Navy to test and train in a variety of ocean conditions. *Id.*

27   at 1191. On October 8, 2003, the parties filed a joint stipulation that restricted the Navy's

28   training to an area of the western Pacific Ocean, with a coastal exclusion zone of at least 30 (and

1    in some areas, 60) nautical miles ("nm"), and additional offshore exclusion zones for the

2    protection of important habitat.  Ex. 3 at 3.  The stipulation was the basis of injunctive relief

3    ordered by the Court on October 14.[7]  *Id.*

4         In fall 2003, through provisions placed in a "must-pass" defense authorization bill, and

5    over objections by many in the Senate, Congress amended the MMPA with respect to "military

6    readiness activities" such as LFA.  *E.g.*, Ex. 101 at S14489 (statement of Sen. Olympia Snowe).

7    The amendments, *inter alia*, exempted such activities from two of the MMPA's permitting

8    provisions—the "small numbers" and "specified geographic region" requirements.  16 U.S.C.

9    §§ 1371(a)(5)(A)(ii), (a)(5)(F).  Accordingly, the Court amended its judgment the following year

10   to dismiss Plaintiffs' claims based on those two provisions.  Ex. 5 at 2–3.  The Court declined,

11   however, to vacate or amend any portion of its original opinion, and the legislative amendments

12   left unaffected several of the Court's holdings under the MMPA, including its holdings regarding

13   additional required mitigation measures, as well as its NEPA and ESA holdings in their entirety.

14   *See id.*[8]

15   **III.    THE NAVY'S NEW PROPOSAL AND NMFS'S 2007 FINAL RULE**

16        The Court's Injunction governed LFA testing and training during its first five years of

17   operation.  By the fifth year, with the Court's mitigation measures in place, the Navy's shipboard

18   observers had spotted only three animals in the vicinity of the two LFA vessels; its passive

19   acoustic monitoring system had detected none and the Navy's active system had recorded only

20   71 hits, with no visual confirmation—all of which raises real questions about the efficacy of the

21   Navy's monitoring in real-world conditions.  Ex. 20 at 19; Baird Decl. ¶¶ 7–10; *see also* Wang

22   Decl. ¶ 9 (state of stranding networks in region).  The Navy has conducted no further field tests of

23   its active acoustic system to validate its claims.  72 Fed. Reg. at 46,874.

24

25   [7] In 2005, the parties negotiated amendments to the 2003 stipulated order pursuant to the Navy's
     operational needs.  Hereinafter, references to the stipulation should be read to include the 2005
26   amendments.

27   [8] Defendants would later file an appeal, challenging the Court's ESA ruling that NMFS had failed
     to estimate takes of listed species in its Incidental Take Statement.  On July 24, 2006, the Ninth
     Circuit dismissed Defendants' appeal for lack of standing.

28

1          On November 10, 2005, the Navy issued a draft SEIS, ostensibly intended to address the

2    concerns expressed by the Court two years earlier.  Notwithstanding the Court's emphasis on the

3    limiting training to low-impact areas, the proposed deployment map was virtually identical to the

4    Navy's 2002 proposal.  The Navy's preferred alternative opens up to 75% of the world's oceans

5    to LFA exercises, adds virtually no new exclusion areas, and reduces the coastal "standoff zone"

6    from at least 30 to 12 nautical miles.  SEIS at ES-1, 2-15 to 2-16.  The Navy also abandoned all

7    of the mitigation measures imposed by the Injunction, and either removed from consideration or

8    rejected the alternatives urged by the Court.  *Id.* at 4-79 to 4-81, 5-1 to 5-5.  Ignoring considerable

9    new information showing the vulnerability of beaked whales to anthropogenic sound, the Navy

10   also ruled out any possibility of serious injury or mortality of those species (*id.* at 4-56); and it

11   considered cumulative impacts only on a global scale, disregarding potential effects, either alone

12   or in combination with mid-frequency sonar, at the sites where exercises occur, sometimes

13   repeatedly.  *Id.* at 4-62 to 4-65.  The Navy finalized the SEIS in April 2007, and issued a record

14   of decision on August 15.

15          Meanwhile, on July 9, 2007, NMFS issued a Proposed Rule uncritically adopting the

16   Navy's analysis, rejecting measures that had successfully mitigated impacts of the LFA system

17   for the past five years.  Once again, NMFS proposed to allow the annual taking of as much as

18   12 percent of any species or stock.  Although the comment period on five-year take permits

19   customarily extends at least 30 to 45 days, and although NMFS had promised the public 45 days

20   on any proposed regulation (71 Fed. Reg. 56,968 (Sept. 28, 2006)), it set an exceptionally brief

21   comment period of only 15 days.  NMFS's truncated public comment period spurred written

22   objections not only from Plaintiffs, but also from the scientific community, more than 30

23   members of Congress, and tens of thousands of citizens.  *E.g.*, Exs. 23–25.  On August 16, 2007,

24   NMFS issued its Final Rule, substantially unchanged from its proposal the month before.  Its

25   letters of authorization ("LOAs"), allowing the largely unmitigated operation of the LFA system

26

27

28

1    for the next 12 months, and Biological Opinions were issued concurrently.  Exs. 15–17; 19.  On

2    September 17, 2007, Plaintiffs filed this action.[9]

3                                            **ARGUMENT**

4    **I.    STANDARD OF REVIEW FOR PRELIMINARY INJUNCTIVE RELIEF**

5            Preliminary injunctive relief is appropriate under the MMPA and NEPA if Plaintiffs can

6    "demonstrate either:  (1) a likelihood of success on the merits and the possibility of irreparable

7    injury; or (2) that serious questions going to the merits were raised and the balance of hardships

8    tips sharply in [their] favor."  *Lands Council v. Martin*, 479 F.3d 636, 639 (9th Cir. 2007)

9    (citation and internal quotations omitted); *Idaho Sporting Congress, Inc. v. Alexander*, 222 F.3d

10   562, 565 (9th Cir. 2000).

11           However, a less stringent test for preliminary injunction applies to ESA claims.  "In cases

12   involving the ESA, Congress removed from the courts their traditional equitable discretion in

13   injunction proceedings of balancing the parties' competing interests."  *Nat'l Wildlife Fed'n v.*

14   *Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994).  Thus, Plaintiffs need only show a

15   reasonable likelihood of a future statutory violation to satisfy the test for a preliminary injunction

16   under ESA.  *Id.*

17   **II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

18           **A.    NMFS Has Failed to Comply with the Marine Mammal Protection Act.**

19           The MMPA was enacted in 1972 pursuant to congressional findings that "certain species

20   and population stocks of marine mammals are, or may be, in danger of extinction or depletion as

21   a result of man's activities," and, further, that "there is inadequate knowledge of the ecology and

22   population dynamics of [these species]."  16 U.S.C. §§ 1361(1), (3).  To prevent the further

23   depletion of these stocks, Congress established a moratorium on the "take" — that is, the

24   harassing, hunting, capturing, or killing — of marine mammals.  16 U.S.C. § 1362(13).  NMFS

25   _____

26   [9] The parties have agreed that, until the Court issues its decision on the instant motion, but no later
     than January 8, 2008, the Navy will temporarily operate LFA under the conditions specified in the
27   expired Injunction, with the exception that it may come within the established coastal exclusion
     zone (but no closer than 12 nm from shore) under certain defined conditions.  The exception does
     not apply to any routine testing or training activities.

28

1    may grant limited exemptions from the moratorium only if, using the best available science, it

2    determines that the takes would have no more than a "negligible impact" on marine mammal

3    populations or stocks, and prescribes methods and means of effecting the "least practicable

4    impact" on them.  16 U.S.C. § 1371(a)(5)(D).

5              **1.     NMFS Has Failed to Prescribe Mitigation and Monitoring**
                        **Measures to Effect the "Least Practicable Impact" on Marine**
6                       **Mammals.**

7              When NMFS issues an incidental take permit, it is required both to prescribe mitigation

8    "effecting the least practicable adverse impact" on marine mammals, and to set "requirements

9    pertaining to the monitoring and reporting" of any take that does occur.  16 U.S.C.

10   § 1371(a)(5)(A)(i)(II).  These duties are not trivial.  Their purpose is (1) to ensure that the

11   permitted take has a negligible impact on affected species, and (2) even where the requirements

12   for a permit have been met, to "reduce as much as practicable the taking of marine mammals."

13   *See NRDC v. U.S. Dep't of the Navy*, 857 F. Supp. 734, 738 (C.D. Cal. 1994), *vacated by consent*

14   *decree*, 1994 U.S. Dist. LEXIS 21630 (C.D. Cal. May 5, 1994).[10]  Not only has NMFS failed to

15   meet its burden under the law, it has repeated some of the same violations that the Court

16   identified in its 2003 Order.

17              **a.      Geographic Restrictions**

18             On summary judgment, the Court held that NMFS violated the MMPA by failing to put

19   important marine mammal habitat off limits, in addition to habitat contained within the coastal

20   exclusion.  279 F. Supp. 2d at 1161–64.  Since 2003, NMFS has made virtually no effort to

21   redress this critical deficiency in its permit.  Indeed, out of the Navy's vast deployment area, an

22   area that encompasses most of the world's species and populations of marine mammals, NMFS

23   chose to add only two new sites to its 2002 exclusion list, one of which is a U.S. National Marine

24   _____

25   [10] Notably, the National Defense Authorization Act ("NDAA") did not alter the Act's "least
     practicable adverse impact" standard for mitigation.  16 U.S.C. § 1371(a)(5)(A)(ii).  Rather, it set
26   a procedural condition requiring NMFS to consult with the Defense Department on readiness
     impacts before making a determination; and it clarified that the determination should "include
27   consideration of personnel safety, practicality of implementation, and impact on the effectiveness
     of the military readiness activity" (*id.*), factors that, indeed, the Court had taken into account in its
     2003 Order.  279 F. Supp. 2d at 1159–64.

28

1    Sanctuary and neither of which falls within the northwest Pacific biomes where the Navy has

2    been operating for the last five years.  67 Fed. Reg. 46,712, 46,787 (July 16, 2002); 72 Fed.

3    Reg. at 46,892.[11]  Instead of defining avoidance areas, NMFS has opted again for a petition

4    process that improperly assigns the burden of identifying them to the public *after* deployment

5    begins.  72 Fed. Reg. at 46,876, 46,878–79.  This relinquishment of NMFS's statutory duty was

6    rejected by the Court in 2003.  279 F. Supp. 2d at 1163.

7            NMFS attempts to justify its inaction by suggesting that it has identified all areas in the

8    world that "are currently appropriate for designation."  72 Fed. Reg. at 46,879.  This position is

9    not supportable, as indicated by the agency's inadequate responses to comments.  For example,

10   the agency refuses to exclude any other established Marine Protected Areas ("MPAs") on the

11   grounds that most MPAs worldwide fall within 12 nautical miles of the coast; yet it provides no

12   rationale for failing to add those MPAs that lie wholly or partly in offshore waters.  72 Fed.

13   Reg. at 46,878; Ex. 88; Hoyt Decl. ¶ 5 (citing, *inter alia*, the Galápagos Marine Resources

14   Reserve (Ecuador), the Great Barrier Reef Marine Park (Australia), and the new Marine National

15   Monument in the Northwest Hawaiian Islands).  Similarly, NMFS completely fails to consider

16   excluding habitat that has been recommended for marine mammal protection by other scientific

17   bodies.  *E.g.*, Ex. 89 at 55–56 (areas proposed by the ACCOBAMS Scientific Committee for

18   protection of discrete Mediterranean populations of beaked whales and other species); *see also*

19   Hoyt Decl. ¶¶ 9-10.  Further, it dismisses areas specifically cited in the Court's opinion

20   (279 F. Supp. 2d at 1162-63), on the grounds that they are "large ocean expanses," without any

21   consideration of whether avoidance of some portion or, indeed, all of those areas would be

22   practicable.  72 Fed. Reg. at 46,878 (rejecting Emperor Seamount Chain and southern portion of

23   Oyashio/Kuroshio area).  And there is no indication that NMFS seriously considered any of the

24   myriad existing sources of marine mammal data and habitat modeling recommended by Plaintiffs

25   and the Marine Mammal Commission.  *E.g.*, Ex. 9 at 11–12; SEIS at G-008 at 4; Exs. 84, 90–92;

26   _____

27   [11] Though NMFS's rule ostensibly adds six locations to the list of Offshore Biologically Important
     Areas ("OBIAs"), four of these areas were already excluded under a separate provision of the
     2002 rule (50 C.F.R. § 216.184(e)(3)–(4)), and thus are not additional mitigations at all.

28

1   Parsons Decl. ¶¶ 11–12; Whitehead Decl. ¶¶ 10–11; Calambokidis Decl. ¶ 9; *see also*

2   279 F. Supp. 2d at 1163 (noting that NMFS "has the ability to identify which areas and which

3   seasons to avoid").  Accordingly, on this critical issue, NMFS has again violated the law.

4   279 F. Supp. 2d at 1161-64; *Navy*, 857 F. Supp. at 738.[12]

5                          **b.      Coastal Exclusion Zone**

6          NMFS has also refused to extend the Navy's coastal exclusion zone beyond 12 nautical

7   miles from shore, reverting to the scheme it authorized before the Court's Injunction was issued.

8   279 F. Supp. 2d at 1164.  In doing so, the agency relied on the Navy's conclusion that positioning

9   the LFA system farther from shore, under the one alternative it considered (a generic 25 nm

10  exclusion), would decrease take of coastal species while increasing take of offshore species.

11  72 Fed. Reg. at 46,872.  NMFS's decision was unlawful.  16 U.S.C. § 1371(a)(5)(A).

12         First, NMFS violated the MMPA by failing to consider the full range of practicable

13  options.  The first proceeding established that, in most situations, the Navy can effectively test

14  and train with LFA at distances from 43 to 200 nautical miles from the coast.  279 F. Supp. 2d

15  at 1162.  No new information has been presented to suggest otherwise.  *See* 72 Fed. Reg. at

16  46,872.  Yet NMFS did not consider the full range of practicable measures, as Plaintiffs have

17  urged (Ex. 9 at 10), including exclusions linked to bathymetry or distance from the shelf break

18  that previously had been suggested by NMFS staff.  Ex. 96 (suggesting dual criterion of "12 nm

19  from the shore or the distance to the 300 m isobath").  NMFS's discussion of its own East Coast

20  exclusion zone validates the environmental benefits of a stand-off distance based on the shelf

21  break.  72 Fed. Reg. at 46,878.  Nowhere in the final rule does NMFS explain why such a

22  measure would be operationally impracticable, or why it could not be imposed at least where it is

23  practicable.  *See id.*  NMFS's failure to consider the full range of practicable options violates the

24

25  _____

26  [12] In addition, NMFS has replied to calls to enlarge the buffer zone around its few exclusion areas
    by increasing that zone by a single kilometer, without suggesting why a further stand-off distance
    from areas like the Monterey Bay National Marine Sanctuary would not be practicable.  72 Fed.
27  Reg. at 46,879, 46,889.  For this reason, too, it has failed to prescribe measures effecting the least
    practicable adverse impact on marine mammals.

28

1    MMPA.  *Navy*, 857 F. Supp. at 738–39 (holding NMFS siting decision invalid for failing to

2    adequately consider full range of practicable offshore distances).

3         Second, in deciding to deny greater protection to indisputably rich coastal habitat, NMFS

4    failed to consider multiple relevant factors.  *Id.* at 739.  Although the Court strongly emphasized

5    the importance of minimizing impacts on endangered species (279 F. Supp. 2d at 1162, 1188,

6    1191), NMFS did not consider how a narrower exclusion zone would affect the

7    disproportionately high number of listed marine mammal species and populations that tend to

8    occupy near-shore waters along the shelf.  *See* 72 Fed. Reg. at 46,872; Whitehead Decl. ¶¶ 13–15

9    (observing that near-shore species account for roughly 50% of all marine mammals listed under

10   ESA and 60% of all species appearing on the International Union for the Conservation of

11   Nature's Red List).  Nor did NMFS consider the greater impacts that a narrow exclusion zone

12   would have on marine protected areas, despite its acknowledgment that most MPAs occur largely

13   within 12 nm from shore.  72 Fed. Reg. at 46,878 (using this point as justification for not

14   considering any additional MPAs).  Finally, NMFS did not consider the additional risks to marine

15   mammals that operations close to shore entail, given, *inter alia*, the greater difficulty of near-

16   coastal animals to escape a sound field that, according to the Navy's analysis (SEIS at 4-74),

17   would cover thousands of square kilometers at high levels of risk.  72 Fed. Reg. at 46,872;

18   Whitehead Decl. ¶ 16.  NMFS's failure to consider these factors was arbitrary and capricious and

19   did not ensure the "least practicable impact" on marine mammals.  *Navy*, 857 F. Supp. at 739

20   (rejecting as arbitrary and capricious decision against siting explosives tests further offshore,

21   when NMFS made decision without properly weighing "trade-offs" in mitigation).[13]

22                          **c.     Monitoring Requirements**

23        In 2003, this Court granted Plaintiffs' motion "with respect to the adequacy of

24   defendants' . . . monitoring under the MMPA."  279 F. Supp. 2d at 1164.  Because they have not

25   changed their monitoring requirements, Defendants continue to act arbitrarily and capriciously.

26   _____

27   [13] Even with respect to the factors it does consider, the Navy's analysis (which NMFS adopts) is
     capricious in its assumptions about species distribution, resulting in a broad underestimate of
     impacts on shelf species.  Whitehead Decl. ¶ 14.

28

1    In particular, the Court examined Defendants' failure to require the use of aerial surveys or

2    observational vessels for LFA sonar missions operated close to shore.  *Id.*  While Defendants

3    "evaluate" the use of small boats and aircraft for pre-operational surveys in the SEIS (SEIS at 5-6

4    to 5-8), they do not indicate why such monitoring is not required or provided in optimal

5    conditions (*e.g.*, high visibility, proximity to aerial assets, amenable boating conditions); they also

6    fail to consider the viability of such monitoring close to shore (where certain alleged drawbacks

7    may be diminished), on the grounds that the Court did not define the term "close to shore."[14]

8    Further, they fail to recognize that the Deputy Secretary of Defense required aerial monitoring

9    (conditions permitting) for certain mid-frequency active sonar activities in all of the Navy's

10    training ranges and operations areas.  Ex. 79, Add. at 1, 3.  Defendants' refusal to use such

11    monitoring, even in optimal conditions on their own training ranges, is arbitrary and capricious.

12    Defendants' cursory dismissal of additional monitoring options also demonstrates their

13    arbitrary and capricious decision-making.  For example, Plaintiffs asked NMFS to consider

14    passive acoustic monitoring using existing acoustic nodes and other external platforms, including

15    passive gliders. Ex. 9 at 16.[15]  However, in response, NMFS summarily stated that certain

16    acoustic nodes are "degraded and not real-time" and conclusorily determined that other external

17    platforms "would only be vessels of opportunity," rendering them impracticable. 72 Fed. Reg. at

18    46,877.  NMFS's cavalier consideration of these monitoring options is insufficient as it failed

19    even to consider their potential usefulness in determining if an area has denser concentrations of

20    marine mammals, information that could be critical for planning LFA exercises and monitoring

21    their impact.  Ex. 100 (passive gliders).

22

23

24    _____

25    [14] Defendants conducted their "evaluation" in the context of the MMPA amendment addressing "military readiness activities."  SEIS at 5–6.  However, to the extent that any monitoring addressed by Defendants falls under section 101(5)(A)(i)(II)(bb) of the MMPA ("requirements

26    pertaining to the monitoring and reporting of such taking"), the NDAA amendment is inapplicable as its reach is limited to the mitigation requirement contained in section 101(5)(A)(i)(II)(aa).

27    [15] Passive gliders are robots that travel through the ocean collecting data on whale calls that are radioed back to the glider's base. Ex. 100.

28

1
2

**2.    NMFS Has Failed to Ensure that the Impacts of LFA Will Be "Negligible."**

3   Under the MMPA, NMFS may issue a take permit only if it first finds that the authorized

4  taking will have only a "negligible impact" on marine mammal species or populations. 16 U.S.C.

5  §§ 1371(a)(5)(A), (D). Remarkably, NMFS's new rule sets the same high ceiling on take that the

6  Court, in 2003, found would sometimes exceed the negligible impact threshold if additional

7  mitigation were not prescribed. 279 F. Supp. 2d at 1159. Having failed to require such additional

8  mitigation, NMFS has again violated the MMPA.

9   In its 2007 rule, NMFS again permits the Navy to take up to 12% of any and all marine

10  mammal species and populations on an annual basis. 72 Fed. Reg. at 46,886. As the Court

11  recognized, the harassment of 12% of a small population of marine mammals (for example, the

12  critically endangered population of western gray whales, of which little more than 100 individuals

13  remain), could affect the reproduction or survival of the population—hardly a "negligible impact."

14  279 F. Supp. 2d at 1159; *see also* Vorontsova Decl. ¶¶ 11–12 (noting additional data and

15  increased concern since 2002 over impacts of intense noise on western gray whales), Ex. 62;

16  Wang Decl. ¶¶ 5–8. The Navy has offered *no* new information to alter that conclusion; indeed, its

17  apparent reuse of some of the same training areas only underscores the potential for repeated

18  annual takes at this impermissible level. Ex. 18 at 48–49 (showing repeated use of mission areas).

19  By permitting such takes "without more restrictions on deploying LFA in sensitive areas and

20  during sensitive periods" (279 F. Supp. 2d at 1159), NMFS has violated the MMPA.

21   Furthermore, NMFS has significantly underestimated the potential for population effects

22  by using abundance data that—for many species—do not correspond to actual marine mammal

23  populations. Borrowing from the Navy, its method for each of the representative areas it models

24  is to (1) aggregate most species into broad groupings, such as "pelagic dolphins" and "blackfish

25  and killer whales," and (2) calculate abundance for those groups of species across what is usually

26  a vast area, assuming that more localized populations do not exist. 72 Fed. Reg. at 46,883–84;

27
28

1    Ex. 10 at 4.2-15 to 4.2-18.[16]  The numbers that result from such a method are inconsistent with

2    NMFS's own prior practice and with the available scientific evidence.  For example, its take

3    numbers for Hawaii—an area that accounts for three of the Navy's 31 representative sites—are

4    contradicted not only by the significantly lower, species-specific abundance estimates that both

5    agencies have used in other authorization processes, but also by the extensive scientific record

6    that has emerged since 2001, indicating that many populations of cetaceans around Hawaii are

7    small, island-associated, and genetically isolated from others in the tropical Pacific.  Exs. 10

8    at 4.2-42 to 43; 12 at D-3 to D-9 (LFA); 102 at 38,713 (RIMPAC exercise); 86; 93; 94; *see also*

9    Baird Decl. ¶¶ 14-17 (concluding that take of such species could well exceed 12% if LFA is used

10   around Hawaii).[17]  Its use of these data in calculating the "upper bound" of expected impacts

11   (72 Fed. Reg. at 46,883–84) is arbitrary and capricious.[18]

12

13           **3.      NMFS Failed to Authorize the Lethal Take of Marine Mammals
                        Despite the Potential for Such Effects.**

14           The heart of the MMPA is a moratorium on the take of marine mammals, to which

15   exceptions are allowed through the authorization process.  16 U.S.C. §§ 1371(a), (a)(5).  It has

16   long been established that, under the moratorium, NMFS cannot selectively authorize only some

17   of the marine mammal takes resulting from an activity, while letting other foreseeable takes occur

18   unaddressed.  *Kokechik Fishermen's Ass'n v. Fed'n of Japan Salmon Fisheries Coop. Ass'n*,

19   839 F.2d 795, 801–02 (D.C. Cir. 1988).  Yet, here, NMFS has essentially done just that—it has

20

21   [16] Because the scope of the authorization is so broad, NMFS bases its negligible impact
     determination for the five-year rule on the Navy's modeling of 31 representative scenarios.
     72 Fed. Reg. at 46,883–84.

22   [17] In the case of Hawaiian bottlenose dolphins, for example, research indicates the presence of an
     island-associated population as small as 141 animals, and NMFS has previously used an

23   abundance estimate of 3,263 to calculate take in other authorizations; the agencies' current LFA
     analysis, by comparison, assumes the "pelagic dolphin" stock around Hawaii is *10.7 million*

24   animals in size and calculates the take percentage for bottlenose dolphins on that basis.  Exs. 94
     (report to NMFS); 102 at 38,713 (prior MMPA authorization); 10 at 4.2-17 (LFA); Baird Decl.

25   ¶ 16.

     [18] NMFS claims that the Navy's past practice indicates that impacts will not exceed 12% annually

26   (72 Fed. Reg. at 46,852); but this nominal schedule, which is based on a particular group of sites
     in the northwest Pacific that the Navy used pursuant to this Court's Injunction and required

27   mitigation (*id.*), does not reflect the scope of the final rule, or the Navy's stated intention (SEIS
     at P-1) to train in completely different regions of the world.

28

1    authorized only the harassment of large numbers of marine mammals, even though there also

2    exists a foreseeable risk of life-threatening injury and mortality.  72 Fed. Reg. at 46,891; Ex. 19

3    at ¶ 3(d); *Kokechik*, 839 F.2d at 800.

4         As discussed above, the evidence linking some forms of anthropogenic sound to whale

5    strandings and mortalities and injuries at sea has expanded dramatically since 2003, and

6    Defendants' rationale for discounting any similar risk from LFA has repeatedly shifted.  *See*

7    *supra* at 5–6, 8.  Significantly, the two justifications that NMFS now offers for its position are

8    inconsistent with the available evidence and with the opinions of its own scientists.

9         *First*, NMFS claims that LFA training would not cause mortalities or serious injuries

10   because the Navy would steer clear of three conditions that were present in some—but not all—

11   sonar-related strandings: the presence of deep water close to land, the channeling of sound

12   through surface ducts, and the use of mid-frequency sources.  72 Fed. Reg. at 46,886.  But these

13   distinctions dissolve on examination.  Given the reduced 12 nm coastal exclusion that NMFS

14   approved, LFA ships would train no farther from shores with deep water than the sonar vessels

15   implicated in the Bahamas, Hawaii, and other stranding events; and LFA is likewise intended to

16   exploit surface ducts, particularly in high latitudes.  Exs. 28 at 30–33; 33 at 32; 41 at 28; 72 Fed.

17   Reg. at 46,849; *see also* Soto Decl. ¶¶ 7–8.  The supposition that low-frequency sources cannot

18   induce the same effects as mid-frequency sonar has not been accepted by NMFS's own scientists,

19   who have expressed strong concern over beaked whale strandings that have involved such

20   sources.  Ex. 47; *see also* Soto Decl. ¶¶ 5–11, 14; Weilgart Decl. ¶ 8.  NMFS's position is further

21   belied by its nearly unique exclusion of the Gully as an OBIA for its population of northern

22   bottlenose whales (a beaked whale species), and by its current conduct of major at-sea research

23   into the effects of LFA sonar on beaked whales.  72 Fed. Reg. at 46,861, 46,865, 46,887; *see also*

24   SEIS at G-005 (Gully).

25        *Second*, NMFS rules out the potential for mortalities or serious injury on the grounds that

26   no strandings have as yet been associated with the system's use.  72 Fed. Reg. at 46,858, 46,886.

27   Yet the LFA system has only been used to date with the Court's mitigation measures in place, and

28   NMFS itself does not believe that the effects of the LFA system would be known.  According to

1    NMFS's mandated stock assessments, injuries and mortalities for Pacific stocks of beaked whales

2    "would rarely be documented, due to the remote nature of many of [the Navy's] activities and the

3    low probability that an injured or dead whale would strand." Ex. 87 at 142, 146, 151.  On the

4    basis of this and other evidence, a court recently rejected a similar claim by Defendants that no

5    strandings have occurred off southern California, despite the Navy's extensive use of mid-

6    frequency sonar there.  Ex. 105 at 8 (Order, *NRDC v. Winter*, No. 8:07-cv-00335-FMC-FMOx,

7    2007 U.S. Dist. LEXIS 57909 (C.D. Cal. Aug. 7, 2007)).  The chances that such effects would be

8    detected and reported in the present case are, if anything, considerably lower.  Wang Decl. ¶ 9.

9         In addition, NMFS has failed to authorize lethal injury and mortality even in

10    circumstances where the Navy would use LFA and mid-frequency sonar concurrently, as was the

11    case in at least one recent major exercise.  Ex. 98 at 43,253.  LFA and mid-frequency sonar,

12    deployed together, were precisely the combination associated with the acknowledged mass

13    mortality of beaked whales off Greece.  Ex. 35 at 2-30.  Under these conditions at the very least,

14    the potential for mortality is foreseeable.  *See Kokechik*, 839 F.2d at 798, 800 (finding it

15    foreseeable that fishery would take northern sea lions even though only one take had been

16    reported in seven years and NMFS considered the probability of any additional take remote); Soto

17    Decl. ¶ 11.

18

19         **4.    NMFS Violated the MMPA by Refusing to Submit Critical
                    Information for Public Review.**

20         NMFS has also failed to comply with the unequivocal notice and public comment

21    requirements of the MMPA.  Section 101(a)(5)(A) of the MMPA requires NMFS to provide

22    notice and an opportunity for public comment *before* making its impact findings and prescribing

23    regulations for the incidental taking of marine mammals.  *See* 16 U.S.C. § 1371(a)(5)(A)(i) (the

24    Secretary shall allow incidental taking "*after notice . . . and opportunity for public comment*")

25    (emphasis added).  Nonetheless, NMFS—over the objections of both Plaintiffs and the Marine

26    Mammal Commission—made findings and prescriptions without providing full notice or

27    opportunity for public comment.  *See* 72 Fed. Reg. at 46,846, 46,852 (cmt. 11).

28

1    Specifically, NMFS had information regarding the Navy's choice of precise operating

2    areas, which could impact its overall analysis, yet failed to address that information in its

3    Proposed Rule or in the SEIS.  This failure precluded the public from reviewing and commenting

4    on the exact kind of information the MMPA was enacted to elicit.  *See* H.R. Rep. No. 92-707, at 8

5    (1971), *reprinted in* 1972 U.S.C.C.A.N. 4144, 4151 ("The public is invited and encouraged to

6    participate fully in the agency decision-making process.  The agencies are further required to

7    provide full information to interested members of the public on what the implications of the

8    program and of any proposed agency actions may be.").

9    Here, NMFS received information regarding the Navy's choice of specific operating areas,

10   and presumably the marine mammals potentially affected during the planned operations, at least

11   three months before issuing its proposed rule.  *See* Ex. 19 (LOAs at § 3(b)) ("This

12   Authorization . . . is valid . . . in accordance with boundary conditions described in the Navy's

13   March 30, 2007, mission intention letter. . . .").[19]  As NMFS relies upon just this type of

14   geography-specific and species-specific information to justify its overall findings and mitigation

15   prescriptions in the Proposed Rule (*e.g.*, 72 Fed. Reg. 37,404, 37,411 (July 9, 2007)), Final Rule

16   (*e.g.*, 72 Fed. Reg. at 46,886) and SEIS (*e.g.*, 4-43 to 4-51), its failure to disclose these new

17   operating areas and species potentially affected, while simultaneously analyzing them in

18   preparation for issuing the 2007–08 LOAs, was arbitrary and capricious.  *See Pac. Coast Fed'n of*

19   *Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005) (NMFS's

20   determination that an alternative would not cause jeopardy to a species was "difficult to accept

21   when it is evident that the agency entirely failed to consider an important aspect of the problem")

22   (citation and internal quotations omitted).  Further, NMFS's refusal to include its analysis of this

23   information in its proposed rule deprived the public of its opportunity to comment on this critical

24

25   _____

26   [19] While it is unclear what specific information was included in the Navy's "mission intention letter," it is likely that it mirrored the type of information contained in past LOA applications (*see, e.g.*, Ex. 21 (detailing specific geographic regions for operation and marine mammals potentially

27   affected)), as the Navy's application for the current LOAs did not contain such information, yet the 2007–08 LOAs issued by NMFS did specify regions and marine mammals.

28

1    information and the accuracy of NMFS's analysis.[20]  *See Idaho Farm Bureau Fed'n v. Babbitt*,

2    58 F.3d 1392, 1403 (9th Cir. 1995) ("Opportunity for public comment is particularly crucial when

3    the accuracy of important material in the record is in question.").

4        **B.    Plaintiffs are Likely to Succeed on Their NEPA Claims.**

5        The National Environmental Policy Act ("NEPA") "is our basic national charter for

6    protection of the environment."  40 C.F.R. § 1500.1.  NEPA requires an Environmental Impact

7    Statement ("EIS") to provide a "full and fair discussion of significant environmental impacts,"

8    including all "reasonably foreseeable" impacts.  40 C.F.R. §§ 1502.1, 1508.8(b).  The EIS must

9    also "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives

10   which were eliminated from detailed study, briefly discuss the reasons for their having been

11   eliminated."  40 C.F.R. § 1502.14(a).  In addition to impacts and alternatives, the EIS must

12   analyze "appropriate mitigation measures" and the "[m]eans to mitigate adverse environmental

13   impacts."  40 C.F.R. §§ 1502.14(f), 1502.16(h).  Despite the Court's prior rulings on these issues,

14   the Navy's Supplemental EIS ("SEIS") violates each of these provisions.

15
16       **1.    The SEIS Fails to Consider All Reasonable Alternatives to the
            Proposed Deployment of LFA.**

17       The Navy fails to meaningfully evaluate "all reasonable alternatives" to the proposed

18   deployment of LFA, although a discussion of alternatives is the "heart of the environmental

19   impact statement."  40 C.F.R. § 1502.14.  This Court previously held that one of the central flaws

20   in the Navy's original EIS was that it failed to consider "training in areas that present a reduced

21   risk of harm to marine life and the marine environment when practicable."  279 F. Supp. 2d at

22   1166.  Despite this clear directive, the SEIS is devoid of any discussion of training in areas of

23   reduced risk to marine life.  In fact, the SEIS fails to identify even a *single* low-impact area, or to

24   _____

25   [20] Further, NMFS's neglect to include its analysis of this critical information as part of its rule
     promulgation and adoption of the SEIS is hardly demonstrative of the "hard look" required under
     NEPA.  *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992) (to ensure that the
26   agency has taken the requisite "hard look" at the environmental consequences of its proposed
     action, a court must carefully review the record to determine whether the agency decision is
27   "founded on a reasoned evaluation of the relevant factors") (citation and internal quotations
     omitted).

28

1    address how concentrating training there might reduce the risk of harm to marine life.  The

2    Navy's failure to do so is contrary to this Court's order and NEPA.  *Id.*; *see also NRDC v. U.S.*

3    *Forest Serv.*, 421 F.3d 797, 814 (9th Cir. 2005) (finding a violation of NEPA in the failure to

4    consider allocating less unspoiled area to development).

5           Rather than discuss areas of lesser impact, the SEIS asserts that the identification of such

6    areas "is not straightforward" since the "reason that certain areas are believed to have minimal

7    marine mammal activity could very well be because of gaps in animal distribution, abundance[,]

8    and density data there."  SEIS at 2-12.  As an initial matter, the Navy's conclusory disclaimer of

9    all ability to identify low-impact areas utterly fails to comply with NEPA's requirement to

10   *rigorously* explore all reasonable alternatives.  40 C.F.R. § 1502.14(a).  Moreover, contrary to the

11   Navy's assertion, it is far from clear that the identification of areas of low marine mammal

12   abundance is impracticable.  Existing studies provide sufficient information on marine mammal

13   density across various regions to allow for a meaningful comparison of potential training sites.

14   *E.g.*, Ex. 90; *see also* Parsons Decl. ¶ 12; Whitehead Decl. ¶ 11.  Regardless, NEPA prohibits an

15   agency from relying upon the absence of information to justify a failure to consider all reasonably

16   foreseeable environmental impacts.  40 C.F.R. § 1502.22(b).  Thus, even if data on marine animal

17   abundance and density were incomplete, the SEIS would still violate NEPA by failing to provide

18   a "summary of existing credible scientific evidence" on the subject.  40 C.F.R. § 1502.22(b)(3).

19          Rather than identify specific, low-impact areas, the Navy proposes instead to "identify

20   areas of high marine life concentrations and avoid them when practicable."  SEIS at 2-12.  Yet

21   nowhere does the SEIS identify areas of high marine life or assess how avoiding them would

22   lessen harm to the environment, if at all.  Instead of conducting an analysis within the four

23   corners of the SEIS document itself, the Navy proposes to do so when the time comes for

24   deployment of LFA in the field.  *Id.*  This proposal to defer the required analysis to a later day—

25   downstream of the public comment process—completely ignores NEPA's fundamental purpose:

26   fostering informed public participation and transparency in agency decision-making.  *See, e.g.*,

27   *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001) (EIS must foster "informed

28   decision-making and informed public participation.") (citation omitted).  What's more, NMFS's

1    blanket approval of deployment of LFA across up to 75% of the world's oceans simply enables

2    this evasion. *See* 72 Fed. Reg. at 46,846, 46,849.

3        The SEIS also fails by omitting any meaningful evaluation of coastal exclusion zones

4    beyond distances of 12 nm and 25 nm.  Notwithstanding the Court's rejection of the Navy's

5    previous coastal exclusion analysis for a similar failing, (279 F. Supp. 2d at 1161–62), the Navy

6    proposes two uniform coastal exclusion zones without regard to whether wider zones may be

7    practicable in areas where the continental shelf extends beyond those distances. *See* SEIS at 4-71

8    to 4-79; Ex. 96.  This is particularly disturbing in light of the Court's determination that, in most

9    instances, the Navy can effectively test and train with LFA at far greater distances from shore.

10   279 F. Supp. 2d at 1162.  Moreover, the SEIS fails to adequately consider adopting a dual-criteria

11   exclusion zone like the one used in the Court's prior Injunction (which sets a coastal exclusion in

12   the Philippine Sea as the greater of 60 nm or 30 nm seaward of the 200 meter isobath).  Ex. 3 at

13   ¶ 5; *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1161 (N.D.

14   Cal. 2006) (failure to consider maintaining exclusion zones already in existence under stipulation

15   violates NEPA).[21]  Finally, the Navy's consideration of coastal exclusion zones fails to reflect a

16   number of clearly relevant factors, including how a wider coastal exclusion would affect the

17   numerous endangered species inhabiting the narrow strip of shelf closest to shore or the ability of

18   near-shore animals to escape the sound field. *See supra* at 12–13.

19       An additional flaw in the Navy's previous EIS was its failure to consider extending

20   shutdown procedures to protect schools of fish.  279 F. Supp. 2d at 1166.  The current SEIS

21   similarly fails to provide meaningful consideration of this issue.  In particular, it identifies studies

22   showing that some fish travel on average the same speed as the LFA vessel; however, this begs

23   the question of whether these fish will be harmed by LFA.  SEIS at 2-13.  The Navy also attempts

24   to justify its proposed limited shutdown procedures by asserting, without support, that active

25   acoustics would result in too many false alarms; however, the Navy fails to provide any

26

27   [21] The Navy states that widening the exclusion zone would not significantly affect the degree of
     harm caused, but provides no support for this assertion.  SEIS at 10-119.

28

1   information upon which to judge the reasonableness of that conclusion, or explain why shutdown

2   alternatives are unacceptable, as required by NEPA. *Id.*; 40 C.F.R. § 1502.1 (EIS "shall inform

3   decisionmakers and the public of the reasonable alternatives which would avoid or minimize

4   adverse impacts."). Given the clear potential for negative impacts on fish populations, the Navy's

5   summary analysis is illegal. Luczkovich Decl. ¶¶ 6–13; Exs. 65–70.

6

7                    **2.    The SEIS Fails to Address or Inappropriately Rejects Mitigation
                            Measures.**

8              The Navy also fails to provide "a reasonably complete discussion of possible mitigation

9   measures," thus "undermin[ing] the 'action-forcing' function of NEPA." *Robertson v. Methow*

10  *Valley Citizens Council*, 490 U.S. 332, 352 (1989); *see also Neighbors of Cuddy Mountain v. U.S.*

11  *Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). For example, its refusal to exclude any other

12  Marine Protected Areas ("MPAs") on the grounds that "most" fall within 12 nautical miles of the

13  coast reflects indolence, not reasonableness. Ex. 13 at 10-125 (providing a list of some MPAs

14  that lie wholly or partly outside of 12 nautical miles but no analysis). There is no discussion as to

15  why those and other offshore MPAs (*see*, *e.g.*, Ex. 88; Hoyt Decl. ¶ 5) should or should not be

16  excluded from exercises. In addition, its cursory dismissal of areas specifically cited in the

17  Court's opinion (279 F. Supp. 2d at 1162–63) because they are "large ocean expanses" (Ex. 13 at

18  10-125) similarly does not constitute "a reasonably complete discussion." Likewise, the agencies

19  fail to seriously consider any of the existing sources of marine mammal data and habitat modeling

20  (*see*, *e.g.*, Exs. 6 at 38–39; 9 at 11–12; SEIS at G-008 at 4), including their own sources. *See*

21  279 F. Supp. 2d at 1163 (NMFS "has the ability to identify which areas and which seasons to

22  avoid").

23             In addition, the SEIS inappropriately rejects wholesale the extension of the coastal zone,

24  as previously required by the Court (*id.* at 1191), dubiously finding that a 25 nm coastal exclusion

25  zone would result in "greater risk of potential impacts to marine animals." SEIS at 4-80; *see*

26  *supra* at 12–13. In rejecting the extension of the coastal zone, the Navy failed to consider a full

27  range of practicable measures that could be combined with any exclusion, including exclusions

28  linked to bathymetry or distance from the shelf break. The Navy admits as much through the

1    discussion of its own East Coast exclusion zone, which was designated as an OBIA "to protect

2    more species." Ex. 13 at 10-131. Yet the SEIS fails to explain why such measures cannot be

3    extended to other coastal zones, which could alleviate some of the "potential impacts" identified

4    with a 25 nm coastal zone. These contradictory positions fail to provide the "hard look" required

5    by NEPA. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*,

6    309 F.3d 1181, 1192 (9th Cir. 2002) (NEPA inadequacies coupled with contradictory statements

7    in environmental documents "do not measure up to the requirements . . . for a 'hard look' and

8    discussion of mitigation measures in significant detail to ensure that environmental consequences

9    have been fairly evaluated.").

10        The agencies also fail to adequately consider additional feasible monitoring measures.

11    For example, underwater passive gliders, though reportedly in use by other governments for sonar

12    mitigation and other purposes, are not considered in the SEIS. Ex. 100. In addition, the Navy

13    relies, in part, on safety considerations in rejecting the use of aerial surveys, but fails to note that

14    such surveys may be safe and practicable when launched from airbases in close proximity to LFA

15    operational sites, such as in the Northern Mariana Islands or Guam, where the Navy has an at-sea

16    training range. SEIS at 5-7. Although these mitigation measures were not included in the

17    previous permanent Injunction, Plaintiffs have urged the use of these and other measures at every

18    opportunity. Because the Navy's SEIS fails to consider all feasible mitigation measures, it

19    violates this Court's order and NEPA.

20

21        **3.    The SEIS Fails to Adequately Consider All Reasonably Foreseeable
              Individual and Cumulative Impacts of LFA.**

22        The Navy's SEIS fails to adequately consider numerous significant impacts of the

23    proposed deployment of LFA. For example, the Navy fails to take a "hard look" at the risk of

24    serious injury to marine mammals, even as the evidence supporting strandings and sonar-related

25    pathologies has grown substantially since the Navy's previous EIS. SEIS at 4-31; *see Robertson*,

26    490 U.S. at 350 (NEPA requires agencies to "take a hard look at environmental consequences")

27    (citation and internal quotations omitted). A series of published studies now shows that exposure

28    to sonar can directly or indirectly induce a suite of severe internal injuries in deep-diving whales,

resembling those seen in decompression sickness, or "the bends." *E.g.*, Exs. 31 at 453–54; 32 at 575; 44 at 1127; *see also* Ex. 43 at 182. Rather than seriously consider this evidence, the Navy fails to include in its discussion any developments in the field since 2004, which includes a succession of peer-reviewed journal articles and expert panel review; and narrowly focuses its discussion on "bubble growth," ignoring scientific consensus that, regardless of the mechanism, injuries are occurring at sea. SEIS at 4-31; Exs. 31; 32; 43 at 182, 185; 44 at 1127. Similarly, the Navy dismisses the potential for its powerful LFA system to cause strandings, notwithstanding this considerable new evidence and the system's operating characteristics. *E.g.*, SEIS at 2-7 (operations close to choke points); *see supra* at II.A.3. This treatment falls short of the Navy's obligation to evaluate all "reasonably foreseeable" impacts, including those impacts which "have catastrophic consequences, even if their probability of occurrence is low," so long as "the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b).

The Navy's discussion of cumulative impacts, which is based on the assumption that LFA will constitute a small proportion of all oceanic noise on a world-wide scale (SEIS at 4-64), is similarly flawed. The Navy never analyzes the cumulative impact of additional LFA noise on a local or regional scale, which is how an actual animal would be affected. According to data cited by the Navy, a single LFA unit generates as much acoustic energy through its six annual missions as 500 supertankers operating for 300 days apiece. SEIS at 4-63; Ex. 48 at 111; Parsons Decl. ¶ 6. The Navy's failure to consider "individually minor but collectively significant" impacts at an operationally meaningful scale is precisely the type of regulatory soft-shoe prohibited by section 1508.7 of NEPA's implementing regulations.[22]

---

[22] Additionally, the SEIS gives inadequate consideration to the synergistic effects of the proposed deployment of LFA in combination with other oceanic noise sources. 40 C.F.R. § 1508.7; SEIS at 4-65. Rather than conducting a meaningful analysis, the Navy instead sidesteps the issue by effectively attempting to define the term "synergistic effects" out of existence, requiring "exactly in phase" transmissions with similar durations, depth, frequency, bandwidth, vertical steering angle, waveform, wavetrain, pulse length, pulse repetition rate, and duty cycle. SEIS at 4-65. Of course, sounds from a variety of sources can have a synergistic effect regardless of whether those sounds converge in the narrow manner required by the SEIS. Ex. 27, Annex K at 10.

1

### C.    NMFS Has Violated the Endangered Species Act.

2         The Endangered Species Act ("ESA") prohibits any person from "taking" species listed as

3    endangered and empowers the Fish and Wildlife Service ("FWS") and NMFS to promulgate

4    regulations prohibiting the taking of any species listed as threatened.  16 U.S.C. §§ 1533,

5    1538(a)(1)(B)–(C), (G).  Under section 7 of ESA, each federal agency, through consultation with

6    NMFS or FWS, must ensure that its activities are "not likely to jeopardize the continued existence

7    of any endangered species or threatened species or result in the destruction or adverse

8    modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2).  For many of the reasons

9    already discussed above, NMFS's 2007 BiOps and Incidental Take Statement fall short of these

10   requirements.

11              **1.    The 2007 Biological Opinions' Incidental Take Statement Fails To**
                         **Specify the Amount or Extent of Take of Endangered and**
12                       **Threatened Species.**

13        Section 7 of ESA requires NMFS to include an Incidental Take Statement ("ITS") in any

14   biological opinion finding that a proposed action will result in the take of an endangered or

15   threatened species, but will not jeopardize that species survival or recovery, and in any case

16   where a biological opinion is issued in conjunction with a small take permit under the MMPA.

17   50 C.F.R. § 402.14(i).  Just as the 2002 ITSs issued by NMFS failed to comply with the ESA,

18   NMFS again failed to include a legally valid ITS with its 2007 BiOps.

19        An ITS must specify the "amount or extent[] of such incidental taking on the species."

20   50 C.F.R. § 402.14(i)(1)(i).  Both the ESA's legislative history and NMFS's regulations express a

21   clear preference for specific numerical values when setting such triggers.  *Ariz. Cattle Growers*

22   *Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1250 (9th Cir. 2001).  Indeed, in cases where the

23   number of individual animals expected to be incidentally taken is not provided in an ITS, NMFS

24   "must establish that no such numerical value could be practically obtained."  *Id.*  Where no

25   numerical value can be obtained, the agency must at least set forth some surrogate for defining

26   the amount or extent of incidental take.  *Id.*

27        Here, neither the 2007 BiOps nor the corresponding August 15, 2007 ITS satisfies the

28   Ninth Circuit's requirements.  The ITS neither provides specific numerical values for listed

1   species of sea turtles, salmon in the Atlantic, or salmon in the Pacific, nor supplies a valid

2   surrogate as required under *Arizona Cattle Growers*.  This failure defies this Court's 2002 and

3   2003 rulings on this issue.  279 F. Supp. 2d at 1184 ("[E]ven where numerical values are

4   improper, the ITS still must contain some surrogate for defining the amount or extent of

5   incidental take.").

6            **2.    NMFS's Biological Opinions Are Arbitrary and Capricious.**

7        For many of the same reasons that the analysis in the SEIS and Final Rule are flawed,

8   NMFS's required findings in the 2007 BiOps are also unsupportable by the record in this case.

9   First, just as the Final Rule assumes that LFA cannot cause mortalities or strandings of marine

10  mammals—despite considerable evidence showing the acute vulnerability of some species to

11  such harm—the 2007 BiOps make the same insupportable assumption.  *See* Ex. 15 at 143–49; *see*

12  *supra* at II.A.3.  Second, just as the Final Rule improperly assumes that the Navy's monitoring

13  scheme will virtually eliminate all possibility of injury at close range, so too do the 2007 BiOps.

14  *See* Ex. 15 at 143; Baird Decl. ¶¶ 7–10.  Finally, just as the Final Rule relies on the Navy's dated

15  models to determine impact, so do the 2007 BiOps.  *See* Ex. 15 at 132.  Consequently, the Court

16  should reject NMFS's "no jeopardy" determination.

17

18  **III.    DEPLOYMENT OF LFA WITHOUT ADEQUATE MITIGATION WILL
            CAUSE IRREPARABLE INJURY**

19       Where, as here, a party shows a probability of success on the merits, the mere

20  "*possibility*" of irreparable harm warrants preliminary injunctive relief.  *Earth Island Inst. v. U.S.*

21  *Forest Serv.*, 442 F.3d 1147, 1158 (9th Cir. 2006) (reversing denial of preliminary injunction on

22  NEPA claim) (emphasis added).  Moreover, when "environmental injury is sufficiently likely, the

23  balance of harms will usually favor the issuance of an injunction to protect the environment."

24  *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (citation and internal

25  quotations omitted).  As discussed above, for Plaintiffs' ESA claim, the balance of harms

26  automatically favors Plaintiffs and need not be considered by the Court.

27       As the Court held in 2003, "the certain harassment and possible injury of marine

28  mammals and other sea creatures, many of them endangered, plainly cannot be remedied by

1    money, and is likely to be long lasting." 279 F. Supp. 2d at 1188. Nothing in the new record

2    warrants a different outcome.

3          There is no doubt that the environmental harm threatened by LFA exceeds the irreparable

4    injury threshold set by the Ninth Circuit. LFA can kill, injure, harass and disturb virtually all

5    forms of marine life, including highly endangered marine mammals. Deployment of LFA

6    threatens to take great numbers of marine mammals and to injure the entire marine environment.

7    Although the full extent of LFA's potential impacts remains unknown, evidence from the studies

8    conducted and/or funded by the Navy, the mass strandings associated with military sonar, and the

9    evidence presented by numerous commenters and Plaintiffs' expert declarants, makes clear that a

10   range of serious environmental effects are attributable to active sonar, including LFA.

11         These threats to the marine environment are described in twelve declarations filed with

12   this Motion from highly qualified experts, some of whom have themselves worked with NMFS

13   on marine acoustic issues.[23] These impacts are likely more severe than the kinds of

14   environmental harms that the Ninth Circuit has found irreparable in the context of acoustic

15   impacts on whales. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 727 (9th Cir.

16   2001) (reversing trial court's denial of preliminary injunction based on threat of cruise ship noise

17   to biologically significant activities of humpback whales such as social ordering, feeding,

18   courtship or alarm).

19         Aside from the compelling evidence of irreparable injury described above, Defendants'

20   many procedural violations are also sufficient irreparable harm to warrant injunctive relief under

21   case law in this Circuit. *Id.* at 738 (quoting *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir.

22

23

24   _____

25   [23] *See, e.g.*, Vorontsova Decl. ¶ 14 (deployment of LFA as intended poses risk of serious harm to
     the western population of gray whales, including possible extinction); Weilgart Decl. ¶ 8 (LFA's
     large spatial and temporal scale indicate there will be significant impacts on the marine

26   environment and animal populations); Bain Decl. ¶ 5 (without superior mitigation, deployment of
     LFA is likely to cause serious injury in marine mammals in the North Pacific Ocean and to subtler

27   but significant adverse effects on a population scale); Wang Decl. ¶ 11 (without substantial
     mitigation, LFA poses a significant threat to cetacean populations in the West Pacific).

28

1  1989) (Breyer, J.)).  Thus, on both grounds, Plaintiffs have presented ample support for a

2  preliminary injunction.[24]

3

4  **IV.    PLAINTIFFS RAISE SERIOUS QUESTIONS AND THE BALANCE OF HARM TIPS SHARPLY IN PLAINTIFFS' FAVOR**

5         Under the Ninth Circuit's alternative test, Plaintiffs need only raise "serious questions"

6  about the merits and show that the balance of harms tips sharply in favor of injunctive relief.

7  *Earth Island*, 442 F.3d at 1159.  "[S]erious questions" are questions that cannot be resolved one

8  way or the other at the hearing on the injunction.  *Republic of the Philippines v. Marcos*,

9  862 F.2d 1355, 1362 (9th Cir. 1988).  As demonstrated above, Plaintiffs have, at a minimum,

10  raised serious questions regarding the Defendants' violations of federal law.

11         This Court has already engaged in the required balancing test and, in previously ordering

12  a preliminary injunction, found that the balance of the hardships tipped decidedly in favor of

13  Plaintiffs.  As noted above, if LFA is immediately deployed under the terms of the new Final

14  Rule and without proper mitigation, the marine environment will suffer irreparable harm.  By

15  contrast, requiring the Navy to adopt common sense mitigation measures, such as that

16  previously ordered by this Court in the *Evans* case, will not prevent the Navy from deploying

17  LFA, but will ensure that the Navy complies with its obligations under federal law in so doing.

18  Any financial impact or minor inconvenience that the Navy might suffer due to a preliminary

19  injunction cannot compare to the risk of extensive and irreparable damage to the marine

20  environment if the global deployment of LFA is allowed, without proper mitigation, before the

21  case can be heard on its merits.

22         It is also appropriate for the Court to consider the public interest in balancing the harms.

23  *Earth Island*, 442 F.3d at 1177; *Makua v. Rumsfeld*, 163 F. Supp. 2d 1202, 1215 (D. Haw. 2001)

24  (When public interest is involved, "a district court must examine whether that public interest

25  favors the plaintiff.").  In *Evans*, this Court concluded that, despite an acknowledged public

26

27  [24] As demonstrated by the numerous declarations filed with this Motion, all of the Plaintiffs easily satisfy the requirements for standing.  *See generally Idaho Farm Bureau Fed'n*, 58 F.3d at 1398-99; *see, e.g.*, Lopez Decl.; Ettman-Sterner Decl.; Rossiter Decl.; Nutter Decl.; Cousteau Decl.

28

1    interest in "military preparedness," the public interest was best served by issuing an injunction

2    against the Navy's use of sonar that was "carefully tailored to reduce the risk to marine mammals

3    and endangered species." 279 F. Supp. 2d at 1190–91. [25] Plaintiffs are not seeking a preliminary

4    injunction that would completely prohibit the Navy's use of LFA for testing and training. Rather,

5    Plaintiffs seek only a carefully tailored injunction, with adequate and appropriate mitigation, such

6    as that previously put in place by this Court.[26]

7                                            **CONCLUSION**

8            For the reasons set forth above, Plaintiffs respectfully request that Defendants be

9    preliminarily enjoined during the pendency of this action so as to limit their use of LFA to terms

10   and mitigation substantially similar to those to which they have already stipulated.

11   Dated:  October 12, 2007

12   ROBERT L. FALK                          JOEL R. REYNOLDS
     ROBIN S. STAFFORD                       CARA A. HOROWITZ
13   SARAH SCHINDLER                         NATURAL RESOURCES DEFENSE
     MORRISON & FOERSTER LLP                   COUNCIL, INC.
14
     By:_____/s/ Robin S. Stafford_____
15               Robin S. Stafford

16   Attorneys for Plaintiffs
     NATURAL RESOURCES DEFENSE
17   COUNCIL, INC., et al.

18   _____
     [25] The law is clear that general concerns regarding national security do not trump environmental
     harm. *See San Luis Obispo Mothers for Peace v. NRC*, 449 F.3d 1016, 1034 (9th Cir. 2006)
19   (absent a statutory exemption, national security concerns cannot trump an agency's obligation to
     comply with federal environmental law).  In another case requiring the precise balancing test this
20   Court must undertake, the District Court in Hawaii determined that the public's interest in the
     protection of endangered species threatened by the Army's proposed military action prevailed
21   over claimed national security concerns. *Makau*, 163 F. Supp. 2d at 1221–22.  In *Makau*, the
     plaintiffs obtained a preliminary injunction to prevent the U.S. Army from conducting live-fire
22   exercises that posed a risk of causing wildfires that could injure or kill various endangered
     species.  The Army argued that "continued reduction in CALFEX training will place the lives of
23   soldiers at risk and will negatively affect national security." *Id*. at 1221.  The Court noted,
     however, that other training sites were available, and even though those other sites "may not be as
24   accessible and may cost more for the Army, financial harm is 'not the sort of "unusual
     circumstance" that justifies a court's refusal to enjoin NEPA violations.'" *Id*. (citation omitted).
25   [26] *NRDC v. Winter*, No. 07-56157, 2007 U.S. App. LEXIS 20965, at *9 (9th Cir. Aug. 31, 2007)
     (holding that the ongoing war tipped the balance of harms in the Navy's favor), is not to the
26   contrary.  Unlike that case, here the Navy has been operating under the Injunction for four
     wartime years, with only one minor modification based on operational needs.  Moreover,
27   Defendants recently stipulated to continue operating under the terms of that Injunction during the
     pendency of this Preliminary Injunction briefing.
28