1  ROBERT FALK (SBN 142007)
   ROBIN S. STAFFORD (SBN 200950)
2  SARAH SCHINDLER (SBN 236414)
   MORRISON & FOERSTER LLP
3  425 Market Street
   San Francisco, California  94105-2482
   Telephone:  (415) 268-7000
4  Facsimile:  (415) 268-7522
   Email: RFalk@mofo.com
5  Email: RStafford@mofo.com
   Email: SSchindler@mofo.com

6  JOEL R. REYNOLDS (SBN 85276)
   CARA HOROWITZ (SBN 220701)
7  NATURAL RESOURCES DEFENSE COUNCIL, INC.
   1314 Second Street
8  Santa Monica, California 90401
   Telephone:  (310) 434-2300
   Facsimile:  (310) 434-2399
9
   Attorneys for Plaintiffs
10 NATURAL RESOURCES DEFENSE COUNCIL,
   INC.; THE HUMANE SOCIETY OF THE UNITED
11 STATES; INTERNATIONAL FUND FOR ANIMAL
   WELFARE; CETACEAN SOCIETY
12 INTERNATIONAL; LEAGUE FOR COASTAL
   PROTECTION; OCEAN FUTURES SOCIETY;
   JEAN-MICHEL COUSTEAU

13

14               UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16 NATURAL RESOURCES DEFENSE COUNCIL,
   INC.; INTERNATIONAL FUND FOR ANIMAL        Civil Action No. CV 07-4771 EDL
17 WELFARE; THE HUMANE SOCIETY OF THE
   UNITED STATES; CETACEAN SOCIETY
18 INTERNATIONAL; LEAGUE FOR COASTAL
   PROTECTION; OCEAN FUTURES SOCIETY;
19 JEAN-MICHEL COUSTEAU
                                              **DECLARATION OF JOSEPH J.**
                    Plaintiffs,              **LUCZKOVICH**
20
          v.
21 CARLOS M. GUTIERREZ, SECRETARY OF THE
   UNITED STATES DEPARTMENT OF COMMERCE;
22 NATIONAL MARINE FISHERIES SERVICE;
   WILLIAM HOGARTH, ASSISTANT
23 ADMINISTRATOR FOR FISHERIES OF THE
   NATIONAL OCEANOGRAPHIC AND
24 ATMOSPHERIC ADMINISTRATION; VICE
   ADMIRAL CONRAD C. LAUTENBACHER, JR.,
25 ADMINISTRATOR OF THE NATIONAL
   OCEANOGRAPHIC AND ATMOSPHERIC
26 ADMINISTRATION; UNITED STATES
   DEPARTMENT OF THE NAVY; DONALD C.
27 WINTER, SECRETARY OF THE UNITED STATES
   DEPARTMENT OF THE NAVY; ADMIRAL MIKE
   MULLEN, CHIEF OF NAVAL OPERATIONS
28                  Defendants.

DECLARATION OF JOSEPH J. LUCZKOVICH
Case No. CV 07-4771 EDL

1    I, JOSEPH J. LUCZKOVICH, declare as follows:

2    1.    This Declaration is submitted in support of Plaintiffs' motion for a preliminary

3    injunction. The statements contained in this Declaration are true and correct to the best of my

4    knowledge and, in the case of my opinions, I believe them to be true. If called as a witness, I

5    could and would testify to the statements contained herein.

6    2.    I am an Associate Professor and Associate Scientist in the East Carolina University

7    Department of Biology and Institute for Interdisciplinary Coastal Science and Policy (formerly

8    known as Institute for Coastal Marine Resources). I received my Bachelor's degree in Biology

9    from Lehigh University in 1978; my Master's in Ecology from Rutgers University in 1982 and

10    my Ph.D. in Biological Science from Florida State University in 1987.

11    3.    I have devoted my professional career to the study of marine fishes and their

12    ecological relationships, focusing on feeding and reproductive activities and the bioacoustics of

13    fishes. I study habitat selection by marine fishes and the behavioral interactions of marine

14    mammals and fishes using passive acoustic methods. I have published 27 peer-reviewed journal

15    articles, acted as an associate editor for the journals *Transactions of the American Fisheries*

16    *Society* and *Environmental Biology of Fishes* and edited a book on fish ecology. I have acted as a

17    peer–reviewer of articles on bioacoustics of fishes for the *Journal of the Acoustical Society of*

18    *America*, *Environmental Biology of Fishes*, and *Transactions of the American Fisheries Society*.

19    I am certified in hydroacoustics and sonar use in fishery investigations (Hydroacoustics course,

20    Biosonics, Inc., October 2005). As a professor at East Carolina University, I have taught

21    university-level courses in Ichthyology, Estuarine Ecology, Marine Ecology, and Environmental

22    Biology. Using passive acoustic survey methods (low-frequency hydrophones and moored buoys

23    with hydrophones), I have been able to uncover patterns of habitat use and sound production that

24    are tied to spawning activities of fishes in the drum and croaker family (Sciaenidae) (Luczkovich

25    et al. 1999. Delimiting spawning areas of weakfish, *Cynoscion regalis* (Family Sciaenidae) in

26    Pamlico Sound, North Carolina using passive hydroacoustic surveys. *Bioacoustics* 10: 143-160).

27    This approach, unlike others traditionally used by fish biologists, allows me to study habitat use

28    and behavior of fishes with minimal impact to the population. In the course of these studies, I

DECLARATION OF JOSEPH J. LUCZKOVICH
Case No. CV 07-4771 EDL                                                                              1

1   discovered that silver perch, *Bairdiella chrysoura,* suppress their mating choruses when

2   bottlenose dolphins, *Tursiops truncatus*, are present and vocalizing.  Bottlenose dolphins are

3   major predators on sound-producing fishes like silver perch.  I then experimentally showed that

4   this "acoustical avoidance" of silver perch was a behavioral response to playbacks of signature

5   whistles of bottlenose dolphin; it appears that silver perch minimize their risk of dolphin detection

6   and predation by this reaction to dolphin sounds (Luczkovich et al. 2000. Sounds of sex and death

7   in the sea: bottlenose dolphin whistles silence mating choruses of silver perch. *Bioacoustics* 11:

8   323-334).

9        4.     In preparing this Declaration, I have reviewed relevant portions of the Navy's

10   Supplemental Environmental Impact Statement ("SEIS") concerning the SURTASS LFA

11   system.  The conclusions I draw and opinions I express in this Declaration are supported by

12   texts and research that other experts in my field would consider reliable.

13        5.     Fish interact with their environment through a number of different sensory

14   systems. Equipped with ears, swim bladders, and lateral line systems, fish are sensitive to

15   underwater sound and use sound to engage in critical behavior patterns. In particular, fish use

16   sound to locate mates, locate prey, listen for – and therefore avoid – predators, and also as

17   means to defend territories and ward off intruding fishes.   The studies that I conducted in 1998

18   on silver perch (*Bairdiella chrysoura*) in the waters off North Carolina offer an illustration of

19   the importance of sound: like other fish species, male silver perch typically emit sound to attract

20   females. However, when bottlenose dolphins (*Tursiops truncatus*), a predator species, would

21   swim in proximity to the perch, the fish, in an effort to avoid detection by the predator, would

22   cease their calling. Experiments in which silver perch in these waters were exposed to

23   artificially-generated dolphin sounds resulted in similar fish behavior.  This demonstrates one

24   way in which the ability to hear can be critical to survival.

25        6.     In addition to relevant portions of the Navy's SEIS, I have reviewed a study

26   referenced therein, entitled *Effects of surveillance towed array sensor system (SURTASS) low*

27   *frequency active sonar on fish* (Popper, et al., 2005. Journal of the Acoustical Society of

28   America, Vol. 117, No. 4, Part 2, page 2440) ("Popper study") .  The Popper study examined

DECLARATION OF JOSEPH J. LUCZKOVICH
Case No. CV 07-4771 EDL                                                                    2

1   the effects of high-intensity, low-frequency sonar on two-fish species, rainbow trout

2   (*Onchorhyncus mykiss*) and channel catfish (*Ictalurus puncatus*). It is my understanding that

3   this experiment, sponsored by the Navy, was undertaken for the purpose of evaluating whether

4   the Navy's SURTASS LFA sound source "would impair the survival of fish and, more

5   importantly, whether survival would be impaired in a typical environment when a ship using

6   SURTASS LFA sonar was in the vicinity of a fish." (SEIS at ES-11).  In the experiment, the

7   fish, placed in a 1-m$^3$ test tank, were exposed to a sound level of 193 dB (re 1 micro Pascal).

8   The effects of the sound exposure on both fish physiology and behavior was observed.  It is my

9   further understanding that the Navy has interpreted the results of the Popper study as evidence

10   that SURTASS LFA is likely to result in no permanent damage to fish (SEIS at 4-16).

11   Notwithstanding the Navy's reading of the Popper study, I remain concerned about the impact

12   of SURTASS LFA exercises on fish, principally the impact that it could have on fish behavioral

13   patterns. Having reviewed both the Popper study and its subsequent interpretation by the Navy

14   (as expressed in the SEIS), I believe that it is indeed possible, and perhaps likely, that the

15   Navy's operation of low-frequency sonar will have a negative impact on populations of fish

16   species in waters where the Navy has received authorization for SURTASS LFA deployment.

17        7.    As an initial matter, the nature of the fish specimens selected for testing in the

18   Popper study is cause for concern.  Notwithstanding the thousands of fish species populating the

19   world's oceans – and therefore potentially impacted by the Navy's deployment of low-

20   frequency sonar – the Popper study undertakes to evaluate the impact of SURTASS LFA on a

21   mere two species. And even then, the species chosen – the rainbow trout and channel catfish –

22   are both freshwater fish (both the rainbow trout and the channel catfish are typically found in

23   streams and lakes).  While it of course cannot be expected that experimentation be conducted on

24   all of the species potentially impacted by low-frequency sonar, it must be noted that the Navy

25   has not undertaken to test the impact of its low-frequency sonar on even one marine pelagic

26   species, and that its assertion that SURTASS LFA will not result in significant harm to fish is

27   largely based on experiments conducted on species that will never be naturally exposed to

28   SURTASS LFA transmission on the open sea.

1   8.      As the Navy describes the Popper study in its SEIS, this exposure of the subject

2   fish resulted in distinct behavior patterns in both species tested: the rainbow trout tended to

3   move toward the bottom of the test tank while the catfish showed an immediate "startle"

4   response. (SEIS at 4-14, 4-15, 4-19).  In my opinion, the response of both species demonstrates

5   not only that fish hear the sound, but that they will undertake efforts to avoid the sound source.

6   This effort is likely involuntary; the "startle" response exhibited by the catfish is likely the

7   outward manifestation of the reaction of a specific set of neurons (Mauthner cells), which

8   causes the muscles to contract on the side of the fish opposite to the noise source, and ultimately

9   results in a twist of the fish's body that approximates the letter "C." Then the fish rapidly flexes

10  muscles on the opposite side, resulting in a rapid escape response away from the sound source.

11  In short, these results strongly suggest that if confronted by SURTASS LFA transmissions, fish

12  will react in much the same way they do when faced with a threat in the real world – they will

13  do what they can to get away from it.

14  9.      The Navy appears to discount this behavior, noting that the trout quickly

15  returned to its pre-stimulus behavior and the catfish "oriented themselves toward the sound

16  source and stayed in that position for the duration of the signal." (SEIS at 4-19). These

17  observations form the apparent basis for the Navy's belief that the sounds used in the Popper

18  study "did not have a marked effect on behavior of the fish studied." (SEIS at 4-19).[1] In my

19  opinion, however, the Popper study does not support this assertion, and, by extension, fails to

20  support the assertion that SURTASS LFA transmissions will not impact fish behavior. Critical

21  to my opinion is the basic fact that the rainbow trout and catfish tested in the Popper study were

22  confined to a 1-$m^3$ test tank. Given these conditions, it is not surprising that these fish would

23  _____

[1] The behavior of the catfish as mentioned in Popper et al. (2005) and in the SURTASS
24  SEIS – namely, the way in which the fish oriented themselves toward the sound source – could
    perhaps signify an effort to minimize physical damage resulting from the sound. Like all hearing
25  specialist fishes, catfish have a swim bladder, an oblong, gas-filled internal organ located behind
    the fish's head and extending down the middle body of the fish. Although I have not viewed the
26  video recordings of the Popper Study, and therefore am not certain what position the catfish took
    when they "…lined up facing the signal source," (SEIS at 4-15), it is possible that these fish took
27  that position in an effort to minimize the cross-sectional area of the swim bladder exposed to
    sound and thus prevent damage to the inner ear. In my opinion, this possibility warrants further
28  inquiry.

DECLARATION OF JOSEPH J. LUCZKOVICH
Case No. CV 07-4771 EDL                                                                      4

1    appear to have been unaffected by the sound; confined to the test tank, the fish had no other

2    place to go.  Viewed in this light, it can be said that the Navy's assertion that "[f]ish behavior

3    after sound exposure was no different than behavior prior to or after tests," (SEIS at 4-14) is

4    misleading. It is not behavior "prior to" or "after" that is critical here, but rather, behavior

5    *during* the test, a time during which the fish did in fact exhibit avoidance behavior.  In my view,

6    this avoidance behavior suggests that in real-world conditions, where the fish would not be

7    confined to a test tank, they would have exhibited a markedly greater level of avoidance,

8    altering their behavior to distance themselves from the sound. Because, as acknowledged in the

9    SEIS, the subject fish "were restrained in tanks and could not move away from the [sound]

10   source" (SEIS at 4-19) the Popper Study is, at best, inconclusive on the subject of behavioral

11   impact of SURTASS LFA.

12         10.    Compounding this problem with the Navy's application of the Popper study to

13   fish behavior is the nature of the specimens analyzed in the Popper study.  The rainbow trout

14   and channel catfish evaluated by Dr. Popper are not wild fish, but farmed. While a wild fish and

15   farmed fish of the same species will be anatomically equivalent, they differ behaviorally.  Fish

16   in the wild must necessarily be more sensitive to their surroundings – constantly on the alert for

17   predators, and in search of mates and food sources. By contrast, fish that live in the confined,

18   controlled environment of an aquafarm are not faced with the constant threat of predation nor is

19   their source of mates or food ever in constant jeopardy. Farmed fish are also routinely handled

20   by humans, as nets are used to transport them from one location to another. In short, a farmed

21   fish is likely to be less sensitive to potential threats, and will act (or, as the case may be, not act)

22   accordingly. Therefore, in my opinion, the exposure of a low-frequency sound source on farmed

23   fish is not a reliable indicator of how wild, pelagic fish will behaviorally react to low-frequency

24   sound in the wild, on the open sea.  Stated differently, I believe that it is indeed possible that,

25   when exposed to the same level of sound at the same time and under the same conditions, a wild

26   fish (the type that the Navy's SEIS should be concerned with) would react with much greater

27   sensitivity than a farmed fish of the same species. Therefore, if a new study somehow undertook

28   to record the effects of the same sound source on wild fish, I would expect that these fish would

1    exhibit an even greater level of avoidance behavior than the already significant and noticeable

2    levels observed in the Popper study. The use of farmed fish in the Popper study (a decision

3    compelled by the experiment's location in the closed environment of the Navy's Sonar Test

4    Facility in Seneca Lake, Dresden, New York) thus helps to further highlight the critical issue of

5    fish behavior. Perhaps, if this experiment was intended to focus solely on direct, physiological

6    effects on fish, it would not matter if the test fish were wild or farmed, as wild and farmed fish

7    are anatomically equivalent. However, if an experiment is also to be applied – as the Navy

8    applies it here – to shed light on the *behavioral* impacts on SURTASS LFA, then, in my

9    opinion, an experiment that tests only farmed fish is not reliable.

10        11.    Because, as discussed above, the Popper study strongly indicates that fish will

11    engage in avoidance behavior when confronted with low-frequency sonar, I am concerned about

12    the negative impact that fish populations will sustain in those waters where the Navy will test

13    and train with SURTASS LFA. The potential effects of an anthropogenically-induced shift in

14    fish behavior are significant. Fish populations of all species use certain critical habitat for

15    specific reasons crucial to the survival of the population. A specific area of a body of water may

16    provide, for example, an abundant food source, ideal spawning grounds, or good shelter from

17    predators. The very fact that fish will return to a particular location time and again to spawn and

18    feed strongly suggests that the fish need this area, and would not be as successful if they

19    attempted to engage in these critical life-functions in other waters. Just as it is with other forms

20    of marine wildlife, for fish, all places are not "equal" in the ocean.

21        12.    If driven from critical habitat, fish populations will be at risk due to factors such

22    as food scarcity and vulnerability to predators. Assuming the role of a kind of "refugee" fish,

23    members of a displaced population could in turn disrupt nearby populations of different (or the

24    same) species. Avoidance behavior in response to an intrusion also requires the expending of

25    valuable energy – which would otherwise be used to spawn or locate food.  Additionally, the

26    disappearance (either through migration or mortality) of known fish populations can in turn

27    have a negative economic impact, as manifested through a long-term decline in fish catches. In

28    an experimental study by Engas et al. (1996) "Effects of seismic shooting on local abundance

1  and catch rates of cod (*Gadus morhua*) and haddock (*Melanogrammus aeglefinus*)" published in

2  the *Canadian Journal of Fisheries and Aquatic Sciences*, Vol. 53, pages 2238-2249, low-

3  frequency noise generated by a seismic air gun used for oil exploration resulted in declines of

4  50% in average catches in trawls and long-lines and this reduction persisted for up to 5 days

5  after sounds ceased, when the study ended. Significant declines in catches of cod and haddock

6  were noted by Engas et al. to occur up to 18 nautical miles from the seismic shooting areas.

7  Humans would not be the only species to experience difficulty in this regard; whales, dolphins,

8  and other predator species could be expected to experience a corresponding level of difficulty

9  catching fish, which in turn would place stress on their respective populations.

10        13.    To reduce the risk of negatively impacting fish populations through SURTASS

11  LFA operations, the Navy should adopt stronger mitigation measures applicable to fish.

12  Because countless pelagic fish species live in waters well beyond coastal waters, the Navy's 12

13  nautical mile exclusion zone will be insufficient to adequately mitigate the harm that could

14  result from the ensonification of a significant numbers of fish. Among other potential measures,

15  the Navy could perhaps adopt measures applicable to large groupings of fish that meet a

16  previously-determined size threshold. Through methods such as air spotting and use of active

17  sonar (which SURTASS LFA vessels would be operating anyway), large schools meeting the

18  size threshold and located both near the surface and at greater depth could be detected, and

19  temporary shutdown procedures could be implemented. In my opinion, the SEIS offers only an

20  inadequate analysis of these and other mitigation measures. I believe that without substantial

21  mitigation measures in place to avoid large concentrations of fish, LFA exercises pose a

22  significant threat to these populations by, at a minimum, interfering with critical behavioral

23  patterns.

24        I hereby declare under penalty of perjury that the foregoing is true and correct.

25  Executed this 12th day of October, 2007.

26

27

28  Joseph J. Luczkovich, Ph.D.

DECLARATION OF JOSEPH J. LUCZKOVICH
Case No. CV 07 4771 EDL

7