RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division
**UNITED STATES DEPARTMENT OF JUSTICE**

JEAN E. WILLIAMS, Chief
KRISTEN L. GUSTAFSON, Senior Trial Attorney
Wildlife and Marine Resources Section
GUILLERMO A. MONTERO, Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
**UNITED STATES DEPARTMENT OF JUSTICE**
Benjamin Franklin Station - P.O. Box 7369/ P.O. Box 663
Washington, D.C. 20044
(202) 305-0211 (tel.) / (202) 305-0443 (tel.)
(202) 305-0275 (fax)/ (202) 305-0274 (fax)
Kristen.Gustafson@usdoj.gov
Guillermo.Montero@usdoj.gov

**Counsel for Federal Defendants**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., | ) <br> ) Civ. Action No. 07-4771-EDL <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | ) DEFENDANTS' OPPOSITION TO <br> ) PLAINTIFFS' MOTION FOR <br> ) PRELIMINARY INJUNCTION |
| CARLOS GUTIERREZ, SECRETARY OF THE UNITED STATES DEPARTMENT OF COMMERCE, et al. | ) <br> ) <br> ) |
| Defendants. | ) <br> ) Judge: Hon. Elizabeth D. Laporte <br> ) Ctrm: E <br> ) Hearing Date: January 16, 2008 <br> ) Time: 2 p.m. <br> ) |

TABLE OF CONTENTS

PAGE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      Marine Mammal Protection Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    Endangered Species Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        I.      The Navy's Need for Long Range Submarine Detection and SURTASS LFA Sonar    3

        II.     The 2002 Regulatory Process and Related Litigation . . . . . . . . . . . . . . . . . . . . . 4

        III.    The 2007 Regulatory Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        IV.     Mitigation and Monitoring Measures Imposed by the Final Rule and Incorporated into the
                Navy's Record of Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        I.      STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF . . . . . . . . . . . . . . . . 7

        II.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        III.    PLAINTIFF CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS   9

                A.      NMFS Has Complied with the Marine Mammal Protection Act . . . . . . . . . . 9

                        1.      NMFS Has Prescribed "Other Means of Effecting the Least Practicable
                                Adverse Impact," and They are Reasonable . . . . . . . . . . . . . . . . . . . 10

                                a.      NMFS Has Acted Reasonably in the Designation of
                                        OBIAs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                                b.      NMFS's Imposition of a 12nm Coastal Exclusion Zone Is
                                        Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                                c.      NMFS's Monitoring Requirements are Reasonable . . . . . . . 16

                        2.      NMFS Has Ensured that Impacts of LFA Sonar Will Be
                                Negligible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                        3.      Lethal Take of Marine Mammals is Not A Reasonably Foreseeable Impact
                                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                        4.      NMFS Provided Full Notice and Opportunity for Public Comment on the
                                Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                B.      The Navy Fully Complied with NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1.    The SEIS Thoroughly Analyzes All Reasonable Alternatives ..... 25
            a.    The Navy adequately considered training in areas of
                  reduced risk ....................................... 26

            b.    The Navy adequately considered extended coastal exclusion zones
                  ................................................. 28

            c.    The Navy adequately considered extending shut-down
                  protocols to fish .................................. 30

      2.    The Navy's Consideration of Mitigation Measures Complies With NEPA
            ....................................................... 31

      3.    The SEIS Adequately Considers All Reasonably Foreseeable Individual
            and Cumulative Impacts ................................. 33

   C.    NMFS Has Complied with the Endangered Species Act ............... 35

      1.    The Incidental Take Statements Specify the Amount or Extent of
            Take .................................................. 35

IV.    PLAINTIFFS CANNOT SHOW IRREPARABLE INJURY ....................... 37

V.    THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST FAVOR THE
      UNITED STATES ................................................ 39

CONCLUSION ....................................................... 40

TABLE OF AUTHORITIES

CASES                                                                                          PAGE

Amoco Produc. Co. v. Village of Gambell, 480 U.S. 531, 544-545 (1987) . . . . . . . . . . . . . . . . . . .  37

Arcamuzi v. Cont'l Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . .  8

Arizona Cattle Growers Ass'n v. FWS, 273 F.3d 1229, 1249-50 (9th Cir. 2001) . . . . . . . . . . .  36 , 37

Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 103 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Bear Lake Watch, Inc. v. FERC, 324 F.3d 1071, 1077 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . .  16

California v. Block, 690 F.2d 753, 761 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Central Arizona Water Conservation Dist. v. EPA, 990 F.2d 1531, 1539 (9th Cir. 1993) . . . . . . . .  16

Chevron U.S.A., Inc. v. Nat. Res. Defense Council, 467 U.S. 837, 843-44 (1984) . . . . . . . . . .  10, 24

City of Sausalito v. O'Neill, 386 F.3d 1186, 1205 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Ctr. for Biological Diversity v. Bureau of Land Mgmt., 422 F. Supp.2d 1115,
  1160-61 (N.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

Dep't of Navy v. Egan, 484 U.S. 518, 529 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

Dep't of Transp. v. Public Citizen, 541 U.S. 752, 764-765 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . .  32

FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 145 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Friends of Endangered Species v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985) . . . . . . . . . . . . . . . .  27

Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1400 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . .  7, 39

Gilligan v. Morgan, 413 U.S. 1, 10 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

Goldie's Bookstore, Inc. v. Superior Court of California, 739 F.2d 466, 472 (9th Cir. 1984) . . . . .  37

Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 442-442 (1974) . . . . . . . . . . . . . . . . . . . . .  7

Greenpeace Action v. Franklin, 14 F.3d 1324, 1334 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . .  14

Havasupai Tribe v. Robertson, 943 F.2d 32 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32, 33

Inland Empire Public Lands Council v. U.S. Forest Service, 88 F.3d 754, 764 (9th Cir. 1996) . . . .  28

Inland Empire Public Lands v. Schultz, 992 F.2d 977, 981 (9th Cir. 1993) . . . . . . . . . . . . . . . .  19, 20

Kokechik Fisherman's Ass'n v. Sec'y of Commerce, 839 F.2d 795 (D.C. Cir. 1988) . . . . . . . . . . .  23

Laguna Greenbelt, Inc. v. U.S. Dept. of Transp., 42 F.3d 517, 524 (9th Cir. 1994) . . . . . . . . . .  25, 31

Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 371 (1989) . . . . . . . . . . . . . . . . . . . . . . . .  2, 8, 27

Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . .  8

<u>Nat. Res. Defense Council v. U.S. Forest Service</u>, 421 F.3d 797 (9th Cir. 2005) . . . . . . . . . . . . . . .  26

<u>Nat. Res. Defense Council v. Winter</u>, 2007 WL 2481465 at *2 (9th Cir. 2007) . . . . . . . . . . . . . .  8, 39

<u>National Cable and Telecommunications Ass'n v. Brand X Internet Services</u>, 125 S. Ct. 2688, 2700-2701 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

<u>National Parks Conservation Ass'n v. U.S. Dep't of Transp.</u>, 222 F.3d 677, 681 n.4
  (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

<u>National Wildlife Federation v. Burlington Northern Railroad, Inc.</u>, 23 F.3d 1508, 1512 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 39

<u>NLRB v. Food Store Employees Union</u>, 417 U.S. 1, 9 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

<u>Norton v. Southern Utah Wilderness Society</u>, 542 U.S. 55, 64 (2004) . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Oregon Natural Res. Council v. Allen</u>, 476 F.3d 1031, 1036-37 (9th Cir. 2007) . . . . . . . . . . .  36, 37

<u>Pyramid Lake Paiute Tribe v. United States Dep't of the Navy</u>, 898 F.2d 1410, 1414
  (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 22 , 24

<u>Save the Yaak Committee v. Block</u>, 840 F.2d 714, 722 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . .  37

<u>Seattle Audubon Society v. Moseley</u>, 80 F.3d 1401, 1404 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . .  25

<u>Sierra Club v. Marsh</u>, 872 F.2d 497, 500 (1st Cir. 1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

<u>Stryker's Bay Neighborhood Council v. Karlen</u>, 444 U.S. 223, 227 (1980) . . . . . . . . . . . . . .  2, 31, 32

<u>Vermont Yankee Nuclear Power Corp. v. NRDC</u>, 435 U.S. 519, 553-554 (1978) . . . . . . . . . . . . . .  13

<u>Water Keeper Alliance v. Dep't of Defense</u>, 271 F.3d 21, 35 (1st Cir. 2001)  . . . . . . . . . . . . . . . .  40

<u>Westlands Water Dist. v. Nat. Res. Def. Council</u>, 43 F.3d 457, 459 (9th Cir. 1994)  . . . . . . . . . . . .  8

<u>Westlands Water District v. U.S. Dep't of the Interior</u>, 376 F.3d 853, 868 (9th Cir. 2004)  . . . . . . .  29

<u>STATUTES</u>

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

16 U.S.C. § 1362(18)(B)-(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

16 U.S.C. § 1371(a)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5, 8

16 U.S.C. § 1371(a)(5)(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

16 U.S.C. § 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

16 U.S.C. § 1536(b)(4)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 37

16 U.S.C. §1536(o) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

42 U.S.C. § 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 4332(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 25

FEDERAL REGULATIONS

40 C.F.R. § 1502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

40 C.F.R. § 1502.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

40 C.F.R. § 1502.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

40 C.F.R. § 1502.14(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

40 C.F.R. § 1502.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

40 C.F.R. § 1502.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

50 C.F.R. § 216.103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

50 C.F.R. § 216.104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

50 C.F.R. § 216.106(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

50 C.F.R. § 216.184 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

50 C.F.R. § 216.184(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

50 C.F.R. § 216.184(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

50 C.F.R § 216.184(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12 , 13

50 C.F.R. § 216.184(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13 , 14

50 C.F.R. § 216.185 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

50 C.F.R. § 216.191 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

50 C.F.R. § 402.13(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 C.F.R. § 402.14(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 C.F.R. § 402.14(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 C.F.R § 402.14(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 C.F.R § 402.14(l)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

# TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| CEZ | Coastal Exclusion Zone |
| dB | Decibel |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| HF/M3 | High Frequency Marine Mammal Monitoring Sonar |
| ITS | Incidental Take Statement |
| LFA | Low Frequency Active |
| LOA | Letter of Authorization |
| MFA | Mid Frequency Active |
| MMPA | Marine Mammal Protection Act |
| NDAA | National Defense Authorization Act |
| NDE | National Defense Exemption |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| OBIA | Offshore Biologically Important Area |
| RL | Received Level |
| ROD | Record of Decision |
| SEIS | Supplemental Environmental Impact Statement |
| SURTASS | Surveillance Towed Array Sensor System |

**INTRODUCTION**

Plaintiffs have recycled old arguments from their first lawsuit, <u>Natural Resources Defense Council, Inc. et al., v. Donald Evans</u>, No. C-02-3805-EDL (N.D. Cal.) (<u>NRDC I</u>), and repackaged them as new claims. Plaintiffs' approach, however, ignores the new environmental documents before the Court now and the critical changes that have taken place in the law and in the state of the science over the five-year period between <u>NRDC I</u> and the current challenge. In short, the legal and factual landscapes have changed, even if Plaintiffs' distaste for LFA sonar has not. Review of the present action and record demonstrates that the agencies have fully complied with all of the relevant statutes and thus, Plaintiffs are not likely to prevail on the merits of any of their claims. Plaintiffs also fail to meet their heavy burden of demonstrating irreparable harm. In contrast, Defendants provide compelling evidence of harm to the public interest if the Court were to enjoin the operation of SURTASS LFA for testing, training, and military operations in littoral areas. The Court should, therefore, deny Plaintiffs' Motion.

**LEGAL BACKGROUND**

**I.      Marine Mammal Protection Act**

Congress amended the Marine Mammal Protection Act (MMPA) in 2003 as it applies to "military readiness activities" in several respects. National Defense Authorization Act for Fiscal Year 2004, Pub. L. 108-136, 117 Stat. 1392 (Nov. 24, 2003) (NDAA). First, Congress amended the sections governing the issuance of incidental take authorizations to eliminate the requirements that the permitted activity take place "within a specified geographical region," and that it involve the taking of only "small numbers" of marine mammals. 16 U.S.C. §§ 1371(a)(5)(F). Congress also specified that NMFS must take into account "consideration of personnel safety, practicality of implementation, and impact on the effectiveness of the military readiness activity" in determining which mitigation measures to prescribe for the "least practicable adverse impact" on affected species and stocks. 16 U.S.C. §§ 1371(a)(5)(A)(ii). Finally, Congress amended the definitions of Level A and Level B harassment. For military readiness activities, harassment now means:

> (i) any act that injures or has the <u>significant</u> potential to injure a marine mammal or marine mammal stock in the wild or;  [Level A]
> (ii) any act that disturbs or is likely to disturb a marine mammal or marine mammal stock in the wild by causing disruption of natural behavioral patterns, including, but not limited to, migration, surfacing, nursing, breeding, feeding, or sheltering, <u>to a point where such behavioral patterns are abandoned or significantly altered</u>.  [Level B]

16 U.S.C. § 1362(18)(B)-(D) (emphasis added).

The use of SURTASS LFA sonar during training, testing, and military operations meets the definition of a "military readiness activity," as is made clear by the legislative history to the NDAA amendments passed in response to the NRDC I lawsuit. See Ex. 74. According to the Conference Report, the NDAA amendments cured deficiencies which were highlighted by NRDC I and other lawsuits, in the take authorization process as it applied to military readiness activities. Id. at *1447. In particular, Congress recognized that military readiness activities must frequently encompass large areas of the ocean and that artificially limiting Navy exercises to a "specified geographical region" provided grist for litigation, but little "demonstrable protection to marine mammals." Id.

## II.     National Environmental Policy Act

The purpose of NEPA, 42 U.S.C. §§ 4321, et seq., is to focus the attention of the federal government and the public on a proposed major federal action so that its consequences can be studied before the action is implemented. Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 371 (1989). NEPA requires that, for all "major Federal actions significantly affecting the quality of the human environment," an agency must prepare a comprehensive environmental impact statement (EIS). 42 U.S.C. § 4332(C). NEPA also requires that an agency prepare a supplemental EIS (SEIS) when there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. 1502.9(c)(1)(ii). The regulations implementing NEPA provide guidance as to the nature and content of an EIS or SEIS. See 40 C.F.R. Part 1502, § 1502.9(c)(4). The regulations clarify that agencies must discuss impacts only in proportion to their significance, and must provide "only enough discussion to show why more study is not warranted." 40 C.F.R. § 1502.2.

In reviewing the sufficiency of an EIS a court is charged only with ensuring that the agency has presented a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." California v. Block, 690 F.2d 753, 761 (9th Cir. 1982). Thus, "'[t]he reviewing court may not 'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies.'" Id. at 1184 (internal citations omitted). In addition, a reviewing court may not force an agency to elevate environmental concerns over other appropriate considerations. Stryker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227 (1980). "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action." Methow

1    Valley, 490 U.S. at 350.

2    **III.    Endangered Species Act**

3        Section 7(a)(2) of the Endangered Species Act (ESA) requires each Federal agency, in

4    consultation with the Secretary of Commerce, to ensure that "any action authorized, funded, or carried

5    out by [that] agency" is not "likely to jeopardize the continued existence of any endangered species or

6    threatened species or result in the destruction or adverse modification" of critical habitat.  16 U.S.C. §

7    1536(a)(2).  If the agency determines that its proposed action is "likely to adversely affect" listed species

8    or designated critical habitat, it must engage in formal consultation with NMFS.  50 C.F.R. §§ 402.13(a),

9    402.14(a)–(b).  Formal consultation typically begins with a written request by the action agency, 50 C.F.R.

10   § 402.14(c), and concludes with the issuance of a biological opinion (BiOp) by the consulting agency.

11   50 C.F.R. § 402.14(l)(1).  The BiOp assesses the likelihood of jeopardy to the species and whether the

12   proposed action will result in destruction or adverse modification of critical habitat.  See 50 C.F.R. §§

13   402.14(g), (h).  If the proposed action is not likely to jeopardize the species, but will result in incidental

14   "take" of members of the listed species, the consulting agency provides an "incidental take statement"

15   (ITS) with the BiOp. 16 U.S.C. § 1536(b)(4); 50 C.F.R § 402.14(i).   The ITS must specify the impact of

16   the incidental taking to the species and those "reasonable and prudent measures" that the consulting

17   agency considers "necessary or appropriate" to minimize the impact of the incidental take and the terms

18   and conditions for implementing them.  16 U.S.C. § 1536(b)(4)(i)-(iv); 50 C.F.R § 402.14(I).  Take in

19   compliance with the ITS is exempt from ESA liability.  16 U.S.C. §1536(o).

**FACTUAL AND PROCEDURAL BACKGROUND**

20   **I.    The Navy's Need for Long Range Submarine Detection and SURTASS LFA Sonar**

21       The Navy developed the Surveillance Towed Array Sensor System Low Frequency Active

22   (SURTASS LFA) sonar system to improve its ability to detect quiet foreign submarines. SEIS at 1-6. The

23   detection effectiveness of current submarine tracking technology in littoral areas, where future naval

24   conflicts are most likely to occur, is significantly degraded by frequently high underwater background

25   noise and difficult underwater acoustic propagation conditions.  SEIS at 1-8.  The world's navies are

26   planning for the use of quiet submarines to patrol littorals and to blockade strategic choke points and other

27   constricted waters, where U.S. aircraft carriers, amphibious task forces, and their supporting ships and

28   crew must operate.  SEIS at 1-2, 1-6.  As a result, the Navy's detection range has become so short that

1
2
3
4
5
6

U.S. forces may have only minutes to respond before hostile submarines can get close enough to U.S. assets to use their weapons against a high value asset such as an aircraft carrier or an amphibious assault ship.  SEIS at 1-4.  To regain the reaction time needed to respond to the increased submarine threat and meet its long-range detection needs, the Navy investigated the use of a broad spectrum of acoustic and non-acoustic technologies. Low frequency sonar was the only system capable of providing reliable long range detection.  See EIS at 1-8 to 1-11, 2-23.

7

**II.     The 2002 Regulatory Process and Related Litigation**

8
9
10
11

As the Court is aware, the agencies undertook significant analysis of LFA sonar under the ESA, MMPA, and NEPA resulting in a Final NEPA EIS and accompanying Record of Decision (ROD), an MMPA Final Rule (2002 Rule), an MMPA Letter of Authorization (LOA), and an accompanying ESA programmatic BiOP and supplemental LOA BiOp, in the years leading up to Plaintiffs' first lawsuit.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs challenged each of these actions in 2002, and on August 26, 2003, the Court issued an Opinion and Order granting the parties' cross-motions for summary judgment in part.  NRDC I, 279 F. Supp.2d 1129 (N.D. Cal. 2003).  Of relevance here, the Court held that the Navy violated NEPA because the EIS did not disclose and analyze studies concerning harm to fish.  The Court also held that the EIS should have considered alternatives that would have extended shutdown procedures to fish and concentrated training in areas that present a reduced risk to marine life.  Id. at 1164-71.  The Court held that NMFS erred under the MMPA by failing to (1) extend the coastal exclusion zone for all areas where close- to-shore training is unnecessary; (2) use aerial surveys or observational vessels for all close-to-shore operations; and (3) designate additional off-limit areas or seasons and Offshore Biologically Important Areas (OBIA).  Id. at 1159-64.  Finally, the Court held that NMFS ran afoul of the ESA by not issuing an ITS with its programmatic BiOp, and by failing to provide a numerical estimate of the amount or extent of incidental take (or an appropriate surrogate) in the ITS for the supplemental BiOp.  Id. at 1181-88.  The Court, however, held that a complete injunction banning use of the SURTASS LFA sonar system was not warranted, and instead issued a tailored injunction based upon a stipulation devised by the parties during court-ordered mediation.  Id. at 1191-92.  That injunction, which expired on August 15, 2007, enlarged coastal exclusion zones beyond what was required by the 2002 Final Rule.  The injunction also specified that the Navy need not conduct pre-operational small boat or aerial surveys.

1

**III.     The 2007 Regulatory Process**

2

In April 2003, the Deputy Assistant Secretary of the Navy for the Environment directed the Navy

3

to prepare an SEIS to address concerns that this Court identified in NRDC I.  The SEIS also addressed

4

legislative changes to the MMPA and information necessary to apply for a new five-year rule under the

5

MMPA as well.  See SEIS at 1-16; ROD at 3.  In November 2005, the Navy published a Notice of

6

Availability of the Navy's Draft SEIS in the Federal Register (70 Fed. Reg. 68,443).  During the 92-day

7

public comment period that followed, public hearings were conducted in Washington, D.C., San Diego,

8

California, and Honolulu, Hawaii.  The Final SEIS was published in April 2007, and the ROD was signed

9

on August 15, 2007 (72 Fed. Reg. 48269).  See ROD at 54, 77.  The SEIS incorporates the contents of the

10

EIS by reference (except as noted or modified), and provides additional information regarding the

11

environment that could potentially be affected by employment of LFA sonar.  The SEIS also includes

12

updated literature reviews and determinations of data gaps, especially for fish, sea turtles, and marine

13

mammals; an impacts analysis based on fish controlled exposure experiments; an updated low frequency

14

sound impact analysis; and new alternatives and cumulative impacts analyses.  SEIS at P-3, P-4, 1-16.

15

In May 2006, the Navy applied to NMFS for a 5-year authorization under the MMPA, 16 U.S.C.

16

§ 1371(a)(5)(A), for the take of marine mammals by Level A and Level B harassment incidental to testing,

17

training and military operations involving the use of SURTASS LFA sonar. Ex. 14.1.[1/]  In September

18

2006, NMFS published a Notice of Receipt of Application and invited public comments on the application

19

over a 30-day period.  71 Fed. Reg. 56,965 (Sept. 28, 2006).  NMFS published a Proposed Rule on July

20

9, 2007, and additional comments on the rule were received over the following 15 days.  72 Fed. Reg.

21

37,404 (July 9, 2007).  The Final Rule, which sets forth the permissible methods of take and other means

22

of effecting the least practicable adverse impact on marine mammals, became effective on August 16,

23

2007.  72 Fed. Reg. 46,846 (August 15, 2007).  In the Final Rule NMFS determined that employment of

24

SURTASS LFA as described in the ROD will have negligible impacts on the affected marine mammal

25

species and stocks.  Id. at 46,889-90.  NMFS issued LOAs for the SURTASS LFA sonar systems aboard

26

the R/V Cory Chouest and the USNS IMPECCABLE (TAGOS-23) on August 15, 2007.  Exs. 2, 3.

27

(LOAs).  Both LOAs are effective from August 16, 2007 until August 15, 2008.

28

---

[1/]     Citations to exhibits to the Declaration of Guillermo A. Montero are referenced as "Ex. ___."
Citations to exhibits to the Declaration of Sarah Schindler are referenced as "Plaintiffs' Ex. ___."

The Navy also consulted with NMFS under ESA Section 7 concerning the possible incidental take of listed species as a result of using LFA sonar. NMFS consulted with itself on the rulemaking and issuance of two LOAs. In a BiOp dated August 14, 2007, NMFS found that the Navy's use of SURTASS LFA sonar in accordance with NMFS's regulations and LOAs may adversely affect, but is not likely to jeopardize, the continued existence of any endangered or threatened species. Exs. 5-6. The BiOp also concluded that the use of LFA sonar "may affect, but is not likely to adversely affect" any designated critical habitat. NMFS made the same findings in a supplemental BiOp for the LOAs for the R/V Cory Chouest and USNS IMPECCABLE (T-AGOS 23). Ex. 7. Both the BiOps contain ITSs which specify the "amount or extent" of the anticipated take. Ex. 6 at 2-3; Ex. 7 at 67-68.

**IV.    Mitigation and Monitoring Measures Imposed by the Final Rule and Incorporated into the Navy's Record of Decision**

As part of the MMPA and NEPA processes, the Navy and NMFS focused on identifying appropriate mitigation and monitoring measures to minimize potential impact to marine mammals, while ensuring that LFA sonar missions would remain effective. Among other things, to avoid the potential for injury to marine mammals, the Navy proposed a detection zone (called the "LFA mitigation zone") surrounding the vessel and extending approximately 1 km, to encompass the area ensonified up to and including 180 dB, the point above which potentially serious problems in the hearing of marine mammals could start to occur. SEIS at 1-28. If a marine mammal were detected within the 180 dB LFA mitigation zone, Navy protocol required immediate suspension of sonar transmission, and permitted the resumption of transmissions only fifteen minutes after the animal had left the 180 dB sound field. NMFS, however, did not accept this proposal in its entirety and instead required augmentation of the 180 dB safety zone with an additional 1 km buffer zone (for a total of 2 km) to ensure to the greatest extent practicable that marine mammals are not subjected to potential injury. 72 Fed. Reg. at 46887. At 2 km from the vessel, possible received levels of sonar diminish dramatically on a logarithmic scale to 174 dB, well below the lowest levels for physical trauma. Id. NMFS also required the Navy to use three overlapping methods of monitoring the area surrounding the SURTASS LFA sonar array: visual monitoring for marine mammals and sea turtles from the SURTASS LFA vessel during daylight hours, use of the passive acoustic SURTASS array to listen for sounds generated by marine mammals as an indicator of their presence, and use of high frequency active acoustic (High Frequency Marine Mammal Monitoring

[HF/M3] sonar) to detect, locate, and track marine mammals that might be affected by low frequency transmissions near the vessel and the sound field produced by the sonar source array. Id. at 46887-88.

In addition, NMFS placed further protective geographical boundaries on the use of the SURTASS LFA system. Sonar operations must be conducted to ensure that the sound field produced does not exceed 180 dB at a distance of 12 nm from any coastline or within 1km seaward of any designated OBIA for marine mammals during the biologically important season for that particular area. In addition, geographic restrictions have been imposed to ensure that the sound field does not exceed 145 dB in the vicinity of known recreational and commercial dive sites. Id. at 46,887. The Final Rule also requires that data be collected during routine operations of LFA sonar, including data from visual and acoustic monitoring, ocean environmental measurements, and technical operational inputs; and the submission of quarterly classified reports (which include all active-mode missions) and an annual report no later than 45 days after the expiration date of the LOA. Id. at 46,892. This unclassified summary of the quarterly reports includes the Navy's assessment of whether takes of marine mammals have occurred within the mitigation and buffer zones and estimates of the percentage of marine mammal stocks effected by sonar operations. NMFS has also required the Navy to submit a Final Comprehensive Report. Id. at 46889.

ARGUMENT

## I.    STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

A preliminary injunction is an extraordinary remedy the entitlement to which the plaintiff bears the burden of proving by clear and convincing evidence. See Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 442-442 (1974). "An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'" Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). There are two interrelated tests: "In order to obtain a preliminary injunction, a party must demonstrate either (1) a likelihood of success on the merits and a possibility of irreparable injury, or (2) the existence of serious questions on the merits and a balance of hardships tipping in its favor." Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1400 (9th Cir. 1992) (citation omitted). "These two tests are not separate but represent a sliding scale in which the required probability of success on the merits decreases as the degree of harm increases." Westlands Water Dist. v. Nat. Res. Def. Council, 43 F.3d 457, 459 (9th Cir. 1994). Additionally, if the public interest is

1   involved, a court must determine whether the balance of public interests supports the issuance or denial
2   of an injunction.  Nat. Res. Defense Council v. Winter, __ F.3d __, 2007 WL 2481465 at *2 (9th Cir.
3   2007).  The relative hardship to the parties is the critical element in deciding at which point along the
4   continuum a stay is justified.  Benda v. Grand Lodge of Int'l Ass'n of Machinists, etc., 584 F.2d 308, 314-
5   315 (9th Cir. 1978).  Under any formulation of the test, the plaintiff must demonstrate a significant threat
6   of irreparable injury.  Arcamuzi v. Cont'l Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987).

7   **II.      STANDARD OF REVIEW**
8          Judicial review of administrative actions, including those involving the ESA, MMPA, and NEPA,
9   is governed by section 706 of the APA, 5 U.S.C. § 706.  City of Sausalito v. O'Neill, 386 F.3d 1186, 1205
10  (9th Cir. 2004).  Under the APA, a reviewing court must satisfy itself that the agency decisions are not
11  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Id. at 1206.  Thus,
12  "the reviewing court must uphold the administrative action if the agency 'considered the relevant factors
13  and articulated a rational connection between the facts found and the choice made.'"  Id.
14         Review under the arbitrary and capricious standard is to be "searching and careful" but "narrow,"
15  and a court is not to substitute its judgment for that of the agency.  Marsh v. Oregon Nat. Res. Council, 490
16  U.S. 360, 378 (1989); see also Sierra Club v. Marsh, 976 F.2d at 769 ("This standard of review is highly
17  deferential; the court must presume the agency action to be valid.").  Deference is especially appropriate
18  when courts review the agency's technical analysis and judgments involving the evaluation of complex
19  scientific data within the agency's technical expertise.  Marsh, 490 U.S. at 377; Mt. Graham Red Squirrel
20  v. Espy, 986 F.2d 1568, 1571 (9th Cir. 1993).

21  **III.     PLAINTIFF CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS**
22         **A.      NMFS Has Complied with the Marine Mammal Protection Act**
23         In relevant part, the MMPA directs the Secretary of Commerce to allow, upon request, the taking
24  of marine mammals incidental to a military readiness activity, for a period of up to five years, if the
25  Secretary finds that the total taking will have a negligible impact on the affected species or stocks.  16
26  U.S.C. § 1371(a)(5)(A), (F).  NMFS's regulations define a "negligible impact" as "an impact resulting
27  from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely
28  affect the species or stock through effects on annual rates of recruitment or survival."  50 C.F.R. §

216.103.  The Secretary must also issue regulations for permissible methods of take and other means of a effecting the "least practicable adverse impact" on the species or stock – taking into account personnel safety, practicability, and impact on effectiveness of the military readiness activity – and requirements pertaining to the monitoring and reporting of take.  16 U.S.C. § 1371(a)(5)(A)(i)(II), (a)(5)(A)(ii).

NMFS has certainly met these requirements.  NMFS reasonably concluded, on the strength of the best science available, that takes incidental to the use of SURTASS LFA sonar for training, testing, and military operations will have no more than a negligible impact on marine mammal species and stocks. NMFS prescribed mitigation measures that honor Congress's intent by effecting the least practicable adverse impact to marine mammals, without unduly burdening the effectiveness of LFA sonar missions. NMFS also prescribed reasonable monitoring and reporting requirements.  Thus, Plaintiffs are unlikely to succeed on the merits of their MMPA claims and are not entitled to preliminary injunctive relief.

Before addressing Plaintiffs' arguments in detail, one global point warrants a response. While Plaintiffs would like this Court to treat its prior findings in <u>NRDC I</u> as binding precedent that foreclosed NMFS's ability to make independent regulatory decisions on a new record, this argument finds no support in the law.  <u>See</u> <u>NLRB v. Food Store Employees Union</u>, 417 U.S. 1, 9 (1974) (recognizing that an agency may reach the same result upon remand so long as it applies the correct legal standards).  The Court found NMFS's decisions on mitigation and monitoring in <u>NRDC I</u> arbitrary because they were not adequately supported by the administrative record in <u>that</u> case.  The fact that the administrative record for the earlier rulemaking failed to explain why certain mitigation measures were rejected does not alter the standard of review for this case.  If the administrative record for the new rulemaking shows that NMFS considered the relevant factors and articulated a rational connection between the facts found and the choice made – which it does – the new rulemaking must be upheld.  <u>Pyramid Lake Paiute Tribe v. United States Dep't of the Navy</u>, 898 F.2d 1410, 1414 (9th Cir. 1990).  Moreover, even if the Court's prior ruling on the adequacy of mitigation was not attributable solely to gaps in the administrative record, but also to the Court's interpretation of the statute, the law is clear that the decision in <u>NRDC I</u> could not preclude NMFS from interpreting the term "least practicable adverse impact," as amended, in the context of the new rulemaking.  <u>See</u> <u>National Cable and Telecommunications Ass'n v. Brand X Internet Services</u>, 125 S. Ct. 2688, 2700-2701 (2005) (reaffirming Chevron standard of deference and holding that not even the stare

decisis effect of Ninth Circuit precedent could foreclose an agency from interpreting an ambiguous statute).  That interpretation is entitled to deference as long as it is reasonable.  Chevron U.S.A., Inc. v. Nat. Res. Defense Council, 467 U.S. 837, 843-44 (1984).

    **1.**    **NMFS Has Prescribed "Other Means of Effecting the Least Practicable Adverse Impact," and They are Reasonable.**

Plaintiffs' "specified geographical region" claims from NRDC I reappear in this lawsuit in the guise of "mitigation measures" claims.  Plaintiffs complained in NRDC I that by imposing no limit on the number of provinces that could be authorized in an LOA, the Final Rule permitted "world-wide" LFA sonar deployment, which conflicted with the MMPA's requirement that incidental take authorizations be limited to a "specified geographical region."  NRDC II, at 1145-1146.  Now, Plaintiffs argue that NMFS's Final Rule fails to impose appropriate "geographic restrictions" on "the Navy's vast deployment area, an area that encompasses most of the world's species and populations of marine mammals."  Pl Br. at 10 and 2 (criticizing the Final Rule for authorizing "near-worldwide" and "near-global" deployment).  This claim fails for several reasons.   First, even though the MMPA, as amended, would not preclude it, the Final Rule does not authorize world-wide deployment, as Plaintiffs contend.  See Response to Comment (RTC) 1, 72 Fed. Reg. at 46,849.  Where the Navy operates is dictated by the projected national security needs for that year, and the Navy seeks take authorization based on those needs.  The Final Rule governs but does not authorize "take."  See 72 Fed. Reg. at 46846; 50 C.F.R. § 216.104.  Rather, take is authorized through LOAs issued by NMFS, which the Navy must apply for on an annual basis.  Id. Second, the underlying theme of Plaintiffs' "geographic restrictions" and "coastal exclusion zone" arguments – which urge the exclusion of sonar from hundreds of areas around the world – is that use of LFA sonar should be severely restricted to limited unproductive portions of the ocean.  In addition to being impracticable for military readiness and scientifically unsound, as explained below, such a restriction – taken to its extreme – would amount to limiting LFA sonar activities to a "specified geographical region," and is unacceptable for the same reasons that Congress identified when it amended the MMPA to eliminate that requirement for military readiness activities.  See Ex. 74.

        **a.**    **NMFS Has Acted Reasonably in the Designation of OBIAs.**

Contrary to what Plaintiffs might think, neither the MMPA nor its implementing regulations require the designation of OBIAs as a part of the rulemaking process at issue here.  Rather, the MMPA

simply requires that the Secretary prescribe methods and means of effecting the "least practicable adverse impact" on species or stock and their habitat. 16 U.S.C. § 1371(a)(5)(A)(i)(II). So long as this standard is met, this Court cannot find that NMFS acted arbitrarily by deciding not to designate particula areas as OBIAs. See Norton v. Southern Utah Wilderness Society, 542 U.S. 55, 64 (2004) (holding that a claim challenging agency action unlawfully withheld "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take") (emphasis in original); see also id. (rejecting challenge to agency's failure to act because the statute, though "mandatory as to the objective to be achieved," left the agency with a great deal of discretion in deciding how to achieve it).

In this case, NMFS reasonably determined that it would not be "practicable" to designate every productive area of the ocean as an OBIA. The Navy needs flexibility to respond to global threats as they develop and, therefore, cannot project with certainty every threat that the Navy might need to train for over an entire 5-year period. 72 Fed. Reg. at 46,847 ("Because of uncertainties in the world's political climate, a detailed account of future operating locations and conditions cannot be predicted."). Placing huge swaths of ocean off-limits to LFA sonar in the Final Rule, as Plaintiffs propose, could deny the Navy access to parts of the world that unexpectedly become critical for LFA training in the future and, therefore, would not be "practicable" within the meaning of Section 1371(a)(5)(A)(ii). See RTC MIC11, 67 Fed. Reg. at 46749 ("[O]perational restrictions in these broad areas could seriously impact the Navy's ability to carry out its mission if these areas were established as OBIAs.").

OBIA designation, however, is not the only means for minimizing adverse impacts to marine mammals. NMFS requires the Navy to monitor (by visual, passive acoustic, and active acoustic means) a 1 km buffer zone around the 180 dB isopleth (which extends to 1km from the sonar source), and delay or suspend sonar transmissions when a marine mammal or sea turtle enters the 2km radius around the vessel. 50 C.F.R. § 216.184(b). This highly effective three-part monitoring regime is expected to reduce the risk of marine mammal injury or death to virtually zero, since no marine mammals will be exposed to received sound levels above 180 dB, the threshold for injury. By extending the buffer zone out to 2km from the sonar source, where sound levels are approximately 174 dB, NMFS has also minimized (to the extent practicable given the limits of monitoring technology) Level B takes at the upper end of the risk continuum, where the highest percentage of marine mammals exposed to the sonar signal are likely to be

behaviorally harassed.  The Navy is required to conduct this three-part monitoring for 30 minutes prior to the first sonar transmission and for at least 15 minutes after the last transmission.  50 C.F.R. §216.185 (a),(b).  The Final Rule also requires that the Navy use the 12 percent per stock cap to guide its mission planning and annual LOA applications.  This 12 percent cap on the annual take of marine mammal stocks ensures that impacts remain negligible.  72 Fed. Reg. at 46886.  The 12 percent cap is a serious limit on sonar use and a driving force for the Navy's site-specific mission planning.  See SEIS Subchapter 4.4; Frankel Decl. ¶32.  During the annual LOA application process, the Navy considers marine mammal habitats, seasonal activities, and behavioral activities when determining potential mission areas to avoid planning LFA sonar operations in areas of known high marine animal densities.  RTC 88, 72 Fed. Reg. at 46877.  Once the cap is reached for a particular stock, the Navy must forego hours of sonar use or plan the remainder of its missions to avoid that stock.  Frankel Decl. ¶32.  This flexible approach minimizes adverse impacts to the extent practicable while also meeting the Navy's operational requirements.  By contrast, OBIA designation is a blunt tool for a nuanced problem, and thus it is appropriately reserved for those areas that meet NMFS's information requirements.  50 C.F.R. §216.191; RTC 95, 72 Fed. Reg. at 46,879 (describing biological information necessary to make an OBIA determination).[2]

Notwithstanding, Plaintiffs' assertion that NMFS did not consider geographical restrictions is without basis.  NMFS has designated ten large areas as OBIAs, including six areas newly designated in the Final Rule.  50 C.F.R § 216.184(f).  In response to a comment on the Proposed Rule from NRDC, NMFS has newly imposed a 1km buffer zone around these OBIAs to limit transmissions to below 174 dB in the OBIAs, which is below the 180 dB exposure threshold at which injury to marine mammals may occur.  50 C.F.R § 216.184(e)(2); RTC 97, 72 Fed. Reg. at 46,879.  In addition, the record shows that NMFS carefully considered many other areas that did not qualify for designation, including those raised by Plaintiffs in public comments.  See RTCs 91, 92, 93, 94, 95, 96, 97; 72 Fed. Reg. at 46,878 - 46,879.  For example, the Final Rule explains that the Oyashio/Kuroshio area off Kamchatka and the Emperor Seamount Chain, both cited in the Court's NRDC I Opinion, were not designated for two good reasons – because the northern portion of the Oyashio/Kuroshio area is in the Bering Sea, where SURTASS LFA

---

[2]    It is not only impracticable and unnecessary to designate every productive area of the ocean as an OBIA, it is scientifically short-sighted.  There are few, if any, non-productive ocean areas.  RTC 79, 72 Fed. Reg. at 46,875-76; Clark Decl. ¶34.

sonar does not operate at all, and because the southern portion of that area and the Emperor Seamount Chain encompass large expanses of open ocean that contain no well-defined migration corridors for marine mammals. See RTC 92, 72 Fed. Reg. at 46,878; SEIS at 10-25. Unlike known migration paths, where marine mammal density is significantly greater than in surrounding waters, non-coastal migratory paths extend over such broad swaths of ocean that marine mammal density is not much greater than in other parts of the open ocean. SEIS at 10-125; RTC MIC11, 67 Fed. Reg. 46712, 46749 (July 16, 2002) (Exh 18). Thus, NMFS determined that open ocean concentrations of marine mammals are adequately protected by the three-part monitoring and mitigation protocols. Id.

NMFS also considered designating Marine Protected Areas (MPAs), including those located offshore, as OBIAs. See RTCs 93, 94, 96; 72 Fed. Reg. at 46,878-46,879. NMFS has designated the Gully, an offshore Canadian MPA, as an OBIA. See RTC 93, 72 Fed. Reg. at 46,878; 50 C.F.R. §216.184(f). As Plaintiffs acknowledge, most MPAs are located in coastal waters and are already protected by the 12nm coastal exclusion zone. See RTCs 93, 94; 72 Fed. Reg. at 46,878 - 46,879; SEIS at 10-125 (evaluating "high seas" MPAs). MPAs offshore of the Philippines, Taiwan, and Russia were determined to be located in waters too shallow for SURTASS LFA operations and were not designated on that basis. SEIS at 10-126, 127. In its Proposed Rule, NMFS solicited public comments on the marine mammal distributions, densities, and biologically important activities that take place in the Northwestern Hawaiian Islands to assist the agency in determining whether certain areas qualified for designation as an OBIA. NMFS received no public comments in response to this request. 72 Fed. Reg. at 46,887; ROD at 57-58.[3]/ Furthermore, it is not true, as Plaintiffs contend, that NMFS failed to consider marine areas

---

[3]/     Plaintiffs argue, without merit, that by allowing the public to participate in the OBIA process NMFS has improperly delegated its statutory responsibilities. NMFS's Rule engages, but does not depend on the public for designating OBIAs. RTC 84, 72 Fed. Reg. at 46,876. Moreover, Plaintiffs' argument that NMFS has improperly assigned the burden to the public "after deployment" rings hollow given that Plaintiffs had five years prior to this rulemaking in which to petition for the designation of OBIAs, during the pendency of the injunction, and not a single one did. Hollingshead Decl. ¶8. Indeed, during the first five years of operation under the first rule, NMFS received no nominations from the public (including the Plaintiffs) for the designation of additional OBIAs. RTC 84, 72 Fed. Reg. at 46,876. In contrast, after five years of silence, Plaintiffs' comment letter on the Proposed Rule lists well over 100 areas that they argue should be considered for OBIA designation, but it provides almost no substantive information that would assist NMFS in assessing the merits of any one of those areas. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 553-554 (1978) (holding that participants in the administrative process must "structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions."). If Plaintiffs had better data about

identified by other scientific bodies. NMFS specifically considered areas identified by the IWC and compiled by the World Conservation Union in connection with the World Bank and Great Barrier Reef Marine Park Authority. See RTCs 95, 96; 72 Fed. Reg. at 46,879. These and other areas did not qualify because they either were too vaguely described and/or lacked the detailed biological information needed for an OBIA designation, were recognized for non-biological reasons, (e.g., IWC Indian Ocean Whale Sanctuary), or were within areas from which sonar use is already excluded (e.g. Arctic and Antarctic Oceans). Id. For all of these reasons, NMFS was not arbitrary and capricious to adopt a cautious approach to designating OBIAs. In addition to OBIA designation, NMFS has reasonably relied on a suite of other more immediate tools for effecting the least practicable adverse impact to marine mammals.

### b.    NMFS's Imposition of a 12nm Coastal Exclusion Zone Is Reasonable.

Plaintiffs also contest NMFS's decision to impose a 12nm coastal exclusion zone on two grounds: (1) that NMFS "failed to consider the full range of practicable options" and (2) that it "failed to consider multiple relevant factors" pertaining to marine mammal impacts. Pl Br. at 12-13. As the record shows, Plaintiffs are incorrect on both counts. See, RTCs 67, 69; 72 Fed. Reg. at 46,872-46,873; SEIS 4-70 to 4-79. First, contrary to Plaintiffs' claim, the prior case did not establish that "the Navy can effectively test and train with LFA at distances from 43 to 200 nautical miles from the coast." Pl. Br. at 12. Quite the opposite, the Court found that the EIS explained that restricting operations to distances of 43 to 200 nm from the coast would "severely limit the effectiveness of the sonar to detect submarines at long enough ranges to allow proper responses." NRDC I, 279 F. Supp.2d at 1162. What the prior record failed to explain adequately was "why the zone could not be extended more than twelve nautical miles but less than 43 to 200 nautical miles." Id. The SEIS examined this very question. See RTC 67, 72 Fed. Reg. at 46,872-46,873; SEIS at 4-70 to 4-79.

The SEIS considered a 25 nm coastal exclusion zone, using an analytical methodology that assessed impacts for nine possible combinations of coastal shelf type (narrow, medium, and wide shelf) and marine mammal species type (shelf, shelf break, and pelagic species). SEIS at 4-78, 4-79. Contrary a particular area that merited its designation as an OBIA, they failed to bring that information to NMFS's attention during the notice and comment periods on the Draft SEIS (Ex. 17), the Notice of Receipt of [Navy's] Application (Ex. 13), and the Proposed Rule (Ex. 9), or during the five years preceding this rulemaking. See Greenpeace Action v. Franklin, 14 F.3d 1324, 1334 (9th Cir. 1992) (holding that basic fairness dictates that plaintiffs "may not establish a scientific controversy post hoc").

to previous assumptions, the analysis revealed that, in most cases, increasing the coastal exclusion zone to 25 nm was less protective than the 12 nm coastal exclusion zone. Id. In fact, a 25 nm coastal exclusion zone decreased potential impacts to marine species in only one out of nine case studies, and increased potential impacts in six out of nine case studies. Id. While increasing the coastal exclusion zone reduced exposure levels for shelf species, it did so at the expense of increasing exposure levels for shelf break and pelagic species. See RTC 67, 69; 72 Fed. Reg. at 46,872. Contrary to Plaintiffs' criticisms, Pl. Br. at 12, this analysis clearly factored in shelf break and bathymetric considerations, and 25 nm was selected, in part, because it was seaward of the shelf break for all three of the shelf cases analyzed. See RTC 67, 72 Fed. Reg. at 46,872. Increasing the distance to 30 nm, or even 60 nm, would not have made a significant difference in the outcome. Id. The Final Rule shows that NMFS properly weighed the "trade-offs" in mitigation: "Analysis of the geometry, bathymetry, sound propagation, and animal densities in a variety of sample areas revealed that the overall risk to marine mammals is lower when SURTASS LFA is operated at 12nm than when it is operated at 25 nm." RTC 69, 72 Fed. Reg. at 46,873. Given these facts and "[g]iven the Navy's stated need to have flexibility to use the system closer to shore if training, testing, or military operational demands required it . . .," NMFS reasonably determined that a 12 nm coastal zone met its obligation to prescribe mitigation that "effects the least practicable adverse impact.[4]/ Id.

In making this decision, NMFS considered the relevant biological factors, including impacts to coastal species and impacts to listed species. Plaintiffs' claim that the SEIS fails to account for near-coastal species is not true. Pl. Br. at 13, Whitehead Decl. ¶¶13-16, Hoyt Decl. ¶6, Baird ¶18. SEIS Subchapter 3.2. addresses near coastal species, including harbor porpoise, sea otters, harbor seal, Hector's dolphin, and vaquita which inhabit near-shore waters including shallow bays, estuaries, and tidal channels under about 200 m (655 ft) in depth; some species of sea lions which live in coastal waters but venture into offshore deep water to feed; and minke whales which were also modeled for eight of the nine LFA mission sites analyzed in Subchapter 4.4.1 of the SEIS. The scenario that Plaintiffs posit, in which the LFA sonar source is moving inshore as coastal animals try to seek safety in shallower waters, is extremely unlikely, given the manner in which SURTASS LFA sonar is typically operated. Although the LFA vessel will necessarily be moving perpendicular toward the coast part of the time there is no foreseeable

---

[4]/    Plaintiffs' argument for a larger coastal exclusion zone is in tension with their stated concern for beaked whale strandings. Tyack Decl. ¶ 31.

1    LFA operational scenario where this would be occurring for an extended period of time. Johnson Decl.

2    ¶11. Finally, as discussed above, the Final Rule and SEIS carefully assessed the merits of designating a

3    wide array of MPAs as OBIAs and concluded that the 12nm coastal exclusion zone provided the necessary

4    protections for marine mammals in those coastal areas.

5          By necessity, the SEIS's analysis of comparative coastal exclusion zones used a generic

6    methodology, rather than a site-specific methodology, since the potential sites would have been almost

7    limitless. See SEIS Subchapters 4.7.6 and 4.7.7; see also SEIS at 10-120 to 10-123 (responding to

8    comments on methodology). Agencies are entitled to a high degree of deference in the selection of

9    scientific methodology. See Bear Lake Watch, Inc. v. FERC, 324 F.3d 1071, 1077 (9th Cir. 2003) ("We

10   defer to agency expertise on questions of methodology unless the agency has completely failed to address

11   some factor, consideration of which was essential to a truly informed decision."). NMFS reasonably relied

12   on the SEIS's finding that extending the coastal exclusion zone to 25 nm produced, at best, a mixed result,

13   and the agency's decision in light of this evidence is entitled to deference. See Central Arizona Water

14   Conservation Dist. v. EPA, 990 F.2d 1531, 1539 (9th Cir. 1993) (holding that courts should "defer to the

15   agency's interpretation of equivocal evidence, so long as it is reasonable").

16         **c.      NMFS's Monitoring Requirements are Reasonable.**

17         Plaintiffs' argument that the NRDC I decision compelled NMFS to change its monitoring

18   requirements is simply incorrect. Pl. Br. at 14. See FCC v. Pottsville Broadcasting Co., 309 U.S. 134,

19   145 (1940) (agency is not foreclosed from making the same decision once it has corrected the errors

20   identified by the Court). Here, Plaintiffs concede that the Navy and NMFS filled the gaps in the record

21   identified by the Court by evaluating the use of small boat surveys and aerial monitoring. Pl. Br. at 14.

22   That is all that was required. See SEIS Subchapter 5.4; RTCs 67, 89, 101; 72 Fed. Reg. at 46,872,

23   46,877, 46,880. Contrary to Plaintiffs' claims, this review was not cursory or lacking explanation. The

24   SEIS evaluates the use of small boats, large boats, multiple boats, power boats, boats launched from shore,

25   military aircraft, and civilian aircraft. SEIS at 10-144, 145. The SEIS also explains that SURTASS LFA

26   sonar vessels operate far from military airfields and ordinarily do not operate with other fleet assets, so

27   naval aircraft would normally be unavailable. SEIS at 5-6, 5-8. The fact that the current National Defense

28   Exemption (NDE) requires aircraft participating in MFA sonar major training exercises to conduct aerial

surveys "when operationally feasible and safe" is no indicia that aerial surveys would be practicable for SURTASS LFA sonar.  Thus, NMFS appropriately concluded that small boat surveys and aerial monitoring were impracticable because they were not effective, were unsafe for the personnel involved, and could harass marine mammals in the area.  RTCs 67, 89, 101; 72 Fed. Reg. at 46,872, 46,877, 46,880. Indeed, the Marine Mammal Commission agreed with NMFS and the Navy's assessment that the use of small boats or aerial surveys immediately before and during SURTASS LFA sonar operations would not be practicable.  SEIS at 10-143.

Plaintiffs concede that NMFS considered the other methods of acoustic passive monitoring that they proposed in their comments on the Proposed Rule.  Pl. Br. at 14.  NMFS explained that SOSUS arrays are no longer manned or maintained, their operations are degraded, and they do not provide real-time information.  RTC 88, 72 Fed. Reg. at 46,876-77.  NMFS explained that other external platforms would be vessels of opportunity only, the SURTASS LFA sonar vessel would have limited or no communications with these platforms, and the time delay in relaying information picked up by these sensors would render their use of little value.  RTCs 88, 101; 72 Fed. Reg. at 46,876-77, 46,880.  The Final Rule demonstrates that NMFS did not "cavalierly" dismiss Plaintiffs" concerns, but rationally concluded that the Navy's three-part monitoring regime provided effective protection for marine mammals.  72 Fed. Reg. at 46,886-87.

## 2.    NMFS Has Ensured that Impacts of LFA Sonar Will Be Negligible.

Plaintiffs' claims that NMFS did not satisfy the negligible impact requirement are also without merit.  Pl. Br. at 15.  First, Plaintiffs' argument wrongly assumes that the Court overturned NMFS's previous negligible impact finding.  In NRDC I, the Court granted summary judgment for the United States on whether NMFS appropriately interpreted and applied the term "negligible impact" in the prior rule which, like the current rule, capped annual takes at 12 percent of any marine mammal stock.  While the Court stressed the importance of adequate mitigation measures to ensure that impacts remained negligible, the Court did not find that the 12 percent cap was arbitrary and capricious.  279 F.Supp.2d at 1159.  The Court's aim was to ensure that annual taking did not exceed 12 percent per stock.  Id. ("And if it turns out that the annual take authorized by each year's LOA [which the Court understood would be 12 percent of any stock] is exceeded and is not limited to harassment but involves actual injury and death,

1    the negligible impact finding must be revisited."). The nature of the relief granted in NRDC I also

2    demonstrates that the Court did not overturn NMFS's negligible impact determination. Id. at 1191-92.

3    The Court did not remand the 12 percent cap back to NMFS for further consideration, and the injunction

4    did not reduce the 12 percent cap. Id. For the last five years, under the terms of the permanent injunction,

5    NMFS has issued annual LOAs that limited the taking of marine mammals to 12 percent per stock per

6    year, and that cap has proven to be effective at ensuring that the impact to marine mammals remained

7    negligible. Exs. 24-29 (Annual and Comprehensive Reports); 72 Fed. Reg. at 46,886.

8          Plaintiffs are also wrong when they claim that there is no new information indicating that the 12

9    percent cap is effective at ensuring that impacts remain negligible. Pl. Br. at 15. To the contrary, the 12

10   percent cap is supported by five years' worth of monitoring and reporting data from the actual operation

11   of SURTASS LFA sonar. Id.; RTCs 13, 22; 72 Fed. Reg. at 46,852-53, 46,855-56. According to the

12   Navy's Comprehensive Report for the 2002-2007 Final Rule, no more than 6 percent of most marine

13   mammal stocks were behaviorally harassed in any given year. A few stocks experienced annual take

14   levels above 6 percent, but none experienced take levels above 11.2 percent. Id. The 12 percent cap in

15   the current Final Rule applies regardless of the number of ships operating LFA sonar or the number of

16   hours of sonar use authorized. By 2012 if the Navy is operating four ships equipped with LFA sonar, it

17   will have to allocate the 12 percent take cap across the annual missions for all four vessels. Id.; RTC 2,

18   72 Fed. Reg. at 46,850. Moreover, the best available science, which included validation of the HF/M3

19   and the results of the Low Frequency Sound Scientific Research Program (LFS SRP) indicated that the

20   likelihood of injury to marine mammals was virtually nil due to the efficacy of the Navy's monitoring

21   regime and that impacts from behavioral harassment were likely to be negligible. See, e.g. RTCs 17-65,

22   72 Fed. Reg. at 46,853-71 (addressing concerns about impacts to marine mammals); 72 Fed. Reg. at

23   46,882-86 (setting forth NMFS's conclusions); FEIS 2-21, 2-22.

24         Finally, Plaintiffs dispute the abundance data that NMFS used to assess the potential for

25   population level effects. Pl. Br. at 15. NMFS addresses this criticism in the Final Rule. See RTCs 40, 41;

26   72 Fed. Reg. at 46,860-61. NMFS explains that where no specific data on marine mammal distributions

27   exist, impact prediction modeling uses an even distribution of marine mammals over the ocean area, since

28   offshore concentrations of marine mammals are not fixed in space and time. Although nearshore

concentrations can be relatively fixed in time or space, LFA sonar operates in deeper offshore waters as a consequence of the system's operational requirements and the coastal exclusion zone. See RTC 40, 72 Fed. Reg. at 46,861. On any given day, the distribution of any particular species is likely to be highly non-uniform, but over time these fluctuations even out. Id. Thus, a model which assumes that individuals of the species can occur anywhere within their range with equal probability over time is appropriate and reasonable. Id. NMFS further explains that the stock assessment modeling that the Navy uses for its LOA applications does not assume that populations are unstructured. Rather, the methodology uses the best scientific information available on the reproductive behavior of each species at each site in order to determine stock affiliation and the risk to the sustainability of each stock. Id.

Plaintiffs' specific criticisms (Pl. Br. at 16) regarding the abundance data for Hawaii rely on the Navy's modeling of 31 sites in the FEIS, which were developed using the most recent NMFS stock assessment reports at the time (six years ago) and a variety of multinational sources on distribution, abundance, and density. SEIS at 4-38. As the Final Rule explains, the MMPA requires annual updates of stock assessment data within U.S. waters, which would include the waters off Hawaii. RTC 40, 72 Fed. Reg. at 46,861. The SEIS's analysis of the affected marine environment in Chapter 3 utilizes the most up-to-date scientific data, including the latest NMFS stock assessments. That the particular stock assessment numbers for Hawaii may have changed since the Navy completed the FEIS in 2001 does not invalidate the ultimate conclusions reached in that document on the basis of those 31 worst-case hypothetical scenarios. Moreover, the SEIS provides a risk assessment case study for an additional 16 missions at nine mission sites, using sites and seasons based on realistic choices for the SURTASS LFA sonar operations proposed in the Navy's August 2007-2008 LOA application. SEIS Subchapter 4.4.2. This case study, which focuses on those areas most likely to see LFA sonar use based on the Navy's current operational needs, supports NMFS's negligible impact finding. SEIS at 4-43 to 4-51. In short, NMFS's methodology was reasonable and fully explained. This is all that is required. Inland Empire Public Lands v. Schultz, 992 F.2d 977, 981 (9th Cir. 1993).

### 3.    Lethal Take of Marine Mammals is Not A Reasonably Foreseeable Impact.

The Final Rule authorizes the incidental, unintentional take of marine mammals by Level A and Level B harassment because Level A and Level B harassment are the reasonably foreseeable impacts of

the action. 72 Fed. Reg. at 46889-90. Lethal take is not a reasonably foreseeable impact. Id. The best available science indicates that 180 dB is a conservative threshold for physical injury to marine mammals. See SEIS at 10-38; FEIS 1.4.2.1; RTC 17, 72 Fed. Reg. at 46,853-54; 67 Fed. Reg. at 46,737-40. The 180 dB isopleth extends approximately 1km from the LFA sonar source. FEIS at 2-14,18. Validation of the HF/M3 sonar demonstrates that the probability of detecting marine mammals before they enter the 1km radius around the ship, where they might be exposed to received levels of 180 dB, approaches 100 percent. FEIS at 2-21, 2-22. Any time that a marine mammal is detected by any means within a 2km radius of the LFA sonar source, sonar use is immediately suspended, making lethal take not a foreseeable impact of the action. 50 C.F.R. §216.184.

Plaintiffs do not challenge the 180 dB threshold for physical injury. Instead, they argue that the "link" between *mid-frequency* sonar and mass strandings of beaked whales in the Bahamas, the Canary Islands, and other locations create a "foreseeable risk" that SURTASS LFA will also cause mortalities. Pl. Br. at 17. As they did before, Plaintiffs again pointedly disregard the significant differences between SURTASS LFA and other acoustic sources. In only one of the fifteen stranding events where Plaintiffs allege an association with "naval exercises," Greece (1996), was a low frequency sonar even present. Complaint ¶61, Pl. Br. at 5. This low frequency sonar was not SURTASS LFA (it operated in a higher frequency range of 450-700 Hz), and it was not operated by itself. Mid-frequency sonars were also used during the Greek NATO exercises. Furthermore, subsequent beaked whale strandings that have implicated only mid-frequency sonar (in combination with certain bathymetric and other factors), support the conclusion that "it was not the LF component in the NATO sonar that triggered the Greece stranding of 1996, but rather the MF component." RTCs 32, 34; 72 Fed. Reg. at 46,858; SEIS at 4-53 to 4-54.

This conclusion is also supported by the best available data on marine mammal hearing. Beaked whales, which appear to be the species most vulnerable to acoustic-induced stranding, are believed to hear best at higher frequencies and poorly in the low frequency range of LFA sonar. RTCs 48, 49, 72 Fed. Reg. at 46,865-66. Since it is generally accepted that marine mammals are unlikely to exhibit an adverse behavioral reaction to sounds they hear poorly or not at all, the LFS SRP focused on assessing the behavioral responses to LFA sonar of baleen whales (blue, fin, gray, and humpback), which are low frequency hearing specialists. See Figure 1-4 Final OEIS/EIS (composite audiogram illustrating marine

mammal hearing); Clark Decl. ¶27. The LFS SRP detected only minor, short-term behavioral responses in the cetaceans that hear best in the low frequency range, and none of the rapid surfacing or premature diving behaviors that have been proposed as a possible contributing factor in beaked whale strandings. RTCs 47, 48, 72 Fed. Reg. at 46,864-65.

While certainly not the primary reason for NMFS's finding, it is also true, as the Final Rule states, that a number of the common features present in recent beaked whale strandings would not be present in SURTASS LFA sonar operations due to the system's operational characteristics and limitations imposed by the Final Rule. RTC 44, 72 Fed. Reg. at 46,863. For example, the fact that the system operates with a 1,500m horizontal towed line array and must be operated at least 12nm from shore at a minimum depth of 200m, would preclude its operation in areas like offshore canyons. See 72 Fed. Reg. at 46,847, 46,863, 46,866; SEIS 4-55 to 4-56; Johnson Decl. ¶21.[5] Thus, none of the available information concerning beaked whale strandings and mid-frequency sonar creates a "foreseeable risk" that SURTASS LFA sonar will contribute to beaked whale strandings.

Plaintiffs also blur the distinctions between SURTASS LFA sonar and other dissimilar acoustic sources that produce sound in the low frequency range. Plaintiffs state, "Low frequency sources have been implicated in two stranding events, and NFMS scientists have expressed strong concerns that low-frequency sources may produce effects similar to those caused by mid-frequency sounds." Pl. Br. at 5. This carefully crafted sentence refers to the Greece (1996) stranding, which is distinguishable , as discussed above, and to a beaked whale stranding in the Gulf of California that occurred in the vicinity of a seismic survey using not LFA sonar, but a different technology, a high intensity airgun array. Plaintiffs similarly state that NMFS scientists have expressed concern that "low-frequency sources" may

---

[5]    It is ironic that Plaintiffs would criticize the designation of an OBIA or the funding of scientific research on beaked whales. Pl. Br. at 17. Neither act, however, constitutes an admission that LFA sonar poses a stranding risk for beaked whales. NMFS designated the Gully as an OBIA because the Canadian Government provided credible scientific information that large numbers of whales from a variety of species are attracted to the Gully by the high food supply, particularly concentrations of zooplankton, lanternfish and squid. This includes–but is not limited to–the northern bottlenose whale (a toothed whale) and the blue whale (a baleen whale listed as endangered under the ESA). Hollingshead Decl. ¶¶9-10. The primary purpose of the beaked whale behavioral response study (BRS), is to assess the behavioral responses of beaked whales to MFA sonar and possibly to other acoustic sources. RTC 40, 72 Fed. Reg. at 46,861; Southall Decl. As this Court noted previously, more information about the mechanisms behind atypical beaked whale strandings would be useful, even if not legally required for the lawful operation of SURTASS LFA sonar. NRDC I, 279 F. Supp.2d at 1174.

contribute to beaked whales strandings.  See Pl Br. at 17.  Here, the reference refers exclusively to a different technology, airguns.  Unlike SURTASS LFA sonar, airguns are impulsive acoustic sources that have predominant energy in the 300-3000 Hz band, overlapping as much with mid-frequency sonar as with LFA sonar.  RTC 49, 72 Fed. Reg. at 46,866-67; Table 1, 72 Fed. Reg. at 46,862.  Tyack Decl. at ¶¶ 15-16.  Moreover, the seismic survey that coincided with the Gulf of California stranding also operated other acoustic sources outside the low frequency range.  Id.  Thus, even assuming an association – which has not been demonstrated – between the stranding and the seismic survey, this event in no way creates a "foreseeable risk" that SURTASS LFA sonar will contribute to beaked whale strandings.

SURTASS LFA sonar has never been implicated in any stranding during 58 missions completed between 2003 and 2007, or in any of the trials completed prior to 2003.  Id.; Johnson Decl. ¶10.  Indeed, the Navy's Final Comprehensive and Annual Reports show that the last five years of LFA operations have not resulted in even one Level A take.  RTC 32, 72 Fed. Reg. at 46,858; Johnson Decl. ¶9; Ex. 29 at 34.  Plaintiffs' argument that whales could have died at sea or stranded without anyone knowing it calls on NMFS and the Navy to disprove speculation for which there is no evidence, but the the law does not require an agency to prove a negative or eliminate all uncertainty.  Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 103 (1983).  It only requires a reasoned decision based on consideration of the relevant factors.  Pyramid Lake, 898 F.2d at 1414.  Here, the available evidence shows that none of the 19 strandings reported in Asia during the first five-year period coincided either temporally or spacially with SURTASS LFA sonar operations.[6/]  SEIS at 10-89; RTC 51, 72 Fed. Reg. at 46,867-68.

Plaintiffs' characterization of the reasons for NMFS's conclusion that SURTASS LFA will not cause lethal takes seriously distorts the record.  Pl. Br. at 17.  A non-selective reading of the Final Rule reveals that NMFS addressed strandings and other theoretical injury mechanisms comprehensively, including the new "evidence" alleged by Plaintiffs.  See RTCs 25, 27, 29, 30, 31, 32, 34, 44, 46, 47, 48, 49, 50, 51, 72 Fed. Reg. at 46,856-68; SEIS 10-87 to 10-98.  In sum, the reason that lethal take is not foreseen is that the overwhelming body of evidence does not support a connection between LFA sonar and beaked whale strandings or any other non-stranding related mechanism of harm.  Id.  After thoroughly

---

[6/]     In addition, SURTASS LFA was operated very close to shore, sometimes at full power, and in close proximity to marine mammals during the LFS SRP in 1997 and 1998.  Despite these well publicized tests occurring off the coasts of California and Hawaii where there are numerous stranding networks, no strandings were reported.  See Johnson Decl. ¶10.

reviewing the available data on sonar and air gun associated strandings, marine mammal hearing, marine mammal behavior, "the bends," acoustically mediated bubble growth, SURTASS LFA sonar's operational characteristics, and the SURTASS LFA sonar operational record -- including the last five years of Navy reports, and the available data from stranding networks and other local sources in the area of LFA operations --, NMFS concluded that "there are no 'new' data: (1) linking LFA sonar to whale strandings, (2) linking LFA sonar to non-stranding related injuries, (3) or describing mechanisms of harm to marine mammals from LFA sonar." RTC 49, 72 Fed. Reg. at 46,866.[7]/

### 4.    NMFS Provided Full Notice and Opportunity for Public Comment on the Rule.

Contrary to Plaintiffs' claims, Pl. Br. at 18, NMFS provided ample notice and opportunity for public comment before making the required findings and prescribing regulations under MMPA Section 101(a)(5)(A). Specifically, on September 28, 2006, NMFS published notice that it had received the Navy's application for a new five-year rule and regulations and solicited public comments and information on that application during a thirty day comment period. 71 Fed. Reg. 56,965 (September 28, 2006) (Ex. 13). On July 9, 2007, NMFS issued a Proposed Rule and sought public comment on that rule during a fifteen day comment period. 72 Fed. Reg. 37,404 (July 9, 2007) (Ex. 9). Both the Notice of Application and the Proposed Rule stated that copies of the Navy's application were available upon request.

Plaintiffs do not dispute that they received adequate notice of the potential areas for which the Navy sought a five-year rule. The Proposed Rule identifies those areas as the Pacific, Atlantic, and Indian Oceans, and the Mediterranean Sea. Id. Instead, Plaintiffs assert that they were entitled to comment on specific information contained in the LOA applications that the Navy had submitted for the R/V Cory Chouest and USNS IMPECCABLE (T-AGOS 23) for year 2007-2008. This argument fails for several reasons. First, the LOA application process is established by NMFS's general implementing regulations for section 101(a)(5)(A), which have been in effect since 1982, and which governed the last rulemaking for SURTASS LFA sonar. RTC 11, 72 Fed. Reg. at 46,852. The purpose of requiring an LOA is not,

---

[7]/    NMFS's decision is nothing like the decision found wanting in Kokechik Fisherman's Ass'n v. Sec'y of Commerce, 839 F.2d 795 (D.C. Cir. 1988), cited by Plaintiffs. Pl. Br. at p. 16. In that case, which involved the commercial fishing provision of the MMPA, take of depleted fur seals was "not merely a remote possibility but a certainty," and by authorizing take of all other marine mammals except the fur seals (whose take could not legally be authorized) the Secretary had allowed fishermen to take fur seals for the price of a civil penalty. Id. at 801-802. Here, NMFS could legally authorize lethal take pursuant to MMPA Section 101(a)(5)(A), but the possibility is so remote that it is not foreseeable.

as Plaintiffs suggest, to make a new negligible impact finding, but to ensure that the authorized taking will be consistent with the original findings. Id.; 46 Fed. Reg. at 21,248, 21,251 (May 18, 1982). NMFS's general implementing regulations do not require the agency to provide public notice and comment on LOA applications. 50 C.F.R. §216.106(a). These regulations constitute NMFS's exercise of the authority delegated to it by Congress to fill gaps left by the MMPA in the implementation of the incidental take authorization process. Chevron, 467 U.S. at 843-44 (1984). As such, they are entitled to deference as long as they are reasonable. Id. The decision not to provide notice and comment on LOA applications is consistent with the specific requirements of MMPA Section 101(a)(5)(A) which are (1) a negligible impact determination for the five-year period, and (2) regulations setting forth mitigation, monitoring, and reporting requirements for the five-year period. RTC 11, 72 Fed. Reg. at 46,852. The statute does not require the regulations to specify the number of marine mammals that may be taken in any given year or in all five, just the permissible methods of take and means of effecting the least practicable adverse impact. Id. Since the purpose of the LOA process is to ensure that take remains consistent with these original findings, it is reasonable for the implementing regulations not to require public notice and comment, and the regulations are entitled to deference. Moreover, the MMPA as amended by the NDAA no longer requires a "military readiness activity" to occur within a "specified geographical region." 16 U.S.C. § 1371(a)(5)(F)(i). Thus, Plaintiffs seek information that they are not entitled to under the law or under NMFS's implementing regulations.

Second, Plaintiffs cannot credibly argue that they were deprived of relevant information, since the Navy's application, which was publicly available, summarized LFA sonar operations for the first three years of the prior rule, provided risk estimates for marine mammal stocks at mission sites for each of those years, and provided this assessment of where operations were most likely to be concentrated:

> [T]he Navy is now faced with growing numbers of quiet diesel submarines, particularly in Asia's key waterways. Thus, the operational tempo for the SURTASS LFA sonar platforms (up to four) could be expected to increase to counter these potential threats during the five-year period of the new LOAs. It can also be expected that these operations may be concentrated in the areas of highest threat, specifically the northwestern Pacific Ocean.

Ex. 14.01 at 58. The SEIS provides similar information in its case study of 16 missions at nine mission sites in the western Pacific that represent "reasonable and realistic choices for SURTASS sonar operations proposed in the LOA application." SEIS at 4-41 to 4-51. Thus, Plaintiffs had the information necessary

1    to participate fully in the decision-making process and to comment on the implications of the proposed

2    action, and Plaintiffs' claims to the contrary are without merit.

3    **B.    The Navy Fully Complied with NEPA**

4        **1.    The SEIS Thoroughly Analyzes All Reasonable Alternatives**

5        Plaintiffs' challenge to the Navy's analysis of alternatives in the SEIS is wholly unfounded in that

6    it ignores the Navy's thorough examination of alternatives as well as the measures that the Navy has taken

7    to address this Court's previous concerns.   NEPA requires that an EIS contain a description and analysis

8    of "alternatives to the proposed action," which the CEQ regulations define as consisting of a "no action"

9    alternative and "all reasonable alternatives."   42 U.S.C. 4332(C); 40 C.F.R. 1502.14(a), (d).   The scope

10   of this analysis is bound by the "purpose and need" underlying the proposed action.   See 40 C.F.R. §

11   1502.13; see also Seattle Audubon Society v. Moseley, 80 F.3d 1401, 1404 (9th Cir. 1996) ("An agency

12   is under no obligation to consider every possible alternative to a proposed action, nor must it consider

13   alternatives that are unlikely to be implemented or those inconsistent with basic policy objectives.");

14   Laguna Greenbelt, Inc. v. U.S. Dept. of Transp., 42 F.3d 517, 524 (9th Cir. 1994).   In this case, the Navy

15   proposed the employment of SURTASS LFA during military operations (exclusive of armed conflict or

16   direct combat support operations) as well as routine training and testing. EIS at 1-1; SEIS at 1-1.   The

17   purpose and need for this proposed action is "to meet U.S. need for improved capability to detect quieter

18   and harder-to-find foreign submarines at long range" so as to "provide U.S. forces with adequate time to

19   react to, and defend against, potential submarine threats while remaining a safe distance beyond a

20   submarine's effective weapons range."   EIS at 1-2; SEIS at 1-2.

21       In furtherance of the Navy's purpose and need for the proposed action, the SEIS examines four

22   alternatives in depth, as well as a no action alternative.  Of relevance here: Alternative 2 (the preferred

23   alternative) proposes the employment of SURTASS LFA with geographic restrictions that would include

24   maintaining sound pressure levels below 145 dB within known recreational and commercial dive sites,

25   and below 180 dB within 12nm of any coastline or within 1km seaward of designated OBIAs; Alternative

26   3 is similar to Alternative 2 with the exception that it proposes a much larger coastal standoff distance

27   (25nm rather than 12nm); and Alternative 4 is similar to Alternative 3, with the exception that it extends

28   shutdown procedures to fish (in addition to marine mammals and sea turtles).  See SEIS 2-13 to 2-16. The

SEIS rigorously examines each of these alternatives – and their effects on a host of environmental resources and values – in comparative form, thus complying with NEPA's requirement that a clear basis for choice among the alternatives be provided to the agency decision-maker and the public. 40 C.F.R. § 1502.14. In addition, the SEIS describes an annual process by which the Navy identifies areas of high marine life concentrations so that they can be avoided where practicable. See SEIS at 2-7 to 2-8, 2-12. This annual risk assessment forms the basis for analysis of alternatives in the SEIS, and is described in Section 4.4 of the SEIS. See SEIS at 4-37 to 4-41. In this manner, the SEIS fully addresses this Court's determination in NRDC I that the Navy should have examined training in areas that present a reduced risk of harm as well as an extension of shutdown procedures beyond marine mammals and sea turtles to schools of fish. NRDC I, 279 F. Supp.2d at 1166.

### a.     The Navy adequately considered training in areas of reduced risk.

Despite this thorough analysis, Plaintiffs complain that the Defendants' analysis of alternatives is deficient because the SEIS does not actually identify "low risk" areas. Pl Br. at 20-21. In order to address this argument, a more thorough description of the Navy's risk assessment methodology is necessary. As the SEIS explains, attempts to identify "low risk" areas are often unreliable. See SEIS at 2-12; Clark Decl. ¶34. Therefore, the four alternatives analyzed in the SEIS adopt a methodology by which areas of high marine life concentration are identified on an annual basis as part of the LOA application process, and then avoided whenever practicable.[8]/ See SEIS at 2-8, 2-12, 10-118. This methodology, which consists of a series of steps, begins with the Navy's identification of its anti-submarine warfare requirements to be met by SURTASS LFA on a given year, and is followed by the proposal of mission areas. Once these proposed mission areas are identified, available published data are collected and analyzed with respect to marine mammal populations and stocks, marine mammal habitat and seasonal activities, and marine mammal behavioral activities within the proposed areas. If marine mammal densities prove to be high during this process, or if sensitive animals are expected to occur, "the mission areas are changed and/or refined and the process is reinitiated for the modified area." SEIS at 2-12 (emphasis added); see also id. at 4-39 to 4-41, Figure 4.4-1. Next, standard acoustic modeling and risk

---

[8]/     This case is readily distinguished from Nat. Res. Defense Council v. USFS, 421 F.3d 797 (9th Cir. 2005). There, the Forest Service failed to analyze an alternative that would have maximized the preservation of roadless areas that were readily identifiable during the NEPA process. Here, by contrast, the Navy and NMFS have determined that "low risk" areas cannot be reliably identified.

analysis are performed, standard mitigation is applied, and risk estimates for marine mammal stocks in the proposed mission area are calculated.  If, at this point, the proposed mission areas fail to meet the restrictions on marine mammal/animal impacts imposed by the Final Rule, the proposed mission area is once again changed or refined, and the entire process is re-initiated.  Id.  The Navy has determined that this process, which is fact intensive and specific to the proposed mission areas, allows the Navy to make a more reliable determination of relative risk and, therefore enables the Navy to identify "low risk" areas that meet the Navy's operational requirements.

Plaintiffs criticize the above methodology on two grounds.  First, Plaintiffs argue that it is "far from clear" that the identification of areas of low marine mammal abundance is impracticable.  Pl Br. at 21.  The declarations cited in support of this assertion, however, describe modeling used to identify areas of relatively high – as opposed to low – cetacean abundance, and are thus fully consistent with the Navy's risk assessment methodology.  See Parsons Decl. ¶12; Whitehead Decl. ¶11.  Moreover, even if they were not, NEPA does not require that this Court weigh conflicting expert opinions or consider whether an agency has employed the best scientific methods.  Friends of Endangered Species v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985).  Rather, the law is clear that "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinion of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  Marsh, 490 U.S. at 378.

Second, Plaintiffs argue that the Navy was required by 40 C.F.R. § 1502.22 to provide a "summary of existing credible scientific evidence" concerning marine mammal abundance and density for all of the ocean waters within the scope of the Final Rule.  See Pl Br. at 21.  That regulation, however, only requires the presentation of such information if it is "relevant to evaluating the reasonably foreseeable significant adverse impacts" resulting from the proposed action and its alternatives.  See §1502.22(b)(3).  In this case, the Navy selects the mission areas that it will propose for risk assessment on an annual basis, as part of its LOA application.  See SEIS at 2-5 (explaining that, "[b]ecause of uncertainties in the world's political climate, a detailed account of future operating locations and conditions cannot be delineated over the next five years").  The areas ultimately proposed as part of this process make up only a small fraction of the waters within the scope of the Final Rule.  Thus, "existing credible scientific evidence" concerning marine mammal density within the scope of the Final Rule only

becomes "relevant" for purposes of Section 1502.22(b)(3) if and when specific mission areas are proposed during the LOA application process.  What Plaintiffs propose – a summarization of all existing data concerning global marine mammal density regardless of whether it corresponds to potential operation areas – is impractical and in no way required by NEPA.  Inland Empire Public Lands Council v. U.S. Forest Service, 88 F.3d 754, 764 (9th Cir. 1996) ("NEPA does not require the government to do the impractical.").  The updated literature reviews, discussion of uncertainty, and determination and disclosure of data gaps for marine mammals in the SEIS fully satisfies the requirements of 40 C.F.R. § 1502.22.  See SEIS at P-3, 4-39, 10-85 and sub-chapter 3.2.

### b.    The Navy adequately considered extended coastal exclusion zones

Plaintiffs' argument that the Navy should have, but failed to, conduct any meaningful analysis of increased coastal exclusion zones is also without merit.  The analysis in the EIS, which included the study of three alternatives, examined a coastal exclusion zone of only 12nm.  See EIS at 2-10 to 2-11.  In response to this Court's finding that the Navy should have considered training in areas that present a reduced risk of harm to marine life, the Navy identified additional alternatives in its SEIS, including one that included a coastal standoff range of 25nm.  See SEIS at 2-16, 4-70, 10-119.  The 12nm and 25nm alternatives were then examined in comparative form, using the generic analytical methodology described at p.___supra. to determine the difference in potential impacts to marine mammals at each distance.  Based on this thorough analysis, the Navy determined that potential risk actually decreases on average when LFA is operated at 12 nm as opposed to 25 nm from shore.  SEIS at 4-79, 10-119; see also Clark Decl. ¶¶ 30-32.  Further, the SEIS explains that the use of a larger coastal exclusion zone as contemplated by Alternative 3 would adversely impact the Navy's ability to achieve military readiness, since a much larger portion of the littorals would be restricted from the conduct of SURTASS LFA sonar operations.  SEIS at 4-81.  This thorough analysis fully complies with NEPA by providing a clear basis for choice between Alternatives 2 and 3.  See 40 C.F.R. § 1502.14.

Moreover, the conclusions reached in the SEIS are in no way contrary to this Court's decision in the previous litigation.  There, the Court concluded – in the context of adjudicating Plaintiffs' MMPA claims – that the Navy had acted arbitrarily by failing to "extend the coastal exclusion zone in all areas except for those few coastal areas where close to shore training is necessary."  NRDC I, 279 F. Supp.2d.

at 1164. The Navy, however, has since extended its NEPA analysis and its description of operational needs in a way that addresses the Court's concerns. The SEIS explains that the world's current political climate makes it impossible to forecast the operational needs or operating locations for SURTASS LFA over the next five years. SEIS at 2-5. The SEIS also makes clear that future naval conflicts are likely to occur within coastal areas, thereby requiring enhanced training there. See SEIS at 2-7; id. at 1-8 to 1-9.

The Plaintiffs' narrow reading of this Court's decision in NRDC I would require the establishment of a larger coastal exclusion zone with only narrowly tailored exceptions for operational needs, even though it is not possible to determine in advance the particular areas where "close to shore" training will become necessary. This is clearly infeasible. Instead, the SEIS addresses the Court's concern with respect to "close to shore" operations, testing, or training in two ways. First, as explained above, the risk assessment methodology that forms part of the annual LOA application process ensures that training and operations avoid marine mammal concentrations when practicable, even when conducted close to shore. See SEIS at 4-39 to 4-41, 10-134 (Response to Comment 5.0.3i). Second, the Navy's Generic Analytical Methodology for Coastal Standoff Range Comparison, also detailed above, demonstrates that increasing coastal exclusion zones does not provide more effective mitigation as was assumed in the previous litigation. See NRDC I, 279 F. Supp.2d at 1161-1162. To the extent Plaintiffs may interpret this Court's holding in NRDC I as a requirement that the Navy or NMFS impose larger coastal exclusion zones, notwithstanding the Navy's analysis in the SEIS, that interpretation would be incorrect as NEPA does not impose substantive requirements. Methow Valley, 490 U.S. at 350.

Finally, the Navy was not required to adopt the consideration of a "dual criteria" exclusion zone similar to the one imposed upon the Navy by this Court's now-expired permanent injunction, which required the greater of 60nm or 30nm seaward of the 200-meter isobath in some areas. See Pl Br. at 22. The law is clear that agencies are not required to "undertake a 'separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.'" Westlands Water District v. U.S. Dep't of the Interior, 376 F.3d 853, 868 (9th Cir. 2004) (quoting Headwaters, Inc. v. Bureau of Land Mgmt., 914 F.2d 1174, 1181 (9th Cir. 1990)). Here, the SEIS examines the environmental impacts of adopting a 25nm coastal exclusion zone assuming three hypothetical shelf break distances to account for the varying width of the continental shelf, and explains

1   that the results of this analysis would remain consistent regardless of whether the coastal exclusion zone

2   were increased to 30nm or 60nm.  See SEIS at 4-76 to 4-77, 10-119.  Accordingly, a separate analysis of

3   "dual criteria" exclusion zones is not required by NEPA.[9]

4                    **c.    The Navy adequately considered extending shut-down protocols to fish**

5          Plaintiffs' argument that the Navy failed to consider extending shutdown procedures to fish is

6   contrary to record evidence and utterly devoid of substance.  See Pl Br. at 22-23.  Following this Court's

7   ruling in the previous litigation, the Navy sponsored a study directed at the effects of SURTASS LFA

8   sonar on hearing, the structure of the ear, and select non-auditory systems in the rainbow trout and channel

9   catfish.  See SEIS at 4-11.  The test subjects were exposed to SURTASS LFA sonar at levels of 193 dB

10  RL for three periods of 108 seconds each (for a total of 324 seconds) with a nine minute quiet period

11  between active periods.  No fish died as a result of these exposures and, in fact, all fish appeared healthy

12  and active until they were sacrificed or returned to the supplier from which they had been purchased.  Of

13  the fish that were sacrificed, histopathology on all major body tissues (brain, swim bladder, heart, liver,

14  gonads, blood, etc.) revealed no differences between the sound exposed fish and the control group.  SEIS

15  at 4-14.  There were also no short- or long-terms effects on ear tissue.  Finally, catfish and some

16  specimens of rainbow trout showed only temporary hearing loss immediately after exposure to the sound

17  source (of only 10-20 dB).  Of these, hearing appeared to return to, or close to, normal within 24 hours

18  in catfish, and preliminary data suggest that recovery in rainbow trout that suffered hearing loss is likely

19  to occur within 96 hours. SEIS at 4-15.

20         As the SEIS explains, the above findings represent a "worst case" scenario that is very unlikely

21  to occur in the wild because a sound level of 193 dB RL exists only within 200 meters of the LFA source

22  array, and is produced by a moving source.  SEIS at 4-16.  Thus, even if a fish were to occur within the

23  193 dB sound field, its exposure would likely be shorter than the three 108 second exposure periods

24  _____
    [9]     Plaintiffs' reliance on Ctr. for Biological Diversity v. Bureau of Land Mgmt., 422 F. Supp.2d
    1115, 1160-61 (N.D. Cal. 2006), is misplaced.  There, the court held that interim road closures, which
25  had been imposed on the BLM as part of a settlement agreement, should have formed part of the
    alternatives analysis in BLM's EIS.  However, the court's holding, that BLM had failed to analyze a
26  viable alternative, was based on BLM's repeated insistence in its decision documents and in separate
    litigation that the interim closures were both reasonable and necessary.  Contrary to Plaintiffs' assertion,
27  it was not based on the fact that the interim road closures had formed part of a previous settlement
    agreement.  The inclusion of a "dual criteria" exclusion zone in the NRDC I settlement agreement
28  therefore in no way constrains the Navy's alternatives analysis in the present case.

described above. Given that exposures at maximum level tested did not cause damage to fish, and what appears to be only temporary and limited hearing loss to some, the SEIS reasonably concludes that the much shorter exposures likely to occur in the wild would not result in any measurable hearing loss or non-auditory damage, and that the potential for fish or schools of fish to be harmed by exposure to LFA signals above 193 dB RL is negligible. SEIS at 2-21, 4-16.[10]/

The SEIS also explains that none of the three monitoring measures currently used for SURTASS LFA would be feasible or practicable as applied to fish. SEIS at 2-13; ROD at 40. Given that the potential for fish or schools of fish to be harmed by exposure to LFA signals is negligible, and because mitigation protocols for fish are infeasible and impractical when applied to the employment of SURTASS LFA, the SEIS reasonably concluded that shutdown procedures should not be extended to fish. SEIS at 4-71, 10-118. As a practical matter, however, there is no reliable way for the HF/M3 operator to distinguish a large fish or fish school from a marine mammal and, therefore, shutdown protocols would be implemented for fish in these circumstances. Johnson Decl. ¶35.

## 2.    The Navy's Consideration of Mitigation Measures Complies With NEPA

Plaintiffs' challenge to the Navy's analysis of mitigation measures is similarly flawed and must be rejected. NEPA requires that an EIS discuss the extent to which steps can be taken to mitigate adverse environmental impacts. See Methow Valley Citizens Council, 490 U.S. at 351-52; Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d 517, 528 (9th Cir. 1994). An EIS should discuss mitigation in sufficient detail as to ensure that environmental consequences have been fully evaluated. Id. NEPA does not, however, require that a mitigation plan be "legally enforceable, funded or even in final form to comply with NEPA's procedural requirements." National Parks Conservation Ass'n v. U.S. Dep't of Transp., 222 F.3d 677, 681 n.4 (9th Cir. 2000). Moreover, an EIS may not be deemed inadequate simply because the selected alternative rejects a mitigation measure. See Stryker's Bay, 444 U.S. at 227 (NEPA does not impose substantive requirements).

The analysis of mitigation measures in the SEIS fully complies with NEPA by proposing and analyzing measures that will avoid significant adverse impacts on marine mammal stocks, sea turtle

---

[10]/    The Navy's complete analysis of impacts to fish, based on both new and pre-existing studies and a revised literature review, appears at SEIS 4-3 to 4-25 and is more fully described in the Popper Declaration.

stocks, and recreational or commercial divers as a result of the employment of SURTASS LFA sonar. See generally SEIS at 5-1 to 5-8. The measures employed include geographic restrictions (in the form of a coastal exclusion zone, an exclusion zone for dive sites, and the designation of OBIAs), the use of a two kilometer buffer zone around the LFA source and corresponding shut-down protocol, and a three-part monitoring program (visual, passive acoustic monitoring, and active acoustic monitoring). Id. In addition, a sensitivity/risk analysis is conducted as part of the annual LOA applications, thereby minimizing the potential threat that sensitive animals or high seasonal densities occur in proposed mission areas. See SEIS at 2-12; 4-40.

Plaintiffs' arguments that additional mitigation measures should have been considered are without merit. First, the Navy thoroughly considered the designation of additional mitigation measures as explained above. See Section III.A.1.a, supra. Second, Plaintiffs' allegations concerning underwater passive gliders (Pl Br. at 14, 24) are not properly before the Court because they were not raised for the Navy's consideration during the comment period on the Draft SEIS. The Supreme Court has made clear that a party's failure to raise particular factors for inclusion in an agency's NEPA analysis during the comment period results in a forfeiture of any objection to the NEPA document on those grounds in a later petition for judicial review. Dep't of Transp. v. Public Citizen, 541 U.S. 752, 764-765 (9th Cir. 2004). In this case, the Navy published a notice of availability for the Draft SEIS in November 2005, and provided a 92 day period for public comment. 70 Fed. Reg. 68,443. Plaintiffs availed themselves of that opportunity by submitting a 45 page comment letter, but made no mention of passive gliders at that time. See SEIS, Appendix B, at B-63 to B-85. Plaintiffs' challenge to the SEIS for failure to consider the use of passive gliders as a mitigation measure is therefore improper. See Havasupai Tribe v. Robertson, 943 F.2d 32 (9th Cir. 1991) ("The [plaintiff] had some obligation to raise these issues during the comment process. Its views were solicited. Absent exceptional circumstances, such belatedly raised issues may not form a basis for reversal of an agency decision."). Accordingly, the SEIS is not arbitrary and capricious merely because it lacks discussion of passive gliders as a mitigation measure.

Third, Plaintiffs' assertion that the Navy inadequately considered the use of aerial surveys is baseless. The SEIS specifically evaluated the use of small boats and aircraft for pre-operational surveys and determined that such surveys are not feasible because they are ineffective and may increase

harassment of marine mammals. SEIS at 5-6 to 5-8; 10-143 to 10-145. In addition, the Navy determined that the use of such surveys is not viable because it is ineffective, impracticable, unsafe, and may increase harassment of marine mammals. Id.. Once again, this analysis satisfies the requirements of NEPA. Plaintiffs' response – that aerial surveys may be safe and practicable when launched from air bases in close proximity to LFA operational sites, See Pl Br. at 24 – is simply wrong. To date, SURTASS LFA operations have not occurred close to airfields but, even if they had, that would not change the conclusions reached in the SEIS with respect to the safety and practicability of conducting such surveys. See Johnson Decl. ¶36. In addition, the locations of LFA operations are classified, making the utilization of civilian land-based aircraft impractical for national security reasons. Id.

Finally, Plaintiffs' arguments concerning the Navy's rejection of an extended coastal exclusion zone has already been addressed in the context of the Navy's alternatives analysis, supra. While Plaintiffs now argue that the Navy failed to consider "a full range of practicable measures that could be combined with any exclusion, including exclusions linked to bathymetry or distance from shelf break," this argument ignores that the risk analysis methodology that forms part of the annual LOA application process will require collection and assessment of published data concerning habitat present in each proposed mission site, thereby addressing Plaintiffs concern that variations in bathymetry or shelf break location may lead to differences in marine mammal concentrations and relative risk. See SEIS at 2-12, 4-39 to 4-40.

### 3. The SEIS Adequately Considers All Reasonably Foreseeable Individual and Cumulative Impacts

NEPA requires that an EIS or SEIS contain a reasonably thorough analysis of both individual and cumulative impacts. 40 C.F.R. §§ 1502.16, 1508.7-8.8. Here, Plaintiffs attack the impacts analysis in the SEIS on grounds that it narrowly confined its analysis of potential at-sea internal injuries – resembling those seen in human decompression sickness, i.e.: "the bends" – to an analysis and discussion of "bubble growth." Pl Br. at 24-25. This argument lacks merit for several reasons. First, decompression sickness is a condition by which a reduction in ambient pressure results in the formation of gas bubbles that would otherwise remain dissolved within a liquid. By thoroughly analyzing the potential for "bubble growth," the SEIS directly and fully addressed Plaintiffs' concerns. SEIS at 4-31 to 4-33, 10-77 to 10-79. Second, Plaintiffs' assertion that the Navy ignored other "mechanisms" by which injuries may occur at sea is

belied by the SEIS.  For example, in addition to an analysis of bubble growth, the SEIS examined resonance as a potential means of LFA-induced non-auditory tissue damage and concluded that injury from resonance is not likely to occur below a sound pressure level of 180 dB RL.  Id. at 4-31.  Finally, the SEIS examined the possibility that injuries could occur at sea from behavioral changes such as rapid surfacing or premature diving, and reasonably concluded that such behavior was not likely to occur as a result of LFA transmissions because no such behavior had been witnessed during the Navy's LFS SRP.  See SEIS at 10-74 (Comment 4.3.33 and Response to Comment).  As this Court has recognized, each of these determinations is entitled to strong deference, and a plaintiffs' disagreement with the conclusions reached does not render the SEIS inadequate.  See NRDC I, 279 F. Supp.2d at 1174 ("The law is clear, however, that when qualified experts on both sides reach carefully reasoned but different conclusions, the Court must defer to the agency's experts.") (citing Marsh, 490 U.S. at 378).

Plaintiffs' assertion that the SEIS fails to consider the potential for strandings as a result of LFA operation is also incorrect.  See Pl Br. at 25.  This analysis occurs in sub-chapter 4.4.3 and the corresponding responses to comments.  See FEIS at 4-51 to 4-56, 10-87 to 10-98.  There, the SEIS describes marine mammal stranding events relating to both natural causes and anthropogenic sound, and thoroughly examines the potential of SURTASS LFA sonar to cause strandings.  The SEIS reasonably concludes on the basis of the best available science that there is no known connection between marine mammal strandings and LFA sonar.  Id. at 4-56, 10-91, 10-98.  This analysis more than satisfies NEPA and, in any event, this Court has already determined that the Navy and NMFS are entitled to rely on their expert's views that the various stranding events described in the EIS and SEIS, and which implicate mid-frequency sonar, do not show that LFA use will have a similar impact.  See NRDC I, 279 F. Supp.2d at 1173.  That decision is dispositive given the Navy's determination that no new data exist linking LFA sonar to strandings.  SEIS at 10-58; see also Tyack Decl.

The SEIS's analysis of cumulative impacts also complies with NEPA, despite Plaintiffs' attempt to characterize that analysis as ignoring impacts on a local or regional scale.  See Pl Br. at 25.  The results of extensive analysis during the LFS SRP indicate that even minor behavioral changes resulting from SURTASS LFA operation can only occur when a marine mammal is relatively close to the LFA source.  See SEIS at 10-107.  Accordingly, these behavioral effects are fully addressed by the risk continuum

approach described in sub-chapter 4.2.3 of the EIS.  In this manner, the EIS and SEIS examine direct impacts to marine mammals on a regional scale.  The SEIS also explains that, for those areas far enough from the sound source that they are not covered by the risk continuum, "the received LFA signal is approximately that of an ambient environment.  Thus, the signals do not add appreciably to the ambient noise levels, and therefore do not accumulate, or collect, to greater effects."  SEIS at 10-107.  Put another way, cumulative impacts from SURTASS LFA sonar operation are not reasonably foreseeable beyond the area covered by the risk continuum because LFA sonar at that distance and decibel level does not add appreciably to typical ambient noise levels.[11]/ Id.  Finally, the SEIS examines the potential for cumulative impacts resulting from the interaction of LFA sonar operation with recognized sources of lethal take, such as bycatch and ship strikes, as well as the potential of LFA sonar operation to cause masking or increased stress levels in marine animals.  SEIS at 4-62 to 4-67.  This analysis appropriately examined the manner in which cumulative impacts from LFA sonar operation and other anthropogenic causes affect marine animals in relation to the location of the LFA source.  Accordingly, Plaintiffs' argument that the SEIS failed to analyze cumulative impacts on a local – as opposed to global – scale is wholly unfounded.

## C.    NMFS Has Complied with the Endangered Species Act

Plaintiffs spend  little time on their ESA claims, relying instead on the arguments made in the MMPA and NEPA contexts to attack the sufficiency of the BiOps. Pl. Br. at 27.  For the same reasons that Plaintiffs' MMPA and NEPA claims fail, their ESA claims also fail and are not addressed further.

### 1.    The Incidental Take Statements Specify the Amount or Extent of Take

Plaintiffs incorrectly assert that the ITSs issued with the 2007 programmatic and supplemental BiOps fail to provide a specific numerical value or adequate surrogate for listed species of salmon and sea turtles.  Pl. Br. at 27.  Plaintiffs are incorrect.  An ITS must specify the impact to listed species by identifying the amount or extent of the anticipated take.  50 C.F.R. §402.14(i)(1)(I.).  While a numerical value is preferred, it is not required, as Congress and this Circuit have recognized there are times when

---

[11]/     In attacking the Navy's analysis of "synergistic" effects from various noise sources, Plaintiffs simply attempt to erect a straw man so that they can knock it down.  See Pl Br. at 25 n.22.  The Navy defines synergistic effects as occurring when sound fields converge, which requires that the multiple sources transmit exactly in phase and with similar signal characteristics.  See SEIS at 4-65.  This does not mean, however, that the Navy has defined "cumulative," as opposed to "synergistic," so narrowly as to downplay any impacts.  Rather, the SEIS also examines cumulative impacts short of sound field convergence.  See, e.g., 10-104 to 10-108.

such a number cannot practically be obtained. Arizona Cattle Growers Ass'n v. FWS, 273 F.3d 1229, 1249-50 (9th Cir. 2001). Consistent with the standard of review under the APA, an ITS that uses a surrogate must simply explain why it was impractical to express a numerical take value. Oregon Natural Res. Council (ONRC) v. Allen, 476 F.3d 1031, 1036-37 (9th Cir. 2007).

The ITS for the programmatic BiOp (Ex. 6), explains that a numerical value estimating the amount of take is impractical for sea turtles and salmon for two reasons. First, given the programmatic nature of the consultation, the BiOp considers the universe of potential operating areas, and not the areas in which the Navy will actually operate, which is determined yearly based on national security priorities. Id. at 3. Thus, NMFS cannot provide a number of individuals that will be taken, because those factors are dependent on location and season of operation. Id. Second, NMFS states that for sea turtles and Atlantic and Pacific salmon, a number is impossible to produce in any event given the current state of scientific information. Id., Ex. 5 at 137-140. The lack of available data does not reflect a lack of effort on the part of NMFS or the Navy. ONRC, 476 F.3d at 1038. Rather, it is a product of the cryptic nature of these species. The programmatic BiOp explains that sea turtles associate with oceanographic fronts, eddies, upwelling areas, and convergence zones whose locations and movements change over time. Ex. 5 at 137. Leatherback turtles, for instance, can travel as much as 10,000 km of open ocean in a single year. Id. at 138. Patchy distribution and migratory habitat make estimating the number of sea turtles that might occur in a specific part of the ocean impossible. Id. The Court in NRDC I questioned why NMFS did not use domestic fishery capture estimates, but the BiOp explains that these estimates are based on capture rates over time and do not reflect the relative abundance of sea turtles in the water column. Id. at 140. Salmon take numbers are equally impractical to obtain because individuals from endangered and threatened species of salmon appear to travel in schools composed of both listed and unlisted salmon species. Id. In addition to having to find a needle in a haystack, current levels of knowledge about the movements of salmon schools or the number of salmon in a school that might occur in the water column in any particular area of the North Pacific or North Atlantic Oceans make identifying a take "amount" impossible. Id. The supplemental BiOp, which updates and tiers from the programmatic opinion, addresses sea turtles only, because listed salmon are not expected to occur in the action areas covered by the 2007-2008 LOAs. Ex. 7. The ITS for the supplemental BiOp explains that sea turtle computer simulations were not available

due to lack of data necessary to run such models, as explained in the programmatic BiOp and in the exposure analysis of the supplemental BiOp. Id. at 51, 68.

As a surrogate, the programmatic BiOp provides that the extent of take of listed salmon and sea turtles will be limited to harassment. Ex. 6 at 3. The supplemental BiOp states that adult and sub-adult sea turtles may be taken, in an area out to 2km from the sonar vessel. Ex. 7 at 68. If any sea turtle is detected that has been harmed, injured, or killed, the need to reinitiate consultation will be triggered. Id. Thus, the two ITSs provide an explanation for why a take number is impractical for listed salmon and sea turtles and a reasonable surrogate that sets a trigger for the reinitiation of consultation, and they comply with the ESA.[12]/  16 U.S.C. § 1536(b)(4).

**IV.    PLAINTIFFS CANNOT SHOW IRREPARABLE INJURY**

Along with showing that it has a likelihood of success on the merits, Plaintiffs must also show that they will suffer irreparable injury in the absence of the issuance of an injunction. See Amoco Produc. Co. v. Village of Gambell, 480 U.S. 531, 544-545 (1987); Save the Yaak Committee v. Block, 840 F.2d 714, 722 (9th Cir. 1988). The burden of justifying interim relief lies with the movant, and threatened, speculative harm does not amount to irreparable injury for purposes of justifying an injunction. National Wildlife Federation v. Burlington Northern Railroad, Inc., 23 F.3d 1508, 1512 (9th Cir. 1994); Goldie's Bookstore, Inc. v. Superior Court of California, 739 F.2d 466, 472 (9th Cir. 1984) (purely speculative injury "does not constitute irreparable injury").

It is important to note that the take of marines mammals in the form of harassment is authorized by law here. Accordingly, such harassment cannot be presumed to constitute irreparable injury since it is permissible under the MMPA and ESA subject to appropriate conditions, all of which have been met here. Second, Plaintiffs do not provide any credible evidence to support their allegations that SURTASS LFA can "kill, injure, harass, and disturb virtually all forms of marine life, including highly endangered

---

[12]/    Even if the programmatic BiOp had not included an ITS, it would have complied with the ESA because the Final Rule does not authorize take, which occurs through LOAs. 72 Fed. Reg. at 46,846. Under Arizona Cattle Growers, an ITS limiting otherwise lawful activities may issue only when it is "reasonably certain" that a take will result from the proposed action. 273 F.3d at 1243. Here, any take associated with issuance of the Final Rule could not be "reasonably certain" since subsequent mission siting and LOA authorization processes had to occur before the taking of marine mammals was authorized under the MMPA. Given that  LFA operations covered by the Final Rule would not take place until LOAs were obtained, take of other listed species related to LFA operation was also remote.

marine mammals," or that the "[d]eployment of LFA threatens to take great numbers of marine mammals and to injure the entire marine environment." Pl Br. at 28. While the Plaintiffs' many declarations contain statements describing alleged threats to the marine environment, those statements are either unsupported scientifically or just plain wrong. For example, Plaintiffs' and their experts place considerable stock in evidence correlating the use of <u>MFA</u> sonar with mass stranding events (under certain circumstances), and ask this Court to find that similar impacts may be caused by the operation of SURTASS LFA. Pl Br. at 5, 17, 25. As noted above, however, there is no foreseeable risk that SURTASS LFA sonar will contribute to beaked whale strandings. Plaintiffs ignore the best available science concerning effects of LFA sonar. <u>See</u> Clark Decl. ¶¶ 24-28, 33; Frankel Decl. ¶15.

There is also no evidence to support Plaintiffs' assertions that the operation of SURTASS LFA with mitigation will result in significant hearing loss, death, hemorrhaging similar to what was observed following some of the stranding events described above, or other significantly adverse effects. <u>See</u> SEIS at 4-30 to 4-37; Tyack Decl. ¶¶ 19-22; Clark Decl. ¶¶ 40-41. Based on a thorough analysis, the SEIS concludes that tissue damage from resonance and bubble growth via rectified diffusion would not occur below a received level of 180 and 190 dB, respectively, and explains that exposure at these levels is unlikely to occur due to the proven effectiveness of Navy's three-part monitoring protocol. <u>See</u> SEIS at 4-30 to 4-33; 50 C.F.R. § 216.184(a), (b); <u>see also</u> Johnson Decl. ¶¶ 30-32 (responding to Plaintiffs' assertions concerning the effectiveness of the Navy's monitoring protocol). Plaintiffs' concern with impacts to beaked whales is also unfounded, as the best available science indicates that beaked whales are much less sensitive to LFA frequencies than the baleen whales tested in the SRP, and therefore much less likely to exhibit a behavioral response to LFA frequencies. <u>Compare</u> Pl Br. at 5-6, 8, 17-18 <u>with</u> Tyack Decl. ¶¶ 14-15; Houser Decl. ¶¶ 22, 24; Clark Decl. ¶¶ 26-29. Similarly, Plaintiffs' argument that bubble growth may result from erratic diving or surfacing behavior by beaked whales exposed to LFA sonar has no merit. <u>See</u> Clark Decl. ¶¶ 16, 18, 20 (noting that baleen whales did not exhibit a "panic" response to LFA sonar); <u>id.</u> ¶¶ 27-31 (explaining that beaked whales are much less likely than baleen whales to exhibit behavioral responses to LFA); Houser Decl. ¶¶ 20-23 (same). Left with no scientific basis for their allegations of harm, Plaintiffs appeal to uncertainty by arguing that the true impact of LFA sonar cannot be known because most marine mammals sink upon death rather than stranding, but this argument is not

1    supported by empirical evidence.  See Houser Decl. ¶11; Ketten Decl. ¶¶ 13-14; Johnson Decl. ¶10.

2    Similarly, Plaintiffs' contention that strandings allegedly resulting from LFA use may go unnoticed

3    because there are no surveys in the mission areas following operations is contrary to record evidence.  In

4    short, Plaintiffs fail to show that irreparable harm will occur from operation of SURTASS LFA.  Given

5    the absence of irreparable injury, the Court should not enjoin its use.[13]/

6    **V.    THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST FAVOR THE UNITED STATES**

7          Where, as here, a strong likelihood of success on the merits has not been demonstrated, a plaintiff

8    must raise serious questions concerning the merits and show that the balance of harms tips sharply in its

9    favor.  Nat. Res. Defense Council v. Winter, __ F.3d __, 2007 WL 2481465 (9th Cir. 2007).[14]/  In making

10   this determination, this Court must consider both the public's interest in national security and military

11   preparedness and the harms that would be suffered by the Navy if this Court were to constrain the

12   operation of SURTASS LFA to the terms of the now expired permanent injunction.  Weinberger v.

13   Romero-Barcelo, 456 U.S. 305, 312 (1982); Natural Res. Def. Council v. Winter, — F.3d —, 2007 WL

14   2481465 at *2.  As explained more fully in the Classified Declaration of Rear Admiral John M. Bird, the

15   balance of injuries in the instant case tips sharply in favor of denying Plaintiffs' motion for a preliminary

16   injunction.  See Bird Decl. ¶¶ 8, 10-11, 15, 17.  Plaintiffs suggest that this Court need not consider the

17   Navy's harm or the public interest here because this Court "has already engaged in the required balancing

18   test . . . and found that the balance of hardships tipped decidedly in favor of the Plaintiffs."  Pl Br. at 29.

19   As with the majority of its arguments, however, Plaintiffs' attempts to rest on this Court's findings in

20   NRDC I are precluded by the development of a new record in the instant case.  New evidence indicates

21   that the harm caused to the Navy and the public interest as a result of the measures imposed in NRDC I

22   has increased since 2003, due to the Navy's increased need to train and operate in the littoral and coastal

23   areas where most future naval conflicts are likely to occur.  See SEIS at 1-8; Johnson Decl. ¶4; Bird Decl.

24

_____

25   [13]/    Plaintiffs misplace their reliance on Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir. 1989).  See Pl. Br. at 28.  "Merely establishing a procedural violation of NEPA does not compel the issuance of a preliminary injunction."  Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1400 (9th Cir. 1992).

26   [14]/    Plaintiffs err in asserting that for the "ESA claim, the balance of harms automatically favors Plaintiffs."  Pl Br. at 27.  National Wildlife Federation v. Burlington Northern Railroad, 23 F.3d 1508, 1510-11 (9th Cir. 1994).

27

28

¶9. At a minimum, this Court must determine whether the public's interest in military preparedness is served by an injunction prohibiting use of LFA sonar in the areas where it may be most needed.

In addition, several of the Court's specific observations bearing on the public interest and the Navy's relative injury must be revisited in light of new evidence cited herein and explained further in Rear Admiral Bird's Classified Declaration. For example, the Court in NRDC I observed that the Navy had failed to explain why it could not expand the coastal exclusion zone beyond the 12nm examined in the EIS "in all but the few coastal areas where conditions require the Navy to test and train close shore." 279 F. Supp.2d at 1162. The SEIS, however, fills this gap by explaining that the world's current political climate makes it impossible to forecast operational needs or operating locations over the next five years. SEIS at 2-5; see also id. at 2-7 ("National Security needs may dictate that many of these operational areas will be close to ports and choke points, such as entrances to straits, channels, and canals."). The evidence presently before the Court also indicates that, despite contrary findings in NRDC I, a permanent injunction would indeed "interfere with the Navy's ability to use LFA sonar during war or in response to imminent threat."[15] 279 F. Supp.2d at 1191. See Johnson Decl. ¶¶6-7 (explaining that the preparation of a system as complex as SURTASS LFA requires a phased training approach, and skills gained through this training are highly perishable and therefore must be maintained). In addition, training and testing through actual use of the SURTASS LFA system with Fleet units and against actual submarines is critical to the formulation of viable anti-submarine warfare tactics. Without this training, the Navy's ability to use SURTASS LFA in times of war or during high threat scenarios would be severely impaired. Bird Decl. ¶20. For these reasons, an injunction barring the Navy's use of SURTASS LFA within the littoral and coastal areas authorized in the LOAs would harm both the Navy and the public. Thus, even if this Court were to find that Defendants violated the law – a finding that the record does not support – this Court should nonetheless exercise its discretion in declining to enjoin the Navy's operation of LFA sonar.

---

[15] In weighing the public's interest in having a trained and effective Navy, this Court should exercise restraint and grant broad deference to the Navy's characterization of the harm the public would suffer in the event of an injunction .See Gilligan v. Morgan, 413 U.S. 1, 10 (1973); Dep't of Navy v. Egan, 484 U.S. 518, 530 (1988); Water Keeper Alliance v. Dep't of Defense, 271 F.3d 21, 35 (1st Cir. 2001).

1

**CONCLUSION**

2
For the foregoing reasons, the Court should deny Plaintiffs' motion.

3
Respectfully submitted this 15th day of November, 2007.

4
RONALD J. TENPAS
Acting Assistant Attorney General

5
United States Department of Justice
Environment & Natural Resources Division

6

7
JEAN E. WILLIAMS,  Chief

8
By:     /s/ Kristen L. Gustafson

9
KRISTEN GUSTAFSON, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division

10
Wildlife & Marine Resources Section

11

12
By:     /s/ Guillermo A. Montero

GUILLERMO MONTERO, Trial Attorney
MA Bar #660903

13
United States Department of Justice
Environment & Natural Resources Division

14
Natural Resources Section
Ben Franklin Station, P.O. Box 663

15
Washington, D.C. 20044-663
Tel. (202) 305-0443/ Fax (202) 305-0274

16
Guillermo.Montero@usdoj.gov

17
Attorneys for Federal Defendants

18

19

20

21

22

23

24

25

26

27

28