1

2  RONALD J. TENPAS
   Acting Assistant Attorney General
3  Environment and Natural Resources Division
   UNITED STATES DEPARTMENT OF JUSTICE

4  JEAN E. WILLIAMS, Chief
   KRISTEN L. GUSTAFSON, Senior Trial Attorney
5  Wildlife and Marine Resources Section
   GUILLERMO MONTERO, Trial Attorney
6  Natural Resources Section
   Environment & Natural Resources Division
7  UNITED STATES DEPARTMENT OF JUSTICE
   Benjamin Franklin Station - P.O. Box 7369/ P.O. Box 663
   Washington, D.C. 20044
8  (202) 305-0211 (tel.) / (202) 305-0443 (tel.)
   (202) 305-0275 (fax) / (202) 305-0274 (fax)
9  Kristen.Gustafson@usdoj.gov
   Guillermo.Montero@usdoj.gov

10 Counsel for Federal Defendants

11

12                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
13                     SAN FRANCISCO DIVISION

14

15

16 NATURAL RESOURCES DEFENSE COUNCIL,  )
   INC., et al.,                        )
17                                       )
          Plaintiffs,                    ) Civ. Action No. 07-4771-EDL
18                                       )
                                         )
                                         ) **DECLARATION OF**
19 CARLOS M. GUTIERREZ, SECRETARY OF     ) **JOSEPH S. JOHNSON**
   THE UNITED STATES DEPARTMENT OF       )
20 COMMERCE, et al.                      )
                                         )
                                         )
21        Federal Defendants.            )
   _____)

22

23

24

DECLARATION OF JOSEPH S. JOHNSON                                        1
Case No. 07-04771 EDL

1    I, JOSEPH STEVEN JOHNSON, pursuant to 28 U.S.C. 1746, declare as follows:

2    1.    I am a civilian employee (GS-15) of the U.S. Navy and currently serve as the

3    Director for Advanced Development of Undersea Systems, Program Executive Office (PEO) for

4    Integrated Warfare Systems (PEO IWS5A).  I currently oversee the development of advanced

5    technologies that are incorporated into existing antisubmarine warfare (ASW) platforms or form

6    the basis for new undersea warfare concepts.  In addition to my duties with PEO IWS, I led the

7    Navy team that, with the National Marine Fisheries Service (NMFS) as a cooperating agency,

8    evaluated the potential effects of Surveillance Towed Array Sensor System Low Frequency

9    Active (SURTASS LFA) sonar operations and reported those findings in the 2001 Final

10    Overseas Environmental Impact Statement/Environmental Impact Statement and the 2007

11    Supplemental Environmental Impact Statement (SEIS).  The SEIS provided the information

12    necessary to apply for a new five-year Final Rule under the Marine Mammal Protection Act

13    (MMPA), which NMFS granted in August 2007.  I am currently the principal Program Sponsor

14    for the 2007/2008 Deep-Diving Odontocetes Behavioral Response Studies, Phase I of which

15    was conducted at the Atlantic Undersea Test and Evaluation Center (AUTEC), Andros Island,

16    The Bahamas, August-September 2007.

17    2.    In my previous position, I was Chief Engineer for Maritime Surveillance

18    Systems (PMS 485)  I oversaw the technical execution of a $2 billion Five Year Defense Plan

19    (FYDP ) Integrated Undersea Surveillance System (IUSS) budget, and led a Team of

20    government civilian/military staff and over 100 civilian contractors.  Prior to that I was the

21    Technical Director for the Chief of Naval Operations, Submarine Warfare Division, Integrated

22    Undersea Surveillance Systems Branch, Code N774T.  My primary duties as Technical Director

23    included scientific and technical oversight of all IUSS operational sensors, development

24    programs, and research and development efforts.  I also acted as principal advisor to the IUSS

DECLARATION OF JOSEPH S. JOHNSON                                    2
Case No. 07-04771 EDL

1    Branch Head for programming, planning and budgeting for both near- and long-range

2    system/sensor upgrades and replacements, and introduction of new systems and sensors in the

3    Fleet.  From 1989 to 1998, I was responsible for the design, development, and Fleet

4    introduction of the SURTASS LFA sonar.

5          3.      In 1996, I became the Program Manager for the SURTASS LFA Environmental

6    Impact Statement (EIS) Program.  I have continued as the Program Manager for the Navy's

7    SEIS and application to NMFS for the subsequent five-year Final Rule and Letters of

8    Authorization (LOAs) for SURTASS LFA sonar operations.  Exhibit A lists some of my

9    publications and presentations about sonar.

10         4.      I graduated from George Mason University in 1981 with a B.S. in mathematics

11   (physics concentration).  I received my M.B.A. in finance from Marymount University in 1988.

12   My awards include the Navy Distinguished Civilian Service Award in 2003, the Navy

13   Meritorious Civilian Service Award in 1998, and the Navy Superior Civilian Service Award in

14   1996.

15         5.      Pursuant to the Court's Preliminary Injunction of November 15, 2002, and the

16   Permanent Injunction of October 14, 2003, the Navy has been conducting testing, training, and

17   operations with SURTASS LFA sonar in areas of the northwestern Pacific Ocean.  In this

18   declaration, I will:

19   •      Provide more specific information regarding SURTASS LFA sonar operations as well as

20   more information regarding the Navy's future plans for SURTASS LFA training and

21   operations;

22   •      Supply information on Navy-sponsored research into the potential effects of SURTASS

23   LFA on the marine environment;

24

DECLARATION OF JOSEPH S. JOHNSON                                                    3
Case No. 07-04771 EDL

1    •     Address specific issues raised in the Declarations of Dr. Baird, Mr. Calambokidis, Dr.

2    Hoyt, Dr. Parsons, Dr. Bain, Dr. DeSoto, Dr. Weilgart, Dr. Luczkovich, Dr. Vorontsova and Dr.

3    Whitehead filed in support of the Plaintiffs' motion for preliminary injunction; and

4    •     Address specific issues in the Plaintiff's Motion for preliminary injunction.

5         6.     Citations for any literature cited in my declaration are listed in Exhibit B.

6                          **The Need for Continuous Training**

7         7.     The best way to prepare a system as complex as SURTASS LFA for possible use

8    in an armed conflict or other contingencies is through a 'phased' training approach, in which the

9    training starts at a basic level and then becomes increasingly complex and intense as the

10   operators of the systems acquire the skills to use it effectively.  With respect to SURTASS LFA,

11   this phased approach needed to begin at a very basic level.  Every area of SURTASS LFA

12   employment and operations had to be addressed, including fundamental concepts, mission

13   planning, system performance, engineering, and active acoustic analysis.  Since 2002, we have

14   been able to develop operational proficiency at each level in the SURTASS LFA organization,

15   from basic operators through senior leadership.

16        8.     Training and operations during the past five years under the initial Rule and

17   LOAs have been successful in that SURTASS LFA has demonstrated the ability to detect target

18   submarines at long range.  Training has been successful in another important way in that the

19   SURTASS LFA crew skills are improving with each successive mission.  However, these skills

20   are extremely perishable—they will be lost if not used regularly.  For example, the ability of the

21   operator to distinguish submarine threat targets from the acoustic "clutter" caused by sound

22   echoes off the seafloor is just such a perishable skill.  Thus, with respect to the currently

23   deployed SURTASS LFA systems onboard the R/V (Research Vessel) *Cory Chouest* and the

24

1    USNS IMPECCABLE (T-AGOS 23)[1/], continued training is required to maintain the skills at

2    the highest levels.  Initial training and operations for the USNS ABLE (T-AGOS 20), which is

3    the next SURTASS LFA ship, are critical in order for the crew to develop the skills necessary to

4    facilitate the turnover of responsibility as the R/V *Cory Chouest* retires in 2008.  Moreover,

5    increasingly complex and intense training, such as training in littoral areas, is necessary to

6    ensure that those operating the system are able to face the demands that would be typical in

7    armed conflict or a real-world contingency.  Finally, training is necessary for new personnel due

8    to normal changes in assignments.  It is, therefore, vitally important that the training now

9    underway be permitted to continue uninterrupted so that the personnel who operate SURTASS

10   LFA will be ready to operate it effectively if needed during armed conflict or other

11   contingencies.

12                           **No Reports of Adverse Impacts**

13          9.      During the initial analyses and permitting process, a number of people expressed

14   concern that the use of LFA sonar would cause wide-spread impacts to the marine environment,

15   especially marine mammals.  This has simply not proven to be the case.  Independent scientific

16   research and the results of actual operations have proven otherwise.

17          10.     SURTASS LFA operations have been conducted by the R/V *Cory Chouest* and

18   USNS IMPECCABLE (T-AGOS 23) in stipulated areas in the northwest Pacific

19   Ocean/Philippine Sea, Sea of Japan, East China Sea, and South China Sea with certain year-

20   round and seasonal restrictions in accordance with the conditions of the Letters of Authorization

21   (LOAs) issued by NMFS.  Under the first five LOAs (August 2002 to August 2007), there were

22   58 missions with approximately 633 hours of active transmissions.  There have been no

23   indications of any strandings, or other harm, to marine mammals associated with the times and

24
_____
[1/]     T-AGOS is the designation for ocean surveillance ships.

1    locations of LFA operations in the northwestern Pacific Ocean.  In addition, estimates of Level

2    B harassment under the MMPA have been consistently below the limits imposed by NMFS in

3    the current Rule and LOAs, as issued.

4          11.    Plaintiffs contend that the Navy's statement that there have been no strandings

5    associated with SURTASS LFA training is baseless because there were no surveys in the area

6    after the operations.  This contention makes no sense to me in light of how SURTASS LFA has

7    been operating and continues to operate.  The Navy keeps detailed records of where and when

8    SURTASS LFA sonar is used, and the locations and times of those active operations (which are

9    classified) are reported to NMFS on a quarterly basis.  The Navy reviewed the available

10   stranding data in the areas where SURTASS LFA operations have occurred.  The stranding

11   reports showed a total of 19 strandings in Asia from January 2003 to August 2006.  None of the

12   reported strandings was coincident either temporally or spatially with SURTASS LFA

13   operations (SEIS at 10-89).  Although the Navy did not use post-operational aerial or small craft

14   surveys, that does not mean we have no data regarding the areas in which SURTASS LFA has

15   been recently used.  SURTASS LFA ships generally stay within a few hundred square miles

16   over the course of a mission; and in some cases employ a racetrack pattern, where the ship

17   actually doubles back on itself every 12 hours or so.  If there were injuries or mortalities, they

18   would have a reasonable probability to have been observed—none were.  It must also be noted

19   that in 1997 and 1998 during the Low Frequency Sound Scientific Research Program (LFS

20   SRP), LFA or LFA sources (full LFA array or an individual LFA source); operated very close

21   to shore, close to marine mammals (particularly baleen whales, several species of odontocetes

22   [including beaked whales], and pinnipeds) with no reported strandings.  These were very well-

23   publicized tests off the coasts of California and Hawaii where there are many viable stranding

24   networks.  There were numerous aerial, boat, and land-based observers before, during and after

DECLARATION OF JOSEPH S. JOHNSON                                                    6
Case No. 07-04771 EDL

1  these tests.  An examination of the facts shows that strandings associated with sonar have never

2  been linked to the sole operation of low frequency (LF) sonar, and our experience with

3  SURTASS LFA sonar bears this out.  (SEIS at 4-51 to 4-56, and 10-87 to 10-98).  Finally, it is

4  worth pointing out that aerial and small craft surveys were not required under the terms of the

5  permanent injunction, which Plaintiffs negotiated with the United States.  In the SEIS, the Navy

6  and NMFS carefully considered using small craft and aerial surveys and determined that such

7  surveys were not practicable.(SEIS at 5-6 to 5-8).  The Marine Mammal Commission (MMC)

8  agreed with this conclusion (SEIS at B-17).

9  **Navy Sponsored Research**

10  12.     The Navy sponsors significant research to study the potential effects of its

11  activities on the marine environment.  In order to fill scientific data gaps during the initial

12  analysis of SURTASS LFA sonar for the FOEIS/EIS, the Navy sponsored research to address

13  the potential effects of LF sound on human divers, which led the Navy to establish a 145-dB

14  received level (RL) criterion for recreational and commercial divers for LF sound exposure.

15  13.     Also during the initial process, the Navy provided independent scientists with the

16  sole use of the R/V *Cory Chouest* and other assets to assess potential effects to biologically

17  significant behavior of several species of baleen whale (those cetaceans considered to be the

18  most at risk from LF anthropogenic sounds) through the performance of controlled exposures.

19  This research, the 1997 to 1998 Low Frequency Sound Scientific Research Program (LFS SRP),

20  was the largest experiment of this type ever performed.  The results of this experiment have led

21  to the development of a risk function (analogous to dose-response curves that are used in

22  disciplines such as epidemiology, toxicology, and pharmacology) to determine the potential

23  behavioral impacts to marine mammals from LF sound.  Many of these data have been

24  published by the independent scientists, without prior Navy approval.

DECLARATION OF JOSEPH S. JOHNSON                                                        7
Case No. 07-04771 EDL

1   14.   The Navy has continued to sponsor research, most notably on the effects of LFA

2   sonar on fish.  The Navy has funded independent research by Dr. Arthur Popper (University of

3   Maryland), an internationally recognized fish acoustics expert, to determine the potential for

4   SURTASS LFA signals to affect fish, a prey species for marine mammals.  Dr. Popper has

5   described that research in much greater detail in his declaration.  The results of this research

6   have recently been independently published in the *Journal of the Acoustical Society of America,*

7   July 2007[2/].

8   15.   The Navy has also partnered with NOAA scientists and an international team of

9   experts to conduct behavioral response studies on deep-diving marine mammals in 2007 and

10  2008.  The team is using a sophisticated array of listening sensors on the seafloor at the U.S.

11  Navy's Atlantic Undersea Test and Evaluation Center (AUTEC) range east of Andros Island,

12  The Bahamas, to detect, track, and monitor diving behavior, as well as mid-frequency sound

13  produced during the experiment.  They are attaching specialized data tags to the animals, using

14  suction cups, to record their movements and the sound they produce and receive.  Scientists are

15  monitoring animal behavior before, during, and after sound exposure.  The initial phase of the

16  Behavioral Response Study (BRS-07) took place on the AUTEC range during August and

17  September 2007.  Additional testing is planned for the summer of 2008.

18  16.   The Navy recognizes the importance of continued research on the effects of

19  anthropogenic sound on the marine environment.  The Navy sponsors approximately $12

20  million worth of research on marine mammals annually, producing numerous professional,

21

22

23  [2/]   Popper, A.N., M.B. Halvorsen, A. Kane, D.L. Miller, M.E. Smith, J. Song, P. Stein, and
    L.E. Wysocki.  2007.  The effects of high-intensity, low- frequency active sonar on rainbow
24  trout.  J. Acoust. Soc. Am. 122(1)

DECLARATION OF JOSEPH S. JOHNSON                                                              8
Case No. 07-04771 EDL

1    peer-reviewed literature.  The Navy will continue research on LF sound on marine mammals as

2    required by the Final Rule and NMFS LOAs, as issued.

3    **SURTASS LFA System Operations**

4         17.    At present, there are two SURTASS LFA sonar systems—one each onboard the

5    R/V *Cory Chouest* and USNS IMPECCABLE (T-AGOS 23).  In addition to these systems, a

6    compact active system has been developed for deployment from existing, smaller SURTASS

7    SWATH-P (Small Waterplane Area Twin Hull-Passive) ocean surveillance ships.  This system

8    upgrade is known as Compact LFA, or CLFA.  CLFA consists of smaller, lighter-weight source

9    elements than the current LFA system, and will be compact enough to be installed on the

10   existing SURTASS platforms.  The operational characteristics of the compact system are

11   comparable to the existing LFA systems as presented in the FOEIS/EIS and Final SEIS.  The

12   frequency requirements for the Compact LFA (CLFA) are somewhat higher, but still within the

13   original 100 to 500 Hz range.  Therefore, the potential impacts from CLFA are expected to be

14   similar to, and not greater than, the effects from the existing SURTASS LFA systems.  Because

15   the CLFA and LFA systems have essentially the same operational parameters, the analyses

16   presented in the FOEIS/EIS in 2001 and the Final SEIS in 2007 are valid for both CLFA and

17   LFA.

18        18.    Three CLFA systems are planned between 2008 and 2011 for the T-AGOS Class

19   19 of ocean surveillance ships.  The first CLFA equipped ship, the USNS ABLE (T-AGOS 20),

20   is scheduled to be operational in the summer of 2008 and will replace the R/V *Cory Chouest*,

21   with the R/V *Cory Chouest* retiring in 2008.  However, no more than two or three systems will

22   be operational through fiscal year (FY) 2010.  Early in FY 2011 the potential exists for four

23   vessels to be operational (SEIS at 2-3).  At no point are there expected to be more than four

24

DECLARATION OF JOSEPH S. JOHNSON                                                                  9
Case No. 07-04771 EDL

1  systems in use, and thus the SEIS considers the employment of up to four systems—the same

2  number of systems analyzed in the Final OEIS/EIS in 2001.

3  **SURTASS LFA Sonar Supplemental Analysis**

4      19.      In response to the Court's ruling on the motion for preliminary injunction, the

5  Deputy Assistant Secretary of the Navy for Environment (DASN(E)) on 11 April 2003 directed

6  the Navy to prepare a supplemental environmental impact statement (SEIS) to address concerns

7  identified by the Court, to provide additional information regarding the environment that could

8  potentially be affected by the SURTASS LFA sonar systems, and to provide additional

9  information related to mitigation.  Specifically, the purpose of the SURTASS LFA Sonar SEIS

10  is to:

11  •      Address concerns of the U.S. District Court for the Northern District of California in its

12  26 August 2003 Opinion and Order in relation to compliance with the National Environmental

13  Policy Act (NEPA), Endangered Species Act (ESA), and Marine Mammal Protection Act

14  (MMPA)[3/];

15  •      Provide information necessary to apply for a new five-year Final Rule and annual LOAs

16  that would provide for incidental takes under the MMPA when the prior rule expired in August

17  2007, taking into account legislative changes to the MMPA and the need to employ up to four

18  SURTASS LFA sonar systems;

19  •      Analyze potential impacts for LFA system upgrades; and

20  •      Provide additional information and analyses pertinent to the proposed action.

21      20.      The Draft SEIS was released for public review on October 28, 2005 with a 92-

22  day comment period ending on February 10, 2006.  The Navy received only 97 comments on

23  _____

[3/]      On December 2, 2004, the Court vacated and dismissed certain MMPA claims based on

24  the National Defense Authorization Act Fiscal Year 2004 (NDAA FY04) amendments to the
MMPA.

DECLARATION OF JOSEPH S. JOHNSON                                                    10
Case No. 07-04771 EDL

1   the Draft SEIS, compared to the 1,070 comments received on the Draft OEIS/EIS in 1999.

2   During the comment period, three public hearings were held in:

3   •       December 1, 2005 in Washington, DC;

4   •       December 3, 2005 in San Diego, CA; and

5   •       December 5, 2005 in Honolulu, HI.

6   The Final SEIS was released in April 2007 and the Record of Decision was signed on August

7   15, 2007 by the Assistant Secretary of the Navy (Installations and Environment) (ASN[I&E]).

8   **Potential Impacts**

9           21.     Plaintiffs argue that SURTASS LFA sonar will cause marine mammal strandings

10  similar to those in The Bahamas (2000), Hawaii (2004), and Canary Islands (2002, 2004).  In

11  particular, they argue that ships operating LFA sonar "would train no farther from shores with

12  deep water than the sonar vessels implicated in the Bahamas, Hawaii, and other stranding

13  events"; and SURTASS LFA is likewise intended to exploit surface ducts, particularly at high

14  latitudes.  Plaintiffs' Motion ( page 17).  Plaintiffs' declarant, Dr. Natacha Aguilar De Soto,

15  further asserts that a 12 nm coastal exclusion zone does not remove the risk of mortalities

16  because in several of the stranding and mortality events in which ship tracks were reported (e.g.,

17  The Bahamas in 2000 and the Canary Islands in 2004), sonars were operated well beyond that

18  distance.  Aguilar De Soto ¶7.  Each of Plaintiffs' arguments suffers from the same flaw, i.e.,

19  none of those strandings involved SURTASS LFA.  For example, by referring to "…the sonar

20  vessels implicated in the Bahamas…", the Plaintiffs appear to purposefully omit the fact that the

21  vessels in the Bahamas stranding event were operating MFA sonar, not SURTASS LFA sonar.

22  Final OEIS/EIS Figure 1-4 (shown below) is a composite audiogram using measured and

23  estimated marine mammal hearing data to illustrate the contention that mysticetes (baleen

24

DECLARATION OF JOSEPH S. JOHNSON                                                        11
Case No. 07-04771 EDL



**Figure 1-4. Composite audiogram of measured and estimated marine mammal hearing data (DoN 2007).**

whales) have the best LF hearing of all marine mammals and that LF hearing sensitivity for odontocetes and pinnipeds is much lower than for mysticetes.

22.    SURTASS LFA sonar has never been implicated in any strandings at any time the system has been operating.  Moreover, there is no LFA operational scenario currently foreseeable that would duplicate the bathymetric, geographic, and oceanographic factors that contributed to the Bahamas strandings.  SURTASS LFA's primary operational practice is the use of convergence zone (CZ)[4] propagation paths in the ocean.  On occasion, when there is a

---

[4]      A convergence zone (CZ) is the region in the deep ocean where sound rays, refracted from the depths, arrive at the surface in successive intervals of 55 to 64 kilometers (30 to 35 nautical miles).  The repeated occurrence of these zones up to several hundred miles from the sound source depends on the refraction of sound at depth and the reflection of these rays at the

1    deep surface duct, particularly at high latitudes, SURTASS LFA sonar could be operated to take

2    advantage of that form of acoustic propagation, but that fact has no bearing on the potential for

3    SURTASS LFA to cause strandings because LFA transmissions only have the potential to

4    injure marine mammals at received levels of 180 dB and above, or approximately 1,000 meters

5    from the array.  Plaintiffs' reasoning here is particularly vexing, given the fact that SURTASS

6    LFA's strong point is its ability to detect submarines at long ranges, which, in the scenario

7    Plaintiffs' posit, would mean that the LFA vessel would generally be a significant distance from

8    shore in order to take advantage of surface duct sound propagation paths.

9        23.    Dr. Aguilar DeSoto also states that a surface duct did *not* occur during all naval

10   maneuvers related to strandings; e.g., during the exercises conducted in the Canary Islands in

11   2002, one of the most closely examined strandings related to sonar.  DeSoto Decl. ¶8.

12   Again, the declarant fails to acknowledge it was MFA sonar, not LFA sonar, that was associated

13   with the Canary Islands strandings in 2002.  Moreover, the declarant's insistence that the 2002

14   Canary Islands strandings occurred with no surface duct present is inaccurate.  D'Spain et al.

15   (2006)[5] state that in regard to the Canary Islands (2002) event, "…one profile…indicates the

16   presence of a surface duct of about 50 meters thickness."  The profile, at page 227 of the D'Spain

17   et al paper, shows nearly iso-velocity conditions (same sound speed throughout the water

18   column) from the surface to about 50 m, thus supporting the contention that there was indeed

19   surface ducting at the time of the strandings.

20       24.    Plaintiffs' declarants, Dr. Linda Weilgart and Dr. Edward Parsons, claim that the

21   Navy did not address the potential for cumulative impacts from the years of operating the LFA

22

23   surface.

[5]      D'Spain, G.L., A. D'Amico, and D.A. Fromm.  2006.  "Properties of the underwater

24   sound fields during some well documented beaked whale mass stranding events".  *The Journal of Cetacean Research and Management*  7( 3):223-237.

1    system in the same region or the cumulative impact of additional LFA noise on a local or

2    regional scale.  Weilgart Decl. ¶5 and Parsons Decl. ¶6.  Plaintiffs' declarants are wrong about

3    both claims.  The Navy evaluated cumulative impacts with "past, present, and reasonably

4    foreseeable future actions."(SEIS at 4-58).  The potential impact that up to four SURTASS LFA

5    sonars may have on the overall oceanic ambient noise level was reviewed in the following

6    contexts:

7    •       Recent changes to ambient sound levels in the world's oceans;

8    •       Operational parameters of the SURTASS LFA sonar system, including proposed

9    mitigation;

10   •       The contribution of SURTASS LFA sonar to oceanic noise levels relative to other

11   human-generated sources of oceanic noise; and

12   •       Cumulative impacts and synergistic effects.

13   Dr. Whitehead's Declaration at ¶7 claims that the complex sound field generated by different

14   sources of "aversive sound" may increase the risk of strong responses in marine mammals.  The

15   potential for a combination of LFA and MFA sonar systems involved in a training exercise to

16   generate "complex sound fields" that could increase the risk of strong responses in marine

17   mammals is minimal because: 1) LFA would be operating at least tens of miles away from any

18   MFA sonar platforms; 2) LFA operates in a different frequency band; and 3) LFA duty cycle is

19   typically only 7.5 percent, meaning 92.5 percent of the time there would be no LFA signals that

20   could "converge" with MFA signals.

21          25.     Plaintiffs have grossly exaggerated SURTASS LFA sonar's contribution to

22   ensonification of the world's oceans.  See, e.g. Hoyt Decl. ¶4 (asserting that a critical, mostly

23   unplanned-for threat to marine mammals in Marine Protected Areas (MPAs) comes from the

24   growing ensonification of the world's oceans); Parsons Decl. ¶6 (asserting that a single LFA

DECLARATION OF JOSEPH S. JOHNSON                                                          14
Case No. 07-04771 EDL

1    unit generates as much acoustic energy through six missions as 505 supertankers operating 300

2    days each).  In a recent analysis for the Policy on Sound and Marine Animals: An International

3    Workshop sponsored by the U.S. Marine Mammal Commission and the U.K. Joint Nature

4    Conservation Committee in 2004, Dr. John Hildebrand provided a comparison of anthropogenic

5    underwater sound sources by their annual energy output (Hildebrand, 2004).  He concluded that

6    increases in anthropogenic sources most likely to contribute to increased noise in order of

7    importance are: commercial shipping, offshore oil and gas exploration and drilling, and naval

8    and other uses of sonar.  As stated in the SEIS (4-63), the percentage of the total anthropogenic

9    acoustic energy budget added by each LFA source is actually closer to 0.5 percent per system

10   (or less), when other man-made sources are considered (Hildebrand, 2004).  When combined

11   with the naturally occurring and other man-made sources of noise in the oceans, the intermittent

12   LFA signals barely contribute a measurable portion of the total acoustic energy.  The SEIS

13   references the Hildebrand (2004) study as a means of estimating an annual energy budget to

14   compare contributions of each anthropogenic noise source.  Dr. Parsons' use of this study in his

15   "supertankers" comparison is inaccurate because it fails to take into account that, unlike the

16   noise from shipping, which is constant and ubiquitous, SURTASS LFA sound is inherently

17   transient.  While it contributes to a compilation of total acoustic energy added to the oceans per

18   annum, it in fact only exists for limited periods.  The exact length of the lifetime of a SURTASS

19   LFA ping is dependent on the acoustic propagation conditions in the ocean where it was

20   generated, but it dissipates quickly, and therefore does not add to the long-term noise levels in

21   the ocean.  Super tanker noise, by contrast, can always be detected in the deep oceans, and *does*

22   add to the long-term increase in oceanic ambient noise.

23        26.     Plaintiffs' declarant Dr. Maria Vorontsova states that airguns and other sources

24   of noise can compromise the fitness of individual western gray whales that feed in the shallow

1    nearshore waters of the continental shelf in near proximity to Piltun Lagoon off northeastern

2    Sakhalin Island[6/] from June until December (Vorontsova Decl. ¶11).  Dr. Vorontsova also states

3    that after feeding in that area, this population of gray whales migrates south off the coasts of

4    Japan and Korea (Province 53, in terms of LFA deployment) to breeding grounds believed by

5    researchers to be in the South China Sea (Province 64); Vorontsova Decl. ¶10.  The declarant

6    has lumped airguns with "other sources of noise", which is a misleading representation,

7    particularly if she is attempting to include LFA in the latter.  LFA and airguns are different

8    sound-producing devices, each with specific characteristics and purposes (SEIS at 10-57).

9    Furthermore, there are no current operational scenarios that include use of LFA in the Sea of

10   Okhotsk.  If or when this would occur, the 12 nm coastal standoff restriction would protect the

11   gray whales during their feeding in the Piltun Bay area, because any exposure of the animals to

12   LFA would be significantly diminished in level due to propagation losses as the signal traveled

13   up-slope from deep to shallow water.  Also, if any of the whales were to venture farther offshore

14   (e.g., during their migration) during such an operation, the tripartite monitoring and mitigation

15   procedures would help avoid any injury.  With regard to potential effects during the whales'

16   migration, the Court's Stipulation Regarding Permanent Injunction[7/] for the first NMFS Rule

17   included: 1) Sea of Japan area–restriction of LFA use May through July; 2) East China Sea

18   area–restriction of LFA use year-round in the vicinity of the whales' migration path from the

19   Korea Strait southwest to the Great Yangtze Bank area, and along the east coast of China, down

20   through the Taiwan Strait; and 3) South China Sea area–restriction of LFA use in the area to the

21

22

23   [6/]     Sakhalin Island is located approximately 20 km (11 nm) from the Russian mainland and
     60 km (32 nm) north of Hokkaido Island, Japan.

24   [7/]     Stipulation regarding permanent injunction.  October 14, 2003.  United States District
     Court, Northern District of California, San Francisco Division, Civil No. 02-3805-EDL.

1    east and northeast of Hainan November through April. The Navy currently continues to

2    recognize these restrictions.

3                              **Mitigation and Monitoring**

4            27.      Plaintiffs' declarant, Dr. Hal Whitehead, criticizes the Navy's coastal exclusion

5    zone analysis because it assumes that the SURTASS LFA source is stationary or moving

6    parallel to the coastline.  Dr. Whitehead argues, "Animals may try to seek safety in shallower

7    inshore waters, but if the source is also moving inshore, this becomes more difficult; the

8    situation would become more dangerous the closer the source is to land.  For this reason also, it

9    is preferable to keep mobile sources away from the coast."  Whitehead Decl. ¶16.

10           28.      The scenario that Dr. Whitehead posits, in which the source is moving inshore as

11   animals try to seek safety in shallower waters, is extremely unlikely, given the manner in which

12   SURTASS LFA sonar is typically operated.  The SURTASS LFA source vessel typically

13   operates at slow speeds of 2 to 4 knots, with no part of the track going closer to the shore than

14   12 nm.  Although, part of the time, the LFA vessel will necessarily be moving perpendicular

15   toward the coast, there is no foreseeable LFA operational scenario where this would be

16   occurring for an extended period of time.  Furthermore, the Navy goes through a sensitivity/risk

17   process (SEIS at 4-39) for all potential LFA mission areas for their annual LOA applications

18   that accounts for seasonal animal densities and sensitive animal activities so that LFA

19   operations are conducted in areas of minimal animal risk to the maximum extent operationally

20   practicable.  It should also be reiterated that, with five years of LFA operations and 58 LFA

21   missions completed under the initial Rule, there have been no reports of any marine animal

22   injuries and no significant behavioral reactions have been observed.

23           29.      Several of Plaintiffs' declarants argue for significant increases in the coastal

24   exclusion zone.  For instance, Dr. Whitehead claims, "[T]he optimal environmental solution

DECLARATION OF JOSEPH S. JOHNSON                                                        17
Case No. 07-04771 EDL

1    would establish a stand-off distance at the greatest possible distance from the coast and,

2    preferably, at some distance seaward of the shelf break, where cetaceans also concentrate."

3    Whitehead Decl. ¶17.  Mr. Calambokidis supports a buffer zone extending several hundred

4    miles, or one CZ ~30 nm.  Calambokidis Decl. ¶ 9.  And Dr. Baird argues for extending the zone

5    beyond 25 nm to protect island populations.  Baird. Decl. ¶18.  In addition to the biological

6    considerations discussed in the SEIS Subchapter 4.7.6 (which addresses a 25 nm coastal

7    exclusion zone in detail), a coastal stand-off of the suggested magnitude is impracticable for

8    national security reasons.  LFA operators need to test and train in the same oceanic environments

9    where they may find themselves in time of real-world hostilities, which will likely include more

10   complex environments such as the littorals.  Thus, it could be detrimental to the Navy's ASW

11   operational capability if the coastal standoff range for LFA were to revert back to the initial

12   permanent injunction ranges of 30 nm and/or 60 nm, for which there is no scientific basis.

13           30.     Plaintiffs offer a variety of criticisms about NMFS's selection of OBIAs, most of

14   which are addressed by NMFS's responses to comments in the Final Rule.  I respond here to

15   one particular complaint raised in the Whitehead Declaration.  Whitehead Decl. ¶ 11.  Dr.

16   Whitehead argues that the Navy should have considered the modeling for worldwide marine

17   mammal distributions that is being developed by the University of St. Andrews to assist the

18   British Royal Navy in managing its sonar training exercises.  Id.  The Navy is well aware of the

19   University of St. Andrews model, which is still a work in progress and must go through the

20   requisite peer-review process before it can be considered to be verified and validated.  The

21   Navy maintains contact with the University of St. Andrews organization responsible for the

22   model design and development, and it will continue to monitor its progress and potential

23   applicability to the selection of LFA operations areas in the future.

24           31.     The Plaintiffs' declarants Dr. David Bain and Dr. Robin Baird state that the

DECLARATION OF JOSEPH S. JOHNSON                                                          18
Case No. 07-04771 EDL

1    Barlow and Gisiner (2006) paper concludes that there are no effective detection methods for

2    beaked whales.  Bain Decl.¶11, Baird Decl.¶8.  This statement needs to be viewed in the context

3    of the entire suite of mitigation used with SURTASS LFA sonar.  The Barlow and Gisiner

4    (2006) paper stated that neither visual nor passive acoustic monitoring have a high probability of

5    detecting and identifying beaked whales.  First, it is worth noting that the Navy uses trained

6    personnel to conduct visual monitoring.  In accordance with 50 CFR § 216.185(a)(1), visual

7    monitoring must be conducted from the ship's bridge during all daylight hours by qualified

8    personnel.  Designation of qualified personnel and training is required as per LOA Condition

9    7(c), as issued, by qualified marine mammal biologists, trained in marine mammal observations.

10   For additional information, see FOEIS/EIS Subchapter 5.2.1, SEIS Subchapter 5.2.1 and 2002

11   Final Rule (67 FR 46752).  Moreover, Drs. Bain and Baird completely ignore the fact that each

12   SURTASS LFA platform employs not only visual and passive acoustic monitoring, but also the

13   highly effective HF/M3 sonar.  Even if, hypothetically, a beaked whale is not detected by visual

14   or passive acoustic means,  the HF/M3 active sonar employed on each SURTASS LFA platform

15   can be expected to detect a beaked whale before it enters the LFA mitigation zone (180-dB

16   sound field), which addresses Dr. Bain's and Dr. Baird's concerns that deep-diving species will

17   not be detected.  See Bain Decl. ¶11, Baird Decl. ¶¶6, 8, and 9.  Use of the HF/M3, in addition to

18   visual and passive acoustic monitoring, also addresses concerns raised by Dr. Parsons and Dr.

19   Aguilar De Soto about the effectiveness of visual surveys.  Parsons Decl.¶13, Aguilar De Soto

20   ¶13.  Finally, as part of the annual LOA application process, beaked whale habitats are avoided

21   to the greatest extent operationally practicable—although, it must be noted that, contrary to what

22   Plaintiffs' declarants claim, beaked whales are not endemic to every continental shelf break in

23   the oceans.

24           32.     In Plaintiffs' motion on page 7 and in their declarants Dr. Robin Baird, Dr.

DECLARATION OF JOSEPH S. JOHNSON                                                           19
Case No. 07-04771 EDL

1   Edward Parsons, and Dr. Natacha Aquilar De Soto argue that the tests performed more than five

2   years ago on the Navy's active acoustic monitoring system, the HF/M3, are insufficient to assess

3   the system's detection probabilities for deep-diving species, and that the low number of reported

4   HF/M3 detections over the Navy's first four years of operation, and the lack of visual sightings

5   to confirm any of those events, raise serious questions about the system's general efficacy in

6   actual monitoring conditions.  Baird Decl. ¶10; Parsons Decl. ¶13; Aguilar De Soto Decl. ¶13.  I

7   strongly disagree.

8           33.     The HF/M3 sonar testing discussed in the Final OEIS/EIS (2-16 through 2-22)

9   documents one of the most extensive and comprehensive field assessment programs for a marine

10  mammal monitoring device ever undertaken.  This testing utilized trained marine mammals in an

11  open ocean setting.  Furthermore, the probability of detecting marine mammals by the HF/M3

12  determined by the above testing is supported by analyses of field data in a sampling of 6 LFA

13  missions between June 2004 and February 2006 presented in the Final Comprehensive Report

14  (DON, 2007a).  Marine animals were initially detected by the HF/M3 sonars onboard the R/V

15  *Cory Chouest* and USNS IMPECCABLE at an average distance of 1,173 m (1,283 yd) from the

16  array and tracked for an average of 21 minutes.  The nominal sweep rate (the time it takes the

17  sonar to complete a 360° horizontal search) for the HF/M3 is 45 to 60 seconds (DON, 2001).

18  Therefore, marine animals would be expected to be within the HF/M3 search beam in excess of 5

19  times; thus, these field data support the premise that even for small odontocetes, the probability

20  of detection is high (FOEIS/EIS at 2-21).  Whether or not the marine mammal is deep-diving

21  (e.g., a beaked whale) is irrelevant; when it penetrates the search beam, it has a very high

22  probability of reflecting HF/M3 transmitted energy and being detected.  Moreover, I disagree

23  that the relatively low number of marine mammals detected by the HF/M3 sonar indicates a

24  failure of the Navy's monitoring regime.  In my view, a better interpretation of these data is that

1    the mitigation requirements imposed by NMFS and the Navy's operations area selection process

2    had placed much of the LFA operations in areas with fewer marine mammals, and that the lack

3    of observed adverse effects supports the interpretation that the mitigation measures were

4    effective.

5        34.    Plaintiffs' declarant Dr. David Bain has suggested that the 5-minute ramp-up

6    period is inadequate given normal marine mammal swimming speeds and the fact that that the

7    initial reaction to noise may not be to move away.  Bain Decl. ¶17.  I assume that the declarant is

8    referring to the HF/M3 sonar and not the SURTASS LFA sonar.  HF/M3 ramps up over a 5-

9    minute period, from 180 dB SL to 220 dB SL.  As stated in response to Comment 5.2.17 in the

10    SEIS (DON, 2007b), the requirement to ramp-up the HF/M3 ensures that marine mammals and

11    sea turtles are detected by the HF/M3 sonar at the lowest sound level possible.  If a marine

12    mammal or sea turtle is detected during ramp-up within the 180-dB sound field, further increases

13    in power are not initiated until the animal is no longer detected.  LFA transmission will not

14    commence until there are no further detections by the HF/M3 sonar within the buffer and

15    mitigation zones for at least 15 minutes.  The HF/M3 ramp-up was never intended to be used to

16    scare the animal(s) away.

17        35.    Plaintiffs' declarant Dr. Joseph Luczkovich argues that the Navy should adopt

18    stronger mitigation measures for fish including methods such as air spotting and active sonar to

19    detect large schools for fish that meet the size threshold (although he does not say what threshold

20    he believes is appropriate) and temporary shutdown procedures.  Aerial surveys and use of active

21    sonar to detect schools of fish are addressed in detail in the SEIS (5-7 to 5-8, 10-139, 10-143,

22    and 10-144) and discussed above.  It should be noted that the Marine Mammal Commission in its

23    comments on the Draft SEIS stated that they concurred with the Navy that carrying out small

24    boat and aerial surveys immediately before and during SURTASS LFA sonar operations in the

1  various offshore training areas would not be a practical mitigation option (SEIS at B-17).  More

2  fundamentally, Dr. Luczkovich's claims are based on the unfounded premise that the LFA

3  source will harm fish and negatively impact fish populations.  See Popper Declaration; SEIS at

4  4-71.  Finally, as a practical matter, a large fish or large fish school may be detected by the

5  HF/M3 sonar, because there is no practical way for the sonar operator to distinguish the target

6  that could be created by a large fish or a fish school from other animals (e.g., baleen whale,

7  dolphin, sea turtle).  On those occasions, the LFA shut down protocols would be implemented in

8  accordance with the current LOAs and CNO Executive Directive to the Fleet (SEIS at 10-42).

9          36.     Plaintiffs claim that aerial monitoring is practicable for SURTASS LFA sonar

10  operations because under the National Defense Exemption (NDE) the Deputy Secretary of

11  Defense required aerial monitoring (conditions permitting) for certain MFA sonar activities in all

12  Navy's training ranges and operations areas (PI Motion at p. 14).  First, the SURTASS LFA

13  sonar SEIS considered the 2006 and 2007 National Defense Exemptions (NDEs) in the decision-

14  making process (SEIS at 1-14 and 6-2).  The 2006 NDE applied to MFA sonar only for a period

15  of six months.  The current January 23, 2007 NDE applies for two years to the use of MFA sonar

16  "during major training exercises" or "within established Department of Defense maritime ranges

17  or established operating areas," and, like the 2006 NDE, it is not applicable to LFA sonar

18  operations.  Under the current NDE, aerial surveys for marine species will be conducted by

19  aircraft *participating* in the ASW event, "when operationally feasible and safe" and "as long as it

20  does not violate safety constraints or interfere with the accomplishment of primary operational

21  duties."  (Plaintiff's Exh. 80 at 2).  The SEIS explains that SURTASS LFA sonar vessels

22  ordinarily do not operate with other fleet assets (SEIS at 5-6, 5-8).

23          37.     Finally, Plaintiffs contend that aerial surveys may be safe and practicable when

24  launched from airbases in close proximity to LFA operational sites, such as the Northern

DECLARATION OF JOSEPH S. JOHNSON                                                                22
Case No. 07-04771 EDL

1    Marianas Islands or Guam (PI Motion at page 24).  As stated above, aerial surveys were

2    considered in the decision process (SEIS at 5-6 to 5-8).  The proximity of LFA operations to

3    land-based airfields does not change this decision.  To date SURTASS LFA operations have not

4    been close to airfields.  More importantly, LFA operations are classified, making the utilization

5    of civilian land-based aircraft impracticable for national security reasons.  Further, as stated

6    above, the MMC does not support aerial monitoring for LFA.

7                                                    **Conclusion**

8              38.       The SURTASS LFA sonar program has made every attempt to meet the very

9    complex regulatory compliance requirements under NEPA, MMPA, ESA, and other applicable

10   laws and regulations.  This process has been open to the public and comments have been

11   welcomed.  As data gaps were recognized, funds were programmed to sponsor independent,

12   scientific research to resolve these issues.  Research efforts are ongoing.  The regulatory process

13   necessary to permit SURTASS LFA operations has been arduous.  Yet, after five years of

14   SURTASS LFA sonar use under the previous permits, there has been no known harm to the

15   marine environment, most notably no known injury to marine mammals.  This lack of serious

16   impacts from SURTASS LFA sonar operations is consistent with the results of recent research

17   and the conclusions of the initial and supplemental SURTASS LFA environmental analyses.

18

19

20

21

22

23

24

DECLARATION OF JOSEPH S. JOHNSON                                                                               23
Case No. 07-04771 EDL

1    Pursuant to 28 U.S.C. §1746, I hereby declare under penalty of perjury that the

2    foregoing is true and correct to the best of my knowledge, information, and belief.

3

4         Executed this  14  day of   November   , 2007 in   Arlington, VA

5

6    _____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DECLARATION OF JOSEPH S. JOHNSON                                              24
Case No. 07-04771 EDL

EXHIBIT A—JOSEPH S. JOHNSON'S SELECTED PUBLICATIONS/REPORTS

1. Record of Decision for Surveillance Towed Array Sensor System Low Frequency Active (SURTASS LFA) Sonar. (J.S. Johnson, DoN PM) 15 August 2007.

2. Annual Report No. 5: Operation of the Surveillance Towed Array Sensor System Low Frequency Active (SURTASS LFA) Sonar Onboard the R/V *Cory Chouest* and USNS IMPECCABLE (T-AGOS 23) Under the National Marine Fisheries Service Letters of Authorization of 15 August 2006, (J.S. Johnson, DoN PM) May 2007

3. Final Supplemental Environmental Impact Statement for SURTASS LFA Sonar (J.S. Johnson, DoN PM); 2007

4. Final Comprehensive Report for the Operation of the Surveillance Towed Array Sensor System Low Frequency Active (SURTASS LFA) Sonar Onboard the R/V *Cory Chouest* and USNS IMPECCABLE (T-AGOS 23) Under the National Marine Fisheries Service Regulations 50 CFR 216 Subpart Q. (J.S. Johnson, DoN PM) January 2007

5. Annual Report No. 4: Operation of the Surveillance Towed Array Sensor System Low Frequency Active (SURTASS LFA) Sonar Onboard the R/V *Cory Chouest* and USNS IMPECCABLE (T-AGOS 23) Under the National Marine Fisheries Service Letters of Authorization of 12 August 2005, (J.S. Johnson, DoN PM) May 2006

6. Annual Report No. 3: Operation of the Surveillance Towed Array Sensor System Low Frequency Active (SURTASS LFA) Sonar Onboard the R/V *Cory Chouest* and USNS IMPECCABLE (T-AGOS 23) Under the National Marine Fisheries Service Letters of Authorization of 13 August 2004, (J.S. Johnson, DoN PM) May 2005.

7. Annual Report No. 2: Operation of the Surveillance Towed Array Sensor System Low Frequency Active (SURTASS LFA) Sonar Onboard the R/V *Cory Chouest* and USNS

1   IMPECCABLE (T-AGOS 23) Under the National Marine Fisheries Service Letters of

2   Authorization of 16 August 2003, (J.S. Johnson, DoN PM) May 2004.

3   8. High Frequency Marine Mammal Monitoring Active Sonar System. in *Proceedings of the*

4   *Workshop on Active Sonar and Cetaceans*, European Cetacean Society 17th Annual Conference,

5   Las Palmas, Gran Canaria, 8 March 2003.

6   9. Annual Report No. 1: Operation of the Surveillance Towed Array Sensor System Low

7   Frequency Active (SURTASS LFA) Sonar Onboard the R/V Cory Chouest Under the National

8   Marine Fisheries Service Letter of Authorization of 16 August 2002, (J.S. Johnson, DoN PM)

9   May 2003.

10  10. SURTASS LFA Sonar: A Scientific Paradigm for Federal and State Environmental

11  Compliance (SECRET), (with J. Mayer and C. Spikes). In *Journal of Underwater Acoustics*.

12  2002.

13  11. High Frequency Marine Mammal Monitoring Active Sonar System, (with Stein, P.J., J.

14  Rudzinsky, M. Birmann, and W.T. Ellison). In *Proceedings of Acoustical Society of America*

15  *Meeting*, 3-6 Dec 2001. Fort Lauderdale, FL, 2002.

16  12. Record of Decision for Surveillance Towed Array Sensor System Low Frequency Active

17  (SURTASS LFA) Sonar. Federal Register Vol. 67, No. 141, p. 48145-48154. (J.S. Johnson, DoN

18  PM) 23 July 2002.

19  13. High Frequency Marine Mammal Monitoring Active Sonar System, (with Stein, P.J., W.T.

20  Ellison). In *Proceedings of the Oceans 2001 MTS/IEEE Meeting*, Honolulu, HI. November 2001.

21  14. Final Overseas/Environmental Impact Statement for SURTASS LFA Sonar (J.S. Johnson,

22  DoN PM); 2001.

23

24

1     EXHIBIT B—LITERATURE CITED

2

3     Barlow, J. & Gisiner, R., 2006. Mitigating, monitoring and assessing the effects of anthropogenic

4     sound on beaked whales. Journal of Cetacean Research and Management, **7**(3):239-249.

5     DoN (Department of the Navy). 2001. Final overseas environmental impact statement and

6     environmental impact statement for Surveillance Towed Array Sensor System Low Frequency

7     Active (SURTASS LFA) sonar. Chief of Naval Operations: Washington, D.C.

8     DoN (Department of the Navy). 2007a. Final Comprehensive Report for the Operation of the

9     Surveillance Towed Array Sensor System Low Frequency Active (SURTASS LFA) Sonar

10    Onboard the R/V *Cory Chouest* and USNS IMPECCABLE (T-AGOS 23) Under the National

11    Marine Fisheries Service Regulatyions 50 CFR 216 Subpart Q. January 2007.

12    DoN (Department of the Navy). 2007b. Final supplemental environmental impact statement for

13    surveillance towed array sensor system low frequency active (SURTASS) sonar, Volume I.

14    Washington, D.C.: Chief of Naval Operations.

15    D'Spain, G.L., A. D'Amico, and D.A. Fromm.  2006.  "Properties of the underwater sound fields

16    during some well documented beaked whale mass stranding events".  The Journal of Cetacean

17    Research and Management  7( 3):223-237.

18    Hildebrand, J. 2004. Overview of Sound Sources in the Marine Environment. Presentation given

19    at the First Plenary Meeting of the Advisory Committee on Acoustic Impacts on Marine

20    Mammals, Marine Mammal Commission, 3-5 February 2004, Bethesda, Maryland.

21    Popper, A. N., M. B. Halvorsen, E. Kane, D.D. Miller, M.E. Smith, P. Stein, and L.E. Wysocki.

22    2007. The effects of high-intensity, low-frequency active sonar on rainbow trout. Journal of the

23    Acoustical Society of America 122:623-635

24

DECLARATION OF JOSEPH S. JOHNSON                                                              27
Case No. 07-04771 EDL