1  RONALD J. TENPAS
2  Acting Assistant Attorney General
3  Environment and Natural Resources Division
4  UNITED STATES DEPARTMENT OF JUSTICE
5  JEAN E. WILLIAMS, Chief
6  KRISTEN L. GUSTAFSON, Senior Trial Attorney
7  Wildlife and Marine Resources Section
8  GUILLERMO MONTERO, Trial Attorney
9  Natural Resources Section
10  Environment & Natural Resources Division
11  UNITED STATES DEPARTMENT OF JUSTICE
12  Benjamin Franklin Station - P.O. Box 7369/ P.O. Box 663
13  Washington, D.C. 20044
14  (202) 305-0211 (tel.) / (202) 305-0443 (tel.)
15  (202) 305-0275 (fax)/ (202) 305-0274 (fax)
16  Kristen.Gustafson@usdoj.gov
17  Guillermo.Montero@usdoj.gov
18
19  Counsel for Federal Defendants
20
21                    UNITED STATES DISTRICT COURT
22                  NORTHERN DISTRICT OF CALIFORNIA
23                       SAN FRANCISCO DIVISION
24
25  NATURAL RESOURCES DEFENSE COUNCIL, )
26  INC., et al.,                      )
27                                     )
28            Plaintiffs,              ) Civ. Action No. 07-4771-EDL
29                                     )
30  v.                                 )
31                                     ) **DECLARATION OF**
32  CARLOS M. GUTIERREZ, SECRETARY OF  ) **REAR ADMIRAL**
33  THE UNITED STATES DEPARTMENT OF    ) **JOHN M. BIRD, U.S. NAVY**
34  COMMERCE, et al.                   )
35                                     )
36            Defendants.              )
37  _____)
38
39
40

DECLARATION OF REAR ADMIRAL JOHN M. BIRD, USN
Case No. CV 07-04771 EDL

1    I, Rear Admiral John M. Bird, do hereby declare as follows:

2

3    **I. INTRODUCTION AND QUALIFICATIONS**

4    1.    I graduated from the United States Naval Academy in 1977 with a Bachelor of Science

5    degree in Mechanical Engineering.  Subsequently, I earned a Masters of Science degree in

6    Engineering Management from Catholic University of America.  I have also completed the

7    Massachusetts Institute of Technology Seminar XXI in Foreign Affairs, International Relations

8    and National Security, an educational program for senior military officers, government officials,

9    and business executives in the national security policy community.

10

11    2.    Upon graduating from the U.S. Naval Academy, I began a career as a submarine officer

12    in the U.S. Navy.  Among my operational assignments, I have served on both fast attack and

13    ballistic missile submarines in both the Pacific and Atlantic Fleets. Some of my operational

14    assignments have included service on: *USS Seahorse* (SSN 669), an attack submarine;  *USS*

15    *Simon Bolivar* (SSBN 641), a fleet ballistic missile submarine; *USS Sea Devil* (SSN 664), an

16    attack submarine; and *USS Tunny* (SSN 682), also an attack submarine. My most recent

17    submarine assignment was on the *USS Scranton* (SSN756), an attack submarine, where I served

18    as the Commanding Officer and was awarded the Naval Submarine League's Jack Darby Award

19    for Inspirational Leadership and Excellence in Command. While I was Commanding Officer, the

20    *USS Scranton* also earned the Submarine Squadron Six Battle Efficiency "E" award[1] for two

21    consecutive years in 1994 and 1995. From August 1999 to April 2001, I commanded Submarine

22    Squadron EIGHT (SUBRON EIGHT) which included eight fast attack submarines stationed in

23    Norfolk, Virginia.  SUBRON EIGHT exercises operational control over its fast attack

24    submarines, a function which encompasses responsibility for tactical and operational readiness

---

[1]    The Battle Efficiency "E" is awarded annually to the small number of U.S. Navy ships,
submarines, aviation and other units that win their battle efficiency competition. The criterion for
the Battle Efficiency Award is the overall readiness of the command to carry out its assigned
wartime tasks, and is based on a year-long evaluation. The competition for the award is, and has
always, been keen. To win, a ship or unit must demonstrate the highest state of battle readiness.

2

DECLARATION OF REAR ADMIRAL JOHN M. BIRD, USN
Case No. CV 07-04771 EDL

1  for war, inspection and monitoring, nuclear and radiological safety, and development and control
2  of submarine operating schedules.

3

4  3.    Staff assignments I have held staff assignments as Special Assistant (Legislative Affairs)
5  to the Chief of Naval Personnel; Principal Assistant in the Office of Deputy Chief of Naval
6  Operations for Undersea Warfare (Readiness and Tactics); Joint Chiefs of Staff Division Chief
7  for Central, South and Southeast Asia; Assistant Deputy Director for Political-Military Affairs
8  Asia, also on the Joint Chiefs of Staff; and Director Operations and Plans, Logistics and
9  Engineering, United States Joint Forces Command .

10

11  4.    From September 2005 to December 2006, I served as the Commander of Submarine
12  Group SEVEN (SUBGRU SEVEN), where I served as both Commander, Task Force SEVEN
13  FOUR[2] and Commander Task Force FIVE FOUR[3] in Yokosuka. In that role, SUBGRU SEVEN
14  was responsible for supporting operations in the Western Pacific and assumed administrative

---

[2]    Submarine Group SEVEN is comprised of submarines deployed to the Western Pacific, three submarines homeported in Guam, and a permanently forward deployed submarine tender. The deployed submarines are rotated from their homeports in Bremerton, Washington, San Diego, California and Pearl Harbor, Hawaii for approximately six months. The tender is home ported out of Guam. Additionally, Submarine Group SEVEN has a representative in Guam who liaisons for supply, logistics and repair support for all submarines assigned to Commander Task Force SEVEN FOUR. Commander Submarine Force Seventh Fleet coordinates and controls submarine activities over a vast expanse covering nearly forty-eight percent of the earth's ocean surface, ranging from the Western Pacific to the Indian Ocean. Commander Task Force SEVEN FOUR as Seventh Fleet's submarine movement advisory authority and operational commander directs all submarine operations and mission tasking requirements in the Seventh Fleet area of responsibility. Commander Task Force SEVEN FOUR is also responsible for staff briefings, reprovisioning and repairs for those submarines operating in Seventh Fleet.

[3]    Submarine Group SEVEN was activated as Commander Task Force ONE FIVE SEVEN on 15 October 1992 to direct all submarine operations and mission tasking requirements in the Central Command area of responsibility, including the Red Sea and Arabian Gulf. On 1 July 1995, upon establishment of U.S. Fifth Fleet in that same area of responsibility, Commander Task Force ONE FIVE SEVEN was redesignated as Commander Task Force FIVE FOUR.

3

DECLARATION OF REAR ADMIRAL JOHN M. BIRD, USN
Case No. CV 07-04771 EDL

1   control over deployed submarines and tenders, reporting to Commander, Submarine Forces

2   Pacific.

3

4   5.      In December 2006, I reported to U.S. Pacific Fleet, Pearl Harbor, Hawaii to assume

5   duties as Deputy Commander and Chief of Staff and continue to hold that responsibility.

6

7   6.      I have an intimate understanding and knowledge of Anti-Submarine Warfare (ASW) and

8   tactics. Through my past and present assignments, I am very familiar with the use of

9   Surveillance Towed Array Sensor System Low Frequency Active sonar (SURTASS LFA) and

10   the harm that will result to national security if the Navy is prevented from using SURTASS LFA

11   for routine training, testing, and operational missions. I have gained this understanding through

12   my extensive at-sea experience on attack and missile submarines, my operational assignments

13   directly relating to ASW, and my staff assignments that were primarily focused on undersea

14   warfare, joint (among services) warfighting capabilities, and foreign political-military issues.

15

16   7.      I have reviewed the unclassified declarations of Vice Admiral Nathman, Vice Admiral

17   Willard, Rear Admiral Padgett and Joseph Johnson that the Government submitted in previous

18   litigation in this Court regarding SURTASS LFA, *NRDC, et al. v. Evans, et al.*, Civ. No. 02-

19   3805 EDL. I agree with everything they have said about the critical need for SURTASS LFA

20   and the critical need to be able to test and train with it in a variety of conditions. Indeed, that

21   need has only increased since those declarations were submitted in 2002-2003.

22

23   **II. THE QUIET SUBMARINE THREAT**

24

25   8.      ASW is the Commander of the Pacific Fleet's (COMPACFLT) #1 warfighting priority.

26   Submarines are operated by numerous navies, including potential adversaries in the Asia-Pacific

27   and Middle East areas. U.S. Navy strike groups are constantly deployed to these high threat

1    areas. Today's modern, quiet diesel-electric submarines – operated by navies across the world –
2    pose the primary threat to the U.S. Navy's ability to perform a number of critically necessary
3    missions. These missions include being able to access and operate in waters near shore, control
4    strategic maritime chokepoints[4], transit international straits, and protect sea lines of
5    communication[5] supporting international commerce.
6
7    9.    Potential adversary nations are investing heavily in submarine technology, including
8    designs for nuclear attack submarines, strategic ballistic missile submarines, and advanced diesel
9    submarines. Over 40 countries have operational modern submarines, or are planning to add them
10   to their naval forces. There are a total of 470 submarines owned by 40 countries—operational
11   (392) or being built (78). Of these, 257 are diesel submarines—their combination of quiet
12   operation and effective weapons gives them a substantial and multifaceted combat capability.
13
14   10.    Diesel-electric submarines equipped with advanced propulsion systems and quieter
15   exterior coatings can covertly operate in the coastal and open ocean areas, possibly blocking U.S.
16   Navy access to combat zones and making U.S. vessels vulnerable to torpedo attacks. Detecting,
17   identifying, locating, tracking and, if necessary, holding[6] diesel-electric submarines is vitally
18   important to the U.S. Navy's ability to conduct operations and accomplish its mission.
19

---

[4]    A chokepoint is a strategic strait or canal which could be closed or blocked to stop sea traffic. There are approximately 200 straits (narrow bodies of water connecting two larger bodies of water) or canals around the world but only a handful are known as chokepoints.

[5]    Sea Lines of Communication refers to primary maritime routes between ports, used for trade, logistics and naval forces. One of the primary functions of the U.S. Navy is to conduct prompt and sustained combat operations at sea. This includes protecting vital sea lanes of communication.

[6]    "Holding" a submarine means to deny enemy submarines an offensive capability by maintaining the ability to destroy them, if and when required.

DECLARATION OF REAR ADMIRAL JOHN M. BIRD, USN
Case No. CV 07-04771 EDL

1    11.    Modern diesel-electric submarines are designed to suppress emitted noise levels
2    specifically to counter and defeat the best available passive sonar technology. Passive sonar
3    involves listening for sounds emitted by a potentially hostile submarine in order to detect,
4    localize and track it. As submarines become quieter through improved sound dampening
5    technology, the usefulness of passive sonar systems has greatly diminished. Until at very close
6    ranges, a diesel-electric submarine operating on battery power is nearly undetectable to U.S. and
7    allied naval forces using passive sonar alone.

8

9    12.    The Russian Federation and the People's Republic of China have publicly declared that
10   the submarine is the single most potent ship in their fleets and the centerpiece of their respective
11   navies. Published naval strategies of potential adversaries, including Iran and North Korea, have
12   expressed similar strategic doctrine. As regional Asian economies recover from the 1997-98
13   financial crisis, established powers and smaller nations are planning to build or buy highly
14   capable new submarines. The competition threatens to shift the power balance among some of
15   the region's long-standing military rivals and poses a potential threat to key trade routes.

16

17   13.    China, Taiwan, India, Pakistan, Singapore, Malaysia, South Korea, Japan and Australia
18   are taking delivery or have ordered advanced, stealthy submarines armed with state-of-the-art
19   missiles and torpedoes capable of striking targets at sea or on land far from their home ports. The
20   2004 promotion of Admiral Zhang Dingfa, a career submariner, to Chief of Staff of the China's
21   People's Liberation Army Navy (PLAN) and a full seat on the Central Military Commission was
22   a clear signal of the primacy of submarine warfare in China's strategy for the Asia-Pacific region
23   (Tkacik, 2006). In February 2005, Secretary of Defense Donald Rumsfeld commented that the
24   size of the Chinese fleet could surpass the U.S. Navy's within a decade. Their new Song-class
25   and Yuan-class diesel-electric submarines will be more lethal when armed with Russian SKVAL
26   ("Squall") torpedoes, which public reports state can reach 200 knots (230 mph) underwater.

6
DECLARATION OF REAR ADMIRAL JOHN M. BIRD, USN
Case No. CV 07-04771 EDL

1    There are reports that the SKVAL is already operational on some Chinese submarines (Tkacik,
2    2006).

3

4    14.    Competition between China and India for maritime influence has keyed India's plan to
5    boost its submarine force with 17 new acquisitions over the next decade. Singapore's inventory
6    has recently reached four Swedish-built diesel submarines. Malaysia has ordered two French-
7    built conventional submarines expected to be operational in 2007 and 2008. With Singapore and
8    Malaysia in the submarine market, Thailand is now considering its underwater options.  As
9    explained in the Navy's Supplemental Environmental Impact Statement, when all these
10   submarines come into service, Asia's key waterways could again become as crowded—and as
11   dangerous—below the surface as they were at the height of the Cold War when U.S. and Soviet
12   submarines hunted each other on a regular basis.

13

14   15.    The destruction of U.S. Carrier Strike Groups (CSGs) and Expeditionary Strike Groups
15   (ESGs) is the focal point in the naval warfare doctrine of many non-aligned nations. CSGs
16   generally consist of six ships: an Aircraft Carrier and five surface combatant ships (combination
17   of Cruisers, Destroyers and Frigates).  In total, nearly 6,000 sailors are in the ships that comprise
18   a CSG. CSGs must be able to conduct operations from near-shore to open ocean, depending on
19   the mission (e.g., combat strike operations using the 48-60 aircraft onboard the carrier). Being
20   able to operate safely in such an environment requires the CSG's ASW commander, a senior
21   officer (CAPTAIN) that is embarked on the Aircraft Carrier, to coordinate the protection efforts
22   of the CSG against a number of opposition force submarines intent on either sinking the carrier,
23   or driving it from the areas in which it must operate.

24

25   16.    ESGs generally consist of three surface combatant ships, as well as a number of
26   amphibious ships, such as an Amphibious Assault ship, Transport Dock ship, and Dock Landing
27   ship, all of which carry U.S. Marines and the means to transport them ashore for amphibious

7

DECLARATION OF REAR ADMIRAL JOHN M. BIRD, USN
Case No. CV 07-04771 EDL

1    landings. ESGs must transit through areas contested by submarines and may be required to

2    conduct amphibious missions within sight of land or "over the horizon" from land. The mission

3    must be accomplished while also engaging opposition submarines and negotiating minefields—

4    all of which require constant attention and coordination by the ESG's ASW commander.

5

6

7    17.    A single diesel-electric submarine that is capable of penetrating U.S. or multinational task

8    force defenses could cause catastrophic damage to those forces, and jeopardize the lives of the

9    thousands of Sailor and Marines onboard our ships. Even the threat of the presence of a quiet

10    diesel submarine could effectively deny or delay U.S. or coalition naval forces access to vital

11    operational areas. As demonstrated in both World Wars, submarines inflict damages to both

12    merchant and military shipping. Compared to the period of World War II, the U.S. is much more

13    dependent on imports from the sea, making the mission of the U.S. Navy to protect vital sea lines

14    of communication even more critical now than it has been in the past.

15

16    18.    As an operational commander, it is my responsibility to know the location of potentially

17    hostile submarines that pose a threat to U.S. and allied forces. SURTASS LFA remains the most

18    effective and best available technology to detect these quiet submarines at long-range, before

19    they can get close enough to use their weapons. The continued availability of SURTASS LFA is

20    critical to the undersea surveillance capability necessary to locate and track these submarines.

21

22    **III. THE CONTINUED AVAILABILITY OF SURTASS LFA IS CRITICAL TO**

23    **NATIONAL SECURITY**

24

25    19.    SURTASS LFA is presently onboard two vessels, currently conducting operations in the

26    northwestern Pacific. The Navy intends to increase the number of these ASW essential

27    platforms to a total of four over the next five years. Only two or three systems will be

DECLARATION OF REAR ADMIRAL JOHN M. BIRD, USN
Case No. CV 07-04771 EDL

1  operational through September 2010, with the potential for four vessels to be operational shortly
2  thereafter.

3

4  20.      The Navy is obligated to provide the best available protection for our forces against the
5  submarine threats described above. SURTASS LFA has substantially increased this protection
6  through its ability to detect quieter and harder-to-find foreign submarines at long range. Training
7  and testing by actually using SURTASS LFA with Fleet units—and against real submarines—is
8  critical to the formulation of viable ASW tactics. SURTASS LFA sonar has been used with
9  great success over the last five years, but complex sonar skills are highly perishable and the
10  Navy must test and train continuously in order to maintain them. In addition, it is essential that
11  the Navy be able to test and train with SURTASS LFA in various ocean environments, not only
12  in limited deep-water areas, as the topography of the ocean bottom and other environmental
13  characteristics dramatically affect system operation. In a real-world situation, Navy sonar
14  operators need to know how to operate SURTASS LFA effectively in whatever environment
15  they may find themselves. As stated by the Vice Chief of Naval Operations in 2002, "No
16  operational commander can employ a system, of any type, with confidence that it is effective in
17  combat unless the personnel using the system have trained to use it and have used it, in a variety
18  of realistic situations." SURTASS LFA is a critical tool in the execution of Seventh Fleet theater
19  plans and operations. The continued uninterrupted operation of SURTASS LFA is a high
20  priority in this most challenging warfare area.

21

22  21.      As demonstrated in my classified declaration in this case, the Navy knows that there are
23  areas where it must be able to use SURTASS LFA sonar as close as 12 nm from the shore. Given
24  that system performance varies by area, and given that the Navy cannot predict with certainty
25  over the full five-year period of the Final Rule where and when it may need to use the system, it
26  is impracticable to attempt to tailor site-specific coastal exclusion zones for all areas described in
27  the Final Rule. Likewise, the difficulty of predicting where threats may occur cautions in favor

9

1  of a discriminating approach to the designation of those offshore biologically important areas
2  (OBIAs) where the use of SURTASS LFA sonar is excluded, since it is not difficult to imagine
3  how placing large areas of the ocean off limits to the sonar's use could have a negative impact on
4  the effectiveness of training, testing, and military operations.
5
6  22.     As addressed in my classified declaration in this case, the Navy provided the National
7  Marine Fisheries Service (NMFS) with information identifying the need to be able to use
8  SURTASS LFA sonar immediately following expiration of the prior authorization on August 15,
9  2007. This information indicated how a gap in SURTASS LFA sonar operations would
10  potentially be detrimental to national security.
11
12  **IV. CONCLUSION**
13
14  23.     While no real-world military action is risk-free, the Department of Defense and the
15  Department of the Navy have demonstrated that they are committed to the stewardship of the
16  environment and the seas. The environmental issues have been thoroughly examined over the
17  past ten years through comprehensive and unprecedented scientific research programs and
18  detailed analysis processes in accordance with applicable environmental laws and regulations.
19  As a result, the Navy and the National Marine Fisheries Service (NMFS) have determined that,
20  with appropriate mitigation measures, SURTASS LFA is and will continue to be used safely,
21  effectively, and in compliance with applicable environmental laws. During the last five years, in
22  accordance with NMFS regulations' monitoring and reporting requirements, the Navy has
23  documented any observed impacts of using SURTASS LFA in the northwestern Pacific Ocean
24  and reported these findings to NMFS. In five years of sonar operation, there has been no
25  reported harm to the marine environment and, most notably, no known injury to marine
26  mammals.
27

1  24.    SURTASS LFA has enabled the Navy to meet the clearly defined, real-world national
2  security need for improved ASW capability by allowing Navy Fleet units to reliably detect
3  quieter and harder-to-find submarines at long range, before they get within their effective
4  weapons range and can launch missiles or torpedoes against our ships or missiles against land
5  targets, foreign or domestic. The operative word here is has.  SURTASS LFA is a combat-ready
6  system.  But in order to protect U.S. and allied fleet assets, and merchant shipping, the operation
7  of SURTASS LFA sonar and the training of our personnel must continue uninterrupted.
8

9  25.    Without the continued operation of SURTASS LFA, both in the open ocean and in the
10 near-shore areas where U.S. Naval forces must operate, our Navy cannot effectively carry out its
11 charter for protection of U.S. and coalition naval forces from the possibility of hostile
12 submarines using torpedoes, missiles, and mines to target our military personnel and innocent
13 civilians. We must continue to counter these real submarine threats.
14

15         Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the
16 United States of America that the foregoing is true and correct to the best of my knowledge,
17 information and belief.
18

19         Executed on the 13th day of November, 2007, at Pearl Harbor, Hawaii

20
21
22                                      John M. Bird
23                                      Rear Admiral, U.S. Navy
24                                      Deputy Commander, United States Pacific Fleet
25
26
27

                                    11
DECLARATION OF REAR ADMIRAL JOHN M. BIRD, USN
Case No. CV 07-04771 EDL