*Exhibit B*

*Exhibit B*

1  THOMAS L. SANSONETTI
   Assistant Attorney General
2  Environment and Natural Resources Division

3  JEAN WILLIAMS, Chief
   Wildlife and Marine Resources Section
4  KRISTEN L. GUSTAFSON, Trial Attorney
   Wildlife & Marine Resources Section
5  ANN D. NAVARO, Senior Attorney
   General Litigation Section
6  MAUREEN RUDOLPH, Trial Attorney
   Policy, Legislation & Special Litigation Section
7  United States Department of Justice
   Environment & Natural Resources Division
8  Benjamin Franklin Station - P. O. Box 7369
   Washington, D.C. 20530
9  (202) 305-0211/ (202) 305-0462/ (202) 305-0544
   (202) 305-0275 (fax)/ (202) 305-0267 (fax)/ (202) 514-4231
10 Kristen.Gustafson@usdoj.gov

11 KEVIN V. RYAN (SBN 118321)
   United States Attorney
12 JAMES A. CODA (SBN 1012669 (WI))
   Assistant United States Attorney
13 Environment & Natural Resources Unit
   450 Golden Gate Avenue, Box 36055
14 San Francisco, California 94102
   Telephone No: (415) 436-6967
15 Facsimile No: (415) 436-6748

16 Attorneys for Defendants

17            UNITED STATES DISTRICT COURT

18           NORTHERN DISTRICT OF CALIFORNIA

19
   NATURAL RESOURCES DEFENSE COUNCIL, INC.,
20      et al.,

21           Plaintiffs,                     Civ. No. 02-3805-EDL

22                                           DEFENDANTS' MOTION FOR
                                             LEAVE TO SUBMIT
23      v.                                   CLASSIFIED EVIDENCE *IN
                                             CAMERA* AND *EX PARTE*
24 DONALD L. EVANS,                          AND MEMORANDUM IN
        et al.,                              SUPPORT
25           Defendants.

26

27
   Defendants' Motion & Mem. For Leave To Submit
28 Classified Evidence In Camera And Ex Parte
   Case No. C 02-3805 EDL

# TABLE OF CONTENTS

1

2   **MOTION** ................................................................................................................. 1

3   **STATEMENT OF ISSUES** ...................................................................................... 1

4   **MEMORANDUM** ..................................................................................................... 1

5   I.    Introduction .................................................................................................. 1

6   II.   Background ................................................................................................... 3

7   III.  Argument ...................................................................................................... 4

8         A.    Courts Routinely Review Classified National Security
                 Information In Camera And Ex Parte ............................................ 4
9
          B.    Reliance Upon Classified Information That Is Not Subject
10               To Public Review Is Expressly Contemplated By The
                 National Environmental Policy Act ............................................... 7
11
          C.    Only The Agency May Determine Who Has A "Need-to-Know"
12               Classified Information ..................................................................... 11

13               1.    Plaintiffs Do Not Have A "Need-to-Know" ....................... 11

14               2.    The Court Cannot Order The Navy To Release The
                       Classified Information To Plaintiffs' Counsel .................. 12
15
          D.    Classified Information Submitted For In Camera And Ex Parte
16               Review Will Be Limited And Narrowly Tailored ........................ 15

17        E.    Certain Security Arrangements Are Necessary ............................ 16

18  IV.   Conclusion .................................................................................................. 17

19

20

21

22

23

24

25

26

27

28

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

ACLU v. Barr, 952 F.2d 457 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

American-Arab Anti-Discrimination Committee v. Reno, 70 F.3d 1045 (9th Cir. 1995) . . . . . .  4

Becena v. Dalton, 94 F.3d 145 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Black v. Sheraton Corp., 564 F.2d 531 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . .  5

Brazil v. Department of the Navy, 66 F.3d 193 (9th Cir. 1991) . . . . . . . . . . . . . . . . . 12, 13, 14

Caribbean Marine Services v. Baldrige, 844 F.2d 668 (9th Cir. 1988) . . . . . . . . . . . . . . . . .  2

Cobb v. Danzig, 190 F.R.D. 564 (S.D. Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Dellums v. Powell, 561 F.2d 242 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Department of the Navy v. Egan, 484 U.S. 518 (1988) . . . . . . . . . . . . . . . . . . . . . . . passim

Dorfmont v. Brown, 913 F.2d 1399 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14

Ellsberg v. Mitchell, 709 F.2d 51 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Frost v. Perry, 919 F. Supp. 1459 (D. Nev. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fund for Animals, Inc. v. Lujan, 962 F.2d 1391 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . .  1

Guillot v. Garrett, 970 F.2d 1320 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Haig v. Agee, 453 U.S. 280 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13, 14

Halkin v. Helms, 598 F.2d 1 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Halperin v. CIA, 629 F.2d 144 (D.C. Cir.1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Halperin v. Kissinger, 807 F.2d 180 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 12

Hudson River Sloop Clearwater v. Department of Navy, 891 F.2d 414 (2d Cir. 1989) . . . . 8, 10

Kasza v. Browner, 133 F.3d 1159 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Kiareldeen v. Ashcroft, 273 F.3d 542 (3rd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 14

Meridian International Logistics, Inc., v. United States, 939 F.2d 740 (9th Cir. 1991) . . . 5, 6, 15

Molerio v. FBI, 749 F.2d 815 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

National Council of Resistance of Iran v. Department of State, 251 F.3d 192 (D.C. Cir. 2001)    4

Perez v. FBI, 71 F.3d 513 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Pollard v. FBI, 705 F.2d 1151 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Regan v. Wald, 468 U.S. 222 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Ryan v. Reno, 168 F.3d 520 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Salisbury v. United States, 690 F.2d 966 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . 4

Students Against Genocide v. Department of State, 257 F.3d 828 (D.C. Cir. 2001) . . . . . . . 14

United States v. American Telephone & Telegraph Co., 567 F.2d 121 (D.C. Cir. 1977) . . . . . . 5

United States v. Belfield, 692 F.2d 141 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Wabun-Inini v. Sessions, 900 F.2d 1234 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Weberman v. National Security Agency, 668 F.2d 767 (2nd Cir. 1982) . . . . . . . . . . . . . . . . 6

Webster v. Doe, 486 U.S. 592 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Weinberger v. Catholic Action of Hawaii, 454 U.S. 139 (1981) . . . . . . . . . . . . . . . . . . . . 7, 8

Westlands Water District v. National Res. Def. Council, 43 F.3d 457 (9th Cir. 1994) . . . . . . 1, 2

**FEDERAL STATUTES**

5 U.S.C. §§552(b)(1), (b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq . . . . . . . . . . . . . . . . . . 7

**FEDERAL REGULATIONS**

28 C.F.R. § 17.17(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16
     § 17.46(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

60 Fed. Reg. 19825 (April 17, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 15

60 Fed. Reg. 40245 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     40248 (August 2, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1
2
3
4

## MOTION

For the reasons stated below, Defendants respectfully move for leave to submit certain classified information to the Court for *in camera* and *ex parte* review pursuant to the procedures described herein and in the attached proposed order.

5

## STATEMENT OF ISSUES

6
7
8
9

The issue before the Court is whether the Court may review certain narrowly tailored classified information relating to national security *in camera* and *ex parte* when considering the balance of the harms if the Navy were preliminarily enjoined from using the active sonar component of the SURTASS LFA system.

10

## MEMORANDUM

11  **I.    Introduction**

12
13
14
15
16
17

This memorandum explains that the Court's review of certain classified national security information *in camera* and *ex parte* is warranted. It is well established that district court judges have the discretion to tailor a proceeding as necessary to accomplish a just result, including the discretion to conduct *in camera* and *ex parte* review of sensitive information in appropriate circumstances. As Defendants explain below, this case presents precisely the type of circumstances that justify the exercise of this type of discretion.

18
19
20
21
22
23
24
25
26

On September 13, 2002, Plaintiffs will file a motion with this Court seeking a preliminary injunction to prevent the United States Navy from operating a new and highly effective active sonar system that will provide the crucial improved ability to detect the presence of potentially hostile submarines and protect our armed forces at sea. This new system, Surveillance Towed Array Sensor System Low Frequency Active (SURTASS LFA) Sonar, was the subject of an unprecedented scientific research effort, extensive public review, environmental analysis pursuant to the National Environmental Policy Act, and review by the National Marine Fisheries Service of the National Oceanic and Atmospheric Administration pursuant to both the Endangered Species Act and the Marine Mammal Protection Act.

27
28

Defendants' Motion & Mem. For Leave To Submit
Classified Evidence In Camera And Ex Parte
Case No. C 02-3805 EDL

1    In assessing the Plaintiffs' motion for a preliminary injunction and the Defendants'

2  opposition thereto, the Court will examine certain familiar factors: "In order to obtain a

3  preliminary injunction, a party must demonstrate either (1) a likelihood of success on the merits

4  and a possibility of irreparable injury, or (2) the existence of serious questions on the merits and a

5  balance of hardships tipping in its favor." Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1400

6  (9th Cir. 1992) (citation omitted); accord Westlands Water Dist. v. Nat. Res. Def. Council, 43

7  F.3d 457, 459 (9th Cir. 1994). "These two tests are not separate but represent a sliding scale in

8  which the required probability of success on the merits decreases as the degree of harm

9  increases." Westland Water Dist., 43 F.3d at 459 (citation omitted). Importantly, if the public

10  interest is involved, a court must determine whether the balance of public interests supports the

11  issuance or denial of an injunction.  Caribbean Marine Services v. Baldrige, 844 F.2d 668, 674

12  (9th Cir. 1988).

13    The public interest, in the form of the protection of national security and the enhancement

14  of military preparedness, is prominent in this matter.  Defendants anticipate that they will submit

15  declarations by Navy officials that will explain the harm to the public interest that would be

16  caused by the Plaintiffs' requested injunction.  This information would be presented to the Court

17  in three forms: (1) in an unclassified declaration that will set forth the importance of SURTASS

18  LFA sonar and the reasons that its use cannot be delayed; (2) in limited, narrowly tailored

19  classified declarations, subject to in camera and ex parte review, that will provide detailed

20  information regarding both the effectiveness of the system against modern quiet submarines and

21  the current threats faced by the United States Navy; and (3) in an unclassified or redacted version

22  of the classified declarations.  Of course, while this short summary represents what Defendants

23  currently believe will be contained in these declarations, the precise information needed to

24  address the public interest factor cannot be determined until Defendants have reviewed Plaintiffs'

25

26

27

28    Defendants' Motion & Mem. For Leave To Submit
     Classified Evidence In Camera And Ex Parte
     Case No. C 02-3805 EDL

1    motion.[1]/

2         As Defendants discuss further below, the procedure that Defendants suggest, *in camera*

3    and *ex parte* review of certain limited information, is routinely followed in cases involving

4    national security matters.  Moreover, if this *in camera* and *ex parte* review occurs as Defendants

5    suggest, Plaintiffs' ability to present their case will not be infringed significantly because that

6    they will receive in an unclassified form an explanation of the need to use SURTASS LFA sonar

7    and the reasons its use cannot be delayed; Defendants' ability to present information essential to

8    their defense will not be significantly hampered; national security information will not be

9    compromised; and the Court will be able to weigh all information relevant to its analysis.

10   **II.     Background**

11        Executive Order 12958 "prescribes a uniform system for classifying, safeguarding and

12   declassifying national security information." 60 Fed. Reg. 19825 (April 17, 1995).  Under the

13   order, information may be classified if it is properly considered within one of the applicable

14   categories, which includes information related to military plans, weapons systems or operations,

15   *Id.* at 19817, and the originating agency determines that release of the information "could be

16   expected to result in damage to the national security."  *Id.* at 19826.  Material is classified into

17

18

19   ─────────────────────────

20   [1]/     Defendants believe that the classified declarations will be self-explanatory, not requiring
     specific briefing or argument by Defendants unless the Court requests further explanation.  This

21   approach does *not* indicate that the information lacks importance to the Court's inquiry – rather
     because the classified declarations will provide important detail supporting the unclassified material

22   submitted to the Court and addressed in Defendants' brief, discussion of the precise details of the
     classified information should not be necessary.  Moreover, any written argument regarding the

23   classified information would have to take place on secured computers and any discussion of the

24   specific content of the classified declarations would have to take place in a closed hearing with only
     those possessing the necessary clearances, including a cleared court reporter.  Any brief or transcript

25   would be subject to the same handling and storage requirements as the classified declarations

26   themselves.  While these are not insurmountable problems, Defendants believe that they do not need
     to be confronted in this proceeding.

27
     Defendants' Motion & Mem. For Leave To Submit
28   Classified Evidence In Camera And Ex Parte
     Case No. C 02-3805 EDL
                                              3

1   one of three levels: confidential, secret and top secret.[2]/  *Id.* at 19826-7.  Classified documents

2   can contain both classified and unclassified material and Executive Order 12958 requires that on

3   "each classified document [the agency] shall, by marking or other means, indicate which portions

4   are classified, with the applicable classification level, which portions are exempt from

5   declassification [] and which portions are unclassified." 60 Fed. Reg. 19825, 19829.  If the

6   document contains both classified and unclassified information, it can be redacted and the

7   prohibitions against disclosure do not apply to the unclassified material.

8   **III.    Argument**

9   **A.    Courts Routinely Review Classified National Security Information *In Camera* and *Ex Parte***

10          It is well established that Courts may review classified national security information *in*

11  *camera* and *ex parte* in a variety of situations. [3]/  *See, e.g., Kasza v. Browner*, 133 F.3d 1159 (9th

12  Cir. 1998) (*in camera* and *ex parte* review of declarations supporting state secrets privilege claim

13

14  _____

15  [2]/     Executive Order 12958 defines the different levels of classified materials as follows: "Top
    Secret" shall be applied to information, the unauthorized disclosure of which reasonably could be

16  expected to cause exceptionally grave damage to the national security that the original classification
    authority is able to identify or describe.  "Secret" shall be applied to information, the unauthorized

17  disclosure of which reasonably could be expected to cause serious damage to the national security
    that the original classification authority is able to identify or describe.  "Confidential" shall be

18  applied to information, the unauthorized disclosure of which reasonably could be expected to cause

19  damage to the national security that the original classification authority is able to identify or describe.
    *Id.* at 19826-7.

20

21  [3]/     Generally, our democratic adversarial system relies upon the sharing of information with
    both sides of the controversy. *See American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d

22  1045, 1069 (9th Cir. 1995) (quoting *Anti-Fascist Committee v. McGrath*, 34 U.S. 123, 170 (1951).
    However, "[t]he national interest requires that certain information be maintained in confidence

23  through a system of classification in order to protect our citizens, our democratic institutions, and

24  our participation within the community of nations.  The unauthorized disclosure of information
    classified in the national interest can cause irreparable damage to the national security and loss of

25  human life." 60 Fed. Reg. 40245.  "It is 'obvious and unarguable' that no governmental interest is

26  more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (internal
    citations omitted).

27

28  Defendants' Motion & Mem. For Leave To Submit
    Classified Evidence In Camera And Ex Parte
    Case No. C 02-3805 EDL

                                             4

1   appropriate); National Council of Resistance of Iran v. Dep't of State, 251 F.3d 192 (D.C. Cir.

2   2001) (*ex parte* review appropriate in case involving national security concerns); Molerio v. FBI,

3   749 F.2d 815, 825 (D.C. Cir. 1984) (*in camera* and *ex parte* review used to resolve merits of

4   constitutional claim); Salisbury v. United States, 690 F.2d 966, 973 n.3 (D.C. Cir. 1982) ("In the

5   instant case, although resort to in camera affidavits was not strictly necessary, the public

6   affidavits being sufficient to support the agency's claim, the District Court was within its

7   discretion in recognizing that important rights were at stake, and in wishing to 'confirm( )' what

8   the public affidavits already indicated."); Pollard v. FBI, 705 F.2d 1151, 1153 (9th Cir. 1983)

9   (upholding *in camera, ex parte* review of documents withheld by the government under FOIA).

10  *Ex parte* review is derived from a court's inherent discretionary power to adopt those procedures

11  that are necessary and appropriate to a particular case.[4]/ See United States v. American

12  Telephone & Telegraph Co., 567 F.2d 121, 131-34 (D.C. Cir. 1977); Black v. Sheraton Corp.,

13  564 F.2d 531, 544-45 (D.C. Cir. 1977); Dellums v. Powell, 561 F.2d 242, 250 (D.C. Cir. 1977).

14          As the Ninth Circuit has stated, "'[e]x parte, in camera hearings are part of a trial judge's

15  procedural arsenal . . . .'" Wabun-Inini v. Sessions, 900 F.2d 1234, 1246 (9th Cir. 1990) (internal

16  citations omitted). In the Wabun-Inini case, the Ninth Circuit addressed a claim that the district

17  court "committed prejudicial error by accepting" *ex parte* and *in camera* submissions that related

18  to the merits of the appellants' claim that the government had violated his rights under the Fourth

19  Amendment of the U.S. Constitution. Id. The appellate court rejected that claim, noting that

20  _____

21  [4]/      For example, were Plaintiffs to seek the classified information that Defendants intend to use
    in this matter pursuant to request made under the provisions of the Freedom of Information Act
22  (FOIA), that request would be properly denied based on Exemption 1. Exemption 1 allows agencies
    to withhold production of materials that are "specifically authorized under criteria established by an
23  Executive Order to be kept secret in the interest of national defense or foreign policy and ... are in
    fact properly classified pursuant to such Executive Order." 5 U.S.C. § 552(b)(1). Were Plaintiffs
24  to seek judicial review of that decision, the court would conduct an *in camera* and *ex parte* review
25  of the documents to determine whether the decision was proper, resolving the merits of the plaintiffs'
    claims without allowing the plaintiffs themselves to see the documents. Pollard v. FBI, 705 F.2d
26  1151, 1153 (9th Cir. 1983).

27
    Defendants' Motion & Mem. For Leave To Submit
28  Classified Evidence In Camera And Ex Parte
    Case No. C 02-3805 EDL

1   where the government provides the necessary "public justification supporting the right to [ex

2   parte] examination," by submitting a legal memorandum and public declaration in the case, a

3   court may, and in Wabun-Inini properly did, resort to *ex parte* review of information.[5] Id. at

4   1247 (receipt of *ex parte, in camera* submissions reviewed under abuse of discretion standard).

5          In Meridian International Logistics, Inc., v. United States, 939 F.2d 740 (9th Cir. 1991),

6   the Ninth Circuit again recognized the ability of a district court to review information on an *in

7   camera* and *ex parte* basis when necessary.  In Meridian, the plaintiff appealed a district court

8   decision dismissing its libel and slander suit after the United States was substituted as the

9   defendant for an FBI agent certified to have been acting in the course of his official duties.  The

10  suit was dismissed because the United States possessed immunity from such actions.  One issue

11  on appeal was whether the district court had properly relied upon an *in camera* and *ex parte*

12  review of the  declaration certifying that the agent's actions were official ones -- the review that

13  ultimately led to dismissal of the plaintiffs' claims.  Id. at 745.  In responding to the plaintiff's

14  claim that the documents should have been subject to review by both parties, the government

15  argued that "to compel disclosure of the FBI declarations would place the Government in an

16  untenable situation – either reveal the secrets of an ongoing investigation or allow an agent to be

17  sued in an individual capacity." Id.

18         In holding that the court's *in camera* and *ex parte* review was proper, the Ninth Circuit

19  explained:

20         While in our judicial system adversary proceedings are the norm and ex parte
           proceedings the exception, this court has generally recognized the capacity of a
21         district judge to "fashion and guide the procedures to be followed in cases before
           him."  "[D]istrict judges are able to consider matters that may be unique to
22         particular fact situations and tailor procedures to serve the ends of justice...." We
           find that the procedure used by the court in the instant case was proper; it
23         adequately balanced the rights of the Government and Meridian.  The
           Government's interest in having FBI documents, which relate to an ongoing

24

25  [5]     As described above, the information at issue in this matter is classified for national security

26  reasons.  Assuming that the Court grants Defendants' motion, Defendants anticipate submitting an

27  explanation of the level of and reason for the classification of the documents.

28  Defendants' Motion & Mem. For Leave To Submit
    Classified Evidence In Camera And Ex Parte
    Case No. C 02-3805 EDL

                                        6

1    investigation, remain confidential was clearly satisfied by the court's action; and
     although Meridian did not have the opportunity to conduct discovery and cross
2    examine the Government's witnesses, its interests as a litigant are satisfied by the
     ex parte/in camera decision of an impartial district judge.  However, because
3    procedures such as these should be used only in unique situations, we are careful
     to limit our holding to the precise facts of this case.

4    
5    Id. (internal citations omitted) (emphasis added).  See also Weberman v. National Security

6    Agency, 668 F.2d 767, 678 (2nd Cir. 1982) (affidavit reviewed on ex parte basis "simply create[d]

     a more complete record"; the "risk presented by participation of counsel ... outweighs the utility
7
     of counsel, or adversary process, in construing a supplement to the record.").
8
9            As the Ninth Circuit was careful to note in Meridian, 939 F.2d at 745, "procedures such

10   as these should be used only in unique situations ...."  This case, with important implications for

11   national security, is such a case.  Moreover, as in the Meridian case, the procedure proposed by

     the Defendants in this matter adequately balances the rights of the parties and allows the Court to
12
     "tailor [its] procedures to serve the ends of justice ...."  Id.  Defendants have proposed to submit
13
14   on an ex parte basis certain limited classified information relating to the harm to the public

15   interest that would be caused by an injunction.  Specifically, the classified documents will

16   provide regarding both the effectiveness of the system against modern quiet submarines and the

     current threats faced by the United States Navy.  Information regarding the importance of the
17
     system and the reasons it cannot be delayed will be provided in an unclassified form to which the
18
19   Plaintiffs may respond.  The Court will then have all the relevant factors before it for review

20   when reaching a decision, and the Plaintiffs' interests "are satisfied by the ex parte/in camera

21   decision of an impartial district judge."  Id.

22   **B.      Reliance Upon Classified Information That Is Not Subject To Public Review Is
             Expressly Contemplated By The National Environmental Policy Act**

23           Plaintiffs in this action bring several claims, including one under the National

24   Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq.  The classified information that

25   Defendants believe will likely be relevant to the Court's analysis, additional detail regarding the

26   "purpose and need" for the system as discussed in the EIS, will be submitted to assist assessment

27   

28   Defendants' Motion & Mem. For Leave To Submit
     Classified Evidence In Camera And Ex Parte
     Case No. C 02-3805 EDL

                                          7

1   of the public interest, as opposed to the potential merit of Plaintiffs' NEPA claim. See Ex. 1. It

2   is well established that a plaintiff has no right of access to classified information that supports the

3   challenged agency decision merely by virtue of bringing a NEPA claim.

4           Indeed, the Supreme Court has confronted the issue of the availability of classified

5   information to the plaintiff in a NEPA action. In Weinberger v. Catholic Action of Hawaii, 454

6   U.S. 139, 141-42 (1981), the Department of Navy constructed an ammunition and weapons

7   storage facility capable of storing nuclear weapons and had prepared an environmental impact

8   assessment (EIA). For national security reasons, and pursuant to its own regulations, the Navy

9   did not disclose in the EIA whether it was actually storing nuclear weapons at the facility. Id. at

10  141. Prior to completion of the facility, a number of organizations challenged the failure of the

11  Navy to prepare a more detailed Environmental Impact Statement (EIS) and specifically

12  complained that the Navy's EIA had failed to assess the risks associated with nuclear weapons

13  storage. Id. at 142. Upon review, the Supreme Court addressed the interrelationship of the twin

14  goals of NEPA, public disclosure and informed decisionmaking, in the context of undisclosed

15  national security information, concluding that "a federal agency might have to include

16  environmental considerations in its decisionmaking process, yet withhold public disclosure of

17  any NEPA documents, in whole or in part, under the authority of a FOIA exemption." 454 U.S.

18  139, 142-43 (1981). Thus, the Court held, inter alia, that "whether or not nuclear weapons are

19  stored at [the facility] is classified information exempt from disclosure to the public under

20  Exemption 1 [of FOIA]." 454 U.S. at 146, and concluded, in relevant part, that "[u]ltimately,

21  whether or not the Navy has complied with NEPA, 'to the fullest extent possible' is beyond

22  judicial scrutiny in this case." Id.

23          Similarly, in Hudson River Sloop Clearwater v. Dept. of Navy, 891 F.2d 414 (2d Cir.

24  1989), several environmental and arms control groups challenged, in relevant part, the Navy's

25  compliance with NEPA with regard to its New York Harbor Homeport proposal. Hudson River,

26  891 F.2d at 416-17. The Navy had prepared an EIS and a supplemental EIS on its Homeport

27

28  Defendants' Motion & Mem. For Leave To Submit
    Classified Evidence In Camera And Ex Parte
    Case No. C 02-3805 EDL

                                              8

1   proposal, both of which the agency released for public review and comment, and additionally

2   conducted an internal consideration of the classified components of the proposal, which the

3   agency did not disclose to the public, pursuant to FOIA Exemptions 1 and 3, 5 U.S.C. §§

4   552(b)(1), (b)(3). Id. at 416-417, 421. These classified components related to the environmental

5   impacts associated with the stationing and deployment of nuclear weapons at the Homeport. Id.

6   at 416-417. The plaintiffs claimed that this internal, non-public deliberation violated NEPA. Id.

7   The Court of Appeals for the Second Circuit found that the Navy had properly invoked FOIA and

8   that "NEPA's mandates are 'essentially procedural'. . . and do not require that environmental

9   concerns be preferred to other appropriate considerations," and that "[c]learly national security

10  interests are among those other considerations." Id. at 423 (internal citations omitted).

11       In another NEPA case involving classified information, the U.S. District Court for the

12  District of New Mexico considered a plaintiff's motion for permission to designate their own

13  representatives to review a classified supplement to a Final EIS. Memorandum Opinion and

14  Order, Los Alamos Study Group v. O'Leary, C.A. 94-1306 (D.N.M., October 23, 1995), attached

15  hereto as Defendants' Exhibit 2. In that case, the Department of Energy had prepared and

16  released to the public an EIS for the construction of the Dual Axis Radiographic Hydrodynamic

17  Test Facility (DARHT) at Los Alamos. The NEPA analysis depended in part on material that

18  DOE classified as Restricted Data under the Atomic Energy Act. Id. at 3. These materials were

19  made available to the Court in a separate classified supplement to the EIS.

20       The court rejected plaintiffs' arguments that classification of the materials by the DOE

21  was an effort to shield the EIS from review and that designation of a properly-cleared

22  representative would ensure that plaintiffs' interests and position would be supported in the

23  litigation. Id. at 3. The court concluded that plaintiffs' interests were adequately protected by the

24  opportunity that the court would have to conduct an *In camera* and *ex parte* inspection of the

25  classified material. Id. at 4. Subsequently, when the court upheld the adequacy of DOE's NEPA

26  compliance and dismissed the case, it encouraged DOE "to use the format of a classified

27

28  Defendants' Motion & Mem. For Leave To Submit
    Classified Evidence In Camera And Ex Parte
    Case No. C 02-3805 EDL

                                    9

1  supplement whenever necessary" because it assisted the court in considering the adequacy of

2  DOE's environmental review.  Memorandum Opinion and Order, Los Alamos Study Group et al.

3  v. O'Leary, C.A. 94-1306 (D.N.M., April 16, 1996) (Def. Ex. 3)

4        The rulings of Catholic Action, Hudson River Sloop, and Los Alamos Study Group

5  plainly apply to this case, and nothing in those rulings can be construed as creating a special right

6  for a member of the public, merely by virtue of bringing a lawsuit, to obtain classified documents

7  that relate to the NEPA analysis at issue.  In fact, in Hudson River Sloop, supra, the Second

8  Circuit stated "that by giving [plaintiffs] access to a classified report would defeat the

9  equilibrium between the military's need for secrecy and the public's right to have access to

10  official information." 891 F.2d at 423, citing Catholic Action, 454 U.S. at 145.  See also Frost v.

11  Perry, 919 F. Supp 1459, 1467 (D. Nev. 1996) ("The need for a classified Declaration . . . only

12  underscores the national security issues . . . present in this lawsuit.  Forcing Defendants to

13  divulge the contents of such a declaration would only result in further harm to the national

14  security."), aff'd Kasza, 133 F.3d 1159.

15        Importantly, these cases acknowledge that a litigant cannot have access to certain

16  information even to resolve the *merits* of its claims.  In this motion, Defendants seek not to have

17  the Court address the merits based on an *ex parte* review, which it has the authority to do, but

18  merely to balance the equities in assessing the requested injunction based, along with other

19  evidence, on limited classified information submitted for *in camera* and *ex parte* review.[6]

20

21

22  C.    **Only The Agency May Determine Who Has A "Need-to-Know" Classified
         Information**

23

24        **1.    Plaintiffs Do Not Have A "Need-to-Know"**

_____

25  [6]      Based on an initial review of Plaintiffs' Amended Complaint, Defendants do not believe that
26  resolution of the merits of Plaintiffs' claims will require consideration of classified information. Of
    course should that initial assessment be incorrect, this issue may have to be re-visited.
27

28  Defendants' Motion & Mem. For Leave To Submit
    Classified Evidence In Camera And Ex Parte
    Case No. C 02-3805 EDL

                                        10

1      A determination of who may have access to classified information is solely within the

2   purview of the classifying agency.  As discussed above, Presidential Executive Orders govern

3   . classification of information. Once an agency makes a classification determination, that material

4   can only be released to those persons who can demonstrate a "need-to-know" and have been

5   through the proper security clearance.  Executive Order 12968, 60 Fed. Reg. 40425, 40248

6   (August 2, 1995).  Executive Order 12968 defines "need to know" as "a determination made by

7   an authorized holder of classified information that a prospective recipient requires access to

8   specific classified information in order to perform or assist in a lawful and authorized

9   governmental function." Id. at p. 40245.  Thus, in order to gain access to classified information,

10  Plaintiffs would have to have a "need to know" as determined by the classifying agency.  That

11  need to know cannot be established by the mere filing of a lawsuit against the government.  Not

12  only does the mere filing of such a lawsuit create no right to classified national security

13  information, but this case can fairly proceed based on the Court's *in camera* and *ex parte* review

14  of certain narrowly tailored classified declarations.[2]/

15  _____

16  [2]/     Plaintiffs may argue that review of a classified declaration *in camera* and *ex parte* procedure
    will violate their constitutional rights, specifically the Due Process Clause.  A review of the case law
17  shows that the review of a classified declaration *in camera* and *ex parte* does not result in a violation
    of due process. Even statutes specifically authorizing *ex parte* review have been held constitutional.
18  See United States v. Belfield, 692 F.2d 141, 147 (D.C. Cir. 1982) (*In camera, ex parte* review under
19  Foreign Intelligence Surveillance Act (FISA) was consistent with Fifth and Sixth Amendments);
    ACLU v. Barr, 952 F.2d 457, 465 (D.C. Cir. 1991) (FISA's procedure for *in camera, ex parte* review
20  "is an acceptable means of adjudication ... constitutional rights.).  Moreover, in assessing an alleged
    due process violation, the Ninth Circuit recognizes a distinction between when the government uses
21  classified information as a shield in defending itself versus use as a sword in civil or criminal
    prosecutions. American-Arab Anti-Discrimination, 70 F.3d at 1070. When the government intends
22  to use classified information as a sword, it may be appropriate for opposing counsel to view the
23  material.  Id.  However, when the government intends to use classified information in defending
    itself, as here, the government's interest in protecting the information favors allowing *ex parte*
24  review.  Id. (citing to United States v. Reynolds, 345 U.S. 1, 6-7 (1953) (in a tort suit against the
25  Government, permitting nonproduction of an Air Force accident investigation report because of
    national security concerns); Ellsberg v. Mitchell, 709 F.2d 51 (D.C. Cir. 1983) (in a constitutional
26  tort suit for damages against officials, allowing the Government to withhold production of wiretap
27

28  Defendants' Motion & Mem. For Leave To Submit
    Classified Evidence In Camera And Ex Parte
    Case No. C 02-3805 EDL

                                    11

1    Nevertheless, Plaintiffs may argue that clearing their counsel and providing access to this

2    material poses no risk to national security. The Navy, with its intimate knowledge of the

3    classified material, is the only entity in a position to make these determinations. Additionally,

4    these determinations do not turn simply upon whether Plaintiffs' counsel could pass the necessary

5    background check. The Navy must decide first whether providing a security clearance to

6    Plaintiffs' counsel is "clearly consistent with the interests of national security," Egan, 484 U.S. at

7    528, and then whether the Plaintiffs' counsel has a "need to know." Executive Order 12968.

8    Regardless of any safeguards and procedures that the Court might impose, the more people with

9    access to sensitive national security information, the greater the risk of detrimental disclosure.

10   Thus, unless both standards for review of classified material can be satisfied with confidence, it

11   is not appropriate for the Navy to provide access to the Plaintiffs' counsel. Moreover, from a

12   policy perspective, Defendants adamantly oppose the notion that the mere filing of a lawsuit

13   creates for Plaintiffs' counsel the "need to know" classified national security information.

14   Establishing such a precedent could open the flood gates to litigation designed for the sole

15   purpose of gaining access to otherwise unavailable classified data. Furthermore, if the standard

16   for whether plaintiffs' counsel is entitled to the material turns solely upon the counsel's ability to

17   pass a background check and agree to a protective order, the Executive Branch would in a very

18   real sense lose its control over the dissemination of classified national security information.

19       2.    **The Court Cannot Order the Navy to Release the Classified Information to
              Plaintiffs' Counsel**

20

21       The Court cannot order the Navy to clear Plaintiffs' counsel if the Court decides not to

22   review the classified information *in camera* and *ex parte*. Ultimately, the decision whether to

23   reveal classified information, and to whom, must be reserved to the agency who designated the

     information as classified. Department of the Navy v. Egan, 484 U.S. 518, 527 (1988)

24

25   (precluding review of security clearance decisions by an outside administrative board); Dorfmont

26   ——————————————

27   information).

28   Defendants' Motion & Mem. For Leave To Submit
     Classified Evidence In Camera And Ex Parte
     Case No. C 02-3805 EDL

                                    12

1    v. Brown, 913 F.2d 1399, 1401 (9th Cir. 1990) (extending Egan and holding that federal courts

2    have "no business" reviewing the merits of a decision by the Executive or his delegee to grant or

3    revoke a security clearance); Brazil v. Department of the Navy, 66 F.3d 193, 195 (9th Cir. 1995)

4    (applying Egan and Dorfmont to preclude review of the merits of a national security decision in a

5    Title VII case). "The authority to protect [national security] information falls on the President as

6    head of the Executive Branch and as Commander in Chief." See, e.g., Egan, 484 U.S. at 527

7    ("His authority to classify and control access to information bearing on national security" and to

8    determine who has access to that information flows primarily from this constitutional investment

9    of power in the President and exists quite apart from any explicit Congressional grant."); Webster

10   v. Doe, 486 U.S. 592 (1988); Halperin v. Kissinger, 807 F.2d 180, 188 (D.C. Cir. 1986)

11   (observing the "executive's duty to preserve our national security").  Substantial deference is

12   provided to the Executive Branch in conducting foreign affairs and protecting national security,

13   and courts traditionally have been reluctant to intrude upon the authority of the Executive in

14   military and national security affairs. See, e.g., Egan, 484 U.S. at 530; Regan v. Wald, 468 U.S.

15   222, 243 (1984); Haig v. Agee, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign

16   policy and national security are rarely proper subjects for judicial intervention.").

17          The general administrative standard governing the  issuance and retention of a security

18   clearance is that such clearance must be "clearly consistent with the interests of national

19   security." Egan, 484 U.S. at 528.  In light of this standard, the Ninth Circuit has held that "no

20   one has a 'right' to a security clearance." Dorfmont, 913 F.2d at 1401 (quoting Egan, 484 U.S. at

21   528.). "The decision to grant or revoke a security clearance is committed to the discretion of the

22   President by law." Id.; Brazil, 66 F.3d at 195 ("At the core of Egan's deference to the national

23   security mission is the recognition that security clearance determinations are 'sensitive and

24   inherently discretionary' exercises, entrusted by law to the Executive.") (quoting Egan, 484 U.S.

25   at 527-29).  Accordingly, courts have consistently held that attacks on the merits of national

26   security decisions, like the kind at issue here, are not judicially reviewable. Id.  See also Ryan v.

27

28   Defendants' Motion & Mem. For Leave To Submit
     Classified Evidence In Camera And Ex Parte
     Case No. C 02-3805 EDL

                                             13

1  Reno, 168 F.3d 520, 523 (D.C. Cir. 1999) ("'For reasons too obvious to call for enlarged

2  discussion, the protection of classified information must be committed to the broad discretion of

3  the agency responsible, and this must include broad discretion to determine who may have access

4  to it.'") (quoting Egan, 484 U.S. at 529); Becerra v. Dalton, 94 F.3d 145, 149 (4th Cir. 1996);

5  Guillot v. Garrett, 970 F.2d 1320, 1324 (4th Cir. 1992); Perez v. FBI, 71 F.3d 513, 514-15 (5th

6  Cir. 1995); Cobb v. Danzig, 190 F.R.D. 564, 566 (S.D. Cal. 1999) ("The Court held that the

7  grant of a security clearance and the protection of classified information must be committed to

8  the broad discretion of the agency responsible.").

9         As courts have frequently recognized, in a variety of contexts, the judicial branch is ill-

10  equipped to second-guess the government's assessment of secrecy classifications and the harm to

11  national security attendant to the disclosure of classified information.  See e.g., Dorfmont, 913

12  F.2d at 1401 ("When it comes to security matters, a federal court is 'an outside nonexpert

13  body.'"); Brazil, 66 F.3d at 195 ( "Thus the Court elected to leave the '[p]redictive judgment of

14  this kind' to 'those with the necessary expertise in protecting [the sensitive material], rather than

15  in the hands of 'an outside nonexpert body.'") (quoting Egan, 484 U.S. at 529); Kiareldeen v.

16  Ashcroft, 273 F.3d 542, 552 (3rd Cir. 2001) ("That the FBI would be unwilling to compromise

17  national security by revealing its undercover sources, is both understandable and comforting.

18  That a court would then choose to criticize the FBI for being unwilling to risk undermining its

19  covert operations against terrorists is somewhat unnerving."); Halkin v. Helms, 598 F.2d 1, 9

20  (D.C. Cir. 1978) ("'The courts, of course, are ill-equipped to become sufficiently steeped in

21  foreign intelligence matters to serve effectively in the review of secrecy classifications in that

22  area.'") (quoting United States v. Marchetti, 466 F.2d 1309, 1318 (4th Cir. 1972)); Students

23  Against Genocide v. Dept. of State, 257 F.3d 828, 835, 837 (D.C. Cir. 2001) (deferring to

24  government's assessment of national security harm so long as it is plausible); Haig v. Agee, 453

25  U.S. at 292; Halperin v. CIA, 629 F.2d 144 (D.C. Cir.1980); Ellsberg v. Mitchell, 709 F.2d 51,

26  57 n.31 (D.C. Cir. 1983) (probability that a particular disclosure will have an adverse effect on

27

28  Defendants' Motion & Mem. For Leave To Submit
Classified Evidence In Camera And Ex Parte
Case No. C 02-3805 EDL

                                          14

1   national security is difficult for judge to assess).

2        An order to disclose classified information to counsel would impermissibly interfere with

3   the Executive Branch's exclusive role in making the national security determination of who

4   should be provided access to classified materials. See Egan, 484 U.S. 518 (1988) (holding that

5   the decision to grant national security clearance is "a sensitive and inherently discretionary

6   judgment call, [] committed by law to the appropriate agency of the Executive Branch.").

7   **D.    Classified Information Submitted For In Camera And *Ex Parte* Review Will Be Limited And Narrowly Tailored**

8   

9        The Defendants anticipate submitting two limited and narrowly tailored classified

declarations along with an unclassified declaration to address the Navy's current assessment of

10  the threat to national security without the SURTASS LFA system and the need for the system.

11  Specifically, we expect to submit classified declarations that provide detailed information

12  regarding the effectiveness of SURTASS LFA sonar against quiet modern submarines and

13  regarding the potential threats faced by the United States Navy that call for use of the system

14  without delay.   Defendants plan to file unclassified and redacted versions of the classified

15  declarations, allowing public review of unclassified material discussed in the document.[a]/

16  

17       The proposed classified declarations have not yet been finalized as we cannot prejudge

the allegations in Plaintiffs' Motion.  However, the classified information will be narrowly

18  tailored to discuss the effectiveness of the system against modern, quiet submarines and the

19  current threats faced by the Navy -- the harm to the public interest in military preparedness if the

20  Navy is forced to delay deploying the use of SURTASS LFA sonar.  In this context, the Navy is

21  

22  [a]/ This is consistent both with Executive Order 12958 regarding marking of classified documents.

23  and the local rules' admonishment regarding over inclusive requests for sealing.  See 60 Fed. Reg. 19825, 19829; Commentary to local rule 79-5 ("As a public forum, the Court will only entertain

24  requests to seal that establish good cause and are narrowly tailored to seal only the particular information that is genuinely privileged or protectable as a trade secret or otherwise has a compelling

25  need for confidentiality. Documents may not be filed under seal pursuant to blanket protective orders

26  covering multiple documents. Counsel should not attempt to seal entire pleadings or memoranda required to be filed pursuant to the Federal Rules of Civil Procedure or these Local Rules.").

27  

28  Defendants' Motion & Mem. For Leave To Submit
Classified Evidence In Camera And Ex Parte
Case No. C 02-3805 EDL

1   in the unique situation of being able to provide the Court with the most up-to-date, accurate

2   information about the state of U.S. naval preparedness, the military preparedness of other

3   countries, and the challenges and threats that the Navy currently faces or anticipates. The

4   deference due the Navy regarding its classification of material and to the Navy's unique position

5   in determining the state of the world's submarine force and the United States' readiness in

6   response, strongly favor the Court's review of this classified material. Without the classified

7   information, the Court cannot fully assess the harm to military preparedness if it decides to

8   enjoin future use of the SURTASS LFA sonar during the pendancy of the litigation. On the other

9   hand, because this classified information is so uniquely within the Navy's expertise, it is unlikely

10  that the Plaintiffs could contribute much more than what they would submit in response to the

11  unclassified declarations. Furthermore, the fact that the Court will review the classified

12  documents and assess the weight that should be given to them, minimizes any potential for

13  Plaintiffs to be harmed by *in camera* and *ex parte* review of this limited information. The

14  Court's review of the information will serve to protect the Plaintiffs' interests. <u>Meridian</u>, 939

15  F.2d at 745 (a plaintiff's "interests as a litigant are satisfied by the ex parte/in camera decision of

16  an impartial district judge).

17          E.      **Certain Security Arrangements Are Necessary**

18          In cases where classified materials are submitted for review, Department of Justice

19  regulations require government counsel to take all appropriate action to protect the information

20  against unauthorized disclosure. <u>See</u> 28 C.F.R. § 17.17(a). These regulations set forth the

21  minimum security measures necessary to protect classified information, and require the

22  undersigned to ensure the Court's cooperation in adopting such measures. <u>See</u> 28 C.F.R.

23  § 17.17(a)(2). In civil proceedings, the security procedures include the following:

24          1.      Classified information is not to be disclosed or introduced into evidence
                    without the prior approval of either the originating agency, the Attorney
25                  General, or the President. <u>See</u> 28 C.F.R. § 17.17(c)(2).

26          2.      Attendance at any proceeding where classified information will be
                    disclosed is to be limited to those persons with appropriate authorization

27

28  Defendants' Motion & Mem. For Leave To Submit
    Classified Evidence In Camera And Ex Parte
    Case No. C 02-3805 EDL
                                        16

1    to access this information, whose duties require knowledge or possession of the classified information to be disclosed. See 28 C.F.R. § 17.17(c)(3).

2    3.    Aside from the Judge herself, access to classified information disclosed in
3    this action is to be limited to those Court employees who have been determined eligible for such access by the Department of Justice Security
4    Officer and who have been fully advised of all pertinent safeguarding requirements and their liability in the event of unauthorized disclosure.
5    See 28 C.F.R. §§ 17.17(c)(3) and (c)(10); 28 C.F.R. § 17.46(c).

6    4.    Classified documents are to be appropriately handled and stored in a
manner consistent with Department of Justice security directives. See 28
7    C.F.R. §§ 17.17(c)(4) & (7).

8    5.    In the event that the Court wishes to hear any testimony or oral argument
which the government believes would include classified information, this
9    testimony or argument is to be recorded and transcribed pursuant to the instructions of the Department of Justice Security Officer. See 28 C.F.R. §
10    17.17(c)(7).

11    6.    Any notes or other documents prepared by the Court or its personnel that
contain classified information are to be prepared, handled, and stored
12    consistent with the directives of the Department of Justice Security
Officer, see 28 C.F.R. § 17.17(c)(7), and retrieved at the close of the
13    proceedings by the Department of Justice Security Officer for safeguarding or destruction. See 28 C.F.R. § 17.17(c)(9).

14
15    7.    At the conclusion of the proceedings, all original classified information
shall be returned to the Department of Justice or the originating agency, or
placed under court seal for safekeeping by the Department of Justice
16    Security Officer. See 28 C.F.R. § 17.17(c)(8).

17    We have inquired with the Office of the United States Attorney in San Francisco and

18    have been informed that there is an appropriate safe available with the Federal Bureau of

19    Investigation located in the Courthouse. An individual with appropriate clearance in the United

20    States Attorney Office has offered to hand-carry over the documents for the Court's review at the

21    appropriate time and to return them to the safe at the end of each day. In the alternative,

22    assuming that the Court's law clerk is cleared, Defendants propose arranging the same procedure

23    for the Court's clerk. Defendants respectfully propose that the Court follow these procedures.

24    IV.    Conclusion

25    For the foregoing reasons, Defendants respectfully request that the Court grant their

26    motion for leave to submit classified evidence *in camera* and *ex parte*.

27

28    Defendants' Motion & Mem. For Leave To Submit
Classified Evidence In Camera And Ex Parte
Case No. C 02-3805 EDL

17

1     Respectfully submitted this 13th day of September, 2002,

2                      THOMAS L. SANSONETTI
                         Assistant Attorney General
3                      Environment and Natural Resources Division

4                      JEAN WILLIAMS
                         Chief, Wildlife and Marine Resources Section

5

6

7                      KRISTEN L. GUSTAFSON, Trial Attorney
                      Wildlife and Marine Resources Section
8                      ANN D. NAVARO, Senior Attorney
                      General Litigation Section
9                      MAUREEN RUDOLPH, Trial Attorney
                      Policy, Legislation, & Special Litigation Section
10                   United States Department of Justice
                      Environment and Natural Resources Division
11                   Benjamin Franklin Station, P.O. Box 7369 and 663
                      Washington, D.C. 20530
12                   (202) 305-0211/(202) 305-0462
                      (202) 305-0275 (fax)/(202) 305-0267

13                      KEVIN V. RYAN (SBN 118321)
                      United States Attorney
14                   JAMES A. CODA (SBN 1012669 (WI))
                      Assistant United States Attorney
15                   Environment & Natural Resources Unit
                     450 Golden Gate Avenue, Box 36055
16                   San Francisco, California 94102
                      Telephone No: (415) 436-6967
17                   Facsimile No: (415) 436-6748

18

19

20

21

22

23

24

25

26

27

28   Defendants' Motion & Mem. For Leave To Submit
     Classified Evidence In Camera And Ex Parte
     Case No. C 02-3805 EDL

                     18

Defendants' Exhibit 1
Case No. C 02-3805 EDL



# FINAL
# OVERSEAS ENVIRONMENTAL IMPACT STATEMENT
## AND
## ENVIRONMENTAL IMPACT STATEMENT
## FOR

# SURVEILLANCE TOWED ARRAY SENSOR SYSTEM
# LOW FREQUENCY ACTIVE
# (SURTASS LFA) SONAR
## Volume 1 of 2



## Department of the Navy
## Chief of Naval Operations
## January 2001





This Overseas Environmental Impact Statement (OEIS)/Environmental Impact Statement (EIS) evaluates the potential environmental effects of employment of the Surveillance Towed Array Sensor System (SURTASS) Low Frequency Active (LFA) sonar. The word "employment" as used in this document means the use of SURTASS LFA sonar during routine training and testing as well as the use of the system during military operations. This analysis does not apply to the use of the system in armed conflict or direct combat support operations, nor during periods of heightened threat conditions, as determined by the National Command Authorities (President and Secretary of Defense or their duly designated alternates or successors, as assisted by the Chairman of the Joint Chiefs of Staff [JCS]) (JCS, 1997).

It has been prepared by the Department of the Navy (DON) in accordance with the requirements of Presidential Executive Order (EO) 12114 (Environmental Effects Abroad of Major Federal Actions) and the National Environmental Policy Act of 1969 (NEPA). The provisions of EO 12114 apply to major federal actions that occur or have effects outside of U.S. territories – the United States, its territories, and possessions. The provisions of NEPA apply to major federal actions that occur or have effects in the United States, its territories, and possessions. The OEIS/EIS is also intended to augment other environmental reviews associated with using the SURTASS LFA sonar:

- Formal consultation under Section 7 of the Endangered Species Act;

- Potential issuance of authorizations to incidentally take marine mammals pursuant to regulations for implementing the Marine Mammal Protection Act; and

- Consistency determinations under provisions of the Coastal Zone Management Act.

The proposed action is the U.S. Navy employment of the SURTASS LFA sonar. As shown in Figure 1-1 (SURTASS LFA Sonar Potential Areas of Operations), this sonar system would be deployed in the non-crosshatched areas. To reduce adverse effects on the marine environment, areas would be excluded as necessary to prevent 180-decibel (dB) sound pressure level (SPL) or greater within 22 kilometers (km) (12 nautical miles [nm]) of land, in offshore biologically important areas during biologically important seasons (see Figure 1-1), and in areas necessary to prevent greater than 145-dB SPL at known recreational and commercial dive sites. The system is a long-range sonar that operates in the low frequency band (below 1,000 Hertz [Hz]) within the frequency range of 100 to 500 Hz, that consists of both active and passive components. Thus, detection does not rely solely on noise generated by the object to be detected. The active array transmits a low frequency (LF) sound pulse that reflects off an object in the water, and the reflected pulse returns in the form of an echo. The passive array receives the return echoes through listening devices (hydrophones).

Environmental Impact Statement



Non Operating Areas     Offshore Biologically Important Areas (outside of 12 nm or 22 km)

Figure 1-1. SURTASS LFA Sonar Potential Areas of Operations

The purpose of the proposed action is to meet U.S. need for improved capability to detect quieter and harder-to-find foreign submarines at long range. This capability would provide U.S. forces with adequate time to react to, and defend against, potential submarine threats while remaining a safe distance beyond a submarine's effective weapons range.

To meet its long-range detection need, the Navy investigated the use of a broad spectrum of acoustic and non-acoustic technologies to enhance antisubmarine warfare (ASW) capabilities. Of those technologies evaluated, low frequency active sonar was the only system capable of providing long-range detection. Low frequency active sonar is, therefore, the only available technology capable of meeting the U.S. need to improve detection of quieter and harder-to-find foreign submarines at long range.

SURTASS LFA Sonar

Since the operation of SURTASS LFA sonar is related to the transmission of sound in the ocean environment, it is important for the reader to have at least an elementary understanding of the science behind the transmission of sound in water. A tutorial on the fundamentals of underwater sound is provided as Appendix B to assist the reader in understanding the technical aspects of this document.

## 1.1 Background

Geography dictates that the U.S. is a maritime nation, as it shares land borders with only two other nations, while the rest of the world community lies overseas. The U.S. has vital economic, political, and military interests and commitments around the globe. Recognizing this, the National Military Strategy (JCS, 1995) stated that naval forces "...ensure freedom of the seas and control strategic choke points..." The U.S. obtains a majority of its vital resources from overseas trade, more than 90 percent of which comes to the U.S. via merchant shipping. As seen in Figure 1-2 (American Sea Lines of Supply), many of the U.S. sea lines of supply lie near or along vital choke points. Many of these choke points (e.g., Suez and Panama Canals, the Persian Gulf entrance, the Strait of Malacca, and the Straits of Florida) are vulnerable to disruption by surface and submarine forces.



Figure 1-2. American Sea Lines of Supply

Environmental Impact Statement

## 1.1.1 The Submarine Threat

The number of countries operating diesel-electric submarines continues to increase and they continue to pose a serious threat to naval operations, in the littoral, as well as in the open ocean (Krause, 1993). Submarines can be used to conduct a broad range of offensive and defensive missions (Naval Doctrine Command, 1997), including:

- Coastal defense;

- Covert surveillance, mining, or attacking of shipping channels and maritime choke points;

- Operation as a self-sufficient platform that can support special operations forces or attack in forward areas (e.g., littoral or "near land" areas of the world); and/or

- Strategic deterrence (e.g., carrying ballistic missiles).

Submarines can accomplish such missions because they possess a number of tactical characteristics that are both dangerous and difficult to counter, including:

- **Stealth** - a submarine is inherently stealthy. This provides a submarine with the dual tactical advantages of opportunity and time for planning an attack with a high probability of success;

- **Lethality** - a submarine can carry highly potent armament (highly destructive torpedoes and cruise missiles) capable of inflicting serious damage to or sinking even the largest ships; and

- **Economy of Force** - a submarine requires fewer operational resources than the resources required to defend against it, as illustrated by the difficulties that the Allied fleet experienced during World War II in defending against a small number of German U-boats in the Atlantic.

An unfriendly nation's aggressive use of even a single submarine has the potential to disrupt operations of U.S. Naval forces and constitutes a threat to U.S. security. The Russian Federation and the People's Republic of China have publicly declared that the submarine is the capital ship of their navies. Many potential adversarial countries have essentially done the same, including Iran and North Korea. A former Indian Navy submarine admiral has commented that developing nations desire submarine forces because they are a most cost-effective platform for the delivery of several types of weapons; they counter surface forces effectively; they are flexible, multi-mission ships; they are covert, and thus can operate with minimal political ramifications; and they can operate without the burden of supporting escorts (JCS, 1995).

SURTASS LFA Sonar

Submarines are ideal weapons for states that lack, or cannot afford, the capability to assert sea control in their own (or others') waterspace (Hervey, 1994). As such, they can operate in an opponent's backyard-- even in the face of determined sea control efforts, they can conduct stealthy and intrusive operations in sensitive areas, and can be inserted early for a wide range of tasks with a high degree of assured survivability (Chapman, 1993). When equipped with mines, advanced torpedoes, and/or anti-ship, and/or land-attack missiles, a submarine is a potent political weapon. A diesel electric submarine able to penetrate a multinational task force's defenses could undermine efforts to manage coalition politics in a single strike (Canadian Maritime Command, 1997).

The quieting of advanced non-U.S. nuclear submarines and advanced conventional (diesel-electric) submarines operating on battery power is now at parity with U.S. submarines. The U.S. no longer enjoys a comfortable acoustic advantage against the front-line submarines of some other nations. The Russian Federation continues to build new classes of highly capable submarines and to operate its newest vessels outside of home waters, including waters contiguous to the U.S. China is investing heavily in submarine technology, including designs for nuclear attack submarines, strategic ballistic-missile submarines, and advanced conventional submarines; the latter through the purchase of KILO-class boats from Russia. China hopes to leap generations of submarine technology in its ambitious buying and building program (NRC, 1997).

The President's National Research Council (NRC) (1997) has projected that by 2035, the U.S. may be seriously and competently challenged by submarines from major powers (Russia and China) or from a number of potentially unfriendly nations. There are currently more than 150 submarines in the navies of potentially unfriendly countries other than Russia. Approximately 45 of these are modern, non-nuclear boats. About 45 more are on order worldwide, principally from German and Russian shipyards. By 2030, it is projected that 75 percent of the submarines in the rest of the world will have advanced capabilities, most likely including air-independent propulsion (AIP) that allows 30 to 50 days of submerged operations without surfacing or snorkeling. When these units are in a defensive mode; that is, not having to travel great distances or at high speed, they have a capability nearly equal to that of the modern nuclear submarine. Quieting technology is expected to proliferate, which will render these submarines difficult to detect, even with the latest ASW passive sonar equipment; and they may be armed with highly capable weapons.

The readiness and proficiency of submarine crews in the rest of the world are improving, and their performance is generally underestimated. Today, high-quality crew training is offered by the countries that export these submarines. Operated competently, these submarines are particularly difficult to find, much less neutralize.

## 1.1.2 U.S. Navy's Antisubmarine Warfare Mission

The increasing modernization of the world's submarine forces means that America's sea lines of supply are extremely susceptible to reprisals during regional conflicts. In the more unlikely case of global conflict, these maritime supply routes would be even more prone to attack. Thus, a critical cornerstone of the Navy's mission to defend the United States is maintaining the antisubmarine warfare (ASW) capability of its Fleet. This global ASW capability will continue to be a requirement for the U.S. Navy far into the foreseeable future. Critical to accomplishing this mission is detecting increasingly stealthy enemy submarines.

The importance of a strong U.S. global ASW capability is defined in a number of Department of Defense (DoD) documents concerning national security. For example, in *Directions for Defense*, ASW was designated as one of the Navy's core competencies by the report of the Commission on Roles and Missions of the Armed Forces. *Joint Vision 2010* (JCS, 1999), which is an operational warfighting vision from the Chairman of the Joint Chiefs of Staff, presents the concepts that the Chairman views as key to achieving future U.S. national security and national military objectives (JCS, 1999). It recognizes the importance of "full spectrum dominance" – the ability to fight and decisively win across the full spectrum of conflict, regardless of battlefield conditions or the nature of the conflict.

The Department of the Navy's *2000 Posture Statement*, which discusses the Navy's mission, direction for the future, and the priorities that guide decision-making, relates the special concern of the warfighting concepts and capabilities of potential adversaries—especially anti-access strategies. It goes on to state that dominance in areas such as ASW will be required to ensure control of the seas and access to the battlespace domain under and on the sea (Department of the Navy [DON], 2000).

The National Academy of Sciences (NAS) (1997) reiterates that ASW is one of the Navy's most fundamental core competencies, and it must remain so in the face of a submarine threat that will increase significantly—perhaps even dramatically—in the 21st century. This increase, which is being fueled by the proliferation of advanced submarine quieting, sensors, and processing techniques and technologies, could result in the submarine becoming the dominant threat to the accomplishment of naval missions (NAS, 1997).

The *1998 ASW Focus Statement* of the Chief of Naval Operations (CNO) further emphasizes the importance of ASW in our national security and sets the direction for operational primacy in ASW (CNO, 1998). The statement recognizes that while the nature of the ASW threat has changed, the Navy is committed to excellence in this crucial mission and to the development of new technologies, coupled with innovative operational concepts that will yield a different approach to ASW. The Navy's goal is to have the best-trained ASW force in the world with the right set of tools to prevail in any type of conflict.

SURTASS LFA sonar meets U.S. need for improved capability to detect quieter and hard-to-find foreign submarines at long range, and provides adequate time to react to and defend against potential submarine threats. The Navy has investigated the use of acoustic and non-acoustic technologies to fill this immediate need. Only low frequency active sonar was identified as the system capable of providing the required long-range detection. Thus, SURTASS LFA sonar is critical to the Navy's ASW efforts.

## 1.1.3  Surveillance and Detection of Submarines

Surveillance of the oceans has been the primary means of detecting enemy submarines. To accomplish this surveillance, surface ships and submarines use the sound-based detection system called SONAR (SOund NAvigation and Ranging) to locate enemy submarines or other underwater objects.

---

**Passive and Active Sonar**

Sonar systems can be separated into two broad categories -- active and passive. Active sonars transmit sound energy (a "ping") and locate objects by detecting the reflection of these sound waves returning from the objects in the form of an echo. Passive sonars listen for sound generated by possible targets.

---

In the past, passive sonars were the dominant sensor used by the Navy for long-range surveillance and initial classification of enemy submarines. Passive sonars have the advantage of silence, in that they do not emit sound that an enemy might detect. Passive sonar was a particularly effective tool of the Navy during the Cold War since the submarines of the former Soviet Union were relatively noisy and could be tracked at long range. The U.S. developed and deployed formidable ASW systems with highly capable passive sonar arrays for broad surveillance of the North Atlantic and North Pacific ocean basins during this period. Geographically fixed systems were known as the Sound Surveillance System (SOSUS) (Tyler, 1992); systems deployed on Naval ships were known as the Surveillance Towed Array Sensor System (SURTASS).

While both these passive sensor systems performed extremely well against the submarine threat of the Cold War years, improvements in, and wide application of, submarine "quieting" technologies in the last decade have caused a significant degradation in their detection effectiveness (Tyler, 1992). These "quieting" technologies, which include hull coatings, sound isolation mounts, and improved propeller design, are increasingly available to forward-fit new submarines or retrofit older submarines, particularly those that are nuclear-powered (Naval Doctrine Command, 1997). In addition, the world's inventory of quieter diesel-electric submarines is increasing.

Other improvements in submarine technology are expected to further reduce submarine noise as well as expand operating ranges and increase periods of submerged operations. For example, the use of air independent propulsion systems minimizes the need for noisy diesel engine operations at or near the surface. In addition, international submarine crews are becoming increasingly proficient at their jobs, allowing them to more intelligently evade detection when submerged.

Shortened detection ranges have been the direct result of increased difficulty in detecting submarines. With current detection ranges in the tens of nautical miles, U.S. forces may have only minutes to respond to a potential submarine threat. This situation is in significant contrast to the margin of safety that was available in the 1970s when U.S. Fleet operating units were able to detect enemy submarines that were hundreds of nautical miles distant.

Over the last decade, Navy research and development (R&D) programs have been challenged to develop an ocean surveillance capability that could effectively detect the presence of quieter submarines at long range. With such a capability, Fleet units would be able to identify submarines underwater, track their routes, predict destinations, and generally maintain an awareness of the tactical situation in the ocean environment. With the information obtained through a long-range surveillance program, U.S. forces would regain the reaction time needed to meet potential undersea threats.

## 1.2 U.S. Navy Research and Development Initiative

The Navy's submarine detection R&D initiatives of the 1980s considered different technologies to achieve the goal of long-range detection of quiet submarines. One approach focused on the use of conventional (existing) Fleet assets (ASW surface and submarine combatants and aircraft). However, this is considered infeasible from tactical and economic perspectives. The use of a substantially larger number of units may attain a level of wide-area coverage, but the need identified in this OEIS/EIS is for long-range detection. As a result, the use of conventional technologies to accomplish long-range detection of submarines was considered infeasible from tactical and economic perspectives.

Navy R&D programs also considered improvement of passive sonar systems for long range detection. However, even with incremental technological changes, the Navy recognized that its passive sonars would not be sufficient to maintain or exceed the needed long-range detection advantage.

## 1.2.1 Non-Acoustic Alternative Underwater Detection Technologies

The Navy studied several non-acoustic ASW technologies in the 1980s as potential candidates for use in detecting submarines, including radar, laser, magnetic, infrared, electronic, electric,

hydrodynamic, and biologic detection systems. Summary descriptions of these alternative detection technologies are provided in Table 1-1. While these alternative technologies have demonstrated some utility in detecting submarines, they cannot reliably provide U.S. forces with long-range detection (hundreds of nautical miles) and longer reaction times due to a number of critical factors:

- Limited range of detection;

- Meteorological and oceanographic limitations;

- Unique operating requirements; and/or

- Requirement for the submarine to be at or near the surface for detection.

## 1.2.2 New Active Sonar Technology

With non-acoustic technologies and/or improvements in passive sonars incapable of providing the needed long-range detection, the Navy then focused its research and testing on the new active sonar technologies. The focus of these efforts was to develop more comprehensive information about the acoustic characteristics and long-range detection capabilities of LF active sonar. The Navy focused its investigation on LF because it is well established that LF sounds (below 1,000 Hz) propagate in seawater more effectively and for longer distances than mid (1,000 to 10,000 Hz) and high frequencies (greater than 10,000 Hz). As discussed above, non-acoustic technologies, improvements in passive sonar, and mid- and high-frequency active sonar cannot feasibly meet long-range detection needs.

The Navy's approach to testing and development of a low frequency active acoustic (LFAA) sonar system was two-pronged and involved testing programs to address:

- Critical scientific issues needing resolution before LFAA systems could be realized; and

- Design and development of a deployable LFAA system.

Because the development of an LFAA system was considered a high national priority, the Navy pursued these research efforts in parallel.

Table 1-1 (Continued)

Summary of Alternative Non-Acoustic ASW Technologies

| Technology | System | Detection Range |
|---|---|---|
| Optical | Low Light-Level TV (LLTV) cameras have proven to be marginally effective, but only when submarines are either on the surface, at periscope depth or, in some cases, just below the surface. Therefore, they are used for short-range localization and attack phases of ASW operations. | Short |
| Hydrodynamic | This short- to medium-range detection alternative refers to a "hump" at the water's surface from horizontal displacement of internal ocean waves caused by a large, solid object (such as a submarine) moving below the water's surface. The water "hump" can be detected from a high-resolution satellite altimeter, although the submarine must be at a relatively shallow depth, with the satellite almost directly overhead.<br><br>The presence of a submarine could be inferred from a number of expendable bathythermographs (XBT). However, there must be correct oceanographic conditions to foster internal waves; the submarine must disturb their structure; and the ASW operator must be aware of the presence of internal waves, be in proximity to that area, and at the same time know that a submarine may be in the vicinity. Therefore, the opportunity for use is low. | Short to medium |
| Biologics | As the submarine travels through the water, it may disturb small bioluminescent sea creatures, sometimes leaving a visible trail. For this detection method to be effective, the submarine must be traveling at speeds greater than 5.5-9.2 km/hr (3-5 knots) at or near the surface, the correct high-density mix of bioluminescent fauna must be present near the sea surface with a low sea state, and a specialized ASW sensor platform must be in proximity. The Navy is no longer pursuing this short- to medium-range technology because opportunity to use this detection methodology was extremely low. | Short to medium |

## 1.2.2.1 Testing Program

In 1987, the Chief of Naval Operations initiated a testing program to more fully evaluate the long-range submarine detection capabilities of LFA sonar. This testing program concentrated its investigative research on resolving fundamental science, engineering, and environmental issues. Phase One of the program involved deep-water tests to enhance the Navy's understanding of such issues as long-range propagation, as well as bottom, surface, and volume reverberation. These tests also addressed issues such as acoustic waveforms, advanced signal processing techniques, and low-frequency transducer (source) technology. This testing provided the Navy with increased understanding of the acoustic characteristics and limitations of LFA sonar technology, and improved underwater environmental and acoustic propagation loss models (hence, increased ability to predict acoustic performance).

Environmental Impact Statement

## 1.2.2.2 SURTASS LFA Sonar Research

The Navy has developed the SURTASS LFA sonar through a systematic research and testing program. The initial phase of the program centered on fundamental technology issues that explored basic science questions (such as reverberation, target strength, propagation and forward scatter), and other issues such as signal processing and system design tradeoffs. The second phase built on the basic science, exploring new scientific and technical issues. The final phase expanded the test and evaluation program to include littoral environments. During each of these phases, the Navy studied issues related to the operation of this system effectively and efficiently in the undersea warfare (USW) environment.

The results of the SURTASS LFA sonar research program expanded the Navy's understanding of LF sound propagation and scattering from the bottom, surface, and ocean volume. The program also contributed meaningful and much needed data to existing oceanographic databases. The results of these environmental acoustic investigations not only directly supported upgrades of Fleet standard models and databases, but they also provided the baseline for SURTASS LFA sonar system performance prediction and analysis capabilities.

## 1.2.2.3  Evaluation of Different LFA Sonar Configurations

After determining that LFA sonar was the only available technology capable of meeting the U.S. need to improve detection of quieter and harder-to-find foreign submarines at long range, the Navy then considered the secondary question of how LFA technology could be most effectively and efficiently deployed.  This led to a range of issues, including: 1) the number of ships that might be equipped with LFA sonar technology; 2) the oceanic areas that would support operation of LFA sonar technology; and 3) the source levels at which LFA sonar technology might be employed.  The Navy's consideration of how to most effectively employ LFA sonar technology relied extensively on the system design and analysis conducted during the research program discussed above in Subchapter 1.2.2.2.

The Navy's evaluation of the different ways in which LFA sonar technology could be configured and employed, while still fulfilling the Navy's need for long-range submarine detection, led to the following conclusions:  1) four ships would need to be equipped with LFA sonar technology; 2) Navy ships would need to be able to operate LFA sonar technology extensively at various sites located in U.S. and international waters; and 3) LFA sonar technology would need to be capable of operating at source levels of at least 215 dB.  The Navy eliminated from further evaluation other LFA sonar technology employment scenarios that did not meet these minimum requirements, because they would not satisfy the Navy's ASW national defense needs.

SURTASS LFA Sonar

# 1.3 Environmental Impact Analysis Process

The Navy has prepared this OEIS/EIS pursuant to:

- Presidential Executive Order (EO) 12114 (Environmental Effects Abroad of Major Federal Actions); and

- National Environmental Policy Act of 1969 (NEPA).

The Navy is the lead agency for the proposed action with the National Marine Fisheries Service (NMFS) of the Department of Commerce's (DoC) National Oceanic and Atmospheric Administration (NOAA) acting as a cooperating agency. Cooperating agencies have jurisdiction by law or special expertise with respect to certain environmental impacts from a proposed action by another agency. The provisions of EO 12114 apply to major federal actions that may affect the marine environment occurring beyond 22 km (12 nm) from the U.S. shore, in the global commons, or within the territory of a non-participating foreign government. The provisions of NEPA apply to major federal actions that may affect the human and natural environment of the U.S. and within 22 km (12 nm) from shore.

The preparation of this OEIS/EIS enables informed and balanced decision-making regarding the environment and assures public participation. In addition, the OEIS/EIS process is coordinated with the requirements of the Marine Mammal Protection Act and the Endangered Species Act.

## 1.3.1 Executive Order 12114

Executive Order 12114, signed in January 1979, directs federal agencies to provide for informed decision-making for actions that have the potential to significantly harm the environment outside U.S. territorial waters, including the exclusive economic zone (EEZ), the global commons, and the environment of non-participating foreign nations, or that impact protected global resources. This order furthers the purpose of NEPA, the Marine Protection, Research, and Sanctuaries Act, and the Deepwater Port Act. Procedures for implementing EO 12114 have been published by the Department of Defense (DoD) at 32 Code of Federal Regulations (CFR) Part 187. The Navy has implemented these procedures through Chief of Naval Operations (CNO) Instruction (OPNAVINST) 5090.1B (Environmental and Natural Resources Program Manual), Appendix E. Actions that may be taken during armed conflict are an exemption in EO 12114, so they are not covered in this OEIS/EIS.

## 1.3.2 National Environmental Policy Act

In 1969, the U.S. Congress passed NEPA, the national charter for environmental planning. NEPA provides for the consideration of environmental issues in federal agency planning and decision-

Environmental Impact Statement

making. The Council on Environmental Quality (CEQ) established guidelines for federal agency implementation of the act (40 CFR Parts 1500 to 1508). OPNAVINST 5090.1B documents the Navy's internal operations instructions on how the department implements the provisions of NEPA.

NEPA requires federal agencies to prepare an EIS for actions that may significantly affect the quality of the human and natural environment. The EIS must provide full disclosure of significant environmental impacts and inform decision-makers and the public of reasonable alternatives, including the No Action Alternative. With respect to full disclosure, the EIS must identify all potential direct and indirect effects that are known, and make a good faith effort to explain the effects that are not known but are "reasonably foreseeable." This includes the agency's responsibility to make informed judgments, and to estimate the potential for future impacts on that basis, especially if trends are ascertainable. However, the agency is not required to engage in speculation or contemplation about future plans that could influence the EIS's analysis of potential direct and indirect effects.

The first step in the NEPA process is the preparation of the formal Notice of Intent (NOI) which is published in the *Federal Register* (FR) and regional and/or local newspapers. The NOI announces the intent of an agency to prepare an EIS (Figure 1-3, The NEPA Process). In addition, the NOI provides an overview of the proposed project and the scope of the EIS, as well as a description of public participation opportunities, the schedule for public scoping meetings, and the location where written comments are received during the scoping period. The NOI for this project was published in the *Federal Register* on July 18, 1996 (FR Vol. 61 No. 139).

Scoping is an early and open process for developing the "scope" of issues to be addressed in the EIS. It is also important for identifying significant or controversial issues related to a proposed action. Through the scoping process, the public helps define and prioritize issues and conveys these issues to the agency through both oral and written comment. The period for public scoping is generally 45 to 60 days in length. Public scoping meetings for this project were held in August 1996.

After scoping, a Draft EIS (DEIS) is prepared. This document provides an assessment of the potential impacts the federal action might have on the human or natural environment. Future environmental conditions with proposed action implementation are compared to current or baseline conditions. The DEIS also informs decision-makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the environment. Reasonable alternatives include those that are practical or feasible from a technical and economic standpoint and are based on common sense.

When a draft EIS has been completed, the U.S. Environmental Protection Agency (USEPA) publishes a Notice of Availability (NOA) in the *Federal Register*. The NOA for this Draft OEIS/EIS was published on July 30, 1999 (FR Vol. 64 No. 146). The draft EIS is circulated for review and comment, typically over a 45-day period, to government agencies, interested private citizens, and local organizations, and is available for general review in public libraries and other publicly



Figure 1-3. The NEPA Process.

accessible locations. This Draft OEIS/EIS was made available for public comment for 90 days, with comments accepted through October 28, 1999. Also, public meetings and hearings were held on the Draft OEIS/EIS as described in Chapter 10.

A Final EIS (FEIS) is then prepared that incorporates, and formally responds to, public comments received on the DEIS. This response can take the form of corrections of DEIS data inaccuracies, clarifications of and modifications to analytical approaches, inclusion of additional data or analyses, modification of the proposed action or alternatives, or simple acknowledgment of a comment. The preferred alternative for implementation is identified in the FEIS, if it was not presented in the DEIS. The FEIS is then circulated for public review for 30 days.

A Record of Decision (ROD) may be issued 30 days after the FEIS has been made available. The ROD identifies all alternatives that were considered, specifying the "environmentally preferable alternative(s)" and the "agency's preferred alternative." The latter is the alternative that the agency believes would fulfill its statutory mission and responsibilities, giving utmost consideration to economic, environmental, technical and other factors. The decision-maker may approve the proposal even if is not the environmentally preferable alternative. The ROD also describes the public involvement and agency decision-making process, and presents the agency's commitments to any mitigation measures. The action can be implemented only after the ROD is signed. The ROD is then published in the *Federal Register*.

Environmental Impact Statement

## 1.3.3 Marine Mammal Protection Act/Endangered Species Act

SURTASS LFA sonar may be employed in areas that are inhabited by marine animals, including birds, fish, sea turtles, and marine mammals. Marine mammals are protected under the provisions of the Marine Mammal Protection Act (MMPA) within U.S. territories or on the high seas. In addition, certain species of marine animals are listed as threatened or endangered under the Endangered Species Act (ESA).

Operation of the SURTASS LFA sonar system would introduce acoustic energy into the water that could cause impacts to marine animals. These reactions could be as simple as a temporary change in behavior. However, where the signals have the potential to cause harassment or injury, these disruptions could constitute incidental but unintentional "takings" under both the ESA and MMPA.

### 1.3.3.1 MMPA

The term "take" as defined in Section 3 (16 United States Code [USC] 1362) of the MMPA and its implementing regulations means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." The term "harassment" means any act of pursuit, torment, or annoyance that has the potential to:

- Injure a marine mammal or marine mammal stock in the wild (MMPA Level A harassment); or

- Disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering (MMPA Level B harassment).

If a specified activity will result in a small take of marine mammals (one that will have no more than a negligible impact on the affected stock), the MMPA allows NMFS to authorize the action for a period of five years at a time. Before NMFS can authorize such takings, however, it must publish regulations that set forth, "...(I) permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance; and (II) requirements pertaining to the monitoring of and reporting of such taking." Once these regulations are finalized, NMFS authorizes the activity through a Letter of Authorization (LOA).

NMFS considers its issuance of some small take regulations and MMPA LOAs to be major federal actions, which require preparation of the appropriate NEPA and/or EO 12114 documentation. Accordingly, NMFS has joined with the Navy as a cooperating agency in this OEIS/EIS effort to ensure all information needed for the NMFS permitting process is developed during this OEIS/EIS preparation and public review process.

In August 1999, the Navy submitted an application to NMFS requesting authorization, pursuant to Section 101(1)(5)(A) of the MMPA, for the incidental taking of marine mammals. After NMFS reviewed the application, it published an Advance Notice of Proposed Rulemaking (ANPR) in the *Federal Register* on October 22, 1999 (FR Vol. 64 No. 204). The draft regulations for the proposed action will be prepared after a 30-day comment period and published in the *Federal Register*. A 45-day public comment period would then follow. At the end of this comment period, NMFS would finalize and publish the regulations in the *Federal Register*. NMFS would then determine whether to issue a Letter of Authorization to the Navy for the incidental taking of marine mammals associated with the employment of SURTASS LFA sonar.

### 1.3.3.2 ESA

Section 3 of the ESA defines "take" as to harass, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct to species listed as threatened or endangered in 50 CFR 402.12(b). The SURTASS LFA Sonar Draft OEIS/EIS served as the basis for the development of the Biological Assessment required under Section 7 of the ESA, and upon its completion and filing with USEPA, the Navy initiated formal consultation with NMFS. The Biological Assessment was submitted to NMFS on October 4, 1999 and constitutes the Navy's evaluation of the potential effects of the proposed action on species listed or proposed for listing under the ESA, or on critical habitat designated for such species. After review of the Biological Assessment, NMFS will issue a Biological Opinion on the proposed action stating that it has determined it would not be likely to jeopardize the continued existence of listed species under the jurisdiction of NMFS or result in the destruction or adverse modification of critical habitat.

## 1.4 Analytical Context

In developing the framework for this OEIS/EIS, the Navy recognized that it needed to address the following issues:

- Adequacy of scientific information on human divers - Data regarding the effects of underwater LF sound on humans are limited. As a result of this, the Navy sponsored independent scientific research to study the potential effects of LF sound on human divers.

- Adequacy of scientific information on marine animals - Data regarding the effects of underwater LF sound on marine animals, and in particular marine mammals, are limited. As a result of this limitation, the Navy conducted a series of original scientific field research projects to address the most critical of the data gaps regarding the potential effects of LF sound on the behavioral responses of free-ranging marine mammals. This research effort is referred to as the Low Frequency Sound Scientific Research Program (LFS SRP).

Environmental Impact Statement

- Analytical approach - Given the data limitations, it was necessary to develop a prudent and conservative approach to the evaluation of potential environmental impacts from SURTASS LFA sonar. A prudent approach was utilized throughout this OEIS/EIS and its supporting studies.

- NEPA disclosure - Under NEPA, the Navy must address the adequacy of scientific information. CEQ regulations implementing NEPA offer protocols for managing situations involving incomplete or unavailable information. The Navy's LFS SRP studies have already helped fill in data gaps on the potential effects of LF sound on marine life, and the ongoing programs and research proposed by the Navy would continue to reduce areas of incomplete information and provide invaluable data that are presently unavailable.

These four topics are addressed in detail in the following material.

## 1.4.1 Adequacy of Scientific Information On Human Divers

The Navy sponsored research to study the potential effects of LF sound on humans in the water. This research was conducted by teams of independent scientists from universities and from military research laboratories. The research is described below and in Subchapter 4.3.2. Based on results from this research, in conjunction with guidelines developed from psychological aversion testing, the Navy concluded that LF sound levels at or below 145 dB would not have an adverse effect on recreational or commercial divers. This led the Navy Submarine Medical Research Laboratory (NSMRL) to establish a 145-dB received level (RL) criterion for recreational and commercial divers. The Navy-sponsored studies on human divers included:

- Tests on Navy divers. This research was conducted by the Applied Research Laboratory, University of Texas, from 1993 to 1995 under the direction of NSMRL. In this study, 87 subjects (Navy divers) participated in 437 tests designed to determine the received sound level threshold below which there was no risk of auditory damage. This research resulted in the establishment of a damage risk threshold of 160 dB received level for 100 seconds or less at a 50 percent duty cycle and cumulative 15 minutes a day. The 160-dB RL threshold was the maximum level recommended as standard guidance for divers who were equivalent in medical health and fitness to Navy divers.

- A study to develop guidance for safe exposure limits for recreational and commercial divers who might be exposed to LF sound from SURTASS LFA sonar. This research was conducted by scientists from the Office of Naval Research (ONR) and NSMRL between June 1997 and November 1998 in conjunction with scientists from University of Rochester, Georgia Institute of Technology, Boston University, University of Pennsylvania, Naval Medical Center San Diego, Duke University, Divers Alert Network, and Applied Research Laboratory, University of Texas. This study, which is incorporated as Technical Report 3 to

this OEIS/EIS, developed guidance criteria for human exposure to LF sounds such as those transmitted by the SURTASS LFA sonar system. Results were based on computer modeling and animal and human studies during which subjects were exposed to known levels of LF sound for known periods of time.

Human guidelines were established based on psychological aversion testing. There was only a two percent aversion reaction subjectively judged as "very severe" by divers at a level of 148 dB. NSMRL therefore determined that scaling back the intensity by 3 dB (a 3 dB reduction equals a 50 percent reduction in signal strength) would provide a suitable margin of safety against psychological aversion for divers. Hence, NSMRL set the RL criterion for recreational and commercial divers at 145 dB (see Appendix A).

The Navy's adoption of the 145-dB interim guidance for operation of low frequency underwater sound sources in the presence of recreational and commercial divers is considered a conservative, protective decision. During operation of the SURTASS LFA sonar, the distance from the source to where the RL is 145 dB (the 145-dB sound field) varies from site to site due to the high variability in underwater sound propagation characteristics and deployment protocols. The most reliable method for ensuring that the criterion of 145 dB maximum RL is maintained at known recreational and commercial dive sites involves the application of validated underwater acoustic models of sound propagation using site-specific environmental parameters. Results provide an estimation of sound pressure level (SPL) as a function of range and depth for each specific site (see Subchapters 2.3.2.1 and 5.1.3).

## 1.4.2  Adequacy of Scientific Information on Marine Animals

Many human activities generate loud underwater sounds, and there is an urgent need for better methods for measuring and estimating potential risk. The quantitative assessment of potential risk is complicated by the scarcity of data in several areas:

- Hearing loss due to sound exposure in air is well studied in humans and some other terrestrial animals. Data regarding underwater hearing capabilities of marine mammals are rare and limited to a few of the smaller species that make convenient subjects in captivity.

- Knowledge of the functions of the sounds produced by most marine mammals is limited.

- Data on the responses of marine mammals to LF sounds are limited.

These data gaps have necessitated the use of various models and extrapolations in order to provide a rational basis for the assessment of potential risk from exposure to LF sounds. To address some of these gaps, the Navy performed underwater acoustic modeling and supported the LFS SRP to study the potential effect of LF sound on free-ranging marine mammals. This research did not specifically

Environmental Impact Statement

address the issue of LF impact on marine mammal hearing; rather, it focused on the behavioral responses of baleen whales to controlled exposure from SURTASS LFA sonar-like signals.

In general, understanding the mechanics of hearing and the biological functions of sounds for marine mammals has improved considerably over the past decade. Specific information on the effects of most types of human-made underwater noises on marine animals is incomplete, but has also increased in recent years. However, as the environmental evaluation of the SURTASS LFA sonar system progressed, the Navy recognized that additional research was required in several areas to address some basic gaps in scientific knowledge. This included development of a scientifically reasonable estimate of the underwater sound exposure levels that may cause injury to marine mammals, and research on the potential effects of LF sound on marine mammal behavior.

While recognizing that not all of the questions on the potential for LF sound to affect marine life are answered, and may not be answered in the foreseeable future, the Navy has combined scientific methodology with a prudent approach throughout this OEIS/EIS to protect the marine environment.

Although there are recognized areas of insufficient knowledge that must be accounted for when estimating the potential direct and indirect effects on marine life from SURTASS LFA sonar, the present level of understanding is deemed adequate to place reasonable bounds on potential impacts.

## Use of Baleen Whales (Mysticetes) as Indicator Species for Other Marine Life

The rationale for using representative species to study the potential effects of LF sound on marine animals emerged from an extensive review in several workshops by a broad group of interested parties: academic scientists, federal regulators, and representatives of environmental and animal welfare groups. The outcome of these discussions concluded that baleen whales (mysticetes) would be the focus of the three phases of the LFS SRP and indicator species for other marine animals in the analysis of underwater acoustic impacts. Mysticetes were chosen because: 1) they were presumed to be most sensitive to sound in the SURTASS LFA sonar frequency band, 2) they have protected status under law, and 3) there is prior evidence of their avoidance responses to LF sounds.

The composite audiogram shown in Figure 1-4 (Marine Mammal Audiograms) uses measured and estimated marine mammal hearing data to illustrate the contention that mysticetes have the best LF hearing of all marine mammals. Studies on pelagic fish and sea turtles indicate that their LF hearing is not as sensitive as that of baleen whales. Deep-diving species such as sperm and beaked whales are presumed not to have LF hearing as good as that of baleen whales. Therefore, all of these groups or species were considered to be at lower risk from LF sound than baleen whales.

One goal of identifying the species most sensitive to LF sound was to produce a model of response that could be applied to other species for which data were lacking. This was also an important element in the selection of species for the LFS SRP research, and was intended to produce estimates of environmental impact that would be conservative when applied to other species.

SURTASS LFA Sonar

The following discussion addresses the three potential areas of impact: injury, behavioral effects, and masking.

## 1.4.2.1 Estimating the Potential for Injury to Marine Mammals

Marine mammals rely on hearing for a wide variety of critical functions. Exposure to sounds that permanently affect their hearing ability poses significant problems for the survival and reproduction of these animals. Many human activities generate loud underwater sounds, and there is an urgent need for methods of estimating potential risk. The quest for a quantitative assessment of risk potential is complicated by scarce data in two areas. First, direct measured data regarding underwater hearing capabilities of marine mammals are generally limited to a few of the smaller species that can be conditioned for hearing tests in the laboratory. Second, hearing loss due to sound exposure is well studied in humans and other terrestrial animals, but data for marine animals are sparse. These data gaps have prompted the use of various models and extrapolations, in order to provide a rational basis for the assessment of risk potential.



Figure 1-4. Marine Mammal Audiograms

Environmental Impact Statement

## Marine Mammal Hearing Thresholds

Assessment of potential risk to a particular species must begin with an estimate of the range of frequencies at which the animal's hearing is most sensitive, and the associated thresholds. The range of sounds produced by a species is generally associated with ranges of good hearing sensitivity, but many species exhibit good hearing sensitivity both above and below the frequency range of sounds they produce. Closely related species of similar body size, vocalization range and ecological habitat are often presumed to have similar hearing. Anatomical models of inner ear function have been used to extend the scope of limited audiometric data (Ketten, 1992, 1994a, 1997, 1998). In Ketten's work, the resonant properties of the basilar membrane provide clues to the probable range of animal hearing. Ketten (1998) delineates marine mammal functional hearing ranges into three categories: 1) infrasonic balaenids (mysticetes) with functional hearing from 15 Hz to 20 kHz, good sensitivity from 20 Hz to 2 kHz, and speculated threshold of best hearing at 80 dB re 1 μPa; 2) sonic to high frequency species with functional hearing range from 100 Hz to 100 kHz with widely varying peak spectra and a minimal threshold commonly at 50 dB re 1 μPa; and 3) ultrasonic dominant species with functional hearing range from 500 Hz to 200 kHz, good sensitivity from 16 kHz to 120 kHz, and minimal hearing threshold commonly at 40 dB re 1 μPa.

The evident difficulties of obtaining measured thresholds for Ketten's first category suggest that an estimation based on a non-direct method of extrapolation be used. Ellison (1997) and Clark and Ellison (2000) propose a general model that estimates lower bounds for hearing sensitivity. This approach assumes that the ambient noise of the environment, combined with general characteristics of vertebrate hearing, create a limit to best hearing. More specifically, the absolute threshold of best hearing can be estimated as:

Best Hearing Threshold = Lowest Ambient Noise Spectra + Critical Ratio

The auditory critical ratio, measured in decibels (dB re 1 Hz) is defined by Richardson (1995b) as the "difference [ratio] between sound power level for a barely audible tone and the spectrum level of background noise at nearby frequencies." The logic in this approach is that evolutionary pressures should select for the most efficient use of the limited dynamic range experienced by the auditory mechanism. Thus, the least detectable sound (i.e., a narrowband signal in dB re 1 μPa) in the frequency band of best hearing should approximate the lowest background noise spectrum level (dB re 1 μPa²/Hz) in that band plus the critical ratio at that frequency. All measured mammalian hearing systems work within a relatively narrow range of critical ratios, on the order of 16 to 24 dB re 1 Hz.

Validation for this approach comes from a comparison of measured results of best hearing thresholds for humans and white whales (beluga: *Delphinapterus leucas*) and their predicted thresholds using the ambient noise and critical ratios method. This comparison revealed remarkable concurrence between the measured and predicted thresholds. For humans, the predicted thresholds were within ± 5 dB of measured thresholds in the 1 – 4 kHz frequency band. For belugas, the predicted thresholds

were within $\pm$ 5 dB of measured thresholds in the 20 – 70 kHz frequency band, and tended to overestimate threshold levels.

In order to extrapolate this approach to the baleen whales, two assumptions were made: 1) in the region from 100 to 500 Hz, the lower bound of ambient noise spectra (absent shipping noise effects) is on the order of 42 to 46 dB re 1 $\mu Pa^2$/Hz (Urick, 1983), and 2) the range of mammalian critical ratios is well approximated by 16 - 24 dB re 1 Hz. Given these assumptions, the range of expected thresholds for baleen whales in the 100-500 Hz frequency band is estimated to be in the range of 58 - 70 dB re 1 $\mu Pa$.

Figure 1-4 illustrates the estimated hearing range for baleen whales from the above method as well as mathematical models based on ear anatomy or inferred from emitted sounds (Ketten, 1994a, 1998; Frankel et al., 1995; Ketten, pers. comm., 2000). Also shown in this figure are composites of the measured lowest thresholds from pinniped and odontocete audiograms (Richardson, et al., 1995b), and an estimate of the lower bound of ambient noise (Urick, 1983).

## Human Hearing Loss Studies

Due to the lack of measured data, estimating the point at which marine mammal hearing loss may occur as a function of sound level and duration requires extrapolation. For example, long-term hearing loss in humans is accelerated by chronic daily 8-hour workplace exposure (over time scales on the order of tens of years) to sounds at levels of 85 dB (A) (in air) or greater (*Guide for Conservation of Hearing in Noise*, American Academy of Ophthalmology and Otolaryngology, 1969; Ward, 1997). This result is shown as a function of the expected population percentage affected after 20 years of exposure in Table 1-2. 85 dB (A) is often cited as the level at which hearing loss occurs after workplace exposure over many years, even though it is actually only the 5th percentile point. The 50th percentile point is 20 dB higher (105 dB), and the 90th percentile point is more than 30 dB higher (115 dB). Therefore, the utilization of 85 dB over threshold is conservative.

Table 1-2

Percent of Noise-Exposed Human Population Likely to Develop Hearing Handicap [due to 20 years exposure] as Distinct from Normal Loss of Hearing with Age

| Exposure Level at Work in dB(A) | Percent Affected at Age 40 after 20 years of exposure |
|---|---|
| 80 | 0 |
| 85 | 5 |
| 95 | 21.4 |
| 105 | 49.9 |
| 115 | 83.9 |

References: *Guide for Conservation of Hearing in Noise*, American Academy of Ophthalmology and Otolaryngology (1969); Ward (1997)

Purpose                                                                                                   and Need

Environmental Impact Statement

The sound power reference unit dB (A) is the frequency-weighted response matching the human hearing threshold, 0 dB (A) being the nominal threshold of best hearing in young healthy humans. It should be noted that free-field human threshold measurements for binaural hearing (in the best human hearing band: 400 to 8,000 Hz) vary between –10 to + 10 dB re 20 µPa (Beranek, 1954; Harris, 1998) depending on measurement objective and technique used.

For a safe single exposure to very intense sound, Ward (1997) has derived a relationship of maximum safe level vs. exposure duration. Thus, levels higher than this may be viewed as potentially harmful. Simple recoverable temporary threshold shifts (which likely occurred at these intense levels of sound) are not included in this damage category. The relationship provided by Ward scales on a 10 log (duration in seconds) basis. Typical values of maximum one-time safe exposure levels above a nominal best hearing threshold of 0 dB re 20 µPa are 144 dB for 1 second, 124 dB at 100 seconds, 112 dB at 20 minutes, 109 dB at 60 minutes, 106 dB at 2 hours, and 100 dB at 8 hours. If viewed as levels above best hearing threshold, these values can be used to extrapolate and thus infer one-time RL thresholds for single safe exposure for other species.

Ward (1997) also introduces another base reference point of value to extrapolation issues. This reference point is termed equivalent quiet (EQ) and is the level of sound to which humans can be exposed continuously with no expected TTS. The lower level for humans is 70 dB re 20 µPa for sounds less than an octave in bandwidth. It is important to note that the value is comparable but slightly less than the "no effect" level of 80 dB in Table 1-2. An interpretation of this comparison is that repeated but modest levels of TTS (occurring from exposures between 70 and 80 dB above threshold) would have no long-term hearing loss effect. A value to be applied later is the difference in dB for humans between EQ and one-time safe exposure to intense sound (i.e., 74 dB for 1 second [144 dB - 70 dB = 74 dB], 54 dB for 100 seconds [124 dB - 70 dB = 54 dB]). See Temporary Threshold Shift (TTS) discussion below.

**Selection of the 180-dB Criterion**

For the purposes of the SURTASS LFA sonar analyses presented in this OEIS/EIS, all marine mammals exposed to RLs ≥ 180 dB are evaluated as if they are injured. The following discussion addresses the basis for determination of this value.

**Extrapolation to Marine Mammals**

If the "dynamic range" between hearing thresholds and problematic exposure levels is the same for marine mammals as for humans, this suggests that potential hearing loss in animals with good LF hearing can be extrapolated from the estimated thresholds shown in Figure 1-4. Selecting 60 dB re 1 µPa as the lower limit of the estimated marine mammal threshold in the 100 to 500 Hz frequency band, the extrapolated human data from Table 1-2 is shown in Table 1-3. For example, adding 60 dB to 80 dB (from first line in Table 1-2) equals 140 dB, as shown in the first line in Table 1-3.

Purpose                                  1-24                                  and Need

Table 1-3

Percent of Marine Mammal Population (with good LF hearing) Likely to Develop
Hearing Handicap (due to long term exposure)

| Level in dB re 1 μPa (octave band or narrower band sounds in 100 to 500 Hz band) | Percent Population Affected after (more than 8 hr/day) long-term (20 yrs) exposure |
|---|---|
| 140 | 0 |
| 145 | 5 |
| 155 | 21.4 |
| 165 | 49.9 |
| 175 | 83.9 |

Table 1-4 provides the equivalent safe one-time exposure levels as a function of duration, based on a 60 dB re 1 μPa best hearing threshold. For example, from the Ward (1997) derivation above, the typical value above a nominal best hearing threshold of 0 dB re 20 μPa is 144 dB for 1 second. Adding 60 dB to this equals 204 dB, as shown in the first line of Table 1-4.

Table 1-4.

Duration and Level of Safe One-Time Exposures to Narrowband Sounds in the 100 to
500 Hz Band

| Signal Duration | Safe One-Time Exposure Level in dB re 1 μPa (octave band or narrower band sounds in 100 to 500 Hz band) |
|---|---|
| 1 sec | 204 |
| 100 sec (max duration for a single SURTASS LFA sonar ping) | 184 |
| 20 min | 172 |
| 60 min | 169 |
| 2 hr | 166 |
| 8 hr | 160 |

The selection of 180 dB as the single-ping criterion for the risk continuum approach is in agreement with extrapolation from the human exposure results. A level of conservatism is also inherent in this comparison, as the risk continuum is based on the lower limit of potential damage, and the human extrapolation is based on the upper level of safety.

Environmental Impact Statement

## Comparison to Fish Hearing Studies

Hastings et al. (1996) studied the effects of intense sound stimulation on the ear and lateral line of the oscar fish (*Astronotus ocellatus*). They found that there was some damage to the sensory hair cells of two of the otolith organs, the lagena and utricle, when the fish were exposed to continuous underwater sound at 300 Hz and 180 dB for one hour. The interpretation of these results was that exposure to a pure tone, high intensity sound continuously for one hour has the potential to damage the ear of fish.

Other studies also suggest that intense sound may result in limited damage to the sensory hair cells in the ears of fish. Cox et al. (1986a, b; 1987) exposed goldfish (*Carassius auratus*), a freshwater fish with specialized and sensitive hearing, to pure tones at 250 and 500 Hz at 204 and 197 dB, respectively, at durations on the order of two hours, and found some indication of hair cell damage. Enger (1981) determined that some ciliary bundles (the sensory part of the hair cell) of the inner ear of the cod (*Gadus morhua*) were destroyed when exposed to sounds at several frequencies from 50 to 400 Hz at 180 dB for 1-5 hours.

Given that the physiology of inner ear hair cells is considered to be similar among vertebrates, and that exposure to 180 dB in water is expected to yield the same shear forces on the inner ears of fish and marine mammals, it seems a valid conclusion that the single-ping 180-dB criterion for SURTASS LFA sonar can be considered to be relatively conservative.

Goldfish in this band have excellent underwater hearing with thresholds in the 60 dB re 1 μPa range (Offutt, 1968). Following the extrapolation based on Ward's (1997) one-time exposure criteria and using a lumped average exposure time of two hours (106 dB from Ward [1997] derivation above) and a threshold of 60 dB, the safe limit would be predicted to be 166 dB (106 dB + 60 dB = 166 dB). Thus, the damage appears to have been caused by levels 14 dB and higher above an extrapolated single continuous two-hour ping guidance criterion (180 dB - 14 dB = 166 dB). Further extrapolation in time would indicate that, for the goldfish, a single 100-second exposure level on the order of 184 dB (see Table 1-4) would have been safe. On this basis, a 100-second duration criterion for SURTASS LFA sonar of 180 dB is conservative.

## Temporary Threshold Shift (TTS)

Temporary threshold shifts (TTS) of varying degrees occur naturally on a routine basis in the environment of virtually all animals, including humans. As discussed previously, TTS is not necessarily harmful on a limited basis; however, an organism could miss important low level signals until its normal hearing sensitivity is restored. Further, TTS serves as an indicator that more extensive exposure (above EQ) or significantly louder levels may cause permanent hearing loss. This is demonstrated in Tables 1-2 (humans) and 1-3 (marine mammals with good LF hearing).

SURTASS LFA Sonar

Two recent measurements of low-level TTS in marine mammals are discussed below along with the extrapolated relationship of these measurements to the selection of 180 dB as the SURTASS LFA sonar single-ping-exposure-limit for the risk assessment.

Schlundt et al. (2000) documented temporary shifts in underwater hearing thresholds in trained bottlenose dolphins (*Tursiops truncatus*) and white whales (*Delphinapterus leucas*) after exposure to intense one-second duration tones at 400 Hz, and 3, 10, 20, and 75 kHz. Of primary importance to this deliberation are the LF-band tones at 400 Hz. At this frequency, the researchers were unable to induce TTS in any animal at levels up to 193 dB re 1 µPa, which was the maximum level achievable with the equipment being used.

This experiment also provides an additional verification point for the extrapolation of the human data set for hearing effects at best hearing. For both species tested, their best hearing threshold is broadly set at about 40 to 45 dB in the 20 to 75 kHz range. In this band, TTS was reported for levels (varying significantly between individuals) from 182 to 193 dB. Applying the extrapolated one-time safe levels above threshold for one-second duration from Ward (1997), the result (144 dB above threshold) is 184 to 189 dB, providing further validation for the extrapolation technique.

Kastak et al. (1999) documented TTS in three species of pinnipeds exposed to varying levels of octave band noise (OBN) for periods on the order of 20 minutes. OBN center frequencies from 100 to 2,000 Hz were used in these tests, and the results presented in the paper pooled the data from each exposure frequency. The results indicate onset of TTS at mean values of 137, 150, and 148 dB re 1 µPa for the harbor seal, sea lion and elephant seal, respectively, for 20- to 22- minute exposures of OBN. Because of the pooling effect, these data also have variations around the mean on the order of –5 to +10 dB. As described in the account of the test, these levels can be considered to represent the lower level for onset of TTS.

Ward (1997) states that in humans ordinary TTS (i.e., effects lasting longer than two minutes) from narrow-band (octave band or less) sound occurs only at exposure levels in excess of 70 dB above hearing threshold. Due to the long exposure time of the stimulus in these tests, one can infer that the EQ level is closely approximated by the onset levels just described, adjusted for the longest duration (8 hours) in Ward's one-time safe level criteria. The difference between 20-minute and 8-hour exposures is 12 dB (see Table 1-4), thereby yielding extrapolated EQ values of 125 dB (137 dB - 12 dB = 125 dB), 138 dB (150 dB - 12 dB = 138 dB), and 136 dB (148 dB - 12 dB = 136 dB), respectively, for the harbor seal, sea lion, and elephant seal data. Applying the SURTASS LFA sonar 100-second EQ differential level of 54 dB (from the section on Human Hearing Loss Study above) to these values results in single-ping safe exposure levels of 179, 193, and 191 dB, respectively, for the three tested animals. Thus, a 100-second duration for SURTASS LFA sonar of 180 dB should be considered appropriate and, based on Kastak et al. (1999) sea lion and elephant seal data, conservative for these species at least.

Environmental Impact Statement

For the purposes of this document 180-dB received level is considered as the point above which some potentially serious problems in the hearing capability of marine mammals could start to occur. Several scientific and technical workshops and meetings at which the 180-dB criterion were developed are:

- High Energy Seismic Survey (HESS) Team Workshop, Pepperdine University School of Law, June 12-13, 1997 (Knastner, 1998);

- Office of Naval Research Workshop on the Effects of Man-Made Noise on the Marine Environment. Washington, DC, February 9-12, 1998 (Gisiner, 1998); and

- National Marine Fisheries Service (Office of Protected Resources) Workshop on Acoustic Criteria, Silver Spring, MD, September 9-12, 1998.

## 1.4.2.2  Estimating the Potential for Behavioral Effect

Marine mammals rely on underwater hearing for a wide variety of biologically critical functions. The primary concern here is that exposure to SURTASS LFA sonar signals could potentially affect their hearing ability or modify biologically important behaviors. Biologically important behaviors are those related to activities essential to the continued existence of a species, such as feeding, migrating, breeding and calving. An individual exposed to LF sound levels high enough to affect its hearing ability could potentially have reduced chances of reproduction or survival. If stocks of animals are exposed to high levels that affect hearing ability, then significant portions of a stock could potentially experience lower rates of reproduction or survival. Given that a LF sound source is loud and can be detected at moderate to low levels over large areas of the ocean, the concern would be that large percentages of species stocks could be exposed to moderate-to-low received sound levels. If animals are disturbed at these moderate-to-low exposure levels such that they experience a significant change in a biologically important behavior, then such exposures could potentially have an impact on rates of reproduction or survival.

## Low Frequency Sound Scientific Research Program

Knowing that cetacean responses to LF sound signals needed to be better defined using controlled experiments, the Navy helped develop and supported the three-year LFS SRP beginning in 1997. The LFS SRP was designed to supplement the limited scope of data from previous studies. This field research program was based on a systematic process for selecting the marine mammal indicator species and field study sites, using inputs from several workshops involving a broad group of interested parties (academic scientists, federal regulators, and representatives of environmental and animal welfare groups). In designing the LFS SRP, the Navy chose to minimize the potential of risk to animals that were the subject of the study by limiting the exposure of subject animals to a maximum RL of 160 dB.

SURTASS LFA Sonar

The LFS SRP produced new information about responses to LF sounds at RLs from 120 to 155 dB. The scientific research team explicitly focused on situations that promoted high RLs, but were seldom able to achieve RLs above 155 dB due to the motion of the whales and maneuvering constraints of the LF source vessel. Controlled experimental tests were performed in three phases, involving the following species and settings:

- Phase I: Blue and fin whales feeding in the Southern California Bight (September – October 1997);

- Phase II: Gray whales migrating past the central California coast (January 1998); and

- Phase III: Humpback whales off Hawaii (February – March 1998).

### Relevance of LFS SRP for Risk Assessment and Quantifying Potential Impacts to Marine Mammals

Prior to the LFS SRP, the expectation was that whales would begin to show avoidance responses at RLs of 120 dB (Malme et al., 1983, 1984). Immediately obvious avoidance responses were expected for levels >140 dB (Richardson et al., 1995b). The LFS SRP experiments detected some short-term behavioral responses at estimated RLs between 120 – 155 dB. In the Phase II research, avoidance responses were sometimes obvious in the field. Although several behavioral responses were revealed through later statistical analysis, there was no significant change in a biologically important behavior detected in any of the three phases. Most animals that did respond returned to normal baseline behavior within a few tens of minutes. These scientific results support the conclusion that potential impact on biologically significant behaviors is negligible for SURTASS LFA sonar RLs ≤145 dB. This shifts the level of potential concern from the previous level of 120 dB to levels >145 dB.

The modeled underwater acoustic RLs (Acoustic Integration Model [AIM] analyses results) presented in Subchapter 4.2 of this OEIS/EIS, which were calculated subsequent to the LFS SRP, suggest that the range of exposure levels for subject animals during the LFS SRP covered an important part of the RL range that would be expected during actual SURTASS LFA sonar operations. The data presented as Figures 1-5a through 1-5c (Modeled Received Levels vs. Percentage of Modeled Pings [from AIM Aggregate Data Results] and Probability of Risk (For All Mysticetes, Odontocetes, Pinnipeds [31 sites]) illustrate that the preponderance of all modeled RLs fall below the 155 dB level, which is within the range of exposures studied during the LFS SRP. Thus, it follows that the scientific conclusion based on the LFS SRP research data should encompass the majority of SURTASS LFA sonar operational scenarios.

Environmental Impact Statement



Figure 1-5a. Modeled Received Levels vs. Percentage of Modeled Pings (from AIM Aggregate Data Results) and Probability of Risk (For All Mysticetes [31 Sites])



Figure 1-5b. Modeled Received Levels vs. Percentage of Modeled Pings (from AIM Aggregate Data Results) and Probability of Risk (For All Odontocetes [31 Sites])

SURTASS LFA Sonar



Figure 1-5c. Modeled Received Levels vs. Percentage of Modeled Pings (from AIM Aggregate Data Results) and Probability of Risk (For All Pinnipeds [31 Sites])

## Long Term Monitoring

Findings from the LFS SRP did not reveal any significant change in a biologically important behavior in marine mammals, and the risk analysis estimated very low risk. However, the Navy considers it prudent to continue monitoring for potential effects of the SURTASS LFA sonar. This monitoring would provide additional data to support the resolution of unresolved scientific issues, and respond to anticipated MMPA reporting requirements. Upon issuance of an LOA by NMFS under the MMPA, the Navy would provide a Long Term Monitoring (LTM) plan.

The Navy's efforts in this regard and its stated intention to conduct LTM (Subchapter 2.4) concurrently with the operation of SURTASS LFA sonar will contribute to the body of scientific knowledge on the potential effects of human-made underwater LF sound on marine life.

## 1.4.2.3 Masking

Masking is the concealment or screening of a sensory process. In the marine environment and the context of this OEIS/EIS, this refers to biologically important sounds being masked, or screened, by louder noises, or sounds within the same frequency band.

Environmental Impact Statement

Masking in fish stocks are discussed in Subchapter 4.1.1.1 (Fish Stocks). Existing evidence supports the hypothesis that masking effects could potentially be significant for fish that have best hearing at the same frequencies of SURTASS LFA sonar. However, given the 10-20 percent duty cycle and maximum 100-second signal duration, masking would be temporary. Additionally, the 30-Hz (approximate maximum) bandwidth of SURTASS LFA sonar signals is only a small fraction of the animal's hearing range—most fish sounds have bandwidths >30 Hz.

Masking in shark stocks is discussed in Subchapter 4.1.1.2 (Shark Stocks). As in bony fishes, masking effects would be most significant for shark species with critical bandwidths at the same frequencies as SURTASS LFA sonar. However, the low duty cycle and maximum 100-second signal transmission window, would lead to only temporary masking, since the intermittent nature of the signal reduces the potential impact. Although long-term effects of masking sounds on sharks have not been studied, these are not expected to be severe because of the limited SURTASS LFA sonar bandwidth (approximate maximum of 30 Hz), and the fact that the signals do not remain at a single frequency for more than ten seconds.

Masking in sea turtle stocks is discussed in Subchapter 4.1.2 (Sea Turtles). For sea turtles, masking effects are potentially significant for those species that have critical hearing bandwidths in the same frequencies as SURTASS LFA sonar. However, masking of this nature would be temporary for the reasons cited above, and also because the geographical restrictions imposed on SURTASS LFA sonar operations would limit the potential for masking of sea turtles in the vicinity of their nesting sites.

As discussed in Subchapter 4.2.7.7 (Potential for Masking) with regard to masking in marine mammals, any masking effects would be temporary and are expected to be negligible, because the SURTASS LFA sonar bandwidth is very limited (approximately 30 Hz), signals do not remain at a single frequency for more than ten seconds, and the system is off at least 80 percent of the time.

## 1.4.3  Analytical Approach

The underwater acoustic analyses described in Chapter 4 incorporate many biological and physical parameters. These parameters allow many situations to be modeled within a common framework. When scientific experts selected the values for these parameters, the best scientific and technical data and information were used, with the goal of selecting the most likely value for each parameter. Each judgment was, however, intentionally tempered by a conservative bias.

The cumulative effect of a series of modestly conservative choices results in a substantial conservative bias in the overall results and percentage of marine mammal stocks potentially affected. For example, suppose ten choices were made, each having a 60 percent chance of being conservative. Next, suppose the model results could be considered correct if at least half of these decisions were correct. The result is a greater than 80 percent chance that the model would be

considered correct. This calculation follows from the cumulative binomial distribution (Dixon and Massey, 1969; Zar, 1996); similar considerations hold for the AIM model structure (Subchapter 4.2.2.2) and risk continuum (Subchapter 4.2.5).

This should be contrasted with an approach that would have selected extremely conservative values for each parameter, thereby representing upper bounds of risk contributed by each factor. The collective effect of this alternative strategy would have been a model that radically exaggerated risk by orders of magnitude (10 to 100 times). The OEIS/EIS sought a more realistic scenario, which would reveal conservative but plausible risk estimates, by incorporating a consistent moderately conservative bias.

## Conservative Assumptions in Research and Modeling

Where necessary, the analysis relies on conservative procedures and assumptions in research and modeling that were independently developed by the scientific team:

- **Human Diver Hearing:** The comprehensive study conducted by ONR and NSMRL between June 1997 and November 1998 in conjunction with a consortium of university and military laboratories (see TR 3) concluded that the maximum intensity used during testing (157 dB RL) did not produce evidence of physiological damage in human subjects. Furthermore, there was only a two percent aversion reaction subjectively reported as "very severe" by divers at 148 dB RL. NSMRL adopted a very conservative approach and determined that scaling back the intensity by 3 dB (which equates to a 50 percent reduction in signal strength) would provide a suitable margin of safety for commercial and recreational divers. Hence, operation of SURTASS LFA sonar systems would be restricted to 145 dB in known areas of recreational and commercial diving.

- **Diver 145-dB Geographic Restrictions Not Included in Modeling:** In order to facilitate the modeling of potential impacts to marine mammals, the geographic restriction of 145 dB for recreational and commercial dive sites was not included in the AIM analysis. For regions with known recreational and commercial dive sites (predominantly coastal), this is more restrictive, in that its application overrides the 180-dB restriction, usually requiring the SURTASS LFA sonar vessel to operate farther offshore.

- **Use of Baleen Whales as Indicator Species:** As described in Subchapters 1.4.1.1 and 4.2, baleen whales (mysticetes) were selected, after review by an independent, broad group of interested parties, as the marine animals most at risk. Baleen whales were used as indicator species for other marine animals in these studies because they are the animals that are the most likely to have the greatest sensitivity to LF sound, have protected status, and have shown avoidance responses to LF sounds.

Environmental Impact Statement

- **Site Selection:** For the acoustic modeling, locations covering the major ocean regions of the world were carefully selected to represent reasonable SURTASS LFA sonar employment. Sites were selected to model the highest potential for effects from the use of SURTASS LFA sonar, and incorporated the following factors:

    – Closest operationally plausible proximity to land (from a SURTASS LFA sonar operations standpoint), where biodiversities are high, and/or offshore biologically important areas are present (particularly for animals most likely to be affected);
    – Acoustic propagation conditions that allow minimum propagation loss or transmission loss (TL) (i.e., longest acoustic transmission ranges); and
    – Time of year selected for maximum animal abundance.

- **Use of 180-dB Criterion:** For the purposes of the SURTASS LFA sonar analyses presented in this OEIS/EIS, all marine animals exposed to RLs ≥ 180 dB are evaluated as if they are injured. A single-ping RL of 180 dB was assumed for the modeling; this level is considered conservative, as detailed herein.

- **Risk Transition:** The parameter of the risk continuum (for SURTASS LFA sonar) that controls how rapidly risk transitions from low to high values with increasing RL was set at a value that produced a curve with a more gradual transition than curves developed by the analyses of migratory gray whale studies of Malme *et al.* (1984). The choice of a more gradual slope than the empirical data was consistent with other decisions to make conservative assumptions when extrapolating from other data sets.

- **Risk Threshold:** The assumption that risk (for SURTASS LFA sonar) could begin at 119 dB is a practical approximation of the RL below which the risk of a significant change in a biologically important behavior approaches zero. In all three phases of the LFS SRP, most animals showed little to no response to SURTASS LFA sonar signals at RLs up to 155 dB, and those individuals that did show a response resumed normal activities within tens of minutes.

- **Cumulative Exposure:** Another conservative assumption involved the potential effects of cumulative exposure. The analysis assumed that the single-ping equivalent (SPE) level scaled in accordance with previous studies of TTS that dealt with continuous sound, even though SURTASS LFA sonar pings would be separated by 6 to 15 minutes of silence. The 20 percent (maximum) duty cycle of SURTASS LFA sonar transmissions implies that any cumulative exposure would be less than that for continuous sounds.

- **Number of Marine Mammals Potentially Affected:** The acoustic modeling simulations incorporated conservative assumptions regarding the fraction of the regional stock in the area potentially affected by the hypothetical SURTASS LFA sonar operation and their animal

movement patterns. Scientific data are typically reported with 95 percent confidence intervals. However, in order to run the acoustic model, an exact number of animals must be specified. Therefore, the upper end of the 95 percent confidence interval was used for stock densities and abundances.

## 1.4.4  NEPA Disclosure

As previously stated, there are, and may always be, scientific data gaps regarding the potential for effects of LF sound on marine life. However, NEPA does provide guidance for how to proceed under situations with incomplete or unavailable information: CEQ regulations (40 CFR 1502.22) indicate that when an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an EIS and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking. The term "incomplete information" refers to information that the agency cannot obtain because the overall costs of doing so are exorbitant. The term "unavailable information" refers to information that cannot be obtained because the means to obtain it are unknown.

The regulations further state that (a) if the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the EIS, and (b) if the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the EIS:

- A statement that such information is incomplete or unavailable.

  Discussions of information gaps occur throughout this document, but are particularly discussed in Subchapter 1.4.1, Adequacy of Scientific Information on Human Divers and Subchapter 1.4.2, Adequacy of Scientific Information on Marine Animals. The Navy has, however, endeavored to supply missing information by conducting original research and modeling. The LFS SRP and human diver studies have contributed significantly to addressing the data gaps.

- A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment.

  With regard to incomplete and unavailable information, "reasonably foreseeable significant adverse impacts" includes impacts that have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the "rule of

Environmental Impact Statement

reason." That is, agencies are not required to discuss "remote and highly speculative consequences."

The relevance of incomplete information in evaluating reasonably foreseeable significant adverse impacts from employment of SURTASS LFA sonar on the human environment is deemed moderate. The Navy has undertaken a reasonable search for relevant, current information associated with identified potential effects, and this OEIS/EIS contains a thorough discussion of the significant aspects of the probable environmental consequences of employment of the SURTASS LFA sonar system.

- A summary of existing credible scientific evidence that is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment.

  Summaries of such evidence are provided throughout this OEIS/EIS, notably in Chapter 4 and in the discussions on the LFS SRP.

- The agency's evaluation of such impacts, based upon theoretical approaches or research methods generally accepted in the scientific community.

  As demonstrated in this document, not only did the Navy base evaluation of potential impacts on the existing, limited data and use generally accepted approaches and methods in doing so, but it also conducted original research to address many of the data gaps. For instance, the Navy developed the risk continuum analysis (Subchapter 4.2.5) and used acoustic modeling; prepared and executed the LFS SRP (Subchapter 4.2.4, TR 1); prepared and performed studies on human divers (Subchapter 4.3.2.1, TR 3); and has proposed a Long Term Monitoring Program (Subchapter 2.4) that includes further scientific research, which has the additional benefit of the potential for collaboration with other members of the scientific community.

## Precedents for Proceeding with the Proposed Action

As stated throughout this section, and the OEIS/EIS as a whole, there are data gaps in what is known about the potential for effects on marine life from LF sound. This lack of information has been dealt with in many ways, including thorough original research, review of the literature, and proposed long term monitoring and research. The limited amount of data on LF sound and marine life is a result, in part, of the difficulties inherent in studying large animals and the unique qualities of the ocean environment.

Precedents for proceeding with the proposed action under these circumstances have been provided by rulings on NEPA documentation, including "frontiers of science" issues for impact analysis.

For instance, in a 1983 Supreme Court decision (on *Baltimore Gas & Electric Co. v. Natural Resources Defense Council*, 475 U.S. 87), the Court ruled on an EIS where the Nuclear Regulatory Commission (NRC) chose to analyze the most probable long-term waste disposal method and then estimate its impacts conservatively, based on the best available information and analysis. The NEPA document contained an expansive discussion of the uncertainties and used known data to extrapolate and identify impacts, resulting in a calculation of resulting consequences. The Court found the approach used by the NRC to be within the realm of "reasoned decision making required by the Administrative Procedures Act." The Court stated that its standard when reviewing was to determine whether the NRC "has considered the relevant factors and articulated a rational connection between the facts found and the choices made."

Further, the Court instructed those conducting review to remember that "...a reviewing court must remember that the NRC is making predictions, within its area of expertise, at the frontiers of science. When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential" (*Baltimore Gas* at 103, relying on *Industrial Union Department v. American Petroleum Institute*, 448 US 607) (1980). It is noted here that the development of this OEIS/EIS and its related research made extensive utilization of professional marine biologists, bioacousticians, environmental physiologists, sensory psychologists, and underwater acoustics experts. The following academic institutions and scientific organizations were involved in the production of this OEIS/EIS:  Cornell University (Bioacoustics Research Program), Woods Hole Oceanographic Institution, University of California-Santa Cruz, Bodega Bay Marine Laboratory, University of Miami (Rosensteil School of Marine Sciences), University of Maryland (Department of Biology), Hubbs Seaworld Research Institute, University of Washington, University of Pennsylvania, University of Rochester, University of West Florida, Georgia Institute of Technology, Duke University, National Marine Mammal Laboratory, National Marine Fisheries Service, University of Hawaii, Marine Mammal Commission, Office of Naval Research, and North Carolina State University (Department of Marine, Earth and Atmospheric Sciences).

For this OEIS/EIS, the Navy, as in the case cited above, estimated its potential for impacts conservatively, based upon the best available information and analysis; included an extended discussion of the uncertainties; used known data to extrapolate and identify impacts to calculate resulting consequences; and considered the relevant factors and articulated a rational connection between the facts found and the choices made. Moreover, the Navy also went beyond such extrapolation and calculation, supporting the design and preparation of original research reports. In addition the Navy proposes a Long Term Monitoring Program that will continue to address many of the data gaps. The data produced by this original research has contributed, and will contribute considerably to the body of knowledge in the area of LF sound and the marine environment. In fact, there will be opportunities for collaboration among the Navy and researchers from other government, academic, and private laboratories and industries.

After having given exhaustive consideration to the state of the research, consulted with experts in the field, and conducted original studies, the Navy has satisfied NEPA requirements regarding

incomplete and/or unavailable information. The Navy has made every effort to supply information where it was lacking in the literature. Although there are, and may always be, data gaps, courts have ruled that proceeding with a proposed action under such circumstances is acceptable and perhaps even unavoidable.

For instance, the D.C. Circuit, in *Scientists Institute for Public Information Inc. v. Atomic Energy Commission*, 481 F. 2d 1079, stated that "NEPA's requirement that the agency describe the anticipated environmental effects of a proposed action is subject to a rule of reason. The agency need not foresee the unforeseeable, but by the same token, neither can it avoid drafting an impact statement simply because describing the environmental effects of the alternatives to a particular agency action involves some degree of forecasting."

Perhaps, however, the most definitive statement for proceeding with the proposed action comes from the 9th Circuit (in *Jicarilla Apache Tribe of Indians v. Morton*, 471 F. 2d 1275) in the context of what NEPA requires insofar as analyzing all possible scientifically based environmental effects:

"If we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project could ever be initiated."

Defendants' Exhibit 2
Case No. C 02-3805 EDL

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LOS ALAMOS STUDY GROUP and
CONCERNED CITIZENS FOR
NUCLEAR SAFETY,

              Plaintiffs,

          v.

HAZEL O'LEARY, Secretary of
Energy, and DEPARTMENT OF
ENERGY,

              Defendants.

**FILED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO 94-1306-M Civil

OCT 23 1995

_R. Phitmore Jr._
CLERK

## MEMORANDUM OPINION
## AND
## ORDER

THIS MATTER comes on for consideration on plaintiffs' motion for permission to designate representative(s) and for Court appointed expert, filed August 21, 1995 [43-1], defendant's motion for expedited hearing on motion to dissolve injunction and dismiss as moot, filed October 11, 1995 [49-1] and plaintiffs' motion for hearing to set briefing schedule for resolution of the case, filed October 13, 1995 [53-1]. Having considered the motions, responses and replies and being otherwise fully advised in the premises, I find that plaintiffs' motion for permission to designate representative(s) and for Court appointed expert is not well taken and is hereby denied; defendant's motion for an expedited hearing is hereby granted, and plaintiffs' motion for a hearing to set briefing schedule for resolution of the case is hereby denied.



## BACKGROUND

Plaintiffs successfully enjoined the ongoing construction of the Dual-Axis Radiographic Hydrotest ("DARHT") facility at Los Alamos National Laboratories until the Department of Energy ("DOE") had completed an environmental impact statement ("EIS"), as required under the National Environmental Policy Act, 42 U.S.C. § 4321 - § 4361 ("NEPA"). <u>See</u> Mem. Op. and Order, Jan. 26, 1995; Preliminary Injunction, Jan. 26, 1995.

On August 7, 1995, I granted DOE's request to identify members of the courtroom staff for security clearance who would assist the Court in the review of the classified supplement to the Final Environmental Impact Statement ("FEIS"), which DOE was in the process of finalizing. Defendant's motions reflect that it has prepared the documentation necessary for the Court to make a final determination in this matter.

I will address the instant motions of both parties in turn.

I.     **Plaintiffs' Motion for Permission to Designate Representative(s) and for Court Appointed Expert**

Plaintiffs request the Court for permission to initiate the security clearance procedure for one or more plaintiffs' representatives to review the classified supplement. They also ask that the Court appoint an expert to "assist the court in analyzing arguments concerning the classified supplement" and in "focusing arguments on the merits that involve classified materials." Pltfs' Mem. at 5. Defendant claims that because the information is congressionally exempted classified material, plaintiffs are not entitled to disclosure of the supplement simply because the supplement has become part of litigation. Defendant also asserts that Court appointment of an expert is not indicated at this time.

2

Government agencies are authorized by statute to classify information and material which, if disclosed, "reasonably could be expected to cause damage to the national security." Ex. Ord. 12356, Sec. 1.2, April 2, 1982, 47 FR 14874, 15557 (Classification Authorities) (revoking Ex. Ord. No. 12065, June 28, 1978). Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) requires public disclosure of the EIS, subject to the provisions of the Freedom of Information Act ("FOIA"). The FOIA provides for nondisclosure of materials which are "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). DOE states that its NEPA analysis includes material which constitutes Restricted Data by statute under the Atomic Energy Act. 42 U.S.C. § 2014(y) (Restricted Data defined in part as "all data concerning . . . [the] design, manufacture, or utilization of atomic weapons . . . "); see also Ex. Ord. 12356, Sec. 1.3, Classification categories (national security; United States Government programs for safeguarding nuclear materials or facilities). DOE asserts that therefore the supplement containing such information is exempt from NEPA's public disclosure mandate. 40 C.F.R. § 1507.3(c), 10 C.F.R. § 1021.340. Non-disclosure of classified materials under NEPA does not absolve an agency from taking environmental considerations into account. Weinerger v. Catholic Action of Hawaii, 454 U.S. 139, 143 (1981). Plaintiffs do not dispute that the supplement should not be publicly disclosed. However, plaintiffs strongly suggest that classification of the supplement is an effort by the defendant to shield the EIS from review and that the provision of a security clearance for its representative will ensure that its interests and position will be supported in the litigation. I disagree. I find that sufficient measures are in place to ensure that plaintiffs are not effectively precluded from presenting their position on the adequacy of the EIS.

3

Defendant has released the draft EIS as well as an unclassified analysis from the classified supplement. I am not convinced that the classified supplement in and of itself contains information which is dispositive and material to the question of whether DOE has complied with NEPA. Defendant has never contended that an EIS need not be done because of the generally classified nature of the project. See Weinberger, 454 U.S. 139 (1918); Hudson River Sloop Clearwater v. Dept. of Navy, 891 F.2d 414 (2nd Cir. 1989).

Plaintiffs are also concerned about allegedly misclassified information. However, the description of what is or is not restricted data under the Atomic Energy Act is sufficiently clear from the statute's provisions so that I may adequately make this determination. See Reeg v. Fetzer, 78 F.R.D. 34, 36 (W.D. Okla. 1976) (court determines whether information appears to be privileged pursuant to the rules of evidence).

Plaintiffs' request for a Court appointed expert pursuant to Fed.R.Evid. 706 is also not well taken, particularly at this time when the Court has not yet reviewed the supplement to know whether an expert would be helpful. I agree with the defendant that plaintiffs' vision of an expert's role where the expert is "analyzing arguments" and "focusing arguments on the merits" is overly judicial in nature. Pltfs. Mem. at 5.

Based on the classified nature of the supplement and the in camera inspection of the material that will take place, I therefore deny plaintiffs' motion for permission to initiate the security clearance procedure for one or more representatives to review the classified supplement and to designate a Court appointed expert.

II.     Defendant's Motion for Expedited Hearing on Motion to Dissolve the Injunction and To Dismiss Case as Moot.

The Preliminary Injunction allows for dissolution of the injunction "upon good cause

4

showing." Defendant filed a Motion for Order to to Dissolve Injunction and Dismiss Case as Moot on October 11, 1995 and at the same time requested the Ccourt for an expedited hearing on November 9, 1995, or as soon thereafter as the Court allows.

I agree with defendants that plaintiffs will not be prejudiced by a hearing on this matter as soon as possible after its response is due. Plaintiffs have had some time now to review the FEIS and become involved in the public participation component. I therefore grant defendant's motion for an expedited hearing in that a hearing will be set as soon as the Court calendar allows.

III.   Plaintiffs' Motion for Hearing to Set Briefing Schedule

I also find that in this case, there is no reason to hold a hearing simply to decide when another hearing will be held. Parties have amply briefed the legal arguments and kept the Court fully apprised of their respective positions. Plaintiffs' motion is therefore denied. Now, Therefore,

IT IS ORDERED that plaintiff's motion for permission to designate representative(s) and for Court appointed expert is hereby denied;

IT IS FURTHER ORDERED that defendant's motion for expedited hearing is hereby granted as qualified above;

IT IS FURTHER ORDERED that plaintiffs' motion for a hearing to set briefing schedule for resolution of the case is hereby denied.

                                    _____
                                    SENIOR UNITED STATES DISTRICT JUDGE

Defendants' Exhibit 3
Case No. C 02-3805 EDL

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

————

**FILED**
AT ALBUQUERQUE

APR 1 6 1996

ROBERT M. MARCH
CLERK

LOS ALAMOS STUDY GROUP and )
CONCERNED CITIZENS FOR )
NUCLEAR SAFETY, )
                              )
           Plaintiffs, )
                              )
           v. )           No. 94-1306-M Civil
                              )
HAZEL O'LEARY, Secretary of )
Energy, and DEPARTMENT OF )
ENERGY, )
                              )
           Defendants. )

## MEMORANDUM OPINION
## AND
## ORDER

THIS MATTER comes on for consideration on Defendants' Motion to Dissolve Injunction and to Dismiss as Moot, filed October 11, 1995 (Document 48). Defendants Department of Energy (hereinafter "DOE") and Hazel O'Leary seek to dissolve the injunction halting construction of the DARHT facility at Los Alamos National Laboratory pending adequate environmental review. See Opinion entered January 26, 1995 (Document 29); Preliminary Injunction entered January 26, 1995 (Document 30); Judgment entered May 5, 1995 (Document 37). Defendants produced a draft environmental impact statement for DARHT by May of 1995 and issued a Final EIS in August, presenting DOE's decision to proceed with DARHT notwithstanding the concomitant environmental costs and risks. See Final Environmental Impact Statement

(EIS), Dual Axis Radiographic Hydrodynamic Test (DARHT) Facility (DOE/EIS-0228) (hereinafter "DARHT FEIS").

My task at this juncture is to assess the adequacy of the DARHT FEIS in light of the requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321 to 4361 (hereinafter "NEPA").  See Judgment entered May 5, 1995 (retaining jurisdiction for the purpose of assessing adequacy of FEIS).  I have reviewed Defendants' memorandum in support of dissolution, Plaintiffs' response, Defendants' reply and Plaintiffs' surreply.  I have also examined two related environmental impact statements: the draft programmatic EIS for the nation's nuclear stockpile stewardship and management program, (DOE/EIS 0236) (February 1996) (hereinafter "SS&M PEIS"), and the nation's draft programmatic EIS on nuclear waste management. (DOE/EIS 0200-D) (August 1995) (hereinafter "WM PEIS").

I have not had the opportunity to review DOE's draft site-wide EIS on the state of environmental degradation at Los Alamos National Laboratory (hereinafter "SWEIS"), which is due to be released in January of 1997.  The production of the DARHT FEIS ahead of the SWEIS and ahead of the final SS&M PEIS is one of the primary complaints raised by Plaintiffs.

I find that notwithstanding the haste with which the DARHT FEIS was produced, and notwithstanding its release prior to a final Los Alamos SWEIS and national SS&M EIS, the DARHT FEIS adequately serves the purposes of NEPA.  The injunction will therefore be lifted and this litigation concluded, not for mootness as Defendants suggest, but for satisfaction.

## BACKGROUND

DARHT is a Dual-Axis Radiographic Hydrodynamic test facility.  It will use radiography, that is, x-ray or gamma ray photography, to capture images of nuclear and conventional weapon

2

components during high explosive detonations. The tests are described as hydrodynamic because some of the materials behave hydraulically, that is, like fluids, when subjected to the intense heat and pressure of a high explosive detonation. DARHT will be used to test aging weapon components in the nation's nuclear stockpile and to advance the basic science of plutonium and uranium metallurgy.

Some tests at DARHT, and all tests involving plutonium, will be contained in steel vessels. Other "shots" will be fired into the open air. The detonations will be audible for some distance, and flying debris will contaminate the perimeter of the facility. Both contained and uncontained shots will generate radioactive waste. The uncontained shots may also set off grass fires. This project therefore necessitates a broad range of mitigation measures, from ear plugs for workers to fire control, long-term waste management, and archeological monitoring of near-by National Register sites. See 40 C.F.R. § 1500.2(f) ("Federal agencies shall to the fullest extent possible ... avoid or minimize any possible adverse effects of their actions upon the quality of the human environment."); § 1508.20 (definition of mitigation).

Los Alamos National Laboratory (hereinafter "LANL") currently has a single-axis radiographic hydrotest facility called PHERMEX which was constructed in the 1960's, however its penetration and the resolution of its images are markedly inferior to that expected from DARHT. Moreover, the addition of a second axis at DARHT creates the capability to obtain time-sequenced images and three-dimensional data. DOE has therefore decided to replace PHERMEX with DARHT and dismantle PHERMEX entirely.

### DISCUSSION

NEPA requires that federal agencies take a "hard look" at the environmental consequences

3

of major federal activities before committing to any particular course of action.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) (quoting Kleppe v. Sierra Club, 427 U.S. 390, 410, n. 21 (1976)).  NEPA documents also provide a "springboard for public comment" and ultimately, public involvement in federal policy formation.  Id. at 349.  NEPA's power, therefore, is in its ordering of agency decision-making, not in dictating any substantive result.  Id. at 350.  So long as environmental damage is honestly regarded, forecasted with "high quality" science, and shared with the public, NEPA is satisfied.  See 40 C.F.R. § 1500.1(b).  Ultimately, what NEPA seeks to preclude is unanticipated and unjustified environmental harm.  See e.g., Laguna Greenbelt, Inc. v. U.S. Dept. of Transp., 42 F.3d 517, 527 (9th Cir. 1994).

In this instance, some environmental damage is certain and the risks are substantial.  DOE intends to conduct dynamic testing with substances like depleted uranium and plutonium, which entail risks in handling, processing, transportation and disposal.  DOE rates the risk of some types of inadvertent detonation as unlikely (U), rather than the more remote classifications of  extremely unlikely (E) and incredible (I).  See DARHT FEIS, Appendix I, Table I-1.  Moreover, DOE knowingly plans to generate radioactive waste for which the proposed permanent disposal site, the Waste Isolation Pilot Plant (hereinafter "WIPP"), has not yet been tested or approved.

For purposes of NEPA, however, it is the adverb "knowingly" which is most crucial.  It is the prerogative of the federal agency, not the court, to weigh the policy imperatives for a project like DARHT with its anticipated environmental harm.  As the Supreme Court stated in Robertson, supra at 350, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."

## I. Adequacy of This EIS:

"A court reviewing the adequacy of an EIS merely examines 'whether there is a reasonable, good faith, objective presentation' of the topics NEPA requires an EIS to cover." Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1522 (10th Cir. 1992) (quoting Johnston v. Davis, 698 F.2d 1088, 1091 (10th Cir. 1983)). These five topics are: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C). Corresponding regulations dictate exactly how the EIS should be structured and what each of the five elements requires. See 40 C.F.R. §§ 1502.1 to 1502.25. The discussion of these topics must be detailed and the ultimate decision "reasoned." See All Indian Pueblo Council v. U.S., 975 F.2d 1437, 1445 (10th Cir. 1992) (EIS tested by "rule of reason").

The DARHT FEIS meets all of these requirements. It assesses the environmental effects of a variety of alternatives to DARHT and amply describes why other alternatives were rejected. See Volume 1, Chapters 3 and 5. The quantity and clarity of data provided for public scrutiny is quite adequate. See especially, Appendices B-K. The dissemination and provision for public scrutiny comply with the dictates of NEPA. See 40 C.F.R. §§ 1503.1 to 1503.4; 10 C.F.R. § 1021.313.

The DARHT FEIS has its limitations. First, it relies on three-year-old data in its assessment of the current state of the environment to be affected. See Chapter 4 (1992 data used

5

to assess existing ground and surface water contamination, airborne pollutants, radiological factors and weather). However, the 1996 draft SS&M PEIS contains a much more thorough analysis of LANL and surrounding environs and I am satisfied that the affected environment has therefore been adequately analyzed, described and considered by DOE. See e.g., 40 C.F.R. §§ 1502.20 and 1502.21 (encouraging tiering and incorporating by reference from other EIS's); see also Sierra Club v. Marita, 46 F.3d 606 (7th Cir. 1995); Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1359 (9th Cir. 1994); Krichbaum v. Kelley, 844 F. Supp. 1107 (W.D. Va. 1994), aff'd, 61 F.3d 900 (4th Cir. 1995) (scientific methodology to be applied is a matter for agency discretion).

Second, LANL is not currently in compliance with federal environmental laws. See e.g., Concerned Citizens for Nuclear Safety v. U.S. Dept. of Energy, CIV No. 94-1039 (Mem. Op. and Order entered April 2, 1996) (radionuclide monitoring and emissions); SS&M PEIS at 4.6.2.10 (waste management and clean-up). Defendants address non-compliance issues briefly in the DARHT FEIS, but contend that they "should not be a barrier to the current DOE mission." Response to Public Comments, Vol. 2, Chap. 3, RPC-130, comment code 53-23. Whether or not such non-compliance should preclude further development, it surely dictates the baseline by which environmental consequences must be assessed. To forecast the environmental effects of DARHT, DOE should assume compliance or non-compliance with environmental standards consistent with LANL's record.

Third, DARHT is inherently WIPP-dependent at a time when WIPP has not yet successfully met regulatory requirements even to conduct testing with transuranic waste. See DARHT FEIS, Chapter 3, § 3.3.8 (wastes to be stored at LANL pending shipment to WIPP);

6

see also Chapter 6, § 6.5 (reliance on WIPP).  In response to another public comment, DOE

indicated that it "does not expect WIPP to be either 'problematic' or 'without [sufficient] capacity'

with regard to management of waste produced at DARHT or PHERMEX."     Response to Public

Comments, Vol. 2, Chap. 3, RPC-35, comment code 14-4.  However, this statement seems

overly optimistic.  See e.g., State of New Mexico v. Watkins, 969 F.2d 1122 (D.C. Cir. 1992)

(discussing waste retrievability problems at WIPP until 'no migration' standard is met).

Again, while such an obstacle may be deemed by DOE insufficient to preclude construction of

DARHT, it must be incorporated into an honest evaluation of DARHT's hazards.  See also WM

PEIS Summary at Table 1.3-2 (WIPP to receive a separate EIS); but see WM PEIS at

Chapter 8 (every evaluated alternative for disposal of transuranic waste other than the 'no

action' alternative relies upon WIPP).

        There are also some signs of hasty preparation.  For example, section 4.8.2.1 promises

a "detailed discussion" of PHERMEX soil contamination studies in section 4.3.3, but section 4.3.3

contains only an additional three sentences on the subject.  A review of the EIS reveals a detailed

discussion of these soil studies in Appendix D.

        Nonetheless, the DARHT FEIS is essentially adequate as an "action-forcing" document.

See Robertson, supra at 350.  The DARHT FEIS contains a reasonable and objective analysis

of DARHT, its foreseeable consequences, and its alternatives.

        It is of course easier to enforce the letter of the law of NEPA than to instill its spirit.  I

have expressed concern in the past over DOE's good faith in connection with their NEPA

obligations.  Defendants began construction on DARHT before performing an EIS and then

refused to halt construction even when they themselves decided an EIS was necessary.  It took a

court order to compel Defendants to comply with NEPA, as it apparently took to compel Defendants to do the SS&M PEIS. See Opinion entered January 26, 1995; see also Council v. Watkins, No. 89-1835 (D.D.C. October 22, 1990). Even upon entry of this injunction, I considered "DOE's promise to consider non-operation of DARHT" "optimistic." Id. at 28 ; see also 40 C.F.R. § 1502.1(g) (the purpose of an EIS is to help make good decisions, not to justify decisions already made); § 1500.1(c) ("NEPA's purpose is not to generate paperwork -- even excellent paperwork -- but to foster excellent action.").

However, I am satisfied that the DARHT FEIS represents a good faith analysis of DARHT in the spirit of NEPA. The document reflects consideration of public comments, as well as comments from state and local government agencies, Indian pueblos, citizen groups and private companies. See Volume 2. Modifications of the project consonant with this feedback are described in section 1.6, including a decision to contain more of the tests. Section 1.6.1.

**II. DARHT's Qualification as an Interim Action:**

The adequacy of the document, however, is only one step toward lifting the injunction. DOE must also demonstrate that DARHT qualifies as an interim action which may proceed ahead of final site-wide and programmatic review. NEPA regulations dictate that:

> While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:
>
> (1)     Is justified independently of the program;
>
> (2)     Is itself accompanied by an adequate environmental impact statement; and
>
> (3)     Will not prejudice the ultimate decision on the program. Interim

8

action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

**40 C.F.R. § 1506.1.**

The parties agree that DARHT will have significant environmental effects and will be covered by the SS&M PEIS and the SWEIS. The parties also agree, and I have previously found, that the existing site-wide EIS of LANL, performed in 1979, is inadequate to support DARHT. See Opinion entered January 26, 1995 at page 17; see also Fund for Animals, Inc. v. Lujan, 794 F. Supp. 1015 (D. Mont. 1991), aff'd, 962 F.2d 1391 (9th Cir. 1992) (adequacy of existing program statement for interim bison management). To proceed in advance of this programmatic and site-wide review, therefore, DARHT must meet the three conditions for an interim action.

The second condition is met. I have found that DARHT is supported by its own adequate EIS. I am also persuaded that the third condition is met. The presence of DARHT at LANL will certainly influence programmatic decision-making, including proposals to consolidate more of DOE's nuclear weapons production and research missions at LANL. See Draft SS&M PEIS. However, by far the larger influence is posed by the existing infrastructure at LANL, both in terms of intellectual and technological resources, including hardened nuclear-qualified space for plutonium processing. It was this infrastructure that drew DARHT to LANL, see DARHT FEIS at § 3.10.1, and which will have by far the greater influence on future programmatic decision-making. It is highly unlikely that DARHT will 'tip the balance.' Nor do I find that the presence of DARHT at LANL will prejudice the SWEIS, given the legacy of DOE activities at LANL.

Whether the action is independently justified raises a separate question. DOE addresses

9

this issue by describing the public policy context which DOE claims makes DARHT an immediate imperative. See Defendants' Reply Memorandum, filed November 20, 1995 at pages 26-38; DARHT FEIS at Chapter 2 (moratorium on underground nuclear testing; inadequacy of PHERMEX). However, I am reluctant to inject policy issues into this discussion, given the mandate of NEPA to act procedurally rather than substantively. See e.g., All Indian Pueblo Council, supra at 1445 (courts are not to "second-guess the experts in policy matters" when considering the adequacy of an EIS).

This element may better be construed as requiring that the project have utility regardless of prospective programmatic choices. Thus, the third requirement asks whether the project will unduly influence programmatic decisions and the first asks whether the project will be meaningful notwithstanding the range of prospective programmatic choices. See e.g., Northwest Resource Information Center, Inc. v. National Marine Fisheries Service, 56 F.3d 1060, 1067-69 (9th Cir. 1995) (analyzing "independent utility"); Dickman v. City of Santa Fe, 724 F. Supp. 1341, 1345-46 (D.N.M. 1989).

DARHT survives such an analysis. DOE has demonstrated that hydrodynamic testing will be central to its nuclear stockpile stewardship missions regardless of how those missions are distributed among the alternative DOE locations. See especially SS&M PEIS at 1.6.2. I find therefore that DARHT has independent justification, has an adequate EIS, and will not prejudice future programmatic or site-wide decision-making.

III. Adequacy of Disclosure on Plutonium Testing:

The DARHT FEIS discusses the anticipated effects of plutonium testing without disclosing the specific quantities of plutonium to be used and other details about the tests. This information

10

is contained in a classified supplement to the DARHT FEIS, which court staff were cleared to review, see Order entered September 5, 1995, but which Plaintiffs and their experts were not. See Memorandum Opinion and Order entered October 23, 1995.

Having now reviewed the classified supplement to the DARHT FEIS, I agree with DOE that the DARHT FEIS would have been inadequate without it. The environmental effects of DARHT cannot be understood with the level of detail that NEPA requires absent the information in the classified supplement.

It is equally clear that "[t]he decision-making and public disclosure goals of [NEPA], though certainly compatible, are not necessarily coextensive." Weinberger v. Catholic Action of Hawaii/Peace Educ. Project, 454 U.S. 139, 143 (1981); see 42 U.S.C. § 4332(2)(C) (NEPA public disclosures bound by parameters of the Freedom of Information Act). DOE is therefore encouraged to use the format of a classified supplement whenever necessary, and to declassify as much of this information as possible.

## CONCLUSION

I have found that DARHT is supported by an adequate environmental impact statement and qualifies as an interim action which may proceed while DOE completes the SS&M PEIS and drafts a new SWEIS for Los Alamos National Laboratory. The purpose for the injunction having been satisfied, see e.g., Rutherford v. U.S., 806 F.2d 1455, 1462 (10th Cir. 1986), the injunction is hereby lifted and this case dismissed. Plaintiffs' bond may be released to counsel of record.

IT IS SO ORDERED.

_____
SENIOR UNITED STATES DISTRICT JUDGE

1
2                          UNITED STATES DISTRICT COURT

3                        NORTHERN DISTRICT OF CALIFORNIA

4    NATURAL RESOURCES DEFENSE COUNCIL, INC.,      )
         et al.,                                   )
5                                                  )
                            Plaintiffs,            )      Civ. No. 02-3805-EDL
6                                                  )
                                                   )
7                       v.                         )      [PROPOSED] ORDER
                                                   )
8    DONALD L. EVANS,                              )
         et al.,                                   )
9                                                  )
                            Defendants.            )
10                                                 )

11           Upon consideration of Defendants' Motion for Leave to Submit Classified Evidence

12   *In Camera* and *Ex Parte* and memorandum in support, and any opposition thereto, it is

13   hereby

14           ORDERED that Defendants' Motion for Leave to Submit Classified Evidence *In*

15   *Camera* and *Ex Parte* is GRANTED; and it is further

16           ORDERED that the classified evidence submitted *in camera* and *ex parte* shall be

17   handled in accordance with the procedures set forth in 28 C.F.R. §17, including the

18   following:

19   (1)  Classified information is not to be disclosed or introduced into evidence without the

20   prior approval of either the originating agency, the Attorney General, or the President.  See

21   28 C.F.R. § 17.17(c)(2).

22   (2) Attendance at any proceeding where classified information will be disclosed is to be

23   limited to those persons with appropriate authorization to access this information, whose

24   duties require knowledge or possession of the classified information to disclosed.  See

25   28 C.F.R. § 17.17(c)(3).

26   (3)  Aside from the Judge herself, access to classified information disclosed in this action is

27   to be limited to those Court employees who have been determined eligible for such access

28   by the Department of Justice Security Officer and who have been fully advised of all

         Proposed Order

1  pertinent safeguarding requirements and their liability in the event of unauthorized

2  disclosure. See 28 C.F.R. §§ 17.17(c)(3) and (c)(10); 28 C.F.R. § 17.46(c).

3  (4)  Classified documents are to be appropriately handled and stored in a manner consistent

4  with Department of Justice security directives. See 28 C.F.R. §§ 17.17(c)(4) & (7).  With

5  regard to National Security Information (NSI), this entails storage in an approved safe.

6  (5)  In the event that the Court wishes to hear any testimony or oral argument which the

7  government believes would include classified information, this testimony or argument is to

8  be recorded and transcribed pursuant to the instructions of the Department of Justice

9  Security Officer. See 28 C.F.R. § 17.17(c)(7).

10  (6)  Any notes or other documents prepared by the Court or its personnel that contain

11  classified information are to be prepared, handled, and stored consistent with the directives

12  of the Department of Justice Security Officer, see 28 C.F.R. § 17.17(c)(7), and retrieved at

13  the close of the proceedings by the Department of Justice Security Officer for safeguarding

14  or destruction. See 28 C.F.R. § 17.17(c)(9).

15  (7) At the conclusion of the proceedings, all original classified information shall be returned

16  to the Department of Justice or the originating agency, or placed under court seal for

17  safekeeping by the Department of Justice Security Officer. See 28 C.F.R. § 17.17(c)(8);

18  and it is further

19      ORDERED that the Defendants shall deposit the classified evidence with the

20  Federal Bureau of Investigation located in the Courthouse, where it shall be stored in an

21  appropriate safe. An individual with appropriate security clearance shall hand-carry the

22  documents to the Court for review and return them to the authorized safe at the end of each

23  day; and it is further

24      ORDERED that the Defendants shall submit unclassified versions of the classified

25  documents, with the classified information redacted, for filing with the clerk's office, and

26  they shall serve Plaintiffs' counsel with copies of those redacted versions.

27      SO ORDERED.

28

Proposed Order                -2-

1  Dated: _____

                                        MAGISTRATE JUDGE ELIZABETH D. LAPORTE

2

3

4

    Submitted this 13th day of September by:

5

    THOMAS L. SANSONETTI

6    Assistant Attorney General
    Environment and Natural Resources Division

7

    JEAN WILLIAMS, Chief

8    Wildlife and Marine Resources Section

9    KRISTEN L. GUSTAFSON, Trial Attorney
    Wildlife & Marine Resources Section

10   ANN D. NAVARO, Trial Attorney
    General Litigation Section

11   MAUREEN RUDOLPH, Trial Attorney
    Policy, Legislation & Special Litigation Section

12   United States Department of Justice
    Environment & Natural Resources Division

13   Benjamin Franklin Station - P. O. Box 7369/ 663/ and 4390
    Washington, D.C. 20044

14   (202) 305-0211/ (202) 305-0462/ (202) 305-0544
    (202) 305-0275 (fax)/ (202) 305-0267 (fax)/ (202) 514-4231 (fax)

15   Kristen.Gustafson@usdoj.gov

16   Attorneys for Federal Defendants

17

18

19

20

21

22

23

24

25

26

27

28

1   THOMAS L. SANSONETTI
    Assistant Attorney General
2   Environment and Natural Resources Division

3   JEAN WILLIAMS, Chief
    Wildlife and Marine Resources Section
4   KRISTEN L. GUSTAFSON, Trial Attorney
    Wildlife & Marine Resources Section
5   ANN D. NAVARO, Senior Attorney
    General Litigation Section
6   MAUREEN RUDOLPH, Trial Attorney
    Policy, Legislation & Special Litigation Section
7   United States Department of Justice
    Environment & Natural Resources Division
8   Benjamin Franklin Station - P. O. Box 7369 and 663
    Washington, D.C. 20530
9   (202) 305-0211/ (202) 305-0462
    (202) 305-0275 (fax)/ (202) 305-0267 (fax)
10  Kristen.Gustafson@usdoj.gov

11  KEVIN V. RYAN (SBN 118321)
    United States Attorney
12  JAMES A. CODA (SBN 1012669 (WI))
    Assistant United States Attorney
13  Environment & Natural Resources Unit
    450 Golden Gate Avenue, Box 36055
14  San Francisco, California 94102
    Telephone No: (415) 436-6967
15  Facsimile No: (415) 436-6748

16  Attorneys for Defendants

17                    UNITED STATES DISTRICT COURT

18                    NORTHERN DISTRICT OF CALIFORNIA

19
    NATURAL RESOURCES DEFENSE COUNCIL, INC.,     )
20       et al.,                                 )
                                                 )
21                   Plaintiffs,                 )  Civ. No. 02-3805-EDL
                                                 )
22                                               )
             v.                                  )  CERTIFICATE OF
23                                               )  SERVICE
    DONALD L. EVANS,                             )
24       et al.,                                 )
                                                 )
25                   Defendants.                 )
                                                 )
26

27       I, Ann D. Navaro, hereby certify that on this 13th day of September 2002, I caused a

28  true copy of the attached **Defendants' Motion for Leave to Submit Classified Evidence**

Certificate of Service

1   In Camera and Ex Parte and Memorandum in Support to be served via facsimile and

2   overnight delivery on the following attorneys of record:

3

4   ANDREW WETZLER
    6310 San Vicente Boulevard
    Suite 250
5   Los Angeles, CA 90048
    (323) 934-1210 (fax)
6

7   ANDREW SABEY
    ROBIN STAFFORD
8   WILLIAM M. FLEISHHACKER
    425 Market Street
9   San Francisco, CA 94105-2482
    (415) 268-7522 (fax)
10

11

12
    _____
    ANN D. NAVARO
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28