RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division

JEAN E. WILLIAMS, Chief
Wildlife and Marine Resources Section
KRISTEN L. GUSTAFSON, Senior Trial Attorney
Wildlife & Marine Resources Section
GUILLERMO A. MONTERO, Trial Attorney
Natural Resources Section
United States Department of Justice
Environment & Natural Resources Division
Benjamin Franklin Station - P.O. Box 7369/ P.O. Box 0663
Washington, D.C. 20530
(202) 305-0211/ (202) 305-0443
(202) 305-0275 (fax)/ (202) 305-0274 (fax)
Kristen.Gustafson@usdoj.gov
Guillermo.Montero@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.,

    Plaintiffs,

v.

CARLOS L. GUTIERREZ, et al.,

    Defendants.

) Civ. No 07-04771-EDL
)
) DECLARATION OF
) REAR ADMIRAL JOHN
) M. BIRD, U.S. NAVY

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

1 of 19

I, Rear Admiral John M. Bird, pursuant to 28 U.S.C. 1746, declare as follows:

I.  (U) QUALIFICATIONS

1. (U) I graduated from the United States Naval Academy in 1977 with a Bachelor of Science degree in Mechanical Engineering. Subsequently, I earned a Masters of Science degree in Engineering Management from Catholic University of America. I have also completed the Massachusetts Institute of Technology Seminar XXI in Foreign Affairs, International Relations and National Security, an educational program for senior military officers, government officials, and business executives in the national security policy community.

2. (U) Upon graduating from the U.S. Naval Academy, I began a career as a submarine officer in the U.S. Navy. Among my operational assignments, I have served on both fast attack and ballistic missile submarines in both the Pacific and Atlantic Fleets. Some of my operational assignments have included service on: *USS Seahorse* (SSN 669), an attack submarine; *USS Simon Bolivar* (SSBN 641), a fleet ballistic missile submarine; *USS Sea Devil* (SSN 664), an attack submarine; and *USS Tunny* (SSN 682), also an attack submarine. My most recent submarine assignment was on the *USS Scranton* (SSN756), an attack submarine, where I served as the Commanding Officer and was awarded the Naval Submarine League's Jack Darby Award for Inspirational Leadership and Excellence in Command. While I was Commanding Officer, the *USS Scranton* also earned the Submarine Squadron Six Battle Efficiency "E" award[1] for two consecutive

---

[1] (U) The Battle Efficiency "E" is awarded annually to the small number of U.S. Navy ships, submarines, aviation and other units that win their battle efficiency competition. The criterion for the Battle Efficiency Award is the overall readiness of the command to carry out its assigned wartime tasks, and is based on a year-long evaluation. The

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

1   years in 1994 and 1995. From August 1999 to April 2001, I commanded Submarine
2   Squadron EIGHT (SUBRON EIGHT) which included eight fast attack submarines
3   stationed in Norfolk, Virginia. SUBRON EIGHT exercises operational control over its
4   fast attack submarines, a function which encompasses responsibility for tactical and
5   operational readiness for war, inspection and monitoring, nuclear and radiological safety,
6   and development and control of submarine operating schedules.
7
8   3.   (U) Staff assignments I have held include serving as Special Assistant
9   (Legislative Affairs) to the Chief of Naval Personnel; Principal Assistant in the Office of
10   Deputy Chief of Naval Operations for Undersea Warfare (Readiness and Tactics); Joint
11   Chiefs of Staff Division Chief for Central, South and Southeast Asia; Assistant Deputy
12   Director for Political-Military Affairs Asia, also on the Joint Chiefs of Staff; and Director
13   Operations and Plans, Logistics and Engineering, United States Joint Forces Command.
14
15   4.   (U) From September 2005 to December 2006, I served as the thirty-ninth
16   Commander of Submarine Group SEVEN (SUBGRU SEVEN), dual-hatted as
17   Commander, Task Force SEVEN FOUR[2] and Commander Task Force FIVE FOUR[3] in

---

competition for the award is, and has always, been keen. To win, a ship or unit must demonstrate the highest state of battle readiness.

[2] (U) Submarine Group SEVEN is comprised of submarines deployed to the Western Pacific, three submarines homeported in Guam, and a permanently forward deployed submarine tender. The deployed submarines are rotated from their homeports in Bremerton, WA, San Diego, California and Pearl Harbor, Hawaii for approximately six months. The tender is home ported out of Guam. Additionally, Submarine Group SEVEN has a representative in Guam who liaisons for supply, logistics and repair support for all submarines assigned to Commander Task Force SEVEN FOUR. Commander Submarine Force Seventh Fleet coordinates and controls submarine activities over a vast expanse covering nearly forty-eight percent of the earth's ocean surface, ranging from the Western Pacific to the Indian Ocean. Commander Task Force SEVEN FOUR as Seventh Fleet's submarine movement advisory authority and operational commander directs all submarine operations and mission tasking requirements in the Seventh Fleet area of

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

1  Yokosuka. In that role, SUBGRU SEVEN was responsible for supporting operations in
2  the Western Pacific and assumed administrative control over deployed submarines and
3  tenders, reporting to Commander, Submarine Forces Pacific.

5.  (U) In December 2006, I reported to U.S. Pacific Fleet, Pearl Harbor, Hawaii to assume duties as Deputy Commander and Chief of Staff and continue to hold that responsibility.

6.  (U) I have an intimate understanding and knowledge of Anti-Submarine Warfare and tactics. Through my past and present assignments, I am very familiar with the use of Surveillance Towed Array Sensor System Low Frequency Active sonar (SURTASS LFA) and the harm that will result to national security if the Navy is prevented from using SURTASS LFA for routine training, testing, and operational missions. I have gained this understanding through my extensive at-sea experience on attack and missile submarines, my operational assignments directly relating to Anti-Submarine Warfare, and my staff assignments that were primarily focused on undersea warfare, joint (among services) warfighting capabilities, and foreign political-military issues.

---

responsibility. Commander Task Force SEVEN FOUR is also responsible for staff briefings, reprovisioning and repairs for those submarines operating in Seventh Fleet.

¹(U) Submarine Group SEVEN was activated as Commander Task Force ONE FIVE SEVEN on 15 October 1992 to direct all submarine operations and mission tasking requirements in the Central Command area of responsibility, including the Red Sea and Arabian Gulf. On 1 July 1995, upon establishment of U.S. Fifth Fleet in that same area of responsibility, Commander Task Force ONE FIVE SEVEN was redesignated as Commander Task Force FIVE FOUR.

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

4 of 19

## II. (U) STATEMENT OF INFORMATION CLASSIFICATION

7.  (U) This declaration addresses the purpose of and the immediate need for the continued, uninterrupted operation of Surveillance Towed Array Sensor System Low Frequency Active ("SURTASS LFA") sonar systems, as well as the need to use certain areas that were and continue to be authorized for use by the 2002 and 2007 Final Rules and Letters of Authorization (LOA) issued by the National Marine Fisheries Service, but which the Navy has been unable to use because of the restrictions imposed by the Court's now expired permanent injunction, issued in Case No.02-3805-EDL.[4] It contains classified information discussing the primary goals and methods of antisubmarine warfare ("ASW"), and reveals current threats to naval forces operating in the western Pacific Ocean, thereby illustrating the need for SURTASS LFA based upon its superior long-range detection capabilities. Accordingly, this declaration contains technical data of which export is restricted by the Arms Export Control Act (Title 22, U.S.C., Sec 2751, et seq.) or the Export Administration Act of 1979, as amended, Title 50, U.S.C., App. 2401, et seq. The classified information in this declaration is marked (C) for CONFIDENTIAL or (S) for SECRET in accordance with Navy regulations (OPNAVINST S5513-5B: Department of Navy Security Classification Guidelines). This information is exempt from 10-year automatic declassification because premature release would (1) reveal information that would impair the development or use of technology within a U.S. weapons system; (2) reveal U.S. military plans or national security emergency preparedness plans; and (3) damage relations between the U.S. and a foreign government,

---

[4] (U) While this Court's injunction expired by its own terms on August 15, 2007, the Navy has stipulated to a restriction on its use of SURTASS LFA sonar consistent with the terms of that injunction (with exceptions for certain operational uses) until the earlier of January 8, 2008, or this Court's decision concerning the plaintiffs' motion for preliminary injunction.

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

reveal a confidential source, or seriously undermine diplomatic activities that are reasonably expected to be ongoing for a period greater than 10 years.

### III. (U) SURTASS LFA IS ESSENTIAL TO THE NAVY'S ABILITY TO COUNTER SUBMARINE THREATS

8.   (U) Anti-Submarine Warfare (ASW) relies on sonar to detect submerged objects that threaten U.S. Navy assets. The purpose of ASW is to protect U.S. and allied ships and potential land-based targets from enemy submarines. Among the highest value assets requiring protection against hostile submarines are Carrier Strike Groups ("CSGs") and Expeditionary Strike Groups ("ESGs"). CSGs typically consist of one or more aircraft carriers, multiple surface combatants,[5] and support ships carrying fuel, food, and ammunition. In a CSG, the aircraft carrier alone is home to as many as 5,300 Sailors. ESGs include surface combatant ships and an amphibious ready group crewed by over 2,600 Sailors and Marines.

9.   (U) The sonar that ASW relies on to locate and track submarines falls into two categories: passive and active. Passive sonar listens for noise made by target objects whereas active sonar places acoustic energy (sound) into the water and then listens for a return sound after it reflects off of a submerged object. SURTASS LFA falls into this latter category and is essential for U.S. Naval and allied forces to operate safely on the high seas or in littoral regions throughout the world.

---

[5] (U) Surface combatants are a subset of naval fighting ships: generally speaking, they are ships built to fight other ships, submarines, or aircraft. Surface combatants include cruisers, destroyers, and frigates, among others. They do not include aircraft carriers, amphibious assault ships and mine hunters.

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No. 07-4771 (EDL)

10. (U)  It is imperative that the Navy be able to detect modern submarines before those submarines can position their weapons within release range of U.S. assets. Modern diesel-electric submarines are extremely difficult to detect with passive sonar due to improvements in quieting technology and ▪

▪                         Our ships are dependent on superior speed and the ability to detect diesel submarines at sufficient ranges to neutralize these submarines, either by destroying them or maneuvering away from them. Figure 1 below illustrates how the noise radiated by increasingly sophisticated classes of submarines has ▪ ▪, which in turn has been a major factor in a focus of effort on active SONAR usage.

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

7 of 19

1
2
3
4
5
6
7
8
9
10
11
12          Figure 1:
13   (Note:
14                                       For example, a 3 decibel
15   reduction in noise actually equates to a 50% reduction in noise level.
16
17
18
19   11.(U)    Quieting technology used by modern submarines includes longer-lasting
20   batteries, rubber sound mounts (which use rubber to dampen the noise or vibration from
21   metal equipment), quieter pumps and better propellers with less cavitation.[6]
22
23           which their submarine commanders use to their advantage to make their
24   submarines even harder to find. Sound travels along different paths underwater

---

[6] (U) As a propeller rotates, low pressure areas can be created along its edges, resulting in bubble formation. As these bubbles collapse under water pressure, they can be very loud and detectable by passive sonar.

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

8 of 19

1  depending on sea temperature, salinity, pressure and bottom topography, all of which
2  change the direction and speed at which sound moves through the water. Because
3  submarines can move up and down in the water, they are able to place themselves in
4  sound pathways where sound does not propagate as well, thus making submarines –
5  particularly the increasingly quiet diesel electric submarines – even more difficult to
6  detect with passive sonar alone. The improvements in quieting technology and tactics
7  have combined such that passive sonar detections are much less reliable than in the past.
8
9              An active sonar signal, by contrast, will successfully reflect off the
10 hull, providing an opportunity for detection.
11 Active sonar is required to support and augment the Navy's search abilities.
12
13 12.  (U)  Typically passive sonar systems have proven effective at detecting modern
14 submarines at ranges of
15
16              The Navy's mid-frequency active (MFA) sonar adds
17 a critical additional capability, with detection ranges, typically and in the right
18 environmental conditions, longer than those of passive sonar alone.
19              SURTASS LFA sonar is an invaluable force multiplier because it has
20 significantly greater detection ranges than other ASW assets.
21
22 13   (U)  The threat of ultra-quiet submarines is amplified further by the simultaneous
23 proliferation of long-range anti-ship cruise missiles (ASCM)
24
25
26              To protect CSGs and ESGs, the U.S.
27              The

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

1  only U.S. Navy asset with the tactical capability to reliably detect a submarine at that
2  distance is SURTASS LFA.

## IV. (U) OTHER MILITARIES ARE INVESTING HEAVILY IN SUBMARINE TECHNOLOGY

14. (U) Modern diesel-electric submarines are increasingly attractive to many militaries because they are the most cost-effective platform for the delivery of several types of weapons, including torpedoes, long-range anti-ship/land target cruise missiles, and a variety of anti-ship mines. With their stealth and ability to operate independently of escort vessels, submarines are the vehicle of choice for potential adversaries intent on attacking surface ships and land targets with torpedoes and missiles. Because submarines are inherently covert, they can be inserted early, with a minimal likelihood of being detected, and conduct intrusive operations close to shore.

15. (U) Potential adversary nations are investing heavily in submarine technology, including designs for nuclear attack submarines, strategic ballistic missile submarines, and advanced diesel-electric submarines. Over 40 countries have operational modern submarines, or are planning to add them to their naval forces. Currently, there are a total of 470 submarines, operational or under construction, owned by 40 countries, up from less than 400 in 2003 and over twice the amount existing during the 1990s. Of these 470 submarines, 257 are diesel-electric. Technological developments discussed above have given the diesel-electric submarine a multifaceted combat capability through a combination of quiet operation and effective weapons systems.

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No 07-4771 (EDL)

10 of 19

1  16. (U) Current and projected submarine acquisitions by the Chinese Navy exemplify
2  the need for long-range submarine detection. Recognizing that the modern diesel-electric
3  submarine is the most cost-effective and stealthy weapons delivery system, China has
4  declared that the submarine is its principal naval vessel, and embarked on an aggressive
5  modernization program. The U.S. Navy's overall capability and presence in the western
6  Pacific is formidable. China recognizes that if naval confrontation with the U.S. becomes
7  necessary,

12  17. (U) The 2004 promotion of Admiral Zhang Dingfa, a career submariner, to the
13  Chief of Staff post of China's People's Liberation Army Navy (PLAN), and a full seat on
14  the Chinese Central Military Commission, was a clear signal: Submarine warfare
15  primacy would take center-stage in China's strategy for the Asia-Pacific region. In
16  February 2005, the United States Secretary of Defense predicted that the size of the
17  Chinese fleet could surpass the U.S. Navy's within a decade.

19  18. (U) In addition to the People's Republic of China, the Russian Federation has
20  publicly declared that the submarine is its single-most potent ship and the centerpiece of
21  its own Navy. Other potential adversaries of the United States, including Iran and North
22  Korea, have published naval strategies that express a similar strategic doctrine. As the
23  regional Asian economies continue to recover from the 1997-98 financial crisis,
24  established and emerging powers, both friend and potential foe, plan to build or buy
25  highly capable modern submarines. China, Taiwan, India, Pakistan, Singapore, Malaysia,
26  South Korea, Japan and Australia have taken delivery of or have ordered advanced
27  stealthy submarines armed with state-of-the-art missiles and torpedoes capable of striking

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

11 of 19

targets at sea or on land far from their home ports. International tensions combined with these new capabilities have the potential to shift the power balance among the region's long-standing military rivals, potentially threatening key trade routes and introducing instability to the region.

19.  (U) In sum, the proliferation of quiet submarines poses a unique challenge to the United States. Many non-aligned nations have identified the destruction of U.S. carrier and expeditionary strike groups as the focal point of their naval warfare doctrine. A single diesel-electric submarine, capable of penetrating U.S. or multinational task force defenses, could cause catastrophic damage to those forces and weaken the domestic and/or coalition political will for peacekeeping or counter-terrorism contingency operations.

V. (U) THE U.S. NAVY'S IMMEDIATE NEED FOR SURTASS LFA

20.  (U) The need for SURTASS LFA is acute.            likely potential situations where a submarine threat would place US Navy assets at risk are:

Of these :

                         presents the greatest challenge and risk to U.S. naval forces.

21.  (U)

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

1
2
3
4
5
6
7   22   (U)   Increasingly.
8
9            Figure 2 shows
10
11
12
13           This figure graphically demonstrates that this
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

13 of 19

Figure 2. (**U**)

**VI. (U) THE NAVY NEEDS TO BE ABLE TO USE AREAS CLOSER TO SHORE THAN WERE PERMITTED BY THE PREVIOUS PERMANENT INJUNCTION**

23.  (**U**) As a result of the restrictions imposed on SURTASS LFA operations by the permanent injunction issued in Case No. 02-3805-EDL, the Navy has been prohibited from operating any closer to shore than either 30 or 60 nm, depending upon the location. This restriction

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

14 of 19

As Figure 3 below illustrates with a hypothetical ASW scenario, reducing standoff distances to the 12 nm allowed by the Final Rule and current LOAs would decrease the "off-limits" areas from the larger, sometimes overlapping circles on the left to the more narrowly drawn circles on the right, and increase the operational flexibility of the SURTASS LFA platform.

Left shows 3 Islands with 60 nm standoff – LFA has no room to operate.
Right shows 3 Islands with 12 nm standoff – allows LFA a new operating area.

Figure 3. (U) Change in Coastal Standoff Distances Opens Operating Areas for LFA use.

24. (M) The court-imposed restrictions also preclude the Navy from conducting military operations in critically-important shallow water areas closer to shore.

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No 07-4771 (EDL)

1    ASW patrolling corridors[7]

2

3

4    Accordingly, it is critically important that the Navy not be

5    prohibited from operating in shallow water regions[8] currently authorized by the Final

6    Rule and corresponding LOAs.

7

8    25.   (U) Because the Navy needs to be able to use SURTASS LFA closer to shore than

9    currently permitted under the injunction ;                                    it

10   necessarily follows that the Navy needs to be able to train and test in those same areas.

11   As part of its planning                                          the Navy conducts

12

13

14

15

16                it is critically important that the personnel operating the system be able

17   to test and train in those same areas to maintain proficiency. As I noted earlier, system

18   performance varies based on a variety of external elements, including water depth,

19   salinity, water temperature, bottom composition, and other factors. The risk of hostilities,

20   including loss of American, allied, and merchant shipping, and associated loss of lives,

21   based .                                    is preventable. The Navy must have the

---

[7] (U) Patrolling corridors is meant to explain ASW barrier patrol as one or more ASW assets (aircraft, surface ships, and/or submarines) patrolling a designated area of ocean (e.g., a box or rectangle) in order to locate and track any enemy submarine that tries to penetrate that area.

[8] (U) The term "shallow waters" means waters that are at least deep enough for the SURTASS LFA vessel to operate. The typical water depth at the center of the SURTASS LFA array is 122 meters (400 feet) and the minimum water depth at which the SURTASS LFA sonar vessel typically operates is 200 meters (656.2 feet).

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

1  operational flexibility to train and operate in all international waters because when
2  hostilities break out, the U.S. will not be able to convince its enemies to agree to fight
3  outside of 30 nm or 60 nm or to stay away from continental shelf breaks.

5  26.   (U) As demonstrated above, the Navy knows that there are areas where it must be
6  able to use SURTASS LFA sonar as close as 12 nm from shore. Given that system
7  performance varies by area, and given that the Navy cannot predict with certainty over
8  the full five-year period of the Final Rule where and when it may need to use the system,
9  it is impracticable to attempt to tailor site-specific coastal exclusion zones for all areas
10 described in the Final Rule.

12 **VII. (U) ANY HIATUS IN SURTASS LFA COVERAGE WOULD BE HARMFUL**
13 **TO NATIONAL SECURITY**

15 27.   (U)

17       Operational deployment of SURTASS LFA must continue uninterrupted to

19 Crew readiness training using SURTASS LFA is crucial for the maintenance of necessary
20 skill levels to utilize the LFA systems and to develop tactics and doctrine for real-world
21 circumstances.

24 28.   (U) This need for uninterrupted coverage was one of the factors considered by

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No. 07-4771 (EDL)

## VIII. (U) CONCLUSION

29. (U) The U.S. Navy currently has confidence in its military superiority in the maritime environment, largely due to its ability to strategically position multiple CSGs and ESGs.

For the reasons stated above, it is also critically important that the Navy be able to use SURTASS LFA in areas authorized under the Final Rule and current

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

18 of 19

1  LOA that are closer to shore than was permitted under the amended permanent
2  injunction.

4  I declare under penalty of perjury under the laws of the United States of America that the
5  foregoing is true and correct to the best of my knowledge, information and belief.

8  Executed on the 13th day of November, 2007, at Pearl Harbor, Hawaii.

Rear Admiral John M. Bird, U.S. Navy

Declaration of Rear Admiral John M. Bird
In Support of Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction
Civ. No.07-4771 (EDL)

19 of 19