1   ROBERT L. FALK (SBN 142007)
    ROBIN S. STAFFORD (SBN 200950)
2   SARAH SCHINDLER (SBN 236414)
    MORRISON & FOERSTER LLP
3   425 Market Street
    San Francisco, California 94105-2482
4   Telephone: (415) 268-7000
    Facsimile: (415) 268-7522
5   Email: RFalk@mofo.com
    Email: RStafford@mofo.com
6   Email: SSchindler@mofo.com

7   JOEL R. REYNOLDS (SBN 85276)
    CARA A. HOROWITZ (SBN 220701)
8   NATURAL RESOURCES DEFENSE COUNCIL, INC.
    1314 Second Street
    Santa Monica, California 90401
9   Telephone: (310) 434-2300
    Facsimile: (310) 434-2399

10  Attorneys for Plaintiffs
    NATURAL RESOURCES DEFENSE COUNCIL, INC.; INTERNATIONAL FUND FOR
11  ANIMAL WELFARE; THE HUMANE SOCIETY OF THE UNITED STATES;
    CETACEAN SOCIETY INTERNATIONAL; LEAGUE FOR COASTAL PROTECTION;
12  OCEAN FUTURES SOCIETY; JEAN-MICHEL COUSTEAU

13                  UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15  NATURAL RESOURCES DEFENSE COUNCIL,          Civil Action No. CV-07-4771-EDL
    INC.; INTERNATIONAL FUND FOR
16  ANIMAL WELFARE; THE HUMANE SOCIETY OF THE
    UNITED STATES; CETACEAN SOCIETY            **REPLY MEMORANDUM IN**
17  INTERNATIONAL; LEAGUE FOR COASTAL          **SUPPORT OF PLAINTIFFS'**
    PROTECTION; OCEAN FUTURES SOCIETY;         **MOTION FOR PRELIMINARY**
18  JEAN-MICHEL COUSTEAU                        **INJUNCTION**

                        Plaintiffs,
19
            v.
20
    CARLOS M. GUTIERREZ, SECRETARY OF THE       **Judge:    Hon. Elizabeth Laporte**
21  UNITED STATES DEPARTMENT OF                 **Ctrm:     E**
    COMMERCE; NATIONAL MARINE FISHERIES         **Hearing Date: January 16, 2008**
22  SERVICE; WILLIAM HOGARTH, ASSISTANT         **Time:      2:00 p.m.**
    ADMINISTRATOR FOR FISHERIES OF THE
23  NATIONAL OCEANOGRAPHIC AND
    ATMOSPHERIC ADMINISTRATION; VICE
24  ADMIRAL CONRAD C. LAUTENBACHER, JR.,
    ADMINISTRATOR OF THE NATIONAL
25  OCEANOGRAPHIC AND ATMOSPHERIC
    ADMINISTRATION; UNITED STATES
26  DEPARTMENT OF THE NAVY; DONALD C.
    WINTER, SECRETARY OF THE UNITED STATES
27  DEPARTMENT OF THE NAVY; ADMIRAL MIKE
    MULLEN, CHIEF OF NAVAL OPERATIONS

                        Defendants.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ............................................ 2

    A.    Plaintiffs Are Likely to Succeed on Their MMPA Claims ........................................ 2

        1.    NMFS Failed to Prescribe Mitigation and Monitoring Measures to Effect the "Least Practicable Impact" on Marine Mammals. .......................... 2

            a.    NMFS Failed to Effect the "Least Practicable Impact" on Marine Mammals and Their Habitat in Identifying Areas for Exclusion ....................................................................................... 3

            b.    NMFS Has Failed to Show that Its Coastal Exclusion Has the Least Practicable Impact on Marine Mammals ..................................... 6

            c.    NMFS's Monitoring Requirements Are Inadequate .............................. 8

        2.    NMFS Has Failed to Ensure That the Impacts of LFA Will Be Negligible. .............................................................................................. 9

        3.    NMFS Failed to Authorize Lethal Take of Marine Mammals ...................... 11

        4.    NMFS Fails to Show That It Did Not Violate the Notice and Public Comment Requirements of the MMPA .................................................... 13

    B.    Plaintiffs Are Likely to Succeed on Their NEPA Claims. ..................................... 15

        1.    The SEIS Fails to Consider All Reasonable Alternatives ........................... 15

        2.    The SEIS Fails to Adequately Consider Extending Shut-Down Procedures to Protect Schools of Fish ...................................................... 16

        3.    The SEIS Fails to Address or Inappropriately Rejects Reasonable Mitigation Measures ........................................................................... 18

        4.    The SEIS Fails to Adequately Consider All Individual and Cumulative Impacts of LFA ................................................................................... 18

    C.    Plaintiffs are Likely to Succeed on their ESA Claims ......................................... 19

        1.    Defendants' Biological Opinions Are Arbitrary and Capricious .................. 19

        2.    Defendants' Incidental Take Statements Are Inadequate. ........................ 20

            a.    The ITSs Do Not Set Forth Numerical Values for Estimated Incidental Takes and Fail to Establish That No Numerical Value Could Practically Be Obtained .......................................................... 20

            b.    The ITS Does Not Set Forth an Adequate Surrogate for Numerical Values as Required by the Ninth Circuit ........................... 21

II.   LFA IS LIKELY TO CAUSE IRREPARABLE INJURY ..................................................... 22

III.  THE BALANCE OF HARMS TIPS IN PLAINTIFFS' FAVOR .......................................... 25

CONCLUSION ............................................................................................................... 25

1

# TABLE OF AUTHORITIES

2

# CASES

3

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife ("ACG")*,
4      273 F.3d 1229 (9th Cir. 2001) ............................................................................ 20, 21, 22

5    *Bear Lake Watch, Inc. v. FERC*,
       324 F.3d 1071 (9th Cir. 2003) ..................................................................................... 17
6

*Churchill County v. Norton*,
7      276 F.3d 1060 (9th Cir. 2001) ..................................................................................... 15

8    *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*,
       673 F.2d 525 (D.C. Cir. 1982) ..................................................................................... 15
9

*Ctr. for Biological Diversity v. BLM*,
10     422 F. Supp. 2d 1115 (N.D. Cal. 2006) ....................................................................... 20

11   *Earth Island Inst. v. U.S. Forest Serv.*,
       442 F.3d 1147 (9th Cir. 2006) ................................................................................ 16, 22
12

13   *Gerber v. Norton*,
       294 F.3d 173 (D.C. Cir. 2002) ..................................................................................... 15

14   *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*,
       857 F.2d 505 (9th Cir. 1988) ....................................................................................... 13
15

16   *Hubbard v. United States*,
       514 U.S. 695 (1995) ....................................................................................................... 2

17   *Idaho Conservation League v. Mumma*,
       956 F.2d 1508 (9th Cir. 1992) ..................................................................................... 18
18

19   *Idaho Sporting Congress v. Thomas*,
       137 F.3d 1146 (9th Cir. 1998) ..................................................................................... 18

20   *Idaho Watersheds Project v. Hahn*,
       307 F.3d 815 (9th Cir. 2002) ....................................................................................... 24
21

*In re Ball*,
22     185 B.R. 595 (9th Cir. BAP 1995) ................................................................................. 2

23   *In re Visness*,
       57 F.3d 775 (9th Cir. 1995) ........................................................................................... 2
24

*Kokechik Fishermen's Ass'n v. Fed'n of Japan Salmon Fisheries Coop. Ass'n*,
25     839 F.2d 795 (D.C. Cir. 1988) ................................................................................ 12-13

26   *Kunaknana v. Clark*,
       742 F.2d 1145 (9th Cir. 1984) ....................................................................................... 5
27

*Mt. Diablo Hosp. v. Shalala*,
28     3 F.3d 1226 (9th Cir. 1993) ......................................................................................... 14

*NLRB v. Food Store Employees Union*,
  417 U.S. 1 (1974) ........................................................................................................ 2

*NRDC v. Evans*
  232 F. Supp. 2d 1003 (N.D. Cal. 2002)................................................................ *passim*

*NRDC v. Evans*
  279 F. Supp. 2d 1129 (N.D. Cal. 2003)................................................................ *passim*

*NRDC v. Navy*,
  857 F. Supp. 734 (C.D. Cal. 1994)................................................................... 3-4, 8

*NRDC v. Winter*,
  2007 WL 3377229 (9th Cir. Nov. 13, 2007) ......................................... 2, 7, 25

*N.W. Res. Info. Ctr., Inc. v. NMFS*,
  56 F.3d 1060 (9th Cir. 1995) ............................................................................. 5

*Nat'l Audubon Soc'y v. Butler*,
  160 F. Supp. 2d 1180 (W.D. Wash. 2001) ...................................................... 22

*Nat'l Black Media Coalition v. FCC*,
  791 F.2d 1016 (2nd Cir. 1986) ......................................................................... 14

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ........................................................................................... 3

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
  241 F.3d 722 (9th Cir. 2001) .......................................................................... 22

*Norton v. S. Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ............................................................................................ 4

*Or. Natural Desert Ass'n v. Rasmussen*,
  451 F. Supp. 2d 1202 (D. Or. 2006)............................................................... 12

*Save Our Ecosystems v. Clark*,
  747 F.2d 1240 (9th Cir. 1984) ....................................................................... 15

*U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*,
  513 U.S. 18 (1994) ............................................................................................ 2

*United States v. James*,
  478 U.S. 597 (1986) ........................................................................................ 20

*Westlands Water Dist. v. U.S. Dep't of the Interior*,
  376 F.3d 853 (9th Cir. 2004)........................................................................... 16

**STATUTES**

5 U.S.C. § 706 .................................................................................................... 4

16 U.S.C.
  § 1361 .............................................................................................................. 7

§ 1371(a)(5) .................................................................................................................. *passim*
§ 1532(19) .................................................................................................................... 21
§ 1536 (b)(4) ........................................................................................................... 20, 21

40 C.F.R.
§ 1502.9(c) .................................................................................................................... 15
§ 1502.14 ...................................................................................................................... 17
§ 1502.20 ...................................................................................................................... 15
§ 1508.28 ...................................................................................................................... 15

50 C.F.R.
§ 402.14(i) .................................................................................................................... 21

66 Fed. Reg.
44550 ............................................................................................................................ 20

67 Fed. Reg.
40232-38 ...................................................................................................................... 20
40234 ............................................................................................................................ 20
46720 ............................................................................................................................ 12
46722-29 ...................................................................................................................... 12
46749 .............................................................................................................................. 4

72 Fed. Reg.
46852-54 ...................................................................................................................... 13
46861 .............................................................................................................................. 6
46862-64 ...................................................................................................................... 12
46867 .............................................................................................................................. 6
46867-68 ...................................................................................................................... 12
46872 .............................................................................................................................. 6
46877 .............................................................................................................................. 8
46878 ................................................................................................................... 5, 6, 7
46879 ...................................................................................................................... 5, 6
46883-84 ...................................................................................................................... 10
46886 ................................................................................................................ 11, 13, 24
46887 .............................................................................................................................. 5
46889 ............................................................................................................................ 10
46892 .............................................................................................................................. 5
46893 .............................................................................................................................. 4

H.R. Conf. Rep. No. 92-1488 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4187 ..................................... 13

H.R. Rep. No. 108-354 (2003), *reprinted in* 2003 U.S.C.C.A.N. 1407 ................................................. 3

1

**INTRODUCTION**

2     The concerns that led this Court to impose a permanent injunction in the first phase of this

3 litigation four years ago ("*Evans*")—and the core legal predicates for that decision—remain present in

4 full force, and require the same outcome here.  The Navy again has failed to comply with MMPA and

5 NEPA requirements that were enacted to minimize harm to marine life and the environment, *i.e.*,

6 requirements that incidental take have no more than a negligible impact on species and stocks; that

7 NMFS prescribe mitigation measures that have the least practicable impact; that take is permitted only

8 pursuant to full public notice and comment procedures; and that the agencies take a "hard look" at

9 reasonably foreseeable environmental impacts, alternatives, and mitigation measures.  Similarly,

10 NMFS has again issued arbitrary and capricious Biological Opinions and inadequate Incidental Take

11 Statements.  Scientific data since the issuance of the prior injunction have only underscored the

12 damaging impacts of ocean noise, and that many populations of marine mammals are small and

13 vulnerable to such impacts.

14     Defendants urge a dismissive approach to these concerns and legal requirements to allow the

15 Navy to *dramatically reduce* the mitigation measures that have governed LFA since 2003.  Among the

16 most serious of the defects in Defendants' environmental documents is that they defer and shift the

17 required analysis and decision-making under the governing statutes to the largely ministerial Letter of

18 Authorization ("LOA") process.  Because the LOA process has been devoid of public participation and

19 scrutiny, this would allow critical decisions about future deployment to be made behind closed doors.

20 Hiding behind the LOA process to frustrate public participation in such decisions, and thereby

21 decreasing the level of environmental protection, strikes at the heart of the MMPA and NEPA.

22     In arguing that Plaintiffs have not firmly established that irreparable harm "will" occur,

23 Defendants ignore controlling precedent that requires only a showing that irreparable harm is

24 "possible."  Plaintiffs have established both a strong probability of success on the merits, and the

25 possibility (indeed, likelihood) of irreparable harm.  Plaintiffs also have raised "serious questions"

26 regarding Defendants' violation of law and have demonstrated that the balance of harms tips decidedly

27 in Plaintiffs' favor.  The Court's imposition of narrowly tailored injunctive relief in its 2002 and 2003

28 decisions was the direct result of this very same balancing.

1    The granting of such relief was ratified earlier this month by the Ninth Circuit decision in

2    *NRDC v. Winter*, on review of a mid-frequency active sonar case currently pending in the Central

3    District of California. 2007 WL 3377229 (9th Cir. Nov. 13, 2007). Ruling on the trial court's issuance

4    of preliminary injunction in that case, the Ninth Circuit concluded that the plaintiffs had

5        shown that the balance of hardships tips in their favor if a properly tailored injunction
6        is issued providing that the Navy's operations may proceed if conducted under
         circumstances that provide satisfactory safeguards for the protection of the
7        environment. Moreover, the public interest would be advanced by an injunction that
         required adequate mitigation measures.

8    *Id.*, at *1. Until the claims in this action are resolved, this is precisely what Plaintiffs seek on this

9    motion: a properly tailored injunction safeguarding marine life, while also permitting Navy operations

10   to proceed under the identical mitigation measures that have governed for the past five years.

11                                        **ARGUMENT**

12   **I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

13        **A.    Plaintiffs Are Likely to Succeed on Their MMPA Claims.**

14              **1.    NMFS Failed to Prescribe Mitigation and Monitoring Measures to
                       Effect the "Least Practicable Impact" on Marine Mammals.**
15

16   Defendants would have the Court believe that the landscape has changed so dramatically since

17   *Evans* as to make the Court's findings in that case irrelevant. Despite Defendants' characterizations,

18   Plaintiffs have not claimed that *Evans* carries the force of "binding precedent." *See* Defs.' Opp. to Pls.'

19   Mot. for Prelim. Inj. ("Opp.") at 9. Nevertheless, the Court in that case faced a virtually identical

20   administrative process; a go-ahead from NMFS with similar justifications; and legal requirements that

21   remain substantially the same as they were five years ago. It therefore defies reason to suggest, as

22   Defendants do, that the Court's previous opinion, and the logic applied therein, have no persuasive

23   effect on these proceedings.[1] And the fact that the 2007 authorization of LFA took place in a separate

24   rulemaking process in no way alters this fundamental principle.[2]

25        [1] Judicial opinions are considered "presumptively correct" and "valuable to the legal community as
26   a whole," and the policy of consistency among judicial opinions applies even when courts are not
     technically bound. *U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994);
27   *Hubbard v. United States*, 514 U.S. 695, 711 (1995); *see also In re Ball*, 185 B.R. 595, 597 (9th Cir.
     BAP 1995); *In re Visness*, 57 F.3d 775 (9th Cir. 1995).
28        [2] Cases cited by Defendants are not to the contrary. *NLRB v. Food Store Employees Union*, 417
     U.S. 1, 9 (1974), *does not* provide that an agency can make identical material mistakes and justify them
     on the basis that the decision has occurred in a new rulemaking. Similarly, Defendants' assertion that
     *[Footnote continued on following page.]*

1    As was true in *Evans*, NMFS may authorize incidental take *only if* it (1) finds that impacts on

2  marine mammal species and stocks will be negligible and (2) prescribes mitigation and monitoring

3  measures to effect the "least practicable adverse impact" on those species and stocks.  *See* 16 U.S.C.

4  § 1371(a)(5)(A).  In forging ahead with inadequate mitigation in disregard of the Court's previous

5  findings on these issues, and in failing to fulfill other requirements of the Act's incidental take

6  provisions, NMFS has violated the MMPA.[3]

7                    **a.    NMFS Failed to Effect the "Least Practicable Impact" on Marine
                            Mammals and Their Habitat in Identifying Areas for Exclusion.**

8
9    NMFS comes to this Court with virtually the same set of geographic exclusions it proposed in

10  2003, arguing once again that the measures it has chosen "are within its discretion and additional

11  measures are unnecessary or impractical."  *See* 279 F. Supp. 2d at 1163.  NMFS is mistaken.

12    First, Defendants argue that NMFS's choice of mitigation measures represents a reasonable

13  exercise of its discretion.  Specifically, they claim that the 12% cap that NMFS imposed to justify its

14  negligible impact finding relieves it of its burden to put additional areas off limits to sonar, since the

15  Navy (not NMFS) will thereby "avoid planning LFA sonar operations in areas of known high marine

16  animal densities."  Opp. 12.  But the Court considered and rejected precisely this scheme in *Evans*,

17  holding that "the mere prospect that future LOAs will consider additional information on marine

18  mammal distribution and the Navy may choose to avoid sensitive areas does not relieve NMFS of its

19  specific statutory responsibility in the present to 'prescribe regulations setting forth . . . means of

20  effecting the least practicable [adverse] impact on such species or stock and its habitat.'" 279 F. Supp.

21  2d at 1163-64 (citing 16 U.S.C. § 1371(a)(5)(D)(ii)(I)); *see also NRDC v. Navy*, 857 F. Supp. 734, 737-

---

22  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005) effectively
    rejects the fundamental principle of stare decisis and stretches the meaning of that case beyond
23  recognition. *Brand X* holds instead that an agency need not follow a court's interpretation of an
    ambiguous statute, unless agency interpretation has been closed off under the first step of *Chevron*
24  analysis. *Id.*
        [3] Defendants note, without argument, that NMFS is required by the amended MMPA to consider
25  personnel safety, practicability, and impact on the effectiveness of military readiness in prescribing
    mitigation.  Opp. 9.  But the cited provision requires only that certain factors be included in the
26  agency's consideration of "practicability"; it does not remove the Act's stringent "least practicable
    adverse impact" standard or its emphasis on consideration of significant habitat (16 U.S.C.
27  § 1371(a)(5)(A)(i)(II)(aa), (ii) (determination "shall include consideration" of personnel safety and
    other factors); *see also* H.R. Rep. No. 108-354 (2003), U.S.C.A.N.N. 1407, 1447.  In fact, the Court
    previously considered these practicability factors in *Evans*, finding that the agency's conclusions ran
28  counter to evidence in the record.  279 F. Supp. 2d at 1161-64.

1  38 (C.D. Cal. 1994).[4]  Such a scheme—which would assign NMFS's statutory duty to the Navy's

2  discretion, shift a present duty into the future, and substitute the negligible impact provision for the

3  Congressionally mandated "least practicable impact" standard for mitigation—is clearly contrary to

4  law.  16 U.S.C. § 1371(a)(5)(D)(ii)(I).[5]

5        Further, Defendants' justification for NMFS's violation is a straw man.  Taking a version of

6  Plaintiffs' recommended geographic restrictions to the extreme, they state that "it would not be

7  'practicable' to designate every productive area of the ocean as an OBIA."  Opp. 10-11.  Defendants

8  argue an all-or-nothing proposition.  If it is not practicable to put every productive area off-limits to

9  LFA, it is still indisputably practicable to exclude some.  72 Fed. Reg. 46893; Ex. 14 (process for

10  designating OBIAs).  For example, the Navy has been able to operate for five years under a modified

11  stipulated injunction notwithstanding the fact that NMFS made the same broad statement about the

12  impracticability of excluding "huge swaths" of ocean in its 2002 Final Rule.  *See* Opp. 11 (citing

13  67 Fed. Reg. 46749).  NMFS's resistance to identifying additional exclusion areas cannot be squared

14  with what the MMPA requires and Plaintiffs request: the prescription of measures to ensure the least

15  practicable adverse impact to marine mammals and their habitat.[6]

16        Defendants are thus left to defend on its face an agency decision to designate virtually no

17  offshore exclusion areas outside the coastal United States, and none where the Navy has operated for

18  
19  [4] Defendants' invocation of *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004), to support their illegally expansive view of NMFS's discretion is inapposite. Unlike the present case, *Norton* was a suit for action unlawfully withheld, brought under APA § 706(1), in which plaintiffs failed to challenge a discrete final agency action. *Id.* at 63-64. Here Plaintiffs, under APA § 706(2), challenge a specific statutory duty that must be discharged through the issuance of regulations—in other words, a final agency action—and Defendants have not contended otherwise.
20  
21  [5] Defendants also argue that their safety zone monitoring is sufficient as an alternative to geographic mitigation. Aside from its limited efficacy within the 2 km safety zone and its manifest inability to prevent the large number of takes outside it, this form of mitigation does not satisfy the clear statutory directive to effect the least practicable impact on such species or stock "and its habitat." 16 U.S.C. § 1371(a)(5)(D)(ii)(I).
22  
23  [6] Defendants theorize that NRDC's claim amounts to an illegal imposition of the "specified geographical region" requirement, from which the NDAA exempted military readiness activities. Opp. 10. Defendants ignore the obvious fact that the "least practicable impact" provision is a distinct requirement of the MMPA that expressly requires NMFS to minimize impacts on both species and habitat (16 U.S.C. § 1371(a)(5)(D)(i)(I)), and that provided a separate basis for the Court's ruling in *Evans*. 279 F. Supp. 2d at 1161-64. This provision is unambiguous: Where, as here, an activity's impacts on marine mammals can practicably be mitigated, such limitations are plainly necessary to satisfy the requirements of the MMPA. *Id.*; 16 U.S.C. § 1371(a)(5)(A)(i)(II). Several Defendants' statements during the NDAA's legislative process, and Congress's express understanding of the amendments, support this conclusion. *See* Supp. Exs. 2-3; Defs' Ex. 74 (changes in incidental take permitting "would not eliminate the existing requirements for mitigation and monitoring").

the past five years.  72 Fed. Reg. 46892.  As the Court observed in *Evans*, "NMFS has the ability to identify which areas and seasons to avoid based on its own data."  279 F. Supp. 2d at 1163 (citing LMRIS database).  Yet there is no indication in the Final Rule or SEIS that NMFS utilized the data available through the government's LMRIS database, let alone the Duke University OBIS-SEAMAP database, IWC Scientific Committee journals and reports, or the numerous sources on marine mammal populations in the scientific record.  *See* 72 Fed. Reg. 46878-79; *see also* SEIS at 10-136, G008 at 4, Exs. 13; 84; 90–92; Parsons Dec. ¶¶ 11–12; Whitehead Dec. ¶¶ 10–11; Calambokidis Dec. ¶ 9.  Indeed, NMFS's approach appears to have been decidedly passive, declining, for example, to exclude any part of the Northwestern Hawaiian Island National Marine Sanctuary on the grounds that the public did not furnish specific information.  72 Fed. Reg. 46887; *see also id.* 46879 (rejecting exclusion of hotspots because commenters did not provide information sufficient "to begin the designation process outlined in the regulations").[7]

Even in this dim light, Defendants' conclusions make little sense.  They explain that they ruled out Marine Protected Areas ("MPAs") within 12 nautical miles ("nm") of shore, but have no answer as to why NMFS failed to exclude any new MPAs outside that distance other than the Gully, including such world-renowned ocean habitat as the Galápagos Marine Resources Reserve, the Great Barrier Reef National Marine Park, and the PELAGOS cetacean sanctuary described at length in Hoyt.  Ex. 88; Opp. 13-14; 72 Fed. Reg. 46878-79; Ex. 89 at 34-39, 55-56 (Mediterranean MPAs existing or proposed by ACCOBAMS Scientific Committee); Hoyt Dec. ¶¶ 5, 7-10.  Nor apparently did they even consider renewing the LFA exclusion areas that have been in place for five years in the Northwest Pacific, which include migratory routes for the critically endangered western gray whale and breeding grounds

<hr />

[7] Defendants suggest that Plaintiffs somehow failed to meet their public comment obligations because they declined to participate in NMFS's *post hoc* regulatory process for OBIAs.  Opp. 13 n.3.  In fact, Plaintiffs alerted the agency to their concerns about the lack of off-limit areas outside the U.S., precisely stated the legal issues at stake, and gave numerous examples of both specific areas they believed should qualify as OBIAs and additional sources of information that the agency should use in designating them.  *E.g.*, Ex. 9 at 10-12 (referencing list of offshore cetacean habitat proposed as MPAs by ACCOBAMS Scientific Committee).  This more than satisfies the standards for public comment. *Kunaknana v. Clark*, 742 F.2d 1145, 1148 (9th Cir. 1984) (no "broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision"); *N.W. Res. Info. Ctr., Inc. v. NMFS*, 56 F.3d 1060, 1067 (9th Cir. 1995) (no waiver of right to object when agency was "well aware of criticisms . . . before, during and after").  Defendants' attempt to place its responsibility on the public under the guise of a public comment requirement is precisely the sort of burden-shifting that the Court rejected in *Evans*.  279 F. Supp. 2d at 1163.

1    for endangered humpback whales.  72 Fed. Reg. 46878-79; Ex. 21 at 1-2; Johnson Dec. ¶ 26 (stating

2    that no impacts on western gray whales are expected since the Navy continues to avoid migratory areas

3    under the Court's injunction).[8]  NMFS's virtually complete lack of recognition of offshore marine

4    mammal habitat outside North America cannot plausibly be reconciled with its responsibility under the

5    MMPA to prescribe "least practicable adverse impact" mitigation for the LFA system.  16 U.S.C.

6    § 1371(a)(5)(A)(i)(II)(aa).

7                  **b.      NMFS Has Failed to Show that Its Coastal Exclusion Has
                           the Least Practicable Impact on Marine Mammals.**

8           NMFS argues that its reversion to a 12 nm coastal exclusion was reasonable because it had

9    sufficiently evaluated the available options and considered the relevant biological factors.  Both claims

10   are without merit.  First, the Court's finding in *Evans* indicates that the Navy did not explain "why the

11   zone could not be extended more than [12 nm] but less than 43 *to* 200 [nm]"—and not, as Defendants

12   would have it, Opp. 14-15, why it could not be extended less than 43 nm.  279 F. Supp. 2d at 1162

13   (emphasis added).  Defendants have presented no evidence to alter this specific conclusion.  *See*

14   72 Fed. Reg. 46861, 46867; SEIS at 3-161, 10-83, 10-122 (suggesting, by contrast, that LFA will

15   usually operate beyond the shelf break in deeper offshore waters).  Instead, they observe that the Navy

16   may need to train closer to shore in certain areas, such as choke points, if operations demand it, Opp.

17   15, 40; but this general assertion is not inconsistent with the Court's reasonable finding in 2003 that, in

18   some areas, a narrower exclusion zone would apply.  279 F. Supp. 2d at 1162.

19          Indeed, contrary to Defendants' assertions, Opp. 15, NMFS (and the Navy) did not consider the

20   very rubric used throughout much of the LFA operating area these last five years: an exclusion of "at

21   least 60 [nm], *or 30 [nm] from the 200 meter isobath* [i.e., the shelf break], whichever is greater."

22   Ex. 3 ¶ 5 (emphasis added).[9]  This contour-based measure takes LFA farther from the continental shelf

23

24        [8] Defendants' explanation of their failure to exclude any part of the Oyashio/Kurashio area adds
     nothing to the public rationale given by NMFS five years ago.  Opp. 12-13 (citing portions of SEIS and
25   2007 Final Rule that declare the area a "large ocean expanse" and refer back to rationale in 2002 Final
     Rule).  That explanation remains inconsistent with NMFS expert Hollingshead's agreement that the
26   area would qualify for future nomination as an OBIA.  279 F. Supp. 2d at 1162; Wang Dec. ¶ 7.
          [9] Defendants are correct, Opp. 15, that NMFS, in its Final Rule, dismisses (without analysis) a flat
27   30 or 60 nm stand-off distance, which was also applied in some areas by the permanent injunction; but
     it does *not* consider the contour-based exclusion that applied to the Philippine Sea under the Court's
28   Order.  72 Fed. Reg. 46872.

1    and the shelf break—the habitat that Defendants agree has the highest concentrations of animals—than

2    Defendants have accounted for.  SEIS at 4-76 to 77; *see also* 72 Fed. Reg. 46878 (basing its east-coast

3    exclusion zone on the shelf break because that avoids "animal concentrations and migration routes" on

4    the shelf).  NMFS's failure to consider the very exclusion regime that had been in place for five years

5    is hardly "reasonable," and certainly did not relieve its burden of effecting the "least practicable

6    impact" on marine mammals.  *See Winter*, 2007 WL 3377229, at *2 (ordering tailored injunction on

7    Navy mid-frequency, in part given "the Navy's past use of additional mitigation measures to reduce the

8    harmful effects"); Johnson Dec. ¶ 33 (LFA program manager's belief that mitigation measures "had

9    placed much of the LFA operations in areas with fewer marine mammals").[10]

10           Even for the two stand-off distances it does consider, Defendants' claim that NMFS accounted

11    for critical factors—such as the disproportionately high number of endangered species within 3 nm of

12    shore—is baseless.  Whitehead Dec. ¶¶ 12-15 (observing that such species make up 50% of ESA- and

13    60% of IUCN-listed marine mammals).  In their brief, Defendants note references to these species in

14    NMFS's adopted SEIS, but cannot cite *any* such treatment in the assumptions they made to determine

15    the coastal exclusion itself.  *See* SEIS at 4-70 to 79.  Not only does NMFS not distinguish between

16    listed and non-listed species in making its determination, but, in assuming these vulnerable near-coastal

17    species are evenly distributed across the continental shelf, it substantially underestimates the relative

18    impacts that the smaller 12 nm exclusion zone would have.  Whitehead Dec. ¶ 14.  Given the critical

19    goal of minimizing impacts to endangered marine mammal species and populations, this omission is

20    significant.  16 U.S.C. § 1361(1), (2); 279 F. Supp. 2d at 1139, 1160-62, 1188-92.

21           Further, it is undisputed that NMFS gave no consideration to the particular difficulty that near-

22    shore animals would have in escaping the sound field, SEIS at 4-73, for which Defendants do not deny

23    the potential for harm.  Opp. 15.  Defendants' vague response that the LFA vessel would not be

24    moving toward shore "for an extended period of time," *id.* 15-16, does not absolve NMFS of its duty to

25    have carefully considered the heightened impacts such movements could have—particularly when, as

26    the Navy has stated, LFA sometimes doubles back on itself in "a racetrack pattern" every 12 hours or

----

[10] Defendants' claims that the need for "flexibility" makes a wider exclusion zone impracticable are also belied by the Navy's record under the permanent injunction, which set a coastal exclusion of *at*

*[Footnote continued on following page.]*

1    so.  Johnson Dec. ¶ 11.  Finally, NMFS simply did not consider how all of these factors, including its

2    take numbers, could be mitigated through a wider coastal exclusion, such as the contour-based

3    exclusion that has been in place for five years.  This narrow approach does not fulfill the careful

4    analysis required under the MMPA.  279 F. Supp. 2d at 1159 ("Although the agency has some

5    discretion to choose among possible mitigation measures, it cannot exercise that discretion to vitiate

6    this stringent standard"); *Navy*, 857 F. Supp. at 739-40 (finding NMFS's rejection of offshore site

7    illegal under MMPA where it did not fully consider relevant factors in weighing mitigation benefit).[11]

8              **c.    NMFS's Monitoring Requirements Are Inadequate.**

9              Defendants' word parsing cannot obscure the fact that NMFS still fails to provide adequate

10   monitoring.  Defendants argue that the SEIS explains that aerial monitoring is infeasible because LFA

11   vessels "*ordinarily* do not operate with other fleet assets, so naval aircraft would *normally* be

12   unavailable."  Opp. 16 (emphasis added).  Defendants' word choice is telling as it is an implicit

13   admission that the SEIS inappropriately neglects to require aerial monitoring when aircraft *are*

14   available because LFA vessels are operating with or near other fleet assets.  Further, Defendants cannot

15   so easily dismiss the fact that the Deputy Secretary of Defense has twice ordered aerial monitoring for

16   certain mid-frequency active sonar activities.[12]  Defendants do not even attempt to explain why

17   monitoring used by the Navy for certain mid-frequency active sonar activities should not be used

18   during optimal conditions for LFA sonar operations.

19             Defendants also choose their words carefully in rationalizing their dismissal of additional

20   monitoring options.  They claim that the SOSUS arrays are "degraded" and do not provide "real-time"

21   information.  Opp. 17; 72 Fed. Reg. 46877.  However, they do not claim that the SOSUS arrays no

22   longer work or that the information they gather could not be used for planning LFA exercises and

23   monitoring their impact; they merely raise the specter of deficiency without exploring the actual

24   *least* 60 nautical miles throughout nearly all of the vast LFA operating area in the Philippine Sea while
     establishing different stand-off distances elsewhere.  Exs. 3 at ¶ 5, 4 at ¶ 4.

25   [11] Defendants also have not shown why enlarging the buffer zone around their few exclusion areas
     by more than a single kilometer would not be practicable, especially since, by their own analysis, noise

26   producing high levels of take would otherwise reach far into the area.  Pls.' Mot. for Prelim. Inj.
     ("Mqt.") 12 n.12; Opp. 15; SEIS at 4-73.

27   [12] In June 2006, the Navy was ordered to "coordinate a focused monitoring effort…[including] at
     least one dedicated aircraft or one dedicated vessel for realtime monitoring."  Ex. 79 at 3.  In January

28   2007, the Deputy Secretary ordered that "Navy aircraft participating in exercises at sea will conduct
     and maintain, when operationally feasible and safe, surveillance of marine species."  Ex. 80 at 2.

1    substance of any deficiencies.[13]  However Defendants explain NMFS's failure to require additional

2    monitoring or fully examine alternatives, they cannot wordsmith their way out of a finding that such

3    action is arbitrary and capricious.

4              **2.    NMFS Has Failed to Ensure That the Impacts of LFA Will Be Negligible.**

5              The MMPA contains the same fundamental requirements for incidental take permitting as it did

6    at the time of *Evans*, prior to the NDAA's passage.[14]  Specifically, NMFS must find, after notice and

7    opportunity for comment, that the specified activity will have no more than a "negligible impact" on

8    marine mammal species and stocks.  16 U.S.C. § 1371(a)(5)(A)(i)(I).

9              Because Defendants rely on a construction of this Court's holding regarding negligible impacts

10   in *Evans*, it is necessary to revisit that holding once again.  Defendants are correct that the Court did

11   not find the 12% cap on take for each species to be per se arbitrary and capricious; Plaintiffs never

12   asserted otherwise.  *See* Mot. 15.  Yet the Court was expressly "concerned that, without more

13   restrictions on deploying LFA in sensitive areas and during sensitive periods, *there will be occasions*

14   *where the impact on particular populations is not merely negligible*."  279 F. Supp. 2d at 1159

15   (emphasis added).  For that reason alone, the Court required strengthened mitigation measures.  The

16   Court's decision not to hold the 12% cap arbitrary and capricious cannot be equated with affirmative

17   approval of that cap or assurance that, without additional mitigation, the impacts of a 12% take would

18   necessarily be negligible.  *Id.*  NMFS's failure to provide the tailored mitigation ordered in *Evans* to

19   avoid training "in sensitive areas and during sensitive periods" (279 F. Supp. 2d at 1159) violates the

20   MMPA.  *E.g.*, Ex. 21 at 1-2 (listing some populations protected under order); Johnson Dec. ¶ 26.

21             Defendants err when they assert that their "monitoring and reporting data" ensure that impacts

22   remain negligible and injuries are "virtually nil."  Opp. 18.  Although Defendants estimate that no more

23   than 11.2% of any marine mammal stock has experienced take in a given year, and that most stocks

24   have experienced 6% take or less, *id.*, their estimates—which are hardly trivial—are in fact based on

---

25   [13] They also claim that passive gliders would merely be "vessels of opportunity," Opp. 17, without
     defining the term or examining whether such gliders could be owned and operated by the Navy.

26   [14] Although NMFS no longer must determine that incidental take will apply only to "small
     numbers" of marine mammals in "specified geographical regions," these factors remain important in

27   determining whether impacts are negligible.  Commenting on the elimination of the "small numbers"
     provision during the NDAA process, NMFS officials explained:  "A substantive effect on more than a

28   small proportion of a population would likely have more than a negligible impact; therefore, *numbers
     are taken into account*, based upon biological significance." Supp. Exs. 2 at 6; 3 at 4 (emphasis added).

1    predictive modeling, not empirical observation. In actuality, the Navy's monitoring is severely limited

2    to a 2 km area around the ship, and even within this range detection rates have admittedly been very

3    low. Ex. 20 at 19 (noting 3 visual detections and 0 passive acoustic detections since 2002); Johnson

4    Dec. ¶¶ 32-33; *see also* Baird Dec. ¶¶ 7, 10. As this Court observed, such low detection rates suggest

5    one of three explanations: the Navy's monitoring measures are deeply flawed, LFA has displaced

6    marine populations, or the permanent injunction worked to prevent take of marine mammals. *See*

7    279 F. Supp. 2d at 1189 (finding the absence of detections "begs the question," pointing to one of these

8    alternative explanations). Impacts to marine mammals are notoriously difficult to observe in any

9    environment, let alone across the impact area of LFA. Ex. 81 at 239-41; Ex. 95; Weilgart Dec. ¶ 9;

10    Parsons Dec. ¶¶ 8, 13; Baird Dec. ¶ 12.[15]

11        Defendants' claim about the effectiveness of abundance modeling similarly misses the mark.

12    *First*, NMFS does not dispute Plaintiffs' observation, Mot. 15-16, that the FEIS' models both aggregate

13    most species into broad groups and assume those species are part of vast stocks, in contradiction of the

14    agency's own past practice. *See* Opp. 19. Despite Defendants' efforts to minimize the relevance of

15    these models, *id.*, they explicitly remain the basis (along with the Navy's modeling of representative

16    sites in the North Pacific) for NMFS's adoption of a 12% "upper bound" of expected impacts for the

17    new five-year permit, and are thus essential to its negligible impact determination. 72 Fed. Reg.

18    46883-84, 46889.[16] *Second*, the abundance numbers used in the Navy's LOA applications, which

19    assume that most species are evenly distributed in vast stocks over large ocean basins, Opp. 19, fail to

20    take account of best available science on population structuring—particularly in areas such as the

21    Northwest Pacific Ocean that largely fall outside the bounds of NMFS stock assessments. Wang Dec.

22 ────────────

23        [15] Even assuming *arguendo* that reported take levels were accurate, they raise serious concerns. For example, at least four marine mammal populations experienced take greater than 5% for two operational years, yet no attempt has been made to evaluate the cumulative effects of sustained take to

24    determine whether impacts on these populations are in fact "negligible." Twelve percent take was never a "magic number," below which take would be shielded from judicial scrutiny. *See Evans*, 279

25    F. Supp. 2d at 1159.
        [16] The other basis for the Navy's negligible impact determination is the Navy's "case study" of nine representative areas in the North Pacific. Opp. 19. As noted below, this modeling from the Navy's

26    first few LOA applications fails to reflect the best available science on abundance in the region; but even if it were accurate, it plainly does not address the other regions covered by the new five-year

27    permit, including the Eastern Pacific (and Hawaii), the North Atlantic, and the Mediterranean. The Navy's new modeling is therefore insufficient to cure a determination that the MMPA requires—after

28    adequate public notice and comment—for incidental take regulations to issue. 16 U.S.C. § 1371(a)(5)(A).

¶ 10 (questioning data used to generate most abundance estimates in South China Sea region); Parsons

Dec. ¶ 10; *see also* Baird Dec. ¶¶ 14-17.  NMFS's reliance on abundance numbers that fail to

differentiate among populations makes its assumption of negligible impacts arbitrary and capricious.

More effective mitigation measures than proposed are necessary.

### 3.   NMFS Failed to Authorize Lethal Take of Marine Mammals.

Defendants do not deny the significant developments that have taken place since 2002 in the

investigation of beaked whale mortalities; they suggest only that none of it applies to LFA.  Opp. 22-

23.  They contend that NMFS's decision not to issue an authorization for lethal take is based on three

conclusions: that there are no new data (1) linking LFA to whale strandings, (2) linking LFA to

injuries, or (3) "describing mechanisms of harm to marine mammals from LFA sonar."  Opp. 23

(citing 72 Fed. Reg. 46886).  None have merit.

Defendants' claim that there are no new data that "describe[e] mechanisms of harm to marine

mammals from LFA sonar" rests primarily on the assumption that beaked whales, hearing "poorly" in

the low frequencies, would not respond behaviorally to LFA as they do to mid-frequency sonar.  Opp.

20, 23; 72 Fed. Reg. 46886.  In fact, scarcely any information exists on the hearing ability of beaked

whales, SEIS 3-60 to 64; but even assuming NMFS's assumptions about beaked whale hearing were

correct, the best *empirical* evidence indicates that beaked whales, like certain other very reactive

marine mammals, react to sounds well outside their most sensitive range of hearing.  Indeed, beaked

whales are presumed to hear poorly in the mid-frequencies as well, and yet have undisputedly at times

been injured and killed on exposure to mid-frequency sonar.  Soto Dec. ¶ 10.  Another acoustically

vulnerable species, the harbor porpoise, is known to react aversively to sounds at levels not far above

its ability to detect them.  Ex. 58; Soto Dec. ¶ 10.  Beaked whales have been shown to alter their dive

patterns—precisely the category of behavior that has been "proposed" as a mechanism for strandings,

Opp. 21—at relatively moderate levels of exposure to shipping noise, whose energy output is

predominantly in the low frequencies.  Ex. 57.[17]  While dwelling on hearing data from other species,

---

[17] Like airguns and ships, LFA also produces sound in the mid-frequencies at significantly lower levels. Exs. 48 at 121 (airguns); 57 at 690 (ships); FEIS at 10-129 (harmonics from LFA).

1    NMFS fails to consider any of this countervailing evidence in its Final Rule.  72 Fed. Reg. 46862-64.[18]

2    Likewise, Defendants' assertion that "LFA sonar has never been implicated in any stranding" or

3    injury, Opp. 22-23, disregards the recognized limitations in the Navy's monitoring effort.  As the Court

4    observed in 2003, none of the Navy's detection measures "are designed to detect marine mammals

5    beyond two kilometers from the LFA source" (279 F. Supp. 2d at 1160); and, indeed, the only

6    mechanism with any potential to detect animals beyond that range, the Navy's passive acoustic system,

7    improbably failed to record a single animal in five years.  Ex. 20 at 19; Baird Dec. ¶¶ 7-13.  Defendants

8    are left to repeat NMFS's claim that "none of the 19 strandings reported in Asia during the first five-

9    year period" coincided with LFA operations, Opp. 22; but, incredibly, that stranding review was

10    expressly based on an amateur website that a college student operated for only 18 months using

11    English-language news stories.  *See* Ex. 99; 72 Fed. Reg. 46867-68; Wang Dec. ¶ 9 (status of stranding

12    reporting in region).  Drawing such a conclusion ("never been implicated") from such a review is not

13    an example of "reasoned" agency decision-making.  Opp. 22; *see, e.g.*, *Or. Natural Desert Ass'n v.*

14    *Rasmussen*, 451 F. Supp. 2d 1202, 1212 (D. Or. 2006).

15    The best evidence that has emerged since 2002—contrary to Defendants' assumptions at the

16    time, Ex. 28 at iii, 67 Fed. Reg. 46720, 46722-29—indicates that exposure to more widely-used sonar

17    systems causes "severe" hemorrhaging and tissue damage in beaked whales, that these injuries occur at

18    sea (and not merely from the fact of stranding), and that they are likely to go undetected.  Exs. 31

19    at 448-54; 43 at 182; 87 at 142, 146, 151.  Alarmingly, the evidence also shows that beaked whale

20    populations in various parts of the world are smaller and more discrete than previously suspected.  *E.g.*,

21    Exs. 84-86; Whitehead ¶ 9.  This is not a case that presents a "very remote possibility" of serious injury

22    and lethal harm, and NMFS's failure to authorize these levels of take, even for operations similar to

23    those of the 1996 Greek strandings, violated the MMPA.  *Kokechik Fishermen's Ass'n v. Fed'n of*

24

25    ———————————
      [18] As Plaintiffs noted, NMFS has also claimed that LFA operations would not present other features
      common to sonar-related mortalities of beaked whales.  Mot. 17.  Defendants respond by stating that
26    LFA would not operate "in areas like offshore canyons" Opp. 21, but that does not address the fact,
      raised by Plaintiffs, that, at 12 nm, LFA ships would train no farther from shores with deep water than
27    the sonar vessels implicated in various stranding events.  Mot. 17; Exs. 28 at 30-33; 33 at 32; 41 at 28;
      Soto Dec. ¶ 7.  Moreover, the Navy has stated that LFA may in fact be operated close to choke points,
28    "such as entrances to straits, channels, and canals."  SEIS at 2-7.

1    *Japan Salmon Fisheries Coop. Ass'n*, 839 F.2d 795, 801 (D.C. Cir. 1988).[19]

2
          **4.    NMFS Fails to Show That It Did Not Violate the Notice and Public
3                 Comment Requirements of the MMPA.**

4         The MMPA's notice and comment directive is not merely a technical hoop that parties must

5    jump through before taking action. Rather, it is vital to the decision-making process itself.[20] By failing

6    to provide information that even NMFS considers necessary to support its negligible impact finding,

7    NMFS obstructed the MMPA's notice and public comment requirement.

8         Defendants do not deny that NMFS reviews specific modeling information that the Navy

9    presents during the LOA process, or that it makes determinations based on that information. 72 Fed.

10   Reg. 46852-54, 46886; SEIS at 4-37. Instead, they argue that the public is not entitled to comment on

11   these data or findings because the regulations do not require the agency to provide public notice and

12   comment on its LOA process. Opp. 24. Defendants' focus on the LOA *process* is misplaced. The

13   relevant inquiry is whether NMFS provided sufficient notice and comment before making its broad

14   finding and before prescribing means of effecting the least practicable adverse impact. Because NMFS

15   failed to meet this basic MMPA requirement, its findings should be rejected.

16        Defendants claim that NMFS met its obligation because it sought public comment on the

17   Navy's application and the Proposed Rule. Opp. 23. Their claim is unsupported. First, Defendants fail

18   to note that the "negligible impact" finding and "least practicable impact" prescriptions rely, in part, on

19   data supplied by the Navy during the LOA process.[21] Yet NMFS was selective in the LOA data it

20   released to support its action and the data it excluded from review. For example, NMFS did not submit

21        [19] Defendants' statement that Plaintiffs do not challenge the 180 dB threshold for physical injury is
     incorrect. The best available science indicates that whales in the Bahamas – the only mortality event
22   for which baseline siting data are available – were likely to have been exposed to sound levels of
     150-60 decibels for 50-150 seconds. Ex. 48 at 120 (published study); Ex. 27, Annex K at 7 (IWC
23   Scientific Committee report). Defendants' 180-decibel threshold is established on the basis of direct
     tissue damage; it has not been revised despite these data and the weight that has been placed on
24   behavioral reactions (such as changes in dive patterns) to explain the injuries observed in beaked
     whales. SEIS at 4-30 to 32; Ex. 43 at 185; Ex. 44 at 1127; Baird Dec. ¶ 11.
         [20] *See, e.g.,* H.R. Conf. Rep. No. 92-1488 (1972), 1972 U.S.C.C.A.N. 4187, 4187-88 (NMFS may
25   make regulations for taking of mammals, "subject to the protective devices…involving public review
     and participation"); *see also, e.g., Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505,
26   508 (9th Cir. 1988) (citation omitted) (NEPA's public comment procedures "reflect the paramount
     Congressional desire to internalize opposing viewpoints into the decision making process to ensure that
27   an agency is cognizant of all the environmental trade-offs that are implicit in a decision").
         [21] *See, e.g.,* 72 Fed. Reg. 46852-54, 46886; SEIS at 4-37 ("The SEIS was developed based on the
28   analyses in [inter alia] the Applications for [LOAs].").

1    North Atlantic data showing substantially greater percentages of takes for many species, including

2    endangered species, than the FEIS predicts for the one "worst case" site it modeled off the U.S. east coast,

3    calling into question its assertion that "there are no new data that contradict any of the assumptions or

4    conclusions made in [the FEIS] (Potential Impacts on Marine Mammals)."  SEIS 4-39.[22]

5         Defendants obscure the fact that they did not submit this key information for public review by

6    suggesting that the SEIS and the Navy's public LOA application contained summaries of three past

7    LOA applications.  *See* Opp. 23-24.  However, NMFS may not cherry-pick which favorable data from

8    LOA applications it will rely upon and make available for comment, and which unfavorable data it will

9    not disclose.  *See Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1232 (9th Cir. 1993) ("[A]n action will not

10   be upheld where the agency has intentionally omitted evidence from consideration.").  It was arbitrary

11   and capricious for NMFS to not disclose essential data for public comment, especially when this type

12   of data is used to justify such broad findings.  *See Nat'l Black Media Coalition v. FCC*, 791 F.2d 1016

13   (2nd Cir. 1986) ("[I]t is not consonant with the purpose of a rulemaking proceeding to promulgate rules

14   on the basis of inadequate data or on data that, in critical degree is *known only to the agency*.").

15        Second, because NMFS abdicates its responsibility to prescribe regulations that effect the least

16   practicable adverse impact, it avoids disclosing the information used by the Navy in its pre-application

17   "sensitivity/risk" analysis.  As noted by Defendants, prior to LOA application, "the Navy considers

18   marine mammal habitats, seasonal activities, and behavioral activities . . . to avoid planning LFA sonar

19   operations in areas of known high marine animal densities."  Opp. 12.  The Navy's analysis includes

20   geographic, spatial, temporal, and operational restrictions, SEIS at 4-40, none of the specifics of which

21   are provided for public comment.  Thus, the Navy is purportedly making determinations on how to

22   lessen the impact on species and stocks, but has never disclosed any of the information behind these

23   determinations.  NMFS cannot avoid public review of key information and findings by parsing them

24   off as part of the LOA process.  Allowing such a coconut-shell game will encourage NMFS to shield

25   _____

       [22] In March 2007, the Navy gave NMFS an annual estimate of potential effects to endangered fin
26   whale stocks for the Virginia Capes Operating Area (VACAPES) in the North Atlantic Ocean. Defs'
     Ex. 32 at 1-1. The estimated take of fin whale stock, for example, is between 3.49% and 6.07%. Yet, in
27   the FOEIS/EIS, the annual estimate of potential effects to fin whale stocks in Onslow Bay, the only
     modeled site off the U.S. east coast, is 0.11%.  Defs' Ex. 19.8 at 4.2 to 4.6. The Navy's fin whale
     estimate for VACAPES is as much as 55 times that for the adjacent Onslow Bay.  NMFS made the low
28   estimate for Onslow Bay, a representative site, available for public review, but not the drastically
     higher estimates for VACAPES.

1    even more information, potentially damaging, from public scrutiny in direct contravention of Congress'

2    intent.[23]  NMFS may be entitled to "fill gaps left by the MMPA in the implementation of the incidental

3    take authorization process," Opp. 24, but not at the expense of an express statutory mandate.

4              **B.      Plaintiffs Are Likely to Succeed on Their NEPA Claims.**

5                    **1.      The SEIS Fails to Consider All Reasonable Alternatives.**

6          The Navy explains its failure to identify any low-risk areas for training, as required by *Evans*,

7    by asserting that identifying any such areas *anywhere* is impracticable.  Opp. 27.  But the dispute on

8    this point is not, as Defendants would paint it, a matter of conflicting expert opinion; the record shows

9    rather that low-density areas have been identified for various species in various locations based on

10   sighting data and habitat preferences, partly through research funded by the Navy.  *E.g.*, Exs. 90

11   (eastern tropical Pacific); 102 at 38712, 38736 (relative densities in Navy Hawaii Operating Area).

12   Moreover, the Navy's claim of impracticability is belied by its own "methodology" of considering

13   whether to move exercises from higher to—presumably—lower density areas during an annual process

14   closed to the public and, indeed, to NMFS.  Opp. 26.  The fundamental question is whether NEPA

15   permits the Navy to completely shift this core environmental analysis outside the NEPA process,

16   violating its important mandate of "informed decision-making and informed public participation"; and

17   the answer to that question is no.  *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001);

18   *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1247 (9th Cir. 1984); 279 F. Supp. 2d at 1163.[24]

19         Defendants would have the Court believe that uncertainties in planning make it impracticable to

20   establish wider coastal exclusions anywhere in the world.  Opp. 29.  That broad assertion—contained

21   nowhere in the SEIS—is at odds with five years of experience under a stipulated injunction that

22   tailored different exclusion zones to different parts of the Navy's vast operating area, and even allowed

23   for amendment.  Exs. 3, 4.  Nor did the Navy evaluate all reasonable alternatives for exclusion.

24         [23] *See Gerber v. Norton*, 294 F.3d 173, 181 (D.C. Cir. 2002) (internal quotation omitted) ("An
     agency may not turn the provision of notice into a bureaucratic game of hide and seek."); *see also*
25   *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982) ("To
     allow an agency to play hunt the peanut with technical information, hiding or disguising the
26   information that it employs, is to condone a practice in which the agency treats what should be a
     genuine interchange as mere bureaucratic sport.").
27         [24] The Navy argues that providing marine mammal density information sufficient to the scope of
     the SEIS is "impracticable."  Opp. 27.  But any difficulty due to the vastly overbroad operational area
28   sought by the Navy is of its own creation, and, in any event, could be dealt with in conformity with
     NEPA through tiering or supplementing the SEIS.  40 C.F.R. §§ 1502.9(c), 1502.20, 1508.28.

1    Contrary to their claims, Defendants did *not* consider, *e.g.*, a contour-based exclusion in the SEIS, *see*

2    SEIS at 4-70 to 79, 10-119, and, even for the exclusions it did consider, it failed to take account of

3    clearly relevant factors such as habitat for endangered species and the particular environmental dangers

4    of near-shore operations.  *See supra* at I.A.1.b.  As Defendants' own authority indicates, the failure to

5    address all reasonable alternatives—particularly one that has been in use for five years—violates

6    NEPA.  *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004).

7                    **2.    The SEIS Fails to Adequately Consider Extending Shut-Down**
                            **Procedures to Protect Schools of Fish.**

8

9            In support of its refusal to consider extending shutdown procedures to fish, the Navy references

10    a study, conducted by Dr. Arthur N. Popper ("Popper study"), designed to examine whether exposure

11    to LFA "would affect fish." SEIS at ES-10; Opp. 30.  Although the Popper study strongly suggests that

12    fish will avoid the LFA sound source, thereby resulting in risk of harm, SEIS at 4-14, 4-15, 4-19;

13    Luczkovich Dec. ¶¶ 8, 10, 11, the Navy has tried to dodge these results, first with the specious

14    assertion that behavior "after sound exposure was no different than behavior prior to or after tests,"

15    SEIS at 4-14,[25] and now with its claim that the experiment cannot be relied upon to evaluate fish

16    behavior at all. Popper Dec. ¶¶ 34, 36, 37, 39.

17            Thus, the Navy finds itself in a bind: On the one hand, if the Popper study can be relied upon to

18    assess fish behavior, then the results clearly demonstrate avoidance, and a corresponding risk of harm

19    to fish populations. Luczkovich Dec., ¶¶ 8, 10, 11. The Navy's superficial and misleading treatment of

20    these results runs afoul of the "hard look" required by NEPA.  *Earth Island Inst. v. U.S. Forest Serv.*,

21    442 F.3d 1147, 1159 (9th Cir. 2006) (hard look should not "improperly minimize negative side

22    effects").  On the other hand, the Navy's latest claim—that the experiment could never be relied upon

23    to assess fish behavior in the first place—constitutes an admission not only that LFA effects on fish

24    behavior remain unknown, but that the Navy has never tried to find out what these effects might be.

25    As behavioral patterns are crucial to the survival of fish populations, Luczkovich Dec. ¶ 11-12, the

─────────────────────

26        [25] This brand of "before-and-after" comparison of fish behavior is misleading because it selectively
ignores the single most relevant inquiry—behavior *during* exposure. *See* Luczkovich Dec. ¶¶ 9-10.

27    Only after Plaintiffs highlighted this interpretive sleight of hand did the Navy backtrack, claiming the
Popper study was never intended to evaluate fish behavior in the first place. Popper Dec., ¶¶ 34, 36, 37,
39.  The Navy appears to have again resorted to a misleading analysis of LFA's effects on fish. *See*

28    *Evans*, 279 F. Supp. 2d at 1171 (finding Navy's treatment of LFA's effects on fish to be arbitrary and
capricious).

1   Navy has implicitly acknowledged a gaping hole in its own analysis, which accordingly warrants no

2   deference from the Court. *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1077 (9th Cir. 2003) (no

3   deference to agency methodology if agency "has completely failed" to address a factor "essential to a

4   truly informed decision.").  Therefore, the Navy has failed to adequately address what its own SEIS

5   refers to as the "critical question"—whether or not LFA "impairs the survival of fish." SEIS at 4-16.

6          The failure to adequately consider fish behavior further highlights the irrelevance of the Navy's

7   claim that since LFA is produced by a moving vessel, the results of the Popper study represent only a

8   "worst-case" outcome. Opp. 30-31; Popper Dec. ¶ 15; SEIS at ES-12, 4-16. Since the Popper study

9   yielded "immediate" behavioral effects at the "onset" of sound transmission, SEIS at 4-14 to 15;

10  Popper Dec. ¶ 37, the duration of exposure is irrelevant to the issue of behavioral impact because a few

11  seconds of exposure are all that is required for behavioral impact to occur.[26]  Moreover, even if the

12  Court were to accept the Navy's claim that the Popper study was never intended to measure behavior,

13  then any "scenario" resulting from the test must necessarily be limited to physical effects and would of

14  course be irrelevant to behavior. Indeed, the Navy never attempts to apply its "worst case" argument to

15  behavior, raising it only in the context of physical effects.  Opp. 30-31; Popper Dec. ¶ 15; SEIS at 4-16.

16         In addition to its unjustifiable conclusion that "the potential for fish or schools of fish to be

17  harmed by [LFA] is negligible," Opp. 31, the Navy further supports its decision not to extend

18  shutdown protocols to fish by citing the supposed impracticability of monitoring measures. *Id.*

19  According to the Navy, passive acoustic detection is simply "infeasible," while active acoustic

20  detection would yield too many "false alarms." *Id.*; SEIS at 2-13, 4-80, 10-118.  Yet because the Navy

21  has offered these conclusory assertions without any further support or explanation, it has violated

22  NEPA's charge to rigorously explore reasonable alternatives and devote "substantial treatment" to each

23  alternative considered. 40 C.F.R. § 1502.14.[27]  The Navy has argued that active acoustic monitoring

24  can be both infeasible due to false alarms and, at the same time, feasible enough to perceive large

25  

26  [26] In fact, because the fish tested by Dr. Popper would likely have exhibited a greater level of avoidance had they not been confined to 1-m3 test tank, Luczkovich Dec. ¶ 10, it is quite possible that, with respect to fish behavior, the Popper study represents a "best case" scenario.

27  [27] On page 2-13 of the SEIS, the Navy appears to promise further analysis of its reasons for rejecting these monitoring measures in subchapter 4.1.1.6. However that subchapter offers no additional discussion.

28

1    schools of fish that are indistinguishable from marine mammals. Opp. 31. Thus, one is left to wonder

2    whether the Navy has chosen to ignore fish impacts because it can adequately monitor those impacts or

3    because it cannot.  Either way, its failure to consider and respond to the potential effects of LFA on fish

4    cannot be reconciled with NEPA.

5          **3.    The SEIS Fails to Address or Inappropriately Rejects Reasonable
                Mitigation Measures.**

6          For the same reasons discussed with respect to the MMPA (*supra* at I.A.1.a.), Defendants have

7    failed to show that the Navy adequately considered feasible mitigation in its SEIS to reduce the impacts

8    of LFA.  Defendants' only response to the SEIS defects that Plaintiffs identified, Mot. 23, is to restate

9    the limited mitigation the Navy did adopt and to assert that additional analysis in the LOA process will

10   be sufficient.  Opp. 32.  Neither reply justifies its inadequate NEPA analysis.  *E.g.*, *Idaho Sporting*

11   *Congress v. Thomas*, 137 F.3d 1146, 1151 (9th Cir. 1998); *see also supra* at I.B.1.

12         Nor can Defendants justify the Navy's inadequate consideration of monitoring measures.

13   Contrary to the assertion that Plaintiffs failed to raise the issue of underwater passive gliders during the

14   comment process, Opp. 32, Plaintiffs in fact urged the Navy to introduce additional forms of acoustic

15   monitoring—a category that includes gliders.  Ex. 6 at 41 (urging use of "acoustic monitoring using the

16   Navy's existing acoustic nodes and other external platforms").  The Navy's failure to consider this

17   monitoring method is ripe for review.  *See Idaho Conservation League v. Mumma*, 956 F.2d 1508,

18   1521 (9th Cir. 1992) (plaintiffs adequately proposed NEPA alternative despite not elucidating all

19   details).  Finally, as discussed above (*supra* at I.A.1.c), Defendants' sweeping rejection of aerial

20   surveys, Opp. 32-33, continues to ignore circumstances in which they may be safe and practicable.[28]

21         **4.    The SEIS Fails to Adequately Consider All Individual and
                Cumulative Impacts of LFA.**

22

23         Defendants incorrectly suggest that by "thoroughly analyzing the potential for 'bubble

24   growth,'" the Navy fully addressed the potential for internal injury in beaked whales at sea.  Opp. 33.

25   The Navy's analysis of bubble growth is hardly adequate; but even assuming it were, the SEIS fails to

26   consider the clear evidence that whales are being severely injured at sea, regardless of the mechanism.

27   _____

28   [28] Further, Defendants now assert for the first time that even if aerial surveys by civilian craft were
     otherwise practicable, they would be infeasible "for national security reasons."  Opp. 33.  This *post hoc*
                                                        *[Footnote continued on following page.]*

1   *See* Mot. 25; Ex. 43 at 182.  In its defense, the Navy cites the SEIS' conclusion that no injuries due to

2   rapid surfacing or diving would occur "because no such behavior had been witnessed during the

3   Navy's LFS SRP."  Opp. 34.  But this conclusion ignores the obvious fact that, despite concerns raised

4   by scientists at the time, the SRP did not study beaked whales.  FEIS at 4.2-27 to 28; *see also* Exs. 87

5   at 142, 146, 151; 81 at 239-41 (difficulty of detecting beaked whales, let alone injuries to same).  This

6   unwarranted dismissal of any risk of severe injuries and mortalities is particularly disturbing given that

7   LFA may be used close to choke points, heightening the risk of harm.  SEIS at 2-7.

8       Nor does the SEIS's analysis of cumulative impacts comply with NEPA.  Defendants' rationale

9   for failing to consider cumulative impacts on a regional or local scale—which is precisely how

10  populations and individual animals would be affected—is at odds with their own SEIS.  Opp. 34-35.

11  Fundamentally, the Navy's global approach ignores the operational realities of its system: deployment

12  in the same regions year after year, apparent re-use of the same locations, and a "racetrack pattern" of

13  movement.  SEIS at 4-41 to 51; Supp. Ex. 5 at 47-56; Johnson Dec. ¶ 11. The Navy's "risk continuum"

14  takes none of this into account.  Furthermore, its attempt to characterize that continuum as comprising

15  a small area of impact "relatively close" to the LFA source, Opp. 34, fails on simple comparison with

16  the continuum itself.  FEIS at 4.2-24, 4.2-32 to 33; Ex. 12 (predicting impacts at received levels as low

17  as 119 decibels, which can occur hundreds of miles away).  The Navy's failure to consider regional

18  impacts on continually revisited areas such as the Sea of Japan or North Philippine Sea—impacts that

19  are buried in the Navy's global analysis—is indefensible.[29]  *See* SEIS at 4-41 (mission sites).

20       **C.      Plaintiffs are Likely to Succeed on their ESA Claims.**

21           **1.      Defendants' Biological Opinions Are Arbitrary and Capricious.**

22       Many of NMFS's required findings in the Biological Opinions ("BiOps") cannot be supported

23  by the record.  Plaintiffs point out the specific ways in which those BiOps are defective in their

24

25  ────────────────────────────────────────────
    rationale appears nowhere in the SEIS and was not subject to review and scrutiny in the NEPA process;
    nor, in any case, would it apply to military aircraft.
26      [29] In addition, the SEIS's narrow definition of synergistic impacts prevented any meaningful
    analysis of the complicating effect of different sound sources in the same sound fields.  *See* Mot. 25
27  n.22.  Defendants' response—that the definition does not affect the cumulative impacts analysis—is a
    *non-sequitur*.  Opp. 35 n.11.  Synergistic impacts and cumulative impacts are two different things, and
28  the SEIS failed to adequately consider either one.

1  Opening Brief, and Defendants do not rebut these points in their Opposition.[30] Mot. 27; Opp. 35.

2  **2.  Defendants' Incidental Take Statements Are Inadequate.[31]**

3  **a.  The ITSs Do Not Set Forth Numerical Values for Estimated Incidental Takes and Fail to Establish That No Numerical Value Could Practically Be Obtained.**

4

5  An ITS must state the impact of any expected take and set forth a specific number when

6  possible.  16 U.S.C. § 1536(b)(4); *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife* ("*ACG*"),

7  273 F.3d 1229, 1250 (9th Cir. 2001).  In "situations in which impact could not be contemplated in

8  terms of a precise number," NMFS must establish that "no such numerical value could be practically

9  obtained."  *Id.*  NMFS failed to do so here.  The issued ITSs neither provide numerical values, nor

10  establish that such values could not practically be obtained.

11  NMFS contends that it cannot—in any location where LFA operates—estimate take for listed

12  sea turtles, Atlantic salmon, or Pacific salmon because such estimates are "impossible to produce with

13  current levels of knowledge," and there are too many factors to consider.  Ex. 16 at 3-4.  Not true.  The

14  BiOps state that it is difficult to estimate takes for sea turtles because they are migratory species with

15  patchy distributions.[32]  But the BiOp then refers to estimates made for sea turtles when calculating

16  takes in domestic fisheries—demonstrating that at least some calculations are possible.  Defs' Ex. 5 at

17  138.  Indeed, NMFS has been making these calculations for years.[33]  The Programmatic BiOp's

18  _____

19  [30] For example, the BiOps assert that taking of listed species will be limited to "harassment" and, for many species including sea turtles and salmon, simply assumes harassment will not cause jeopardy, without analyzing whether such impacts would affect breeding, migration, or other vital functions. This does not satisfy NMFS's burden. *See United States v. James*, 478 U.S. 597, 604-06 (1986).

20  [31] Defendants incorrectly argue they are not obligated to issue an ITS for a programmatic BiOp. Opp. 37 n.12. ESA states that, "after consultation," NMFS "shall provide" an ITS where: (a) the agency action under review will not jeopardize the continued existence of listed species or result in adverse modification of critical habitat; (b) the incidental taking of listed species will not result in jeopardy or adverse modification; and (c) the taking is "authorized pursuant to [the MMPA]."  16 U.S.C. § 1536(b)(4).  All three conditions are met here.  Further, an ITS is required where, as here, there is a "reasonable certainty" take will occur if the agency action is carried out.  *ACG*, 273 F.3d at 1243.  NMFS must issue an ITS with the programmatic BiOp, and may not use its intent to issue future ITSs to avoid its current obligation.

21
22
23
24

24  [32] This very argument was rejected as inadequate by a court examining an ITS for the desert tortoise.  *Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115, 1137-39 (N.D. Cal. 2006).

25  [33] There are many studies of, and even ITSs for, sea turtles.  *See, e.g.*, 67 Fed. Reg. 40234. NMFS has also used observed sea turtle interactions with fishing gear as a proxy for turtle presence.  *See* 67 Fed. Reg. 40232-38. Similarly, NMFS has adopted seasonal area closures to protect leatherback and loggerhead sea turtles, based on both observed interactions and satellite tagging data.  *See* 66 Fed. Reg. 44550; Supp. Ex. 6 at 38 (stating that "Navy's analyses concluded that the possible number of times a leatherback sea turtle could be in the vicinity of a SURTASS LFA vessel would be less than three out of 18,000 animals per year per vessel . . . this probability could increase if SURTASS LFA vessels were deployed in tropical and subtropical regions").

26
27
28

1    discussion of salmon similarly contradicts NMFS's assertion that take estimations are "impossible," as

2    the BiOp presents even greater detail and data for salmon than for sea turtles.[34]  Defendants also argue

3    it is too difficult to estimate salmon takes because listed and non-listed salmon species co-occur.  Yet

4    NMFS's own guidance documents contemplate such listed/non-listed species co-occurrences and

5    recommend using the non-listed species to estimate impacts on the listed species.  Supp. Ex. 4 at 4-47.

6         Finally, Defendants' fare no better in the argument of impossibility due to the large amount or

7    complexity of available information.  The language in *ACG* regarding the practicability of assessing

8    incidental take contemplated a situation with *inadequate* information, 273 F.3d at 1245-50, not a

9    situation where NMFS has the necessary information but calculations are arduous.  To hold otherwise

10   would set a dangerous precedent whereby large-scale projects threatening the broadest impacts would

11   escape the scrutiny required by the ESA.

**b.    The ITS Does Not Set Forth an Adequate Surrogate for Numerical Values as Required by the Ninth Circuit.**

13        Where it legitimately is not possible to provide a numerical value, an ITS can use a surrogate.

14   Assuming *arguendo* that Defendants had established impossibility here, the ITSs would still be

15   inadequate because they have not provided a proper surrogate.  *ACG* explains that "the use of

16   ecological conditions as a surrogate for defining the amount or extent of incidental take is reasonable

17   so long as these conditions are linked to the take of the protected species." 273 F.3d at 1250.  In the

18   programmatic ITS, instead of setting forth a surrogate based on ecological conditions, NMFS limits

19   acceptable take to "harassment."[35]  Because "take" encompasses harassment, limiting take to

20   harassment means only that the Navy will take listed species.  This is plainly inadequate, as it fails to

21   set forth the projected impact as required.  16 U.S.C. §§ 1532(19), 1536 (b)(4); 50 C.F.R. § 402.14(i).

22        Moreover, even if "harassment" were an acceptable surrogate, which it is not, the ITSs would

23   be inadequate because the Navy fails to ensure takes are *limited* to harassment.  The ITSs require the

24   Navy to monitor LFA's effect on listed species, and where its use causes injury or death, the Navy

---

[34] It defines the range for Atlantic salmon, explaining specifically that they risk LFA exposure off Newfoundland and in the southern Labrador Sea, and gives details on Pacific salmon.  Def. Ex. at 140.

[35] The ITS accompanying the Supplemental BiOp also limits take to a 2 km radius from the sonar vessel.  This Court previously rejected Defendants' use of a 2 km mitigation zone as a surrogate.  279 F. Supp. 2d at 1187 (criticizing Defendants' failure "to link changes in environmental conditions to the taking of endangered species").

1    must reinitiate consultation. Ex. 16 at 5; Def. Ex. 7 at 68; Opp. 37. But the Navy only plans to conduct

2    monitoring exercises before and during LFA transmissions; without adequate test monitoring, the Navy

3    cannot establish that the impact on listed species will not include other forms of take. Defs' Ex. 5 at 5.

4          In sum, the ITSs for LFA deployment are inadequate because they do not include numerical

5    values for take. They do not establish it is impractical to provide numbers, nor they offer adequate

6    surrogates for estimating take. Instead, the ITSs state the Navy will take by harassment, and they then

7    fail to ensure even that limitation will be met.

8    **II.     LFA IS LIKELY TO CAUSE IRREPARABLE INJURY.**

9          Plaintiffs have established that deployment of LFA threatens to take great numbers of marine

10   mammals and disrupt the global marine environment. Plaintiffs also have demonstrated that

11   Defendants violated the MMPA, NEPA, and ESA when they issued their Final Rule, SEIS, Biological

12   Opinions, ITS, and LOA. Whether the Court applies the likelihood of success and risk of irreparable

13   harm standard, or the serious questions and favorable balance of harms standard, the same outcome is

14   warranted—a narrowly tailored injunction restricting the deployment of LFA, similar to the one under

15   which the Navy has been operating for the past five years.

16         As a threshold matter, Defendants' brief improperly raises the standard for a preliminary

17   injunction, contending that Plaintiffs must show "they *will* suffer irreparable injury" absent injunctive

18   relief. Opp. 37 (emphasis added). In fact, the governing standard requires only that Plaintiffs

19   demonstrate a "*possibility*" of irreparable harm, not certainty. *See, e.g.*, *Earth Island*, 442 F.3d at 1159

20   (holding that district court applied improper legal standard in requiring "significant threat" or "concrete

21   probability" of irreparable harm). That standard has clearly been met in this case. Mot. 27-29.

22         Next, Defendants baldly assert that because harassment of marine mammals is "permissible

23   under the MMPA and ESA subject to appropriate conditions," "such harassment cannot be presumed to

24   constitute irreparable injury." Opp. 37. The law is to the contrary. *See, e.g.*, *Nat'l Parks &*

25   *Conservation Ass'n v. Babbitt*, 241 F.3d 722, 732 (9th Cir. 2001); *Nat'l Audubon Soc'y v. Butler*, 160

26   F. Supp. 2d 1180, 1191 (W.D. Wash. 2001). Indeed, this Court itself found in *Evans* that "[w]hile

27   defendants argue that harassment cannot be presumed to constitute irreparable injury because it is

28   permissible under the MMPA subject to appropriate conditions, these conditions have not been met . . . .

1  In enacting the MMPA, Congress clearly expressed its concern about the harm caused by harassment

2  of marine mammals."  279 F. Supp. 2d at 1188.  Here, again, the "appropriate conditions" under which

3  take in the form of harassment is legally permissible have not been met, and such harassment is

4  sufficient to support a finding of irreparable injury.

5       There is no merit to Defendants' contention that "Plaintiffs do not provide any credible

6  evidence to support their allegations that SURTASS LFA can 'kill, injure, harass, and disturb virtually

7  all forms of marine life . . .' or that the '[d]eployment of LFA threatens to take great numbers of marine

8  mammals and to injure the entire marine environment.'"  Opp. 37-38.  Plaintiffs, in fact, have

9  established in both their Motion and supporting declarations a strong factual basis for their concern that

10 LFA creates a significant risk of irreparable harm from harassment, injury, and even death.  *See, e.g.*,

11 Balcom Dec. ¶ 14 (beaked whale expert, concludes that "deployment of the LFA system in the North

12 Pacific creates a substantial risk of injury, strandings, and habitat displacement in species already

13 known to be vulnerable to sudden and severe acoustic impacts"); Calambokidis Dec. ¶ 10 (expert on

14 baleen whales, concludes that "LFA presents a substantial risk of imminent harm to marine mammals,

15 including endangered populations of humpback and blue whales"); Luczkovich Dec. ¶ 13 (expert in fish

16 behavior and ecology, concludes that "without substantial mitigation measures . . . LFA exercises pose

17 a significant threat to these populations by, at a minimum, interfering with critical behavioral

18 patterns"); Soto Dec. ¶ 14 (beaked whale expert, concludes that evidence over past 5 years "increases

19 concern about the potential for [LFA] to impact beaked whales"); Wang Dec. ¶ 11 (expert on Western

20 Pacific marine mammals, concludes that "LFA exercises pose a significant threat to cetacean

21 populations in the region"); Whitehead Dec. ¶ 5 (expert in population ecology, concludes that "LFA is

22 likely to have adverse impacts on marine mammals at a population scale").

23       Defendants deny the existence of any evidence that LFA may cause injury and mortality.  Opp.

24 38.  In fact, the best evidence since 2002—contrary to Defendants' claims then—indicates that the

25 injuries associated with a far more widely-used sonar system are severe, are occurring at sea (apart

26 from stranding), and are likely to go undetected.  *E.g.*, Ex. 31 at 448-54 (published study); Ex. 43

27 at 182 (MMC expert panel); Ex. 87 at 142, 146, 151 (NMFS stock assessments).  Defendants'

28 assumptions about beaked whale hearing are belied by studies that show they and other acoustically

1  sensitive species react strongly to sounds well outside their best hearing range. *E.g.*, Exs. 58; Soto

2  ¶ 10; *see also supra* at IA3. Defendants have not yet conducted their long-deferred research on the

3  impacts of LFA on beaked whales; but, as Plaintiffs' experts have noted, the science since 2002

4  increases concerns, not diminishes them. Soto Dec. ¶ 14; Bain Dec. ¶¶ 7-19. Further, the Navy's

5  monitoring is insufficient to prevent injury even from the direct tissue damage that Defendants

6  acknowledge. Baird Dec. ¶¶ 6-13; Ex. 81 at 239-41; *see also* 279 F. Supp. 2d at 1160.

7        Defendants have failed to present any new information or modeling that would warrant a

8  change in the Court's prior conclusion on irreparable harm. Their own estimates, including the Navy's

9  "post-operational" estimates, allow annual taking of as much as 12% of any species or stock—hardly a

10  trivial (Opp. 38) impact.[36] *See* 72 Fed. Reg. at 46886; *see also Idaho Watersheds Project v. Hahn*,

11  307 F.3d 815, 833 (9th Cir. 2002) (affirming findings of irreparable harm and finding Bureau of Land

12  Management's "own studies, entered into the record before the district court, document environmental

13  harm caused by cattle grazing without adequate protective measures"). The risk to populations only

14  increases given LFA's repeated use in the same regions and, apparently, in the same areas, as well as

15  increasing evidence of population structure in marine mammals. SEIS at 4-41 to 51; Supp. Ex. 5 at 47-

16  56; Johnson Dec. ¶ 11; Bain Dec. ¶ 7; Whitehead ¶ 9; Exs. 84-86.

17        Accordingly, based in part on Defendants' *own modeling*, and, as this Court recognized in

18  2003, irreparable harm is unquestionably possible and, indeed, is likely. *See* 232 F.Supp.2d at 1053

19  (Plaintiffs "have shown the possibility, indeed probability, of irreparable injury, particularly under the

20  liberal standard applicable under these statutes. It is undisputed that marine mammals, many of whom

21  depend on sensitive hearing for essential activities like finding food and mates and avoiding predators,

22  and some of whom are endangered species, will at a minimum be harassed by the extremely loud and

23  far traveling LFA sonar."). Even if, as Defendants contend, the underlying record has changed in some

24  respects, the legal standard applied by the Court, and the harmful impacts of LFA on marine mammals,

25  have not. Therefore, the sound reasoning and logic employed by the Court in issuing a preliminary

26  injunction in the previous litigation applies equally and mandates the same outcome here.

27

28  [36] As this Court recognized, the harassment of 12% of a small population of marine mammals could
affect the reproduction or survival of the population. 279 F. Supp. 2d at 1159; *see also* Vorontsova
Dec. ¶¶ 11–12, Ex. 62; Wang Dec. ¶¶ 5–8.

1    **III.    THE BALANCE OF HARMS TIPS IN PLAINTIFFS' FAVOR.**

2    In *Evans*, this Court held that the balance of harms on virtually identical facts tipped in favor of

3    Plaintiffs, and issued an injunction tailoring the Navy's use of LFA for training and testing purposes.

4    Among the harms posed by Defendants' LFA plan are exposure of 75% of the world's oceans to

5    harmful sound waves with virtually no exclusion areas, with take of up to 12% of each marine species,

6    and no protection for the world's most important and fragile marine resources. *See* Hoyt Dec. ¶ 5. The

7    breadth and the severity of the potential harm are great and—for some species—potentially

8    devastating. As this Court previously recognized, there is a compelling public interest in species and

9    ecosystem protection "not only to the American public but to the international community, and not

10   only to present generations but to future generations." *Evans*, 279 F. Supp. 2d at 1190 ("Stewardship

11   of the world's precious oceans and the marine life within them is undoubtedly of utmost importance.").

12   Defendants' attempt to couch this case in terms of whales versus national security misstates the

13   nature of the preliminary injunction. Plaintiffs seek only to maintain the status quo by keeping in place

14   an injunction that does not prohibit LFA, but restricts the Navy's use of LFA during training and

15   testing exercises. The Navy has been using LFA under the same terms sought here for over five years.

16   Military preparedness will not materially suffer, and the injunction will not force a "hiatus" in LFA

17   deployment as Defendants contend. Bird Classified Dec. § VII. The Navy's wish to train in coastal

18   waters, *Id.* § VI, is not a basis for seeking a blanket allowance to use LFA in *all* coastal waters and

19   without meaningful mitigation measures. An injunction requiring protection is in the public interest

20   and should be granted. *Winter*, 2007 WL 3377229 at *1 (preliminary injunction is proper because "the

21   public interest would be advanced by an injunction that required adequate mitigation measures").

22   **CONCLUSION**

23   Plaintiffs respectfully request that Defendants be preliminarily enjoined during the pendency of

24   this action so as to limit their use of LFA to terms and mitigation substantially similar to those to which

25   they have already stipulated.

26   Dated:  November 30, 2007          MORRISON & FOERSTER LLP
                                        NATURAL RESOURCES DEFENSE COUNCIL, INC.

27
                                        By:_____/s/ Robin S. Stafford_____
28                                             Robin S. Stafford
                                        MORRISON & FOERSTER LLP
                                        Attorneys for Plaintiffs