

**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, Maryland 20910

THE DIRECTOR

AUG 14 2007

| | |
|---|---|
| MEMORANDUM FOR: | Rodney F. Weiher, Ph.D.<br>NOAA NEPA Coordinator |
| FROM: | William T. Hogarth<br>Assistant Administrator |
| SUBJECT: | Adoption of the Department of the Navy's Final Supplemental Environmental Impact Statement (SEIS) on *Surveillance Towed Array Sensory System Low Frequency Active (SURTASS LFA) Sonar*—DECISION MEMORANDUM |

Based on the subject supplemental environmental impact statement (SEIS), I have determined that the impacts evaluated by the Department of the Navy are substantially the same as the impacts of NOAA's proposed action to issue regulations to govern the unintentional takings of marine mammals incidental to Navy operation of the Surveillance Towed Array Sensor System (SURTASS) Low Frequency Active (LFA) sonar. The EIS includes all required components for adoption by NOAA (NOAA Guidance on Adopting National Environmental Policy Act Documents Prepared by Other Federal Agencies, 2003). I have determined that it is not necessary to prepare a separate Environmental Assessment or SEIS to issue regulations to govern the unintentional takings of marine mammals incidental to Navy operation of the SURTASS LFA sonar and that adoption of the Department of the Navy's SEIS is appropriate.

I request your concurrence in this determination by signing below. Please return this memorandum for our files.

1. I concur. _____  8/14/07
                                                                                              Date

2. I do not concur. _____
                                                                                              Date

Attachments





UNITED STATES DEPARTMENT OF COMMERCE
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, Maryland 20910

THE DIRECTOR

AUG 14 2007

| | |
|---|---|
| Memorandum To: | The Record |
| From: | William T. Hogarth |
| Subject: | Adoption of the Final Supplemental Environmental Impact Statement for Surveillance Towed Array Sensor System Low Frequency Active (SURTASS LFA) Sonar |

**Background**

NOAA's Proposed Action
NOAA is issuing regulations and Letters of Authorizations (LOAs) to the Department of the Navy to govern the unintentional takings of marine mammals incidental to Navy operation of the Surveillance Towed Array Sensor System (SURTASS) Low Frequency Active (LFA) Sonar. The issuance of regulations are required by the Marine Mammal Protection Act (MMPA).

Section 101(a)(5)(A) of the Marine Mammal Protection Act (16 U.S.C. 1361 et seq.)(MMPA) directs the Secretary of Commerce (Secretary) to allow, upon request, the incidental, but not intentional taking of marine mammals by U.S. citizens who engage in a military readiness activity if certain findings are made and regulations are issued. An authorization may be granted for periods of 5 years or less if the Secretary finds that the total taking will have a negligible impact on the affected species or stock(s), will not have an unmitigable adverse impact on the availability of the species or stock(s) for certain subsistence uses. The Secretary must also issue regulations setting forth the permissible methods of taking and other means of effecting the least practicable adverse impact, including a consideration of personnel safety, the practicality of implementation of any mitigation, and the impact on the effectiveness of the subject military readiness activity, and the requirements pertaining to the monitoring and reporting of such taking. NMFS authorizes the incidental take through LOAs (50 CFR 216.106).

NMFS has defined "negligible impact" in 50 CFR 216.103 as "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." For the purposes of "military readiness activities" harassment is defined as: (i) any act that injures or has the significant potential to injure a marine mammal or marine mammal stock in the wild [Level A harassment]; or (ii) any act that disturbs or is likely to disturb a marine mammal or marine mammal stock in the wild by causing disruption of natural behavioral patterns, including, but not limited to, migration,

EXHIBIT B
2
THE ASSISTANT ADMINISTRATOR
FOR FISHERIES




surfacing, nursing, breeding, feeding, or sheltering, to a point where such behavioral patterns are abandoned or significantly altered [Level B harassment].

The Department of the Navy's Proposed Action
On May 12, 2006, NMFS received an application from the Navy requesting an authorization under section 101(a)(5)(A) of the MMPA for the taking of marine mammals incidental to deploying the SURTASS LFA sonar system for military readiness activities to include training, testing and routine military operations within the world's oceans (except for Arctic and Antarctic waters, coastal regions as specified in this rule, and offshore biologically important areas (OBIAs)) for a period of time not to exceed 5 years.

The Navy is proposing the employment of up to four SURTASS LFA sonar systems in the oceanic areas of the Pacific, Atlantic, and Indian oceans and the Mediterranean Sea. The Navy's primary mission is to maintain, equip, and operate combat-ready naval forces capable of winning wars, deterring aggression and maintaining freedom of the seas. The Secretary of the Navy and Chief of Naval Operations (CNO) have continually validated that antisubmarine warfare is a critical part of that mission—a mission that requires unfettered access to both the high seas and the littorals. In order to be prepared for all potential threats, the Navy must not only continue to test and train in the open ocean, but also in littoral environments.

The purpose of SURTASS LFA sonar is to provide the Navy with a reliable and dependable system for long-range detection of quieter, harder-to-find submarines. Low-frequency (LF) sound travels in seawater for greater distances than higher frequency sound used by most other active sonars. According to the Navy, the SURTASS LFA sonar system would meet the Navy's need for improved detection and tracking of new-generation submarines at a longer range. This would maximize the opportunity for U.S. armed forces to safely react to, and defend against, potential submarine threats while remaining a safe distance beyond a submarine's effective weapons range.

In response to the requirements of Federal laws, the Navy prepared a Final Supplemental Impact Statement (SEIS) pursuant to:

- Presidential Executive Order (EO) 12114 (Environmental Effects Abroad of Major Federal Actions); and
- National Environmental Policy Act of 1969 (NEPA).

The preparation of the Final SEIS enables informed and balanced decision-making regarding the environment and assures public participation. In addition, the Final SEIS process is coordinated with the requirements of the MMPA and the Endangered Species Act (ESA). The Navy was the lead agency for this action and NOAA acted as the cooperating agency. Cooperating agencies have jurisdiction by law or special expertise with respect to certain environmental impacts from a proposed action by another agency. The provisions of EO 12114 apply to major Federal actions that may affect the marine environment occurring beyond 22 km (12 nm) from the U.S. shore, in global commons,

or within the territory of a non-participating foreign government. The provisions of NEPA apply to major federal actions that may affect the human and natural environment of the U.S. and within 22 km (12 nm) from shore.

Comparison of the Proposed Actions
The Navy requested regulations to govern the unintentional takings of marine mammals incidental to Navy operation of SURTASS LFA sonar under the MMPA and prepared the Final SEIS to analyze the impacts from the proposed action. NOAA is issuing regulations for this action and, as the cooperating agency, is adopting the Final SEIS. The issuance of regulations in itself is a major federal action which requires and EIS under NEPA.

NMFS fully participated in the development of the Final SEIS. NOAA-NMFS and NOAA-National Ocean Service (NOS) provided comments in the Final SEIS. NOAA provided specific comments for inclusion in future environmental analyses on OBIAs, invertebrates, fish, and marine mammals. Further, NOAA stated:

> The National Oceanic and Atmospheric Administration (NOAA) has reviewed the Final Supplemental Impact Statement (FSEIS) for the Surveillance Towed Array Sensor System Low Frequency Active (SURTASS LFA) Sonar. NOAA acknowledges the Navy's need to deploy SURTASS LFA sonar systems on oceanic areas while minimizing the environmental effects of these activities. In order to assist the Navy in completing its environmental review of this project, NOAA provides the following comments for consideration by the Department of the Navy.
>
> NOAA supports the preferred alternative which incorporates the protections for national marine sanctuary resources developed in the course of consultation pursuant to section 304(d) of the National Marine Sanctuaries Act (16 U.S.C. 1434(d)). This consultation concluded with a commitment by the Navy to ensure this system is operated in a manner that minimizes the potential for the system to injure sanctuary resources.

The Final SEIS fully analyzes the effects of the Navy's action on the marine environment and, through NOAA's adoption, satisfies the NEPA requirements for the issuance of regulations for the Navy's actions under the MMPA.

**Alternatives and Impact Assessment**

Summary of Alternatives
NEPA requires federal agencies to prepare an EIS that discusses the environmental effects of a reasonable range of alternatives (including the No Action Alternative). Reasonable alternatives are those that will accomplish the purpose and meet the need of the proposed action, and those that are practical and feasible from a technical and economic standpoint. However, the lead agency is not required to engage in speculation

or contemplation about possible future plans that could influence the EIS's analysis of potential direct and indirect effects at some nebulous point in the future.

The 2001 Final EIS considered three alternatives: the No Action alternative, Alternative 1 (employment with geographic restrictions and monitoring mitigation), and Alternative 2 (unrestricted operation). Alternative 1 was the Navy's preferred alternative. Additionally, the Final EIS considered but rejected other alternatives (other technologies), which is discussed later in this memorandum. The alternatives in the Final SEIS were intended to address NEPA deficiencies identified in the District Court's August 26, 2003 opinion, as well as fulfill the Navy's responsibilities under NEPA with regard to changes in the proposed action.

In addition to the No Action Alternative, the Final SEIS provided analyses of four alternatives. The analyses of these five alternatives are intended to fulfill the Navy's responsibilities under NEPA with regard to changes in the proposed action. Among other things, the Final SEIS considers mitigation measures including coastal standoff restrictions of 22 and 46 km (12 and 25 nm), seasonal restrictions, the designation of additional OBIAs[1], and shutdown procedures for schools of fish. The five alternatives considered in the SEIS are as follows:

- No Action Alternative;
- Alternative 1—Same as the FOEIS/EIS Preferred Alternative;
- Alternative 2 (Preferred Alternative)—Alternative 1 with additional OBIAs;
- Alternative 3—Alternative 1 with extended coastal standoff distance to 46 km (25 nm); and
- Alternative 4—Alternative 1 with additional OBIAs, extended coastal standoff distance to 46 km (25 nm), and shutdown procedures for schools of fish.

## No Action Alternative

Under this alternative, operational deployment of the active component (LFA) of SURTASS LFA sonar will not occur. Under this alternative, the Navy's ability to locate and defend against enemy submarines would be greatly impaired. The lack of a long-range submarine detection capability would make it possible for potentially hostile submarines to clandestinely place themselves into position to threaten U.S. Fleet units and land-based targets. Without this long-range surveillance capability, the reaction times to submarines would be greatly reduced and the effectiveness of close-in, tactical systems to neutralize threats would be seriously, if not fatally, compromised. The purpose for ASW is to improve U.S. detection of quieter and harder-to-find submarines at long range. The No Action alternative would not fulfill this purpose.

---

[1] As defined in the SURTASS LFA Sonar FOEIS/EIS Subchapter 2.3.2.1, offshore biologically important areas, or OBIAs, are defined as those areas of the world's oceans outside of the geographic stand off distance of a coastline where marine animals of concern (those animals listed under the ESA and/or marine mammals) congregate in high densities to carry out biologically important activities. These areas include migration corridors; breeding and calving grounds; and feeding grounds.

Table 1. SURTASS LFA Sonar System Alternatives Matrix

| Proposed Restrictions/ Monitoring | No Action Alternative | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 |
|---|---|---|---|---|---|
| Dive Sites | NA | 145 dB | 145 dB | 145 dB | 145 dB |
| Coastline Restrictions | NA | <180 dB at 12 nm | <180 dB at 12 nm | <180 dB at 25 nm | <180 dB at 25 nm |
| Seasonal Variations | NA | Yes | Yes | Yes | Yes |
| Original OBIAs | NA | Yes | Yes | Yes [1] | Yes [1] |
| Additional OBIAs | NA | No | Yes | No | Yes [1] |
| Shutdown Procedures for Schools of Fish | NA | No | No | No | Yes |
| Visual Monitoring | NA | Yes | Yes | Yes | Yes |
| Passive Acoustic Monitoring | NA | Yes | Yes | Yes | Yes |
| Active Acoustic Monitoring | NA | Yes | Yes | Yes | Yes |
| Reporting | NA | Yes | Yes | Yes | Yes |

Note: 1. Only those OBIAs, or portion thereof, that are outside of coastal standoff distance.

## Alternative 1

This alternative proposes the employment of SURTASS LFA sonar technology with geographical restrictions to include maintaining sound pressure level below 180 dB within 22 km (12 nm) of any coastline and within the originally designated OBIAs (see Table 2.3 of the Navy's Final EIS, January 2001, and LOAs, as issued) that are outside of 22 km (12 nm). Restrictions for OBIAs are year-round or seasonal, as dictated by marine animal abundances. LFA sound fields will not exceed 145 dB within known recreational and commercial dive sites. Monitoring mitigation includes visual, passive acoustic, and active acoustic (HF/M3 sonar) to prevent injury to marine animals when employing SURTASS LFA sonar by providing methods to detect these animals within the 180-dB LFA mitigation zone.

## Alternative 2 (The Preferred Alternative)

Alternative 2 is the Navy's preferred alternative. This alternative is the same as Alternative 1, but with additional OBIAs, including seasonal restrictions, as listed in Table 2 lists seven additional OBIAs based on consultation with the NOAA's Office of National Marine Sanctuaries and Presidential EO 13178.

## Alternative 3

Alternative 3 is the same as Alternative 1, but with a greater coastal standoff distance. This alternative proposes the employment of SURTASS LFA sonar technology with geographical restrictions to include maintaining sound pressure level to below 180 dB within 46 km (25 nm) of any coastline and within designated OBIAs that are outside of 46 km (25 nm).

6

## Alternative 4

Alternative 4 is the same as Alternative 1, but with additional OBIAs, extended coastal standoff distance to 46 km (25 nm), and shutdown procedures for fish.

Table 2. Offshore Biologically Important Areas

| Area Number | Name of Area | Location of Area | Months of Importance |
|---|---|---|---|
| 1 | 200 m isobath of North American East Coast[1] | From 28°N to 50°N west of 40°W | Year Round |
| 2 | Costa Rica Dome | Centered at 9°N and 88°W | Year Round |
| 3 | Antarctic Convergence Zone | 30°E to 80°E: 45°S. 80°E to 150°E: 55°S 150°E to 50°W: 60°S 50°W to 30°E: 50°S | October through March |
| 4 | Hawaiian Island Humpback Whale NMS—Penguin Bank[2] | Centered at 21°N and 157° 30''W | November 1 through May 1 |
| 5 | Cordell Bank NMS[2] | Boundaries IAW 15 CFR 922.110 | Year Round |
| 6 | Gulf of the Farallones NMS[2] | Boundaries IAW 15 CFR 922.80 | Year Round |
| 7 | Monterey Bay NMS[2] | Boundaries IAW 15 CFR 922.130 | Year Round |
| 8 | Olympic Coast NMS[2] | Within 23 nm of coast from 47°07'N to 48°30'N latitude | December, January, March and May |
| 9 | Flower Garden Banks (NMS)[2] | Boundaries IAW 15 CFR 922.120 | Year Round |

Note: 1. OBIA boundaries encompass Northern Right Whale Critical Habitat, Stellwagen Bank NMS, Monitor NMS, and Gray's Reef NMS.
2. Office of National Marine Sanctuaries, National Ocean Service, NOAA, letter dated 15 May 2001.

<u>Alternatives Considered But Rejected</u>
The Navy's 2001 Final EIS, which is incorporated by reference into the Final SEIS, considered alternatives to using LFA, such as other passive acoustic and non-acoustic technologies. These were also addressed in the NMFS Final Rule and the ROD (67 FR 48152). These alternatives were eliminated from detailed study in the Final EIS in accordance with CEQ Regulation §1502.14 (a). The additional alternatives considered alternative detection methods, including radar, laser, magnetic, infrared, electronic, electric, hydrodynamic, and biological technologies, and high- or mid-frequency sonar. It was concluded in the Final EIS that these technologies did not meet the purpose and need of the proposed action to provide Naval forces with reliable long-range detection and, thus, did not provide adequate reaction time to counter potential threats. Furthermore,

they were not considered to be practical and/or feasible for technical and economic reasons. Therefore, they were not considered further as alternatives.

Environmental Consequences
Since the Navy is using a low frequency sonar, the environmental consequences primarily concern affected species. Impacts on invertebrates, fish (including sharks), sea turtles, and marine mammals were evaluated for effects on non-auditory injury, permanent loss of hearing, temporary loss of hearing, behavioral change, and masking. Particular attention was given to potential controversial effects including acoustically mediated bubble growth (a form a decompression sickness) and strandings of marine mammals. The Final SEIS also discussed impacts on socioeconomics, including commercial and recreational fisheries, recreational activities such as swimming, snorkeling, recreational diving, and whale watching, research and exploration activities such as oceanographic research and oil and gas production, and it examined impacts on coastal zone management. Due to the high level of controversy, the Final SEIS thoroughly discussed cumulative impacts, focusing on anthropogenic oceanic noise. Impacts were examined in conjunction with other (multiple) SURTASS LFA vessels, commercial shipping, oil and gas industry, and other military and commercial sonars. Cumulative impacts due to injury and lethal takes were also analyzed in conjunction with bycatch, ship strikes, and authorized whale takes (for scientific research and subsistence whaling).

The environmental consequences for the Preferred Alternative concluded "the potential impact on any stock of marine mammals from injury is considered to be negligible, and the effect on the stock of any marine mammal from significant change in a biologically important behavior is considered to be minimal. Any momentary behavioral responses and possible indirect impacts to marine mammals due to potential impacts on prey species are considered not to be biologically significant effects. Any auditory masking in mysticetes, odontocetes, or pinnipeds is not expected to be severe and would be temporary. Further, the potential impact on any stock of fish, sharks or sea turtles from injury is also considered to be negligible, and the effect on the stock of any fish, sharks or sea turtles from significant change in a biologically important behavior is considered to be negligible to minimal. Any auditory masking in fish, sharks or sea turtles is expected to be of minimal significance and, if occurring, would be temporary." Last, with the additional OBIAs, "potential impacts to marine animals from SURTASS LFA sonar operations from this alternative would be slightly decreased."

Scoping and Public Hearings
The major different between the preparation of an EIS and a Supplemental EIS is that scoping is not required. 40 CFR 1502.9 states:

> (c) Agencies: (4) Shall prepare, circulate, and file a supplemental to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

Therefore, scoping on the Supplemental EIS was not conducted. The Notice of Intent (NOI) for the SEIS was published in the *Federal Register* on July 28, 2003 (68 FR 44311). It broadly described the decision to prepare a supplemental analysis to provide additional information regarding the environment that could be potentially affected by employment of SURTASS LFA sonar and additional information related to mitigation of the potential impacts of the system. In November 2005, copies of the Draft SEIS were distributed to agencies and officials of federal, state, and local governments, citizen groups and associations, and other interested parties. Copies of the Draft SEIS were made available for review at seventeen public libraries located in many coastal states including Hawaii. Copies were also available via the SURTASS LFA Sonar Internet website (http://www.surtass-lfa-eis.com). Public hearings were held as follows:

- December 1, 2005 in Washington, DC;
- December 3, 2005 in San Diego, CA; and
- December 5, 2005 in Honolulu, HI.

The public review period was originally scheduled to end on December 27, 2005, but due to numerous requests from both individuals and organizations, the comment period was extended up to and including February 10, 2006 (70 FR 76786).

The Navy received 97 comments and no petitions during the public comment period. In addition, no statements were presented at the December 1, 2005, public hearing in Washington, DC; 3 statements were presented at the December 3, 2005, public hearing in San Diego, CA; and 11 statements were presented at the December 5, 2005, public hearing in Honolulu, HI. NOAA fully participated in the public hearings. Examples of subjects from public comments include the purpose and need for SURTASS LFA sonar, mitigation measures, operational restrictions, effects on marine animals, effects on socioeconomics, the impact analysis, and cumulative and synergistic impacts. The Final SEIS fully responded to these comments.

**NOAA Review**

The Office of Protected Resources, NMFS, NOAA has review the Navy's SEIS and concludes that the impacts evaluated by the Office of Protected Resources are substantially the same as the impacts of NOAA's propose action to issue the Navy regulations to govern the unintentional takings of marine mammals incidental to Navy operation of the SURTASS LFA sonar under the MMPA. In addition, the Office of Protected Resources has evaluated the Navy's SEIS and found that it includes all required components for adoption by NOAA including:
- A discussing of the purpose and need for the action;
- A summary of the EIS, including the issues to be resolved, and in the Final SEIS, the major conclusions and areas of controversy including those raised by the public;
- A listing of the alternatives to the proposed action;
- A description of the affected environment;

- A succinct description of the environmental impacts of the proposed action and alternatives, including cumulative impacts; and
- A listing of agencies and persons consulted, and whom copies of the SEIS are sent.

### NOAA as a Cooperating Agency

NOAA agreed to be a cooperating agency in a letter dated September 26, 2003. Representatives from NMFS were present during meetings discussing the development of the SEIS. NMFS received pre-Draft copies of the SEIS for review and provided comments on the documents. When the Draft SEIS was published, NOAA (Office of Program Planning and Integration) provided comments (letter sent on December 20, 2005). NOAA stated that they support the preferred alternative which incorporates the protections for national marine sanctuary resources developed in the course of consultation pursuant to section 304(d) of the National Marine Sanctuaries Act (16 U.S.C. 1434(d)). This consultation concluded with a commitment by the Navy to ensure this system is operated in a manner that minimizes the potential for the system to injure sanctuary resources. NOAA also requested that Davidson Seamount be added to the list of OBIAs and that the entry for the Northwestern Hawaiian Islands Coral Reef Ecosystem Reserve be clarified in the SEIS. The Navy clarified the statement on the Northwestern Hawaiian Islands Coral Reef Ecosystem Reserve in the Final SEIS and responded to the request to adding the Davidson Seamount:

> NOAA Office of Program Planning and Integration requested that Davidson Seamount be listed as an OBIA because it is an important feeding ground for sperm whales along the California coast. It is very close to the Monterey Bay National Marine Sanctuary (MBNMS), and NOAA is currently in the process for expanding the MBNMS. The center of the seamount is 35 degrees 43 min 12 sec N, 122 degrees 43 min 12 sec W. Davidson Seamount is located 120 km (65 nm) to the southwest of Monterey, 150 km (81 nm) west of Cambria. It is 42 km (22.7 nm) long and 13.5 km (7.3 nm) wide at a depth of 1,300 m (4,265 ft).

> The Navy is currently evaluating the proposal to make Davidson Seamount an OBIA and will provide a response prior to the termination of the current NMFS Rule authorizing LFA operations.

The Final SEIS was published on May 4, 2007. NOAA-NMFS and NOAA-National Ocean Service (NOS) provided comments in the Final SEIS (letter sent on June 4, 2007). NOAA provided specific comments for inclusion in future environmental analyses on Offshore Biologically Important Areas (OBIAs), invertebrates, fish, and marine mammals. Further, NOAA stated:

> The National Oceanic and Atmospheric Administration (NOAA) has reviewed the Final Supplemental Impact Statement (FSEIS) for the Surveillance Towed Array Sensor System Low Frequency Active (SURTASS LFA) Sonar. NOAA acknowledges the Navy's need to deploy SURTASS LFA systems on oceanic

areas while minimizing the environmental effects of these activities. In order to assist the Navy in completing its environmental review of this project, NOAA provides the following comments for consideration by the Department of the Navy.

NOAA supports the preferred alternative which incorporates the protections for national marine sanctuary resources developed in the course of consultation pursuant to section 304(d) of the National Marine Sanctuaries Act (16 U.S.C. 1434(d)). This consultation concluded with a commitment by the Navy to ensure this system is operated in a manner that minimizes the potential for the system to injure sanctuary resources.

After a thorough analysis of the Davidson Seamount, the Navy consulted with NMFS Office of Protected Resources, and decided that the Davidson Seamount, at this time, does not fit the requirements of an OBIA (as set by the Final Rule, §216.191) due to a lack of data regarding the importance of the grounds as a feeding habitat.

Determination
As a result of this review, the Office of Protected Resources has determined t it is not necessary to prepare a separate Environmental Assessment or EIS to issue the Navy regulations to govern the unintentional takings of marine mammals incidental to Navy operation of the SURTASS LFA sonar under the MMPA and that adoption of the Navy's SEIS is appropriate.

NOAA therefore agrees that the impacts of the operation of up to four SURTASS LFA sonar systems are negligible and have been addressed by limitations in the employment of the system (i.e., geographical restrictions and monitoring mitigation). Moreover, SURTASS LFA sonar is not expected to cause lethal takes of marine mammals. NMFS stated in the Final Rule that they "determined that the incidental taking of marine mammals resulting from SURTASS LFA sonar operations would have a negligible impact on the affected marine mammal species or stocks over the 5-year period of LFA sonar operations covered by these regulations. That assessment is based on a number of factors: (1) the best information available indicates that effects from SPLs less than 180 dB will be limited to short-term Level B behavioral harassment averaging less than 10 percent annually for most affected species; (2) the mitigation and monitoring is highly effective in preventing exposures of 180 dB or greater; (3) the results of monitoring as described in the Navy's Comprehensive Report supports the conclusion that takings will be limited to Level B harassment and not have more than a negligible impact on affected species or stocks of marine mammals; (4) the small number of SURTASS LFA sonar systems (two systems in FY 2008 and FY 2009 (totaling 864 hours of operation annually), 3 in FY 2010 (totaling 1296 hours of operation annually), and 4 systems in FY 2011 and FY 20012 (totaling 1728 hours of operation annually)) that would be operating world-wide; (5) that the LFA sonar vessel must be underway while transmitting (in order to keep the receiver array deployed), limiting the duration of exposure for marine mammals to those few minutes when the SURTASS LFA sound energy is moving through that part of the water column inhabited by marine mammals; (6) for convergence

zone (CZ) propagation, the characteristics of the acoustic sound path, which deflect the sound below the water depth inhabited by marine mammals for much of the sound propagation (see illustration 67 FR page 46715 (July 16, 2002); (7) the findings of the SRP on LF sounds on marine mammals indicated no significant change in biologically important behavior from exposure to sound levels up to 155 dB; and (8) during the 40 LFA sonar missions between 2002 and 2006, there were only three visual observations of marine mammals and only 71 detections by the HF/M3 sonar, which all resulted in mitigation protocol suspensions in operations. These measures all indicate that while marine mammals will potentially be affected by the SURTASS LFA sonar sounds, these impacts will be short-term behavioral effects and are not likely to adversely affect marine mammal species or stocks through effects on annual rates of reproduction or survival.

Finally, because SURTASS LFA sonar operations will not take place in Arctic waters, it would not have an unmitigable adverse impact on the availability of marine mammals for subsistence uses identified in MMPA section 101(a)(5)(A)(i), 16 USC 1371(a) (5)(A)(i).

**Conclusions and Findings**

As stated previously, NOAA has determined that the incidental taking of marine mammals resulting from SURTASS LFA sonar operations would have a negligible impact on the affected marine mammal species or stocks over the 5-year period of LFA sonar operations covered by the regulations. While marine mammals will potentially be affected by the SURTASS LFA sonar sounds, these impacts will be short-term behavioral effects and are not likely to adversely affect marine mammal species or stocks through effects on annual rates of reproduction or survival. Further, it would not have an unmitigable adverse impact on the availability of marine mammals for subsistence uses identified in MMPA section 101(a)(5)(A)(i), 16 USC 1371(a) (5)(A)(i).

Based on these conclusions, NOAA is adopting the Navy's Final Supplemental Environmental Impact Statement for Surveillance Towed Array Sensor System Low Frequency Active (SURTASS LFA) Sonar. There are no conditions being placed on this adoption of the Navy's Final SEIS. The issuance of regulations in itself is a major federal action that may affect the human and natural environment of the U.S. and within 22 km (12 nm) from shore and the adoption of the Navy's Final SEIS fulfills NOAA's NEPA requirement.