ROBERT FALK (SBN 142007)
ROBIN S. STAFFORD (SBN 200950)
SARAH SCHINDLER (SBN 236414)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522
Email: RFalk@mofo.com
Email: RStafford@mofo.com
Email: SSchindler@mofo.com

JOEL R. REYNOLDS (SBN 85276)
CARA HOROWITZ (SBN 220701)
NATURAL RESOURCES DEFENSE COUNCIL, INC.
1314 Second Street
Santa Monica, California 90401
Telephone:  (310) 434-2300
Facsimile:  (310) 434-2399

Attorneys for Plaintiffs
NATURAL RESOURCES DEFENSE COUNCIL,
INC.; THE HUMANE SOCIETY OF THE UNITED
STATES; INTERNATIONAL FUND FOR ANIMAL
WELFARE; CETACEAN SOCIETY
INTERNATIONAL; LEAGUE FOR COASTAL
PROTECTION; OCEAN FUTURES SOCIETY;
JEAN-MICHEL COUSTEAU

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC.; INTERNATIONAL FUND FOR ANIMAL WELFARE; THE HUMANE SOCIETY OF THE UNITED STATES; CETACEAN SOCIETY INTERNATIONAL; LEAGUE FOR COASTAL PROTECTION; OCEAN FUTURES SOCIETY; JEAN-MICHEL COUSTEAU<br><br>Plaintiffs,<br><br>v.<br><br>CARLOS M. GUTIERREZ, SECRETARY OF THE UNITED STATES DEPARTMENT OF COMMERCE; NATIONAL MARINE FISHERIES SERVICE; WILLIAM HOGARTH, ASSISTANT ADMINISTRATOR FOR FISHERIES OF THE NATIONAL OCEANOGRAPHIC AND ATMOSPHERIC ADMINISTRATION; VICE ADMIRAL CONRAD C. LAUTENBACHER, JR., ADMINISTRATOR OF THE NATIONAL OCEANOGRAPHIC AND ATMOSPHERIC ADMINISTRATION; UNITED STATES DEPARTMENT OF THE NAVY; DONALD C. WINTER, SECRETARY OF THE UNITED STATES DEPARTMENT OF THE NAVY; ADMIRAL MIKE MULLEN, CHIEF OF NAVAL OPERATIONS<br><br>Defendants. | Civil Action No. 07-4771-EDL<br><br><br>**DECLARATION OF ROBIN STAFFORD IN SUPPORT OF PLAINTIFFS' RESPONSE TO ORDER REQUIRING FURTHER INFORMATION** |

1    I, Robin Stafford, declare under penalty of perjury under the laws of the United States of

2    America that the following is true and correct:

3        1.    I am an attorney with Morrison and Foerster in San Francisco, California, and an

4    attorney for Plaintiffs in the present case.  I am duly licensed to practice law in the State of

5    California and before the United States District Court for the Northern District of California.  I

6    am submitting this Declaration in support of Plaintiffs' Response to Order Requiring Further

7    Information.  The statements contained in this Declaration are true and correct to the best of my

8    knowledge and, in the case of my opinions, I believe them to be true.  If called as a witness, I

9    could and would testify to the statements contained herein.

10        2.    **Exhibit 1** is a true and correct copy of "Assessment of Deep Diving Whales

11    Major Distribution within the Monterey Bay National Marine Sanctuary," April 4, 2001,

12    available at http://montereybay.noaa.gov/Resourcepro/reports/LFAreport/welcome.html

13    (accessed Jan. 29, 2008).

14        3.    **Exhibit 2** is a true and correct copy of "Monterey Bay National Marine

15    Sanctuary Regulations," National Oceanic and Atmospheric Administration, 71 Fed. Reg.

16    59,050 (Oct. 6, 2006) (Proposed Rule).

17

18    I hereby declare under penalty of perjury that the foregoing is true and correct.

19    Executed this 31st day of January, 2008.

20

21    */s/ Robin Stafford*____

22    Robin Stafford

23

24

25

26

27

28

# Exhibit 1



ASSESSMENT OF DEEP DIVING WHALES
MAJOR DISTRIBUTION WITHIN THE
MONTEREY BAY NATIONAL MARINE SANCTUARY

APRIL 4, 2001

## Assessment of Deep Diving Whales Major Distribution Within the MBNMS

Introduction

Deep Diving Whales

All Whales

Blue Whales

Northern Pacific Right Whales

Humpback Whales

Fin Whales

Sperm Whales

Beaked Whales

Marine Mammal Abundance

Sea Turtle Abundance

Acoustic Impacts

NEPA Issues

Observers

Research Activities

## Introduction

Currently the U.S. Navy is consulting with the Director of the Office of National Marine Sanctuaries in order to deploy Surveillance Towed Array Sensor System Low Frequency Active Sonar (SURTASS LFA) within the Monterey Bay National Marine Sanctuary. The sonar system is a long-range, low frequency sonar that has both active and passive components. The purpose of the proposed action is to meet U.S. need for improved capability to detect foreign submarines at long range. The characteristics and operating features of the active component (LFA) are:

- The source is a vertical line array of up to 18 source emitters suspended below the vessel.

- LFA's transmitted beam is omnidirectional (360 degrees along a horizontal plane (nominal depth of the center of the array is 122m [400 ft]), with a narrow vertical beamwidth that can be steered above or below the horizontal axis.

- The source frequency is between 100 and 500 Hz. A variety of signal types can be used including continuous wave (CW) and frequency-modulated signals.

It is possible that this deployment of acoustics will adversely affect Sanctuary resources. Operation of the SURTASS LFA system may constitute a violation of federal regulations at 15 CFR (922.132 (5)) which prohibit taking any marine mammal, sea turtle or seabird in or above the Sanctuary, except as permitted by regulations, under the Marine Mammal Protection Act, the Endangered Species Act, and the Migratory Bird Treaty Act. NOAA Fisheries (NMFS) will determine whether to grant the Department of Defense a small take exemption under the Marine Mammal Protection Act.

The FEIS for SURTASS LFA Appendix A states: "Sanctuary regulations require that military activities be carried out in a manner that avoids to the maximum extent practicable adverse impacts on Sanctuary resources and qualities. The Navy has determined that Alternative 1 of the Draft OEIS/EIS would meet this requirement".



Sanctuary regulations at 15 CFR 922.132 (c) except some Department of Defense activities from the above prohibitions, but only military activities specifically identified in the MBNMS Final Environmental Impact Statement/ Management Plan (FEIS/MP) published in June 1992. Sanctuary regulations are very clear in

stating that the prohibitions in paragraphs (a) (2) through (9) do not apply to existing military activities carried out by the Department of Defense. SURTASS LFA was not identified as a pre-existing activity in the 1992 FEIS/MP, and would therefore not be eligible for exception from these prohibitions. However, new activities may be exempted after consultation between the Director and the Department of Defense.

We understand the intent of the Navy's proposal is to keep the sound source outside the limits of the United States Territorial Sea. This should reduce potential impacts to the migrating Gray whales during the winter and spring. However, the Monterey Bay National Marine Sanctuary has concerns regarding the variety and distributions of deep diving whales throughout our boundaries, in particular, offshore areas beyond the Territorial Sea during spring, summer, and fall.

**Deep Diving Whales Range Distribution Charts**
The Sanctuary has compiled charts of the range and distribution of some of the deep-diving whale species present within our region. All of these species are either threatened or endangered, and all are sought by a growing number of whale watching boats in central California. These data are summarized below.

**Chart 1 -- Deep Diving Whales Major Range Distribution.** The Blue Whale major adult area is illustrated by green diagonals and is within Sanctuary boundaries from May through December. The Right Whale adult area is depicted by the light orange dots and ranges throughout Sanctuary boundaries from October through March. The Humpback Whale major adult area is illustrated by purple diagonals and is within Sanctuary boundaries from May through October. The Fin Whale major adult area is depicted by blue dots and is within Sanctuary boundaries from April through September. The Sperm Whale major adult area is illustrated by orange verticals and is over Davidson Seamount on a year-round basis.

**Chart 2 -- Blue Whale Range Distribution.** 
Blue Whales are the largest animal to live on earth and in the past decade its numbers have surged locally. The Monterey Bay National Marine Sanctuary hosts several hundred blue whales annually who come to the region to feed on krill. These animals are highly mobile and it is thought that they move regularly between the Monterey Bay region and other feeding grounds near Cordell Bank and the Channel Islands. Blue Whales within the MBNMS range throughout the Sanctuary boundaries from May to December as depicted by the blue dots. The area in green illustrates the major adult area from May to September.

**Chart 3 -- Northern Pacific Right Whale Range Distribution.** Marine Scientists consider the Northern Pacific Right Whale the most rare mammal in the world. It represents a separate subspecies from the Atlantic Right Whale, which we understand the Navy has elected to avoid on the eastern U.S. seaboard. The three most recent sightings of the Northern Pacific Right Whale south of Alaska have occurred in the Monterey Bay National Marine Sanctuary, two of which occurred in the last four years. The entire region is considered to be within the Right Whales' range. Any disturbance to this extremely rare whale could be disastrous. Right Whales within the MBNMS range throughout the Sanctuary boundaries from October through March as depicted by the orange dots.



**Chart 4 -- Humpback Whale Range Distribution.** Humpback whales are highly acoustic animals known for their "songs". Their songs are long and complex intertwining melodies, which can sometimes last up to twenty minutes long. These songs are repeated continuously for hours. The Humpbacks in the North American Pacific populations all sing the same song which progressively changes over the years. The bulk of evidence thus far, points to the singing whales being males; it is thought that these songs are a function of mating behavior. Any device that has the potential to effect, impede, or alter this behavior should be examined critically. Humpback whales within the MBNMS range throughout the Sanctuary boundaries from May through October. The area depicted in red diagonals is the major adult concentration for feeding and migration from May through October, as well as the recreational viewing area from June through September. The area in blue dots depicts the major adult area for feeding and migration from May through October.



**Chart 5 -- Fin Whale Range Distribution.** Once one of the most abundant of the large whales, the Fin whale was heavily exploited by the whaling industry and its population has been severely depleted. Current figures suggest that a mere 80,000 animals remain worldwide with between fifty and several hundred in the MBNMS. Fin whales within the MBNMS range throughout the Sanctuary boundaries from April through September and commonly feed on krill associated with upwelling at the boundaries of offshore currents. The area depicted by small blue dots illustrates the major adult area whereas the area depicted by the larger blue dots illustrates the general adult area.

**Chart 6 -- Sperm Whale Range Distribution**.
The Sperm whale is the deepest diving whale and 
can swim to depths of 1000 m, and stay
submerged for over an hour. At depth there is
very little light available and hence these whales
have developed a superior echolocation ability,
which they use to find their prey. As such, these
animals are highly dependent upon sound. It is
unlikely that an observer on a ship would be able to accurately
interpret this animal's reaction to LFA, or to even see a Sperm
whale feeding in the Sanctuary. Sperm whales within the
MBNMS range throughout the Sanctuary boundaries on a year
round basis. The adult area within Sanctuary boundaries is
illustrated by blue dots. The major adult area that should be
noted, though it is outside of Sanctuary boundaries, is the area
around Davidson Seamount as depicted by the orange lines.

## Beaked Whales
The Monterey Bay National Marine Sanctuary has three species of
beaked whales that inhabit our waters – the Baird's, Cuvier's and
Hubbs beaked whale. Little is known about these cetaceans. They
may be rare or merely elusive, but generally they live in deep
offshore waters and have escaped live studies.
Studies of dead beaked whales from the March 2000 Bahamas
strandings by Kenneth Balcomb, indicate that a resonance
phenomena in the whales cranial airspaces may be responsible for
tearing apart the delicate tissue around the ears and brain. Kenneth
Balcomb further reiterated that the resonance frequency of
airspaces in Cuvier's beaked whales to be about 290 Hz at 500
meters depth, which is precisely the middle frequency of LFA as
described in the OEIS/EIS.

## Marine Mammal Abundance Information
**Table 1** was generated from data compiled by the National Marine
Fisheries Service and reports the estimated Pacific populations as
well as the estimated California populations for the following
species of whales: Blue, Humpback, Fin, Minke, Gray, Northern
Right, Sperm, Cuvier's Beaked, Baird's Beaked, and Mesoplodont
Beaked. Migrating species are indicated seasonally on the right of
the table.

From: Forney et al. 2000, U.S. Pacific Marine Mammal Stock
Assessments: 2000.
NOAA Technical Memorandum NMFS/SWFSC 300

| Species | Estimated Pacific Population | CV | CA Estimated Population* | CV* | Winter | Spring | Summer | Fall |
|---|---|---|---|---|---|---|---|---|
| Blue Whale | 1940 | 0.15 | not calculated | | Migrating S | Migrating N | Present | Present |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Humpback Whale | 905 | 0.06 | 319 | 0.41 | Migrating S | Migrating N | Present | Present |
| Fin Whale | 1236 | 0.2 | 49 | 1.0 | Lower #'s | Lower #'s | Present | Present |
| Minke Whale | 631 | 0.45 | 73 | 0.62 | Present | Present | Present | Present |
| Gray Whale | 26635 | 0.1006 | not calculated | | Migrating S | Migrating N | Absent | Absent |
| Northern Right Whale | Unknown | | not calculated | | Possible | Unknown | Unknown | Unknown |
| Sperm Whale | 1191 | 0.22 | 892 | 0.99 | Present | Peak | Peak | Present |
| Cuvier's Beaked Whale | 5870 | 0.38 | not calculated | | Possible | Possible | Possible | Possible |
| Baird's Beaked Whale | 379 | 0.23 | not calculated | | Lower #'s | Lower #'s | Possible | Possible |
| Mesoplodont Beaked Whales | 4098 | 0.5 | not calculated | | Possible | Possible | Possible | Possible |

*Forney et al. 1995. (Not corrected for diving whales)
CV= Coefficient of Variation

**Table 2** is taken from the Final EIS/EIR for the California ATOC project and estimates the marine mammal stock of the following species of whale: Blue Humpback, Fin, Minke, Gray, Sei, Northern Right, Sperm and Beaked for the offshore central California area. This table separates Winter/Spring populations from Summer/Fall populations.

From: Final EIS/EIR for the California Acoustic Thermometry of Ocean Climate Project, April 1995. Estimates of the stock of marine mammal species offshore central California

| Species | Winter/Spring Population | CV | Summer/Fall Population | CV |
|---|---|---|---|---|
| Blue Whale | 28 | 1.03 | 2198 | 0.36 |
| Humpback Whale | 375 | 0.36 | 609 | 0.41 |
| Fin Whale | 78 | 0.8 | 913 | 0.59 |
| Minke Whale | 71 | 0.61 | 569 | 1.1 |
| Gray Whale | 20869 | 0.34 | not calculated | |
| Sei Whale | not calculated | | 61 | 1.21 |
| Northern Right Whale | 16 | 1.08 | not calculated | |
| Sperm Whale | 857(1286)* | 1.05 | 725(1088)* | 0.47 |

| | | | |
|---|---|---|---|
| Beaked Whales (Cuvier's, Baird's, Mesoplodont) | 426(852)* 0.38 | 1430(2860)* | 0.91 |

\* Numbers in ( ) indicate estimates accounting for whales submerged during entire survey evolution
CV= Coefficient of Variation

## Sea Turtle Abundance Information

Table 3 is taken from the Final EIS/EIR for the California ATOC project and estimates the following sea turtle species: Leatherback, Green, Olive and Loggerhead. The abundance of these species is unknown.

From: Final EIS/EIR for the California Acoustic Thermometry of Ocean Climate Project, April 1995
Estimates of the stock of sea turtle species offshore central California

| Species | Abundance | Remarks |
|---|---|---|
| Leatherback Sea Turtle | Unknown | Note 13 |
| Green Sea Turtle | Unknown | Note 11,12 |
| Olive Ridley Sea Turtle | Unknown | Note 11 |
| Loggerhead Sea Turtle | Unknown | Note 11 |

Note 11: NOAA-TM-NMFS-F/SPO-2, Dec 1992 (for eastern tropical Pacific [ETP])
Note 12: "Green turtles are the most commonly observed hard-shelled sea turtle
on the western coast of the USA." (NOAA-TM-NMFS-SWFSC-186, Sep 193)
Note 13: Predominant sea turtle in central California coastal area (Eckert, pers. Comm., 1994)

## Acoustic impacts

The University of California at Santa Cruz, Marine Mammal and Seabird Ecology Group has produced a technical report for LFA EIS entitled Marine Vertebrates and Low Frequency Sound that states:

Richardson et al. (1991) found that belugas have an auditory threshold of 40 dB. This suggests, by analogy, that belugas experience discomfort at sounds of 140-160 dB (Gordon and Moscrop 1996). If cetaceans such as baleen whales have similarly low auditory thresholds for LFS, then sound levels of 195-210 dB could result in immediate damage and permanent threshold shift (PTS).

Because all species of mysticete whale recorded to date produce

loud, species-specific signals in the low-frequency band, they are particularly at risk from manmade LFS. It is unclear whether low-frequency signals produced by most mysticetes are used for communication, orientation, navigation, or detection of predators and prey. However, disruption of any of these functions could interfere with normal activities and behavior, and potentially impact the reproductive success of individuals and eventually the size of a population.

Furthermore, Whale Biologist Kenneth C. Balcomb, has stated in a letter sent to Mr. J.S. Johnson, SURTASS LFA Sonar OEIS/EIS Program Manager, dated February 23, 2001 that:

Based on two significant mass mortality events (Greece and the Bahamas) the body of evidence indicates that not only is resonance with LFA and sonar frequencies a problem for beaked whales, the sound pressure level of 180 db RL is demonstrably not safe for beaked whales and is probably not safe for other cetaceans.

## NEPA issues
The following is a list of public hearings held by the Department of Defense regarding LFA: Norfolk, Virginia 1999, San Diego, California 1999, and Honolulu, Hawaii 1999. The National Environmental Policy Act requires agencies to provide public notice to people and agencies who may be interested or affected (40 CFR 1506.6[b]) and to those who have requested it (40 CFR 1506.09(b)(1). The residents of the communities adjacent to the Sanctuary boundaries were not adequately informed of this proposed project.

Furthermore, it is the position of the MBNMS that the latest research mentioned above presents a seriously different picture of the likely environmental consequences of the proposed action not adequately envisioned by the original EIS, such that the Navy's failure to act on it may be arbitrary or capricious. A Supplemental Environmental Impact Statement (SEIS) would assist in adequately addressing potential ill effects of SURTASS LFA to species in the marine environment offshore central California.

The Sanctuary recognizes that thus far the Department of Defense has spent in excess of $350 million dollars developing the technology for this project. We applaud their dedication to ensuring, as stated in the FOEIS/EIS, "monies expended on the SURTASS LFA sonar program do not bind the Navy to deploy the SURTASS LFA sonar as proposed".

## Observers
The Department of the Navy proposes in the Final Environmental Impact statement (p.2-14) to use visual monitoring for marine mammals and sea turtles from the SURTASS LFA sonar vessel during daylight hours. Generally, cetaceans spend over 90% of their lives below the water surface. This being stated, it is easy to comprehend why ship-based observers may be unsuccessful in identifying potentially impacted animals.

### Research Activities

The Monterey area is recognized nationally and internationally for the extensive myriad research activities and organizations that are active in the region. Annually $160 million is spent on marine research at twenty-six facilities within the region. This research is conducted on a year-round basis throughout Sanctuary waters, but typically more effort is expended during the summer months. Hundreds, if not thousands, of research projects are conducted in Sanctuary waters each year. Obviously, underwater sound would have undesirable ramifications on these on-going studies and projects.

Home | Introduction | Visitors | Education | Research | Protection | Calendar
Foundation | Search



Credits
For comments or question please refer to the
Webmaster

Last modified on: **Jan 15, 2000**





ASSESSMENT OF DEEP DIVING WHALES
MAJOR DISTRIBUTION WITHIN THE
MONTEREY BAY NATIONAL MARINE SANCTUARY

APRIL 4, 2001

### Sperm Whale Range Distribution

Introduction

Deep Diving
Whales

All Whales

Blue Whales

Northern
Pacific
Right Whales

Humpback
Whales

Fin Whales

Sperm
Whales

Beaked
Whales

Marine
Mammal
Abundance

Sea Turtle
Abundance

Acoustic
Impacts

NEPA Issues

Observers

Research
Activities



**Chart 6 -- Sperm Whale Range Distribution**. The Sperm whale is the deepest diving whale and can swim to depths of 1000 m, and stay submerged for over an hour. At depth there is very little light available and hence these whales have developed a superior echolocation ability, which they use to find their prey. As such, these animals are highly dependent upon sound. It is unlikely that an observer on a ship would be able to accurately interpret this animal's reaction to LFA, or to even see a Sperm whale feeding in the Sanctuary. Sperm whales within the MBNMS range throughout



the Sanctuary boundaries on a year round basis. The adult area within Sanctuary boundaries is illustrated by blue dots. The major adult area that should be noted, though it is outside of Sanctuary boundaries, is the area around Davidson Seamount as depicted by the orange lines.

**Home | Introduction | Visitors | Education | Research | Protection | Calendar Foundation | Search**





Credits
For comments or question please refer to the
Webmaster

Last modified on: **Jan 15, 2000**

# Exhibit 2

**59050**    **Federal Register** / Vol. 71, No. 194 / Friday, October 6, 2006 / Proposed Rules

**Appendix B to Subpart G of Part 922—Line Representing the 50–Fathom Isobath Surrounding Cordell Bank**

Coordinates listed in this Appendix are unprojected (Geographic Coordinate System)

and based on the North American Datum of 1983 (NAD83).

CORDELL BANK FIFTY FATHOM LINE

| Point ID # | Latitude | Longitude | Point ID # | Latitude | Longitude |
|---|---|---|---|---|---|
| 1 | 37.96034 | −123.40371 | 8 | 38.07588 | −123.47195 |
| 2 | 37.96172 | −123.42081 | 9 | 38.06451 | −123.46146 |
| 3 | 37.99110 | −123.44379 | 10 | 38.07123 | −123.44467 |
| 4 | 38.00406 | −123.46443 | 11 | 38.04446 | −123.40286 |
| 5 | 38.01637 | −123.46076 | 12 | 38.01442 | −123.38588 |
| 6 | 38.04684 | −123.47920 | 13 | 37.98859 | −123.37533 |
| 7 | 38.07106 | −123.48754 | 14 | 37.97071 | −123.38605 |

[FR Doc. E6–16337 Filed 10–5–06; 8:45 am]

BILLING CODE 3510–NK–P

---

## DEPARTMENT OF COMMERCE

**National Oceanic and Atmospheric Administration**

**15 CFR Part 922**

[Docket No. 0648–AT15: 060809215–6215–01]

RIN 0648–AT15

**Monterey Bay National Marine Sanctuary Regulations**

**AGENCY:** National Marine Sanctuary Program (NMSP), National Ocean Service (NOS), National Oceanic and Atmospheric Administration (NOAA), Department of Commerce (DOC).

**ACTION:** Proposed rule; notice of public availability of draft management plan/draft environmental impact statement.

**SUMMARY:** The National Oceanic and Atmospheric Administration (NOAA) is proposing a draft revised management plan, revised Designation Document, and revised regulations for the Monterey Bay National Marine Sanctuary (MBNMS or Sanctuary). Changes to the Designation Document include expanding the boundaries to include the Davidson Seamount, changing the scope of regulations to include possession of a Sanctuary historical resource outside of the Sanctuary, and introduction of introduced species. The proposed regulations would revise and provide greater clarity to existing regulations.

**DATES:** Public hearings will be held as detailed in the **SUPPLEMENTARY INFORMATION** section.

Comments will be considered if received by January 5, 2007.

**ADDRESSES:** Written comments should be sent by mail to: Brady Phillips, JMPR

Management Plan Coordinator, NOAA National Marine Sanctuary Program, 1305 East-West Highway, N/ORM–6, Silver Spring, MD 20910, by e-mail to *jointplancomments@noaa.gov*, or by fax to (301) 713–0404. Copies of the DMP/DEIS are available from the same address and on the Web at *http://www.sanctuaries.nos.noaa.gov/jointplan*. Comments can also be submitted to the Federal e-Rulemaking Portal: *http://www.regulations.gov*. Follow the instructions for submitting comments.

Written comments regarding the burden-hour estimates or other aspects of the collection-of-information requirements contained in this proposed rule may be submitted to David Bizot, National Permit Coordinator, National Marine Sanctuary Program, 1305 East-West Highway, N/ORM–6, Silver Spring, Maryland 20910, by e-mail to *David.Bizot@noaa.gov*, or by fax to 301–713–0404; and by e-mail to *David_Rostker@omb.eop.gov*, or fax to (202) 395–7285.

**FOR FURTHER INFORMATION CONTACT:** Huff McGonigal, Environmental Policy Specialist, 831–647–4254 or *huff.mcgonigal@noaa.gov*.

**SUPPLEMENTARY INFORMATION:**

### Introduction

Pursuant to section 304(e) of the National Marine Sanctuaries Act (16 U.S.C. 1434 *et seq.*) (NMSA), the National Marine Sanctuary Program (NMSP) has conducted a review of the management plan for Monterey Bay National Marine Sanctuary. The review has resulted in a proposed new management plan for the Sanctuary, some proposed revisions to existing regulations, and some proposed new regulations. The proposed new regulations include prohibitions on:

• discharging or depositing any matter from a cruise ship other than

vessel engine cooling water, vessel generator cooling water, or anchor wash;

• releasing or otherwise introducing from within or into the Sanctuary an introduced species;

• disturbing or taking a Sanctuary resource below 3000 feet of the sea surface in the Davidson Seamount Management Zone;

• deserting a vessel aground, at anchor, or adrift within the Sanctuary; and

• leaving harmful matter aboard a grounded or deserted vessel within the Sanctuary.

These measures would afford better protection to the nationally significant natural and historical resources of the MBNMS.

Existing regulations would also be revised to:

• replace the term "seabed" with "submerged lands", the term used in the NMSA;

• correct inaccuracies in the coordinates and description of the Sanctuary's seaward and shoreline boundaries;

• clarify that discharges/deposits allowed from marine sanitation devices apply only to Type I and Type II marine sanitation devices and that vessel operators are required to lock all marine sanitation devices in a manner that prevents discharge of untreated sewage;

• specify that the existing exception for discharging or depositing fish, fish parts, or chumming materials (bait) applies only to such discharge/deposits during the conduct of traditional fishing activities within the Sanctuary;

• make the prohibition on possession of Sanctuary historical resources apply both within and outside the Sanctuary;

• clarify that the exceptions from the prohibition against altering the submerged lands within the Sanctuary only apply to the extent necessary to accomplish the excepted activities;

• modify the definition of Attract or Attracting to apply to all animals;

• expand the existing prohibition on the attraction of white sharks in state waters to apply throughout the Sanctuary;

• clarify that the prohibition against discharges/deposits applies to discharges/deposits both within and into the Sanctuary;

• clarify that discharges/deposits resulting from vessel generator cooling water, anchor wash, and clean bilge water (meaning not containing detectable levels of harmful matter as defined) are excepted from the discharge/deposit prohibition;

• revise the definition of *motorized personal watercraft*; and

• clarify and refine the permit procedures to clarify required findings and considerations as well as remove outdated language regarding standard conditions.

The proposed new management plan for the Sanctuary contains a series of action plans that outline management, research, education, outreach, operational, and performance measurement activities that are planned for the next five years. The activities are designed to address specific issues facing the Sanctuary and, in doing so, help achieve the mandates of the NMSP and the Sanctuary's designation.

This document publishes the proposed new regulations and the proposed changes to existing regulations, publishes the text of the proposed Revised Designation Document for the Sanctuary, and announces the availability of the draft management plan and the draft environmental impact statement (DMP/DEIS). The existing MBNMS Designation Document was published in 1992 to establish the Sanctuary, and per the NMSA (16 U.S.C. 1434(a)(4)) describes the geographic area proposed to be included within the Sanctuary, the characteristics of the area that give it conservation, recreational, ecological, historical, research, educational, or esthetic value, and the types of activities that will be subject to regulation by the Secretary to protect those characteristics. The NMSP is proposing certain revisions to its Designation Document, which include changes to the description of the area, and several substantive changes to the Sanctuary's scope of regulations.

Because this proposed action includes changes to the Sanctuary's terms of designation, NOAA has developed a DEIS pursuant to section 304(a)(2) of the NMSA, 16 U.S.C. 1434(a)(2), and consistent with and in fulfillment of the requirements of the National Environmental Policy Act of 1969.

*Sanctuary Environment*

The MBNMS is located offshore of California's central coast, adjacent to and south of the Gulf of the Farallones National Marine Sanctuary. It encompasses a shoreline length of approximately 268 miles between Marin in Marin County and Cambria in San Luis Obispo County and approximately 4,016 square nautical miles of ocean and coastal waters, and the submerged lands thereunder, extending an average distance of 30 miles from shore. Supporting some of the world's most diverse marine ecosystems, it is home to numerous mammals, seabirds, fishes, invertebrates, and plants in a remarkably productive coastal environment. The Sanctuary's natural resources include the nation's largest kelp forests, one of North America's largest underwater canyons, and the closest-to-shore deep ocean environment in the continental United States. The MBNMS was established for the purposes of protecting and managing the conservation, ecological, recreational, research, educational, historical, and esthetic resources and qualities of the area.

**Proposed Revised Designation Document**

The Designation Document for the Sanctuary contains the terms of designation as defined in the NMSA (16 U.S.C. 1434(a)(4)). NOAA is proposing certain changes to the Designation Document for the MBNMS as part of this management plan review. Boundary coordinates in the revised Designation Document and in the Sanctuary regulations would also reflect minor technical changes and would be expressed by coordinates based on the North American Datum of 1983 (NAD 83).

The MBNMS Designation Document boundary description is proposed to be amended to include the Davidson Seamount Management Zone, a 585 square mile area defined by the geodetic lines connecting the coordinates provided in Appendix F to this subpart. The Davidson Seamount is located 75 miles to the southwest of Monterey, due west of San Simeon and is home to a diverse assemblage of deep water organisms. This highly diverse community includes many endemic species and fragile, long-lived cold-water corals and sponges.

NOAA proposes to amend the MBNMS Designation Document to update Article III, Characteristics of the Area That Give It Particular Value, to, for example, discuss the Davidson Seamount Management Zone.

NOAA also proposes to modify the MBNMS Designation Document to authorize Sanctuary regulation of introducing or otherwise releasing introduced species. A priority issue identified during the management plan review was addressing the threat posed by introduced species. One of the recommended strategies for addressing this was to develop a regulation prohibiting such releases.

NOAA also proposes to modify the MBNMS Designation Document to authorize regulation of the possession of a Sanctuary historical resource wherever the resource is found. The existing designation document currently lists as subject to regulation "possessing within the Sanctuary a Sanctuary resource * * *". The NMSP would like to make clear that a prohibition against possession of Sanctuary historical resources would apply outside the Sanctuary boundaries (e.g., at a harbor).

The MBNMS Designation Document is also proposed to be modified to replace the term "seabed" with the term "submerged lands" to be consistent with terminology in the NMSA.

NOAA also proposes to delete Appendices I and II of the MBNMS Designation Document and refer to the site regulations for Sanctuary seaward boundaries and the location of four sites designated for disposal of dredged material. This will also delete outdated language related to study areas for dredged material disposal sites outside the MBNMS boundaries.

Last, minor punctuation improvements are proposed to be made to the MBNMS Designation Document.

**Proposed Revised Designation Document for the Monterey Bay National Marine Sanctuary**

Under the authority of Title III of the Marine Protection, Research, and Sanctuaries Act of 1972, as amended (the "Act"), 16 U.S.C. 1431 *et seq.*, Monterey Bay and its surrounding waters offshore of central California, and the submerged lands under Monterey Bay and its surrounding waters, as described in Article II, are hereby designated as the Monterey Bay National Marine Sanctuary for the purposes of protecting and managing the conservation, ecological, recreational, research, educational, historical, and esthetic resources and qualities of the area.

*Article I. Effect of Designation*

The Act authorizes the issuance of such final regulations as are necessary and reasonable to implement the

designation, including managing and protecting the conservation, recreational, ecological, historical, research, educational, and esthetic resources and qualities of the Monterey Bay National Marine Sanctuary. Section 1 of Article IV of this Designation Document lists activities of the types that either are to be regulated on the effective date of designation or may have to be regulated at some later date in order to protect Sanctuary resources and qualities. Listing does not necessarily mean that a type of activity will be regulated; however, if a type of activity is not listed, it may not be regulated, except on an emergency basis, unless section 1 of Article IV is amended to include the type of activity by the same procedures by which the original designation was made.

*Article II. Description of the Area*

The MBNMS consists of two separate areas. (a) The first area consists of an area of approximately 4016 square nautical miles (nmi) of coastal and ocean waters, and submerged lands thereunder, in and surrounding Monterey Bay off the central coast of California. The northern terminus of the Sanctuary boundary is located along the southern boundary of the Gulf of the Farallones National Marine Sanctuary (GFNMS) beginning at Rocky Point just south of Stinson Beach in Marin County. The Sanctuary boundary follows the GFNMS boundary westward to a point approximately 29 NM offshore from Moss Beach in San Mateo County. The Sanctuary boundary then extends southward in a series of arcs, which generally follow the 500 fathom isobath, to a point approximately 27 nmi offshore of Cambria, in San Luis Obispo County. The Sanctuary boundary then extends eastward towards shore until it intersects the Mean High Water Line (MHWL) along the coast near Cambria. The Sanctuary boundary then follows the MHWL northward to the northern terminus at Rocky Point. The shoreward Sanctuary boundary excludes a small area between Point Bonita and Point San Pedro. Pillar Point Harbor, Santa Cruz Harbor, Monterey Harbor, and Moss Landing Harbor are all excluded from the Sanctuary shoreward from the points listed in Appendix A of the site regulations except for Moss Landing Harbor, where all of Elkhorn Slough east of the Highway One bridge, and west of the tide gate at Elkhorn Road and toward the center channel from the MHWL is included within the Sanctuary, excluding areas within the Elkhorn Slough National Estuarine Research Reserve. Exact coordinates for

the seaward boundary and harbor exclusions are provided in Appendix A of the site regulations.

(b) The Davidson Seamount Management Zone (DSMZ) is also part of the Sanctuary. This area, bounded by geodetic lines connecting a rectangle centered on the top of the Davidson Seamount, consists of approximately 585 square nmi of ocean waters and the submerged lands thereunder. This portion of the Sanctuary is located approximately 70 nmi off the coast of San Simeon in San Luis Obispo County. Exact coordinates for the DSMZ boundary are provided in Appendix F of the site regulations.

*Article III. Characteristics of the Area That Give It Particular Value*

The Monterey Bay area is characterized by a combination of oceanic conditions and undersea topography that provides for a highly productive ecosystem and a wide variety of marine habitat. The area is characterized by a narrow continental shelf fringed by a variety of coastal types. The Monterey Submarine Canyon is unique in its size, configuration, and proximity to shore. This canyon system provides habitat for pelagic communities and, along with other distinct bathymetric features, may modify currents and act to enrich local waters through strong seasonal upwelling. Monterey Bay itself is a rare geological feature, as it is one of the few large embayments along the Pacific coast.

The Monterey Bay area has a highly diverse floral and faunal component. Algal diversity is extremely high and the concentrations of pinnipeds, whales, otters and some seabird species are outstanding. The fish stocks, particularly in Monterey Bay, are abundant and the variety of crustaceans and other invertebrates is high.

In addition there are many direct and indirect human uses of the area. The most important economic activity directly dependent on the resources is commercial fishing, which has played an important role in the history of Monterey Bay and continues to be of great economic value.

The diverse resources of the Monterey Bay area are enjoyed by the residents of this area as well as numerous visitors. The population of Monterey and Santa Cruz counties is rapidly expanding and is based in large part on the attractiveness of the area's natural beauty. The high water quality and the resulting variety of biota and their proximity to shore is one of the prime reasons for the international renown of the area as a prime tourist location. The

quality and abundance of the natural resources have attracted human beings from the earliest prehistoric times to the present and as a result the area contains significant historical, e.g., archaeological and paleontological, resources, such as Costanoan Indian midden deposits, aboriginal remains, and sunken ships and aircraft.

The biological and physical characteristics of the Monterey Bay area combine to provide outstanding opportunities for scientific research on many aspects of marine ecosystems. The diverse habitats are readily accessible to researchers. Twenty-six research and education facilities are found within the Monterey Bay area. These institutions are exceptional resources with a long history of research and large databases possessing a considerable amount of baseline information on the Bay and its resources. Extensive marine and coastal education and interpretive efforts complement Monterey Bay's many research activities. For example, the Monterey Bay Aquarium has attracted millions of visitors who have experienced the interpretive exhibits of the marine environment. Point Lobos Ecological Reserve, Elkhorn Slough National Estuarine Research Reserve, Long Marine Laboratory and Año Nuevo State Reserve all have excellent docent programs serving the public, and marine related programs for school groups and teachers.

As to Davidson Seamount, it is located offshore of California, seventy-five miles southwest of Monterey, due west of San Simeon, and is one of the largest known seamounts in U.S. waters. Davidson Seamount is twenty-six miles long and eight miles wide. From base to crest, Davidson Seamount is 7,480 feet tall; yet still 4,101 feet below the sea surface. Davidson Seamount has an atypical seamount shape, having northeast-trending ridges created by a type of volcanism only recently described. It last erupted about 12 million years ago. This large geographic feature was the first underwater formation to be characterized as a "seamount" and was named after the Coast and Geodetic Survey (forerunner to the National Ocean Service) scientist George Davidson. Davidson Seamount's geographical importance is due to its location in the California Current, which likely provides a larger flux of carbon (food) to the sessile organisms on the seamount surface relative to a majority of other seamounts in the Pacific and may have unique links to the nearby Partington and Monterey submarine canyons.

The surface water habitat of the Davidson Seamount hosts a variety of

seabirds, marine mammals, and pelagic fishes, e.g., albatrosses, shearwaters, sperm whales, killer whales, albacore tuna, and ocean sunfish. Organisms in the midwater habitat have a patchy distribution, e.g., jellies and swimming worms, with marine snow, organic matter that continually ''rains'' down from the sea surface, providing an important food source for deep-sea animals. The seamount crest habitat is the most diverse of habitats in the Davidson Seamount area, including large gorgonian coral (e.g., Paragorgia sp.) forests, vast sponge fields (many undescribed species), crabs, deep-sea fishes, shrimp, and basket stars. The seamount slope habitat is composed of cobble and rocky areas interspersed with areas of ash and sediment, and hosts a diverse assemblage of sessile invertebrates and rare deep-sea fishes. The seamount base habitat is the interface between rocky outcrops and the flat, deep soft bottom habitat.

Davidson Seamount is home to previously undiscovered species and species assemblages, such as large patches of corals and sponges, where there is an opportunity to discover unique associations between species and other ecological processes. The high biological diversity of these assemblages has not been found on other central California seamounts. Davidson Seamount's importance for conservation revolves around the endemism of seamount species, potential future harvest damage to coral and sponge assemblages, and the low resilience of these species. Abundant and large, fragile species (e.g., corals greater than eight feet tall, and at least 200 years old, as well as vast fields of sponges) and an apparently physically undisturbed seafloor appear relatively pristine. Research cruises to the Davidson Seamount in the early 2000s have captivated the imagination of the public through international news, television productions, a new NOAA visitor center film, and popular Web sites. The well-developed education initiatives of the NMSP, one of the few NOAA programs mandated to develop education programs, provides an opportunity to educate the public about seamounts as well as cold water corals and sponges. This is a critical advantage of Davidson Seamount designation, as few other sanctuaries include deep-sea corals and seamounts, a necessity in conservation and addressing new public interest in these issues.

The 1992 Final Environmental Impact Statement/Management Plan [and 2006 Draft Environmental Impact Statement/Management Plan] provide more detail on the characteristics of the Monterey Bay and Davidson Seamount area that give it particular value.

*Article IV. Scope of Regulations*

Section 1. Activities Subject to Regulation

The following activities are subject to regulation, including prohibition, to the extent necessary and reasonable to ensure the protection and management of the conservation, ecological, recreational, research, educational, historical, and esthetic resources and qualities of the Sanctuary:

a. Exploring for, developing, or producing oil, gas, or minerals (e.g., clay, stone, sand, metalliferous ores, gravel, non-metalliferous ores, or any other solid material or other matter of commercial value) within the Sanctuary;

b. Discharging or depositing, from within the boundary of the Sanctuary, any material or other matter, except dredged material deposited at disposal sites authorized prior to the effective date of Sanctuary designation, provided that the activity is pursuant to, and complies with the terms and conditions of, a valid Federal permit or approval existing on the effective date of Sanctuary designation;

c. Discharging or depositing, from beyond the boundary of the Sanctuary, any material or other matter, except dredged material deposited at the authorized disposal sites described in Appendix D to the site regulations, provided that the activity is pursuant to, and complies with the terms and conditions of, a valid Federal permit or approval;

d. Taking, removing, moving, catching, collecting, harvesting, feeding, injuring, destroying, or causing the loss of, or attempting to take, remove, move, catch, collect, harvest, feed, injure, destroy, or cause the loss of, a marine mammal, sea turtle, seabird, historical resource, or other Sanctuary resource;

e. Drilling into, dredging, or otherwise altering the submerged lands of the Sanctuary; or constructing, placing, or abandoning any structure, material, or other matter on or in the submerged lands of the Sanctuary;

f. Possessing within the Sanctuary a Sanctuary resource or any other resource, regardless of where taken, removed, moved, caught, collected, or harvested, that, if it had been found within the Sanctuary, would be a Sanctuary resource;

g. Possessing any Sanctuary historical resource;

h. Flying a motorized aircraft above the Sanctuary;

i. Operating a vessel (i.e., water craft of any description) within the Sanctuary;

j. Aquaculture or kelp harvesting within the Sanctuary;

k. Interfering with, obstructing, delaying, or preventing an investigation, search, seizure, or disposition of seized property in connection with enforcement of the Act or any regulation or permit issued under the Act;

l. Introducing or otherwise releasing from within or into the Sanctuary an introduced species.

Section 2. Emergencies

Where necessary to prevent or minimize the destruction of, loss of, or injury to a Sanctuary resource or quality, or minimize the imminent risk of such destruction, loss, or injury, any and all activities, including those not listed in section 1 of this Article, are subject to immediate temporary regulation, including prohibition.

*Article V. Effect on Leases, Permits, Licenses, and Rights*

Pursuant to section 304(c)(1) of the Act, 16 U.S.C. 1434(c)(1), no valid lease, permit, license, approval, or other authorization issued by any Federal, State or local authority of competent jurisdiction, or any right of subsistence use or access, may be terminated by the Secretary of Commerce or designee as a result of this designation or as a result of any Sanctuary regulation if such authorization or right was in existence on the effective date of this designation. The Secretary of Commerce or designee, however, may regulate the exercise (including, but not limited to, the imposition of terms and conditions) of such authorization or right consistent with the purposes for which the Sanctuary is designated.

In no event may the Secretary or designee issue a permit authorizing, or otherwise approve: (1) The exploration for development of or production of oil, gas, or minerals within the Sanctuary except for limited, small-scale jade collection in the Jade Cove area of the Sanctuary [defined as the area bounded by the 35.92222 N latitude parallel (coastal reference point: beach access stairway at South Sand Dollar Beach), the 35.88889 N latitude parallel (coastal reference point: westernmost tip of Cape San Martin), and the mean high tide line seaward to the 90 foot isobath (depth line)]; (2) the discharge of primary-treated sewage (except for regulation, pursuant to section 304(c)(1) of the Act, of the exercise of valid authorizations in existence on the effective date of Sanctuary designation and issued by other authorities of competent

jurisdiction); or (3) the disposal of dredged material within the Sanctuary other than at sites authorized by the U.S. Environmental Protection Agency (in consultation with the U.S. Army Corps of Engineers) prior to the effective date of designation. Any purported authorizations issued by other authorities after the effective date of Sanctuary designation for any of these activities within the Sanctuary shall be invalid.

*Article VI. Alterations to This Designation*

The terms of designation, as defined under section 304(a) of the Act, may be modified only by the same procedures by which the original designation is made, including public hearings, consultation with interested Federal, State, and local agencies, review by the appropriate Congressional committees and Governor of the State of California, and approval by the Secretary of Commerce or designee.

**[END OF DESIGNATION DOCUMENT]**

**Summary of the Proposed Regulatory Amendments**

Introduced species in the marine and estuarine environment alter species composition, threaten the abundance and/or diversity of native marine species (especially threatened and endangered species), interfere with the ecosystem's function and disrupt commercial and recreational activities. Introduced species may cause local extinction of native species either by preying upon them directly or by outcompeting them for prey. For example, the European green crab, now found in Elkhorn Slough, both preys on the young of valuable species (such as Dungeness crab) and competes with them for resources. Introduced species may cause changes in physical habitat structure. For example, burrows caused by the isopod Sphaeroma quoyanum, originally from New Zealand and Australia, are found in banks throughout the Elkhorn Slough, and may exacerbate the high rate of tidal erosion in the Slough. Introduced species pose a significant threat to the natural biological communities and ecological processes in the Monterey Bay National Marine Sanctuary and may have a particularly large impact on the Sanctuary's twenty-six threatened and endangered species.

Introduced species may become a new form of predator, competitor, disturber, parasite, or disease that can have devastating effects upon ecosystems. For example, introduced species impacts on native coastal marine species of the Sanctuary could include: replacement of a functionally similar native species through competition; reduction in abundance or elimination of an entire population of a native species, which can affect native species richness; inhibition of normal growth or increased mortality of the host and associated species; increased intra-or interspecies competition with native species; creation or alteration of original substrate and habitat; hybridization with native species; and direct or indirect toxicity (e.g., toxic diatoms). Changes in species interactions can lead to disrupted nutrient cycles and altered energy flows that ripple through an entire ecosystem. Exotic species may also pose threats to endangered species, and native species diversity. A number of non-native species now found in the Monterey Bay region were introduced elsewhere on the west coast but have spread through, for example, hull-fouling and ballast water discharge.

Introduced species are a major economic and environmental threat to the living resources and habitats of the MBNMS as well as the commercial and recreational uses that depend on these resources. Once established, introduced species can be extremely difficult, if not impossible, to eradicate. Introduced species have become increasingly common in recent decades, and the rate of invasions continues to accelerate at a rapid pace. Estuaries are particularly vulnerable to invasion; and large ports, such as San Francisco Bay, can support hundreds of introduced species with significant impacts to native ecosystems. Although there are numerous efforts underway at the international, federal and state levels to address the issue of introduced species, the existing management plan for the Monterey Bay National Marine Sanctuary does not include any specific discussion of introduced species.

The proposed regulatory changes would prohibit introducing or otherwise releasing from within or into the Sanctuary an introduced species, except striped bass (Morone saxatilis) released during catch and release fishing activity. ''Introduced species'' is defined to mean: (1) a species (including but not limited to any of its biological matter capable of propagation) that is non-native to the ecosystems protected by the Sanctuary; or (2) any organism into which genetic matter from another species has been transferred in order that the host organism acquires the genetic traits of the transferred genes. This prohibition is designed to help reduce the risk from introduced species, including their seeds, eggs, spores, and other biological material capable of propagating. The intent of the prohibition is to prevent injury to Sanctuary resources and qualities, to protect the biodiversity of the Sanctuary ecosystems, and to preserve the native functional aspects of the Sanctuary ecosystems, all of which are put at risk by introduced species. During consultations with the State of California, concern was expressed that striped bass would qualify as an introduced species and that an angler who catches and then releases a striped bass would be in violation of the proposed regulation. While prohibiting such activity was not the intent of the regulation, to address this concern, the regulation now exempts striped bass as the only introduced species for which there is an active fishery.

The proposed regulatory changes would also modify the existing definition of motorized personal watercraft (MPWC); this change is proposed to avoid disturbance and other injury to marine wildlife by MPWCs, minimize user conflicts between MPWC operators and other recreationalists, and continue to provide opportunities for MPWC use within the MBNMS. Implementing this modified definition would help fulfill the original intent of the regulation and its zoning restriction. No changes to the current prohibition or MPWC zones are proposed.

MPWC are small, fast, and highly maneuverable craft that possess unconventionally high thrust capability and horsepower relative to their size and weight. Their small size, shallow draft, instant thrust, and ''quick reflex'' enable them to operate closer to shore and in areas that would commonly pose a hazard to conventional craft operating at comparable speeds. Resources such as sea otters and seabirds are either unable to avoid these craft or are frequently alarmed enough to significantly modify their behavior such as cessation of feeding or abandonment of young. Tow-in surfing activity using MPWC has been increasing at many traditional surfing locations in the MBNMS, regardless of surf conditions. The MBNMS has received complaints by surfers, beachgoers, and coastal residents that the use of MPWC in traditional surfing areas has produced conflicts with other ocean users and has caused disturbance of wildlife. During the designation of the MBNMS, the operation of MPWC in nearshore areas was identified as an activity that should be prohibited to avoid such impacts.

The current regulation restricts MPWC to specific zones within the MBNMS. However, the current definition of MPWC does not cover all

**Federal Register** / Vol. 71, No. 194 / Friday, October 6, 2006 / Proposed Rules    **59055**

types of existing MPWC. Watercraft that are larger and can accommodate three or more persons are not subject to the regulations because they are not included in the current definition. The existing regulation therefore does not fully address the threat posed by MPWC to marine resources and the issue of user conflict. To address these concerns, changes are proposed to the current definition that would cover all categories of MPWC and that would therefore eliminate the loophole in the current regulation. The proposed changes would expand the definition of MPWC to address a broader range of watercraft that would be restricted.

The current definition of MPWC for the MBNMS at 15 CFR 922.131 states: "Motorized personal water craft means any motorized vessel that is less than fifteen feet in length as manufactured, is capable of exceeding a speed of fifteen knots, and has the capacity to carry not more than the operator and one other person while in operation. The term includes, but is not limited to, jet skis, wet bikes, surf jets, miniature speed boats, air boats and hovercraft."

The current definition is insufficient to meet NOAA's original goal of restricting the operation of small, highly maneuverable watercraft within the boundaries of the MBNMS. It does not encompass the majority of MPWC operating within the MBNMS today because it is based upon outdated MPWC design characteristics of the early 1990s. Since 1992, MPWC manufacturers have built increasingly larger craft with 3+ passenger riding capacity or varied design characteristics that place these craft outside the current MBNMS regulatory definition. These newer craft effectively skirt the definition, yet they retain or exceed the performance capabilities of their predecessors that pose a threat to Sanctuary resources and qualities. The above MPWC definition is based solely upon static design characteristics that have rendered it obsolete and ineffective over time, and the definition needs a complete replacement.

NOAA has therefore developed a more flexible, integrated three-part definition for continued relevance, despite continuing MPWC design changes. Should a future MPWC design unexpectedly displace any one part of the definition, one or both of the remaining two parts would still apply to sustain the intent of the definition. Part 1 focuses on operating characteristics and is not constrained by hull design or propulsion unit specifications. Part 2 focuses on high-speed hull designs that shed water (e.g., Kawasaki Corporation's Jet Ski line) and is not constrained by

propulsion unit specifications or operating characteristics. Part 3 focuses on jet boats that share the same operating capabilities as craft that meet the definition under parts 1 and 2 but where passengers sit inside the craft. The new definition is intended to effectively identify all craft of concern without inadvertently restricting other watercraft. The new proposed definition states: "Motorized personal watercraft means (1) any vessel, propelled by machinery, that is designed to be operated by standing, sitting, or kneeling on, astride, or behind the vessel, in contrast to the conventional manner, where the operator stands or sits inside the vessel; (2) any vessel less than 20 feet in length overall as manufactured and propelled by machinery and that has been exempted from compliance with the U.S. Coast Guard's Maximum Capacities Marking for Load Capacity regulation found at 33 CFR Parts 181 and 183, except submarines; or (3) any other vessel that is less than 20 feet in length overall as manufactured, and is propelled by a water jet pump or drive."

Though the vast majority of MPWC operated in the Sanctuary today are similar to Kawasaki's classic Jet Ski design, a variety of craft are currently marketed that are equally maneuverable at high speeds, with shallow drafts, and powerful thrust/weight ratios. One such innovation involves a remotely operated water-jet propulsion pod controlled via a tow line by a skier behind the pod. Water-jet propelled surf boards are also available. Small, highly maneuverable jet boats have also entered the market. These non-conventional watercraft designs demonstrate the creative variations in MPWC that warrant a more resilient regulatory definition.

Part 1 of the proposed definition is similar to current definitions of MPWC used by the Gulf of the Farallones and Florida Keys National Marine Sanctuaries, the National Park Service, and the State of California's Harbors and Navigation Code. However, it differs by omitting reference to a particular hull design, length, or propulsion system in order to prevent the definition from becoming obsolete over time due to the rapidly evolving MPWC design market. It also no longer focuses on vessels "capable of exceeding a speed of fifteen knots." This language was difficult to enforce and did not sufficiently aid in encompassing those vessels of concern to the NMSP. A vessel's speed is also captured in other ways in the proposed definition. The new definition also identifies a wider variety of riding postures common to the unconventional vessel designs that pose a threat to

Sanctuary resources and qualities. These threats arise because these design features increase the vessel's maneuverability and allow riders to enter shallow water zones and areas adjacent to small islands and off-shore rocks used by marine mammals and seabirds as breeding, nursing, and resting areas.

Part 1 identifies the operating characteristics of most vessels of concern at the present time. However, part 1 alone does not reach all craft of concern. For this reason, parts 2 and 3 were included in the definition.

Part 2 utilizes an existing U.S. Coast Guard regulation to identify many existing and future vessel designs that pose a threat to Sanctuary resources and qualities. The Coast Guard requires special testing for most powered vessels under 20 feet in length. This is due to the unique stability and displacement characteristics of these vessels that affect passenger safety (33 CFR Part 183). The weight/size ratio of these small craft presents a higher risk of swamping, capsizing, sinking, and passenger dismount. The Coast Guard requires that the results of the vessel stability tests be printed on a capacity plate affixed to each vessel design for which the special testing is required (33 CFR Part 181). A key component of the Coast Guard's regulation is a stability test. To conduct this test, weight is systematically added to the outer hull until it tips to the waterline, allowing water to flood into the vessel. From such tests, computations can be made to determine the maximum safe passenger and cargo loading capacity for that vessel design.

Some high-speed unconventional vessels (e.g., jet bikes, hovercraft, air boats, and race boats) are designed without carrying spaces that hold water. In other words, their hull designs prevent flooding, because they do not have open hulls into which water will flow. Since this design feature makes it impossible to complete the tests required by 33 CFR Part 183, the manufacturers of such craft routinely seek and receive exemptions from these testing and labeling requirements.

With the exception of submarines, the "powered" surface vessel designs exempted pursuant to the Coast Guard regulations at 33 CFR Parts 181 and 183 (e.g., jet bikes, hovercraft, air boats, and race boats) possess two or more of the following characteristics: robust buoyancy, rapid acceleration, high maneuverability at speed, and shallow draft. These and associated design characteristics afford such vessels unique access and operability within sensitive marine areas (e.g., marine

mammal and seabird enclaves). This poses a threat to Sanctuary resources and qualities—the same threat that prompted regulatory restrictions on the operation of such hull designs within the MBNMS in 1992. NOAA's rationale and authority to impose such restrictions were affirmed in *Personal Watercraft Industry Association, et al.* v. *Department of Commerce*, 48 F.3d 540 (D.C. Cir. 1995).

By referencing the Coast Guard regulations at 33 CFR Parts 181 and 183, NOAA can effectively and precisely identify various vessels of concern while avoiding an excessively lengthy definition for MPWC. Although part 2 of the definition includes some vessel designs already captured by part 1, it compensates for static aspects of part 1 that could result in a regulatory loophole due to rapidly evolving MPWC designs, as has happened with the current definition.

Parts 1 and 2 largely address problems caused by non-conventional hull designs, which allow the user to enter sensitive and important wildlife habitats. But they do not adequately address the emergence of small, conventional hulls powered by water jet propulsion systems. Jet propulsion systems give vessels many of the same operating characteristics and capabilities of the previously identified vessels of concern (e.g., rapid acceleration, high maneuverability at speed, and shallow draft). They therefore allow these vessels to operate in areas where wildlife is most frequently found. Part 3 was thus developed to include these small craft in the definition. Jet propulsion vessels that are longer than twenty feet do not generally possess these same operational characteristics and capabilities, and are thus excluded from the definition. Further, Coast Guard regulations often categorize small boats as less than 20 feet in length. NOAA has similarly adopted this standard to differentiate between smaller and larger jet-propelled vessels.

The proposed regulations would also clarify and modify the existing (1992) regulation prohibiting discharging or depositing any material or other matter. Clarifications include: the regulation applies to discharges/deposits from within or into the Sanctuary; the exception for fish, fish parts, or chumming materials (bait) applies only to such discharges/deposits made during the conduct of traditional fishing operations within the Sanctuary; and the exception for effluent discharges from marine sanitation devices applies only to operable Type I or II marine sanitation devices approved by the U.S.

Coast Guard in accordance with the Federal Water Pollution Control Act. The existing exception for vessel wastes "generated by a marine sanitation device" was intended to prohibit the dumping of untreated sewage into the Sanctuary; the proposed modification to this exception makes express that such discharges are only allowed if generated by Type I or II marine sanitation devices (Type I and Type II marine sanitation devices treat wastes, but Type III marine sanitation devices do not). The proposed modification would also require vessel operators to lock all marine sanitation devices in a manner that prevents the discharge of untreated sewage. This requirement would aid in enforcement and compliance with Sanctuary regulations.

The proposed regulatory amendments would clarify that current exceptions to the prohibition on discharges/deposits from vessels for graywater and deck wash down must be biodegradable. The proposed changes would also clarify that discharges/deposits from vessel generator cooling water, anchor wash, and clean bilge water (meaning not containing detectable levels of harmful matter as defined) are excepted from the discharge/deposit prohibition.

The discharge/deposit of oily wastes from bilge pumping is currently prohibited. This prohibition is proposed to be replaced by language requiring that all bilge discharges/deposits be clean, meaning not containing detectable levels of harmful matter as defined. For purposes of determining detectable levels of oil in bilge discharges/deposits, a detectable level of oil is interpreted here to include any waste that produces a visible sheen. This change would provide clarification regarding permitted contents of bilge water discharges/deposits.

The discharge/deposit of ballast water is not covered by any exception to the discharge/deposit prohibition, and therefore is prohibited. The discharge/deposit of ballast water is a common source of introduced species and will remain prohibited.

The proposed discharge/deposit regulations distinguish cruise ship discharges/deposits from discharges/deposits of other vessels. A "cruise ship" is proposed to be defined to mean a vessel with 250 or more passenger berths for hire. Although there are exceptions to the general vessel discharge/deposit regulations for certain matter, the only discharges/deposits proposed to be permitted from a cruise ship are vessel engine cooling water, generator cooling water, and anchor wash. These discharges/deposits are also exceptions in the general vessel

discharge/deposit regulations. The purpose of regulating cruise ship discharges/deposits is to reduce adverse effects on the marine environment as a result of pollutant discharges/deposits. A wide array of pollutants, such as sewage and graywater, are discharged/deposited in larger volumes from cruise ships than other ships due to their sheer size and passenger capacity. The existing and proposed general vessel discharge/deposit regulations except biodegradable effluent generated by a Type I or II marine sanitation device, but the large volumes of such discharged effluent associated with cruise ships may not adequately disperse to avoid harm to marine resources. Additionally, the volume of biodegradable material from a cruise ship resulting from deck washdown greatly exceeds the volumes associated with typical vessels used in the Sanctuary. Although several laws and regulations partly address these issues, there is a need for a more comprehensive prohibition on cruise ship discharges/deposits within the Sanctuary.

The proposed regulatory changes would extend the existing regulation prohibiting possession of a Sanctuary historical resource to prohibit possession either within or outside the Sanctuary. The proposed clarification would increase protection of Sanctuary resources by making it illegal to possess historical resources in any geographic location (e.g., harbors).

The proposed regulatory changes would also modify the existing prohibition against altering the seabed of the Sanctuary. The term "seabed" would be replaced with "submerged lands" to be consistent with the NMSA. Additionally, the submerged lands in estuarine areas within the Sanctuary such as Elkhorn Slough are not accurately described as "seabed". The proposed regulatory changes would also clarify that activities currently excepted from the prohibition against altering the submerged lands or constructing, placing or abandoning any matter on them are only excepted to the extent that disturbing the submerged lands is necessary to their completion. There are no exceptions to the prohibition against disturbing the submerged lands within the DSMZ, other than impacts that are incidental and necessary to the conduct of traditional fishing operations. Please note, however, that fishing in the DSMZ below 3000 feet is prohibited under 50 CFR 660 (fisheries off West Coast states and in the Western Pacific).

To address concerns regarding the threats to the marine environment from deserted vessels, the NMSP is proposing

**Federal Register** / Vol. 71, No. 194 / Friday, October 6, 2006 / Proposed Rules 59057

a regulation to minimize this threat. The proposed regulation would prohibit deserting a vessel aground, at anchor, or adrift in the Sanctuary. This prohibition would help reduce or avoid injury to Sanctuary resources and qualities from vessels impacting shoreline habitats and potentially discharging harmful matter. To clarify which vessels would be considered deserted, the NMSP is also proposing to define "deserting" as:

(a) leaving a vessel aground or adrift: (1) without notification to the Director of the vessel going aground or becoming adrift within 12 hours of its discovery and developing and presenting to the Director a preliminary salvage plan within 24 hours of such notification; (2) after expressing or otherwise manifesting intention not to undertake or to cease salvage efforts; or (3) when the owner/operator cannot after reasonable efforts by the Director be reached within 12 hours of the vessel's condition being reported to authorities; or

(b) leaving a vessel at anchor when its condition creates potential for a grounding, discharge, or deposit and the owner/operator fails to secure the vessel in a timely manner.

The proposed changes include an additional regulation that would prohibit leaving harmful matter aboard a grounded or deserted vessel. Once a vessel is grounded there is a high risk of discharge/deposit of harmful matter into the marine environment. Harmful matter aboard a deserted vessel also poses a threat to Sanctuary resources and water quality. Currently, preemptive removal of harmful substances (*e.g.*, motor oil) is not required by regulation. This prohibition would help reduce or avoid harm to Sanctuary resources and qualities from hazardous or other harmful matter from a vessel.

NOAA proposes to modify the regulations to define and incorporate the DSMZ into the Sanctuary, and establish a unique set of prohibitions for that area. The Davidson Seamount is located outside of MBNMS, 120 kilometers (75 miles) to the southwest of Monterey, and is one of the largest known seamounts in U.S. waters. It is 42 kilometers (26 miles) long and 13 kilometers (8 miles) wide. From base to crest, Davidson Seamount is 2,400 meters (7,480 feet) tall, yet it is still 1,260 meters (4,101 feet) below the sea surface. Threats from fishing are relatively remote; the top of the seamount is too deep for most fish trawling technology. However, future fishing efforts could target the seamount.

The NMSP has determined that the Davidson Seamount requires protection from the take or other injury to benthic organisms or those organisms living near the sea floor because of the

seamount's special ecological and fragile qualities and potential future threats that could adversely affect these qualities. Therefore, the Davidson Seamount is proposed for inclusion in MBNMS.

The NMSP consulted with the Pacific Fishery Management Council (PFMC) and the National Marine Fisheries Service (NMFS) on the most appropriate level of resource protection for the Davidson Seamount and the various means for achieving it. This consultation coincided with the culmination of the PFMC's separate, longer-term efforts to identify and protect Essential Fish Habitat (EFH) on the West coast. PFMC unanimously supported the incorporation of the seamount into the Monterey Bay National Marine Sanctuary, but recommended that protection from fishing impacts be achieved by including Davidson Seamount as one of the areas being considered for protection as EFH under the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) at 50 CFR part 660. NMFS subsequently approved and implemented this recommendation by designating Davidson Seamount as EFH and prohibiting all fishing below 3000 feet in the area proposed to be included in the MBNMS.

A square area around the seamount would be incorporated into the Sanctuary approximately 25 nautical miles (46 kilometers; 29 miles) per side. The incorporated area would include the water and submerged lands thereunder. The proposed regulation would prohibit moving, removing, taking, collecting, catching, harvesting, disturbing, breaking, cutting, or otherwise injuring, or attempting to move, remove, take, collect, catch, harvest, disturb, break, cut, or otherwise injure, any Sanctuary resource located more than 3,000 feet below the sea surface within the DSMZ. It would also prohibit possessing any Sanctuary resource the source of which is more than 3,000 feet below the sea surface within the DSMZ. These prohibitions would not apply to commercial and recreational fishing below 3000 feet within the DSMZ conducted pursuant to 50 CFR part 660 (Fisheries off West Coast States and in the Western Pacific), or possession of fish resulting from commercial and recreational fishing below 3000 feet within the DSMZ conducted pursuant to 50 CFR part 660 (Fisheries off West Coast States and in the Western Pacific). The Sanctuary regulation does, however, prohibit resource extraction conducted for research purposes, as research

extraction is not within the scope of the Magnuson-Stevens prohibition. As mentioned above, NOAA Fisheries, under the Magnuson-Stevens Act, has designated this area as EFH and prohibited fishing conducted pursuant to 50 CFR part 660 below 3000 feet. In practical terms, there would be no difference between the prohibition of fishing below 3000 feet pursuant to the Magnuson-Stevens Act and protection of these same resources by applying the prohibition in this proposed rule under the National Marine Sanctuaries Act to the same fishing activity.

By incorporating the seamount into the MBNMS, its resources would be protected and opportunities would arise for a better understanding of the seamount.

White sharks have experienced harassment from cage diving operations, filming, and other wildlife watching operations. MBNMS regulations currently prohibit white shark attraction activities within specific areas of the Sanctuary, including the area out to the seaward limit of state waters (three miles from the coastline). The proposed changes to the regulation would extend this prohibition to the entire Sanctuary. The purpose of this prohibition is to protect white sharks from intrusive activities during their critical feeding life-cycle in all areas of the Sanctuary. The prohibition would avoid potential user conflicts between researchers and adventure tourism and would prevent intervention with feeding behavior of white sharks. This regulation is not expected or intended to impact any current fishing operations within the MBNMS. In addition to this prohibition, the regulatory definition of "attract or attracting" is proposed to be clarified to expressly include "decoys" as an attraction mechanism that would be prohibited and, while the scope of the regulation would only apply to white sharks, to be modified so as to apply to all animals for the purpose of being consistent with definitions for other national marine sanctuaries.

The proposed regulations would define and recognize the location of pre-existing dredged material disposal site SF–12. Definition of the SF–12 site is needed to clarify its exact location and to allow disposal of dredged material to occur at the head of the Monterey Canyon. This location would allow sediment flow into the Monterey Canyon, as originally intended. The location of dredged material disposal site SF–12 has been described inconsistently, which has led to confusion about the area designated for disposal of dredged material off of Moss Landing. Defining and codifying the

area of disposal for SF–12 in MBNMS's regulations would provide exact coordinates and eliminate multiple descriptions of various points of disposal, while ensuring that the definition is consistent with the original intent of the project. No increase in the volume of dredged material is a part of this action. The U.S. Army Corps of Engineers and Environmental Protection Agency approved this change in location in early 2006. The proposed regulations would also incorporate the coordinates of dredged material disposal site SF–14. Also, Santa Cruz and Monterey Harbors have identified additional dredged material disposal sites that were in use prior to MBNMS designation. These sites were not recognized at the time of designation. The proposed regulations would codify these areas and would provide exact coordinates for the disposal areas, and thereby formally recognize historic sites used prior to the designation of MBNMS.

The proposed changes to the Sanctuary regulations also include grammatical and technical changes to the permitting procedures section to remove extraneous language concerning standard permit conditions and to add clarity to the necessary findings and considerations for issuance of a permit.

The proposed changes also include technical changes to the Sanctuary boundaries, which are referenced in Appendix A to the proposed regulations below. With the exception of adding Davidson Seamount, the minor changes are for purposes of clarifying existing boundaries.

**Public Hearings**

NOAA is publishing this proposed rule to provide notice to the public and invite advice, recommendations, information, and other comments from interested parties on the proposed rule and Draft Management Plan/Draft Environmental Impact Statement (DMP/DEIS). Public hearings will be held as detailed below:

(1) November 29, 2006, 6:30 p.m. at the Cambria Pines Lodge, 2905 Burton Drive, Cambria, CA 93428.

(2) November 29, 2006, 6:30 p.m. at the Bodega Marine Laboratory, 2099 Westside Road, Bodega Bay, CA 94923.

(3) November 30, 2006, 6:30 p.m. at the Monterey Conference Center, One Portola Plaza, Monterey, CA 93940.

(4) November 30, 2006, 6:30 p.m. at the Dance Palace Community Center, 503 B Street, Point Reyes Station, CA 94956.

(5) December 5, 2006, 6:30 p.m. at the University of California Santa Cruz Inn

and Conference Center, 611 Ocean Street, Santa Cruz, CA 95060.

(6) December 5, 2006, 6:30 p.m. at the Fort Mason Center, Firehouse (NE corner of Center), San Francisco, CA 94123

(7) December 6, 2006, 6:30 p.m. at the Community United Methodist Church, 777 Miramontes Street, Half Moon Bay, CA 94019.

**Miscellaneous Rulemaking Requirements**

*National Marine Sanctuaries Act*

Section 304(a)(4) of the NMSA (16 U.S.C. 1434(a)(4)) requires that the procedures specified in section 304 for designating a National Marine Sanctuary be followed for modifying any term of designation. In particular, section 304 requires that the Secretary of Commerce submit to the Committee on Resources of the United States House of Representatives, the Committee on Commerce, Science, and Transportation of the United States Senate and the Governor of California, no later than the same day as this notice is published, documents including a copy of this notice, the terms of the proposed designation (or in this case, the proposed changes thereto), the proposed regulations, a draft management plan detailing the proposed goals and objectives, management responsibilities, research activities for the area, and a draft environmental impact statement. In accordance with section 304, the required documents have been submitted to the specified Congressional Committees.

*National Environmental Policy Act*

When changing a term of designation of a National Marine Sanctuary, section 304 of the NMSA (16 U.S.C. 1434) requires the preparation of a draft environmental impact statement (DEIS), as provided by the National Environmental Policy Act of 1969 (42 U.S.C. 4321 *et seq.*) and that the DEIS be made available to the public. NOAA has prepared a Draft Management Plan (DMP)/DEIS on the proposal and copies are available at the address and website listed in the Address section of this proposed rule. Responses to comments received on the DMP/DEIS will be published in the FMP/FEIS and preamble to the final rule.

*Executive Order 12866: Regulatory Impact*

This proposed rule has been determined to be not significant within the meaning of Executive Order 12866.

*Executive Order 13132: Federalism Assessment*

NOAA has concluded that this regulatory action falls within the definition of ''policies that have federalism implications'' within the meaning of Executive Order 13132. The proposed changes will not preempt State law, but will simply complement existing State authorities. In keeping with the intent of the Executive Order, the NMSP consulted with a number of entities within the State who participated in development of the proposed rule, including but not limited to, the California Department of Boating and Waterways, the California State Lands Commission, the California Department of Fish and Game, and the California Resources Agency.

*Regulatory Flexibility Act*

The Chief Counsel for Regulation of the Department of Commerce certified to the Chief Counsel for Advocacy of the Small Business Administration that this proposed rule, if adopted, would not have a significant economic impact on a substantial number of small entities. The factual basis for this certification is as follows:

Based primarily on recent socioeconomic studies, and on-site surveys of visitor use, NMSP has identified the following small businesses and small organizations as defined by the Regulatory Flexibility Act. Small business concerns operating within the Sanctuary include over 500 commercial fishing operations, more than 30 consumptive recreational charter businesses, over 30 non-consumptive recreational charter businesses, approximately 3 motorized personal watercraft businesses, and approximately 10 marine salvage companies.

Small organizations operating within the Sanctuary include non-governmental organizations (NGOs) and/or non-profit organizations (NPOs) dedicated to environmental education, research, restoration, and conservation concerning marine and maritime heritage resources. There are approximately 50 small organizations active in the Sanctuary including non-profit organizations (NPOs) involved in education, research, restoration, and conservation activities. Cambria, Carmel-by-the-Sea, Pacific Grove, City of Monterey, City of Seaside, Del Rey Oaks, Marina, Castroville, Pajaro, Soquel, Capitola, Rio Del Mar, Aptos, Pacifica, Half Moon Bay, San Mateo County Harbor District, Santa Cruz Port District and Moss Landing Harbor District would qualify as ''small

governmental jurisdictions'' directly adjacent to the Sanctuary.

The proposed prohibition on possession of Sanctuary historical resources outside of Sanctuary boundaries is not expected to result in a significant adverse impact to current small entity operations within the Sanctuary. The relevant activities of those small entities whose operations may involve the incidental take of Sanctuary historical resources, i.e., traditional fishing operations, aquaculture, and kelp harvesting, would remain excepted from this regulation.

The proposed prohibition on introducing or otherwise releasing from within or into the Sanctuary an introduced species would be applicable to all small entity operations but is not expected to significantly adversely impact these operations. The introduction or other release of introduced species is not part of the business or operational practices associated with any of the identified small entities; for those small entities whose operational practices may include catch and release of striped bass (*Morone saxatilis*), (i.e., consumptive recreational charter business), an exception has been provided for striped bass released during catch and release fishing activity. By prohibiting such introductions, indirect benefits may result for certain small entities since their activities could potentially be negatively impacted by the spread of introduced species.

None of the small entities conducting activities within the Sanctuary are expected to be adversely impacted by replacing ''seabed'' with ''submerged lands''. Similarly, proposed corrected inaccuracies in and clarifications to the Sanctuary's boundary coordinates would not introduce any new regulations or requirements that would adversely impact any of the small entities operating within the Sanctuary.

The proposed modification to the Sanctuary's discharge regulation clarifying that discharges allowed from marine sanitation devices apply only to Type I and Type II marine sanitation devices is applicable to all small entities that operate boats in the Sanctuary and would require that all vessels lock their marine sanitation devices in such a way as to prevent discharge of untreated sewage. This change would merely clarify the original intent of the Sanctuary's discharge regulation, which is that raw sewage not be discharged from vessels into the Sanctuary, but rather must first be treated by a marine sanitation device. The requirement to lock marine sanitation devices would facilitate enforcement and compliance.

To the extent that this clarification might affect customary, though illegal, sewage discharge practices of some vessel-based small entity operations not using Type I or Type II marine sanitation devices, the adverse effect on those activities is expected to be less than significant. Additionally, commercial fishing, consumptive and non-consumptive charter businesses, and non-governmental organizations may receive indirect benefits from the clarification of this prohibition on release of raw sewage, especially as it might pertain to preventing large volume discharges from larger vessels, since it may contribute to sustaining favorable environmental quality in their area of operation.

The proposed prohibition on discharge from cruise ships would have no adverse impacts on any current small entity operations. The Small Business Administration defines the threshold for a ''Scenic and Sightseeing Transportation, Water'' small business as an entity that has average annual receipts of $6.5 million per year or less (NAICS 487210). ''Cruise ship'' is defined by the Sanctuary to mean a vessel with 250 or more passenger berths for hire. All of the cruise ship entities that operate vessels in the Sanctuary with more than 250 passenger berths are considered large entities. Additionally, cruise ships would not be prevented from operating in the Sanctuary, as indicated by the exception for ''vessel engine cooling water, vessel generator cooling water, and anchor wash''. All other discharge/deposit matter must be disposed of beyond the Sanctuary boundary, provided that it does not enter the Sanctuary and injure a Sanctuary resource.

The proposed prohibition on deserting a vessel aground, at anchor, or adrift would not have a significant adverse impact on small entities, as doing so is not an aspect of operation and as such the adverse impact to small entities would be less than significant. Indirect beneficial effects from this prohibition may result for those small entities, such as commercial fishing and recreational charter businesses that depend upon a healthy nearshore marine environment that is not subjected to vessel groundings, hazardous spills, and wildlife disturbance risks that grounded vessels can pose.

The proposed modification to the Sanctuary's motorized personal watercraft (MPWC) regulation's current definition would cover all categories of MPWC and would eliminate the existing loophole in the current regulations. The proposed change would expand the definition of MPWC to address a broader range of watercraft that would be restricted. Implementing this modified definition would help fulfill the original intent of the regulation and its zoning restrictions. The proposed modification would not have a significant adverse impact on small businesses directly involved in MPWC services. The majority of the MPWC industry is geared toward lake and river based recreation. A less than significant portion of the MPWC industry involves general MPWC use in the ocean waters of the MBNMS. No small businesses are directly linked with MPWC use in the MBNMS. While approximately 3 MPWC dealers and rental businesses operate in the greater MBNMS area, none are specifically targeting customers intending to use the craft in marine waters. One MPWC safety school based near Los Angeles operates a portion of its business within the MBNMS; however, the majority of the instruction takes place outside of the MBNMS.

The proposed prohibition of moving, removing, taking, collecting, catching, harvesting, disturbing, breaking, cutting, or otherwise injuring, or attempting to move, remove, take, collect, catch, harvest, disturb, break, cut, or otherwise injure, any Sanctuary resource located more than 3,000 feet below the sea surface in the Davidson Seamount Management Zone would not impact small businesses operating in the MBNMS; nor would the parallel possession regulation. The small entities most likely to be affected by this prohibition could be small fishing entities; however, there is currently no fishing that occurs below 3000 feet in the DSMZ. Additionally, these entities would not be impacted because the prohibition on fishing at greater than 3000 feet in the DSMZ is already accomplished through Essential Fish Habitat regulations under the Magnuson-Stevens Act. For persons wishing to conduct research activities affected by this prohibition, a permit could be issued, if appropriate, to conduct the activity.

The proposed change to the regulation that currently prohibits white shark attraction activities within a specific area of the Sanctuary, i.e., the area out to the seaward limit of state waters (three miles from the coastline), would extend this prohibition to the entire Sanctuary. No adventure tourism related small businesses currently attract white sharks in the MBNMS, so there would be no impact to small businesses.

The proposed regulatory amendments that clarify current exceptions to the prohibition on discharges/deposits from vessels for graywater and deck wash

down must be biodegradable would not significantly impact small businesses. Biodegradable cleaning materials are generally no more costly than non-biodegradable cleaning materials. Biodegradable graywater is accepted for vessels other than cruise ships, which are not small businesses. Deck washdowns can still occur; however, the cleaning materials must also be biodegradable. Additionally, the proposed changes clarifying that vessel generator cooling water, clean bilge water, and anchor wash are excepted from the prohibition would not impact small businesses. This is only a clarification of the status quo.

The discharge of chum for the purpose of attracting white sharks would be prohibited but as discussed, there would be no significant impact on small business entities as no adventure tourism businesses currently attract white sharks in the MBNMS. The use of chum incidental and necessary to fishing is exempt from the discharge prohibition and would therefore not result in economic impacts.

The prohibition against leaving harmful matter on a grounded or deserted vessel would not have a significant adverse impact on small entities, as doing so is not an aspect of operation; as such the adverse impact to small entities would be less than significant. Indirect beneficial effects from this prohibition may result for those small entities, such as commercial fishing and recreational charter businesses that depend upon a healthy nearshore marine environment that is not subjected to the discharge of harmful matter from grounded or deserted vessels.

Because this action would not have a significant economic impact on a substantial number of small entities, no initial regulatory flexibility analysis was prepared.

*Paperwork Reduction Act*

This proposed rule involves an existing information collection requirement previously approved by OMB (OMB# 0648–0141) under the Paperwork Reduction Act of 1980, 44 U.S.C. 3501 *et seq.* The proposed rule will not require any change to the currently approved OMB approval and would not result in any change in the public burden in applying for and complying with NMSP permitting requirements.

The public reporting burden for these permit application requirements is estimated to average 1.00 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and

maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate, or any other aspect of this data collection, including suggestions for reducing the burden, to David Bizot, National Permit Coordinator, NOAA National Marine Sanctuary Program, 1305 East-West Highway, N/ORM–6, Silver Spring, MD 20910, by e-mail to *David.Bizot@noaa.gov,* by fax to (301) 713–0404; or by e-mail to *David_Rostker@omb.eop.gov,* or fax to (202) 395–7285.

The proposed revised permit regulations would require the Director of the NMSP to consider the proposed activity for which a permit application has been received. The proposed modifications to the permit procedures and criteria (15 CFR 922.133) would further refine current requirements and procedures of the general National Marine Sanctuary Program regulations (15 CFR 922.48(a) and (c)). The proposed modifications would also clarify existing requirements for permit applications found in the Office of Management and Budget approved applicant guidelines (OMB Control Number 0648–0141). The revised permit regulations would add language about: The qualifications, finances, and proposed methods of the applicant; the compatibility of the proposed method with the value of the Sanctuary and the primary objective of protection of Sanctuary resources and qualities; the necessity of the proposed activity; and the reasonably expected end value of the proposed activity.

Notwithstanding any other provision of law, no person is required to respond to, nor shall any person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act, unless that collection of information displays a currently valid OMB control number.

In this proposed rule, NOAA is publishing in its entirety 15 CFR Part 922, Subpart M, as it would read with the amendments described above. Those amendments are the subject of this proposed rule and request for comments. NOAA's publishing of the entire body of regulations specifically governing the MBNMS, showing the proposed changes, is meant to facilitate the reader's understanding of the regulations and better inform public comments.

**List of Subjects in 15 CFR Part 922**

Administrative practice and procedure, Boats and Boating safety, Coastal zone, Education, Environmental

protection, Fish, Harbors, Marine mammals, Marine pollution, Marine resources, Marine safety, Natural resources, Penalties, Recreation and recreation areas, Reporting and recordkeeping requirements, Research, Water pollution control, Water resources, Wildlife.

(Federal Domestic Assistance Catalog Number 11.429 Marine Sanctuary Program)

Dated: September 26, 2006.

**Elizabeth R. Scheffler,**
*Associate Assistant Administrator for Management, Ocean Services and Coastal Zone Management.*

Accordingly, for the reasons set forth above, 15 CFR part 922 is proposed to be amended as follows:

**PART 922—[AMENDED]**

1. The authority citation for part 922 continues to read as follows:

**Authority:** 16 U.S.C. 1431 *et seq.*

2. The regulations for MBNMS (15 CFR part 922, Subpart M) are revised to read as follows:

**Subpart M—Monterey Bay National Marine Sanctuary**

Sec.
922.130  Boundary.
922.131  Definitions.
922.132  Prohibited or otherwise regulated activities.
922.133  Permit procedures and criteria.
922.134  Notification and review.
Appendix A to Subpart M of Part 922—Monterey Bay National Marine Sanctuary Boundary Coordinates
Appendix B to Subpart M of Part 922—Zones Within the Sanctuary Where Overflights Below 1000 Feet are Prohibited
Appendix C to Subpart M of Part 922—Dredged Material Disposal Sites Within the Sanctuary
Appendix D to Subpart M of Part 922—Dredged Material Disposal Sites Adjacent to the Monterey Bay National Marine Sanctuary
Appendix E to Subpart M of Part 922—Motorized Personal Watercraft Zones and Access Routes Within the Sanctuary
Appendix F to Subpart M of Part 922—Davidson Seamount Management Zone

**§ 922.130  Boundary.**

The Monterey Bay National Marine Sanctuary (Sanctuary) consists of two separate areas.

(a) The first area consists of an area of approximately 4016 square nautical miles (nmi) of coastal and ocean waters, and submerged lands thereunder, in and surrounding Monterey Bay off the central coast of California. The northern terminus of the Sanctuary boundary is located along the southern boundary of the Gulf of the Farallones National Marine Sanctuary (GFNMS) beginning

at Rocky Point just south of Stinson Beach in Marin County. The Sanctuary boundary follows the GFNMS boundary westward to a point approximately 29 nmi offshore from Moss Beach in San Mateo County. The Sanctuary boundary then extends southward in a series of arcs, which generally follow the 500 fathom isobath, to a point approximately 27 nmi offshore of Cambria, in San Luis Obispo County. The Sanctuary boundary then extends eastward towards shore until it intersects the Mean High Water Line (MHWL) along the coast near Cambria. The Sanctuary boundary then follows the MHWL northward to the northern terminus at Rocky Point. The shoreward Sanctuary boundary excludes a small area between Point Bonita and Point San Pedro. Pillar Point Harbor, Santa Cruz Harbor, Monterey Harbor, and Moss Landing Harbor are all excluded from the Sanctuary shoreward from the points listed in Appendix A except for Moss Landing Harbor, where all of Elkhorn Slough east of the Highway One bridge, and west of the tide gate at Elkhorn Road and toward the center channel from the MHWL is included within the Sanctuary, excluding areas within the Elkhorn Slough National Estuarine Research Reserve. Exact coordinates for the seaward boundary and harbor exclusions are provided in appendix A to this subpart.

(b) The Davidson Seamount Management Zone is also part of the Sanctuary. This area, bounded by geodetic lines connecting a rectangle centered on the top of the Davidson Seamount, consists of approximately 585 square nmi of ocean waters and the submerged lands thereunder. This portion of the Sanctuary is located approximately 70 nmi off the coast of San Simeon in San Luis Obispo County. Exact coordinates for the DSMZ boundary are provided in appendix F to this subpart.

### § 922.131   Definitions.

In addition to those definitions found at 15 CFR 922.3, the following definitions apply to this subpart:

*Attract or attracting* means the conduct of any activity that lures or may lure any animal by using food, bait, chum, dyes, decoys, acoustics, or any other means, except the mere presence of human beings (e.g., swimmers, divers, boaters, kayakers, surfers).

*Cruise ship* means a vessel with 250 or more passenger berths for hire.

*Deserting* means:

(1) Leaving a vessel aground or adrift:

(i) Without notification to the Director of the vessel going aground or becoming adrift within 12 hours of its discovery

and developing and presenting to the Director a preliminary salvage plan within 24 hours of such notification;

(ii) After expressing or otherwise manifesting intention not to undertake or to cease salvage efforts; or

(iii) When the owner/operator cannot after reasonable efforts by the Director be reached within 12 hours of the vessel's condition being reported to authorities; or

(2) Leaving a vessel at anchor when its condition creates potential for a grounding, discharge, or deposit and the owner/operator fails to secure the vessel in a timely manner.

*Federal Project* means any water resources development project conducted by the U.S. Army Corps of Engineers or operating under a permit or other authorization issued by the Corps of Engineers and authorized by Federal law.

*Hand tool* means a hand-held implement, utilized for the collection of jade pursuant to 15 CFR 922.132(a)(1), that is no greater than 36 inches in length and has no moving parts (e.g., dive knife, pry bar, or abalone iron). Pneumatic, mechanical, electrical, hydraulic, or explosive tools are, therefore, examples of what does not meet this definition.

*Harmful matter* means any substance, or combination of substances, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may pose a present or potential threat to Sanctuary resources or qualities, including but not limited to: Fishing nets, fishing line, hooks, fuel, oil, and those contaminants (regardless of quantity) listed pursuant to 42 U.S.C. 9601(14) of the Comprehensive Environmental Response, Compensation and Liability Act at 40 CFR 302.4.

*Introduced species* means:

(1) A species (including but not limited to any of its biological matter capable of propagation) that is non-native to the ecosystems protected by the Sanctuary; or

(2) Any organism into which genetic matter from another species has been transferred in order that the host organism acquires the genetic traits of the transferred genes.

*Motorized personal watercraft (MPWC)* means:

(1) Any vessel, propelled by machinery, that is designed to be operated by standing, sitting, or kneeling on, astride, or behind the vessel, in contrast to the conventional manner, where the operator stands or sits inside the vessel;

(2) Any vessel less than 20 feet in length overall as manufactured and

propelled by machinery and that has been exempted from compliance with the U.S. Coast Guard's Maximum Capacities Marking for Load Capacity regulation found at 33 CFR parts 181 and 183, except submarines; or

(3) Any other vessel that is less than 20 feet in length overall as manufactured, and is propelled by a water jet pump or drive.

*The Davidson Seamount Management Zone* means the area bounded by geodetic lines connecting a rectangle centered on the top of the Davidson Seamount, and consists of approximately 585 square nmi of ocean waters and the submerged lands thereunder. This portion of the Sanctuary is located approximately 70 nmi off the coast of San Simeon in San Luis Obispo County. Exact coordinates for the DSMZ boundary are provided in appendix F to this subpart.

### § 922.132   Prohibited or otherwise regulated activities.

(a) Except as specified in paragraphs (b) through (e) of this section, the following activities are prohibited and thus are unlawful for any person to conduct or to cause to be conducted:

(1) Exploring for, developing, or producing oil, gas, or minerals within the Sanctuary, except: Jade may be collected (meaning removed) from the area bounded by the 35.92222 N latitude parallel (coastal reference point: Beach access stairway at south Sand Dollar Beach), the 35.88889 N latitude parallel (coastal reference point: Westernmost tip of Cape San Martin), and from the mean high tide line seaward to the 90-foot isobath (depth line) (the "authorized area") *provided that:*

(i) Only jade already loose from the submerged lands of the Sanctuary may be collected;

(ii) No tool may be used to collect jade except:

(A) A hand tool (as defined at 15 CFR 922.131) to maneuver or lift the jade or scratch the surface of a stone as necessary to determine if it is jade;

(B) A lift bag or multiple lift bags with a combined lift capacity of no more than two hundred pounds; or

(C) A vessel (except for motorized personal watercraft) (see paragraph (a)(7) of this section) to provide access to the authorized area;

(iii) Each person may collect only what that person individually carries; and

(iv) For any loose piece of jade that cannot be collected under paragraphs (a)(1)(ii) and (iii) of this section, any person may apply for a permit to collect such a loose piece by following the procedures in 15 CFR 922.133.

(2)(i) Discharging or depositing from within or into the Sanctuary, other than from a cruise ship, any material or other matter, except:

(A) Fish, fish parts, chumming materials, or bait used in or resulting from traditional fishing operations within the Sanctuary, provided that such discharge or deposit is during the conduct of traditional fishing operations within the Sanctuary;

(B) Biodegradable effluent incidental to vessel use and generated by an operable Type I or II marine sanitation device (U.S. Coast Guard classification) approved in accordance with section 312 of the Federal Water Pollution Control Act, as amended (FWPCA), 33 U.S.C. 1322. Vessel operators must lock all marine sanitation devices in a manner that prevents discharge of untreated sewage;

(C) Biodegradable vessel deck wash down, vessel engine cooling water, vessel generator cooling water, anchor wash, clean bilge water (meaning not containing detectable levels of harmful matter as defined), or graywater as defined by section 312 of the FWPCA that is biodegradable;

(D) Vessel engine or generator exhaust; or

(E) Dredged material deposited at disposal sites authorized by the U.S. Environmental Protection Agency (EPA) (in consultation with the U.S. Army Corps of Engineers (COE)) prior to the effective date of Sanctuary designation (January 1, 1993), provided that the activity is pursuant to, and complies with the terms and conditions of, a valid Federal permit or approval existing on January 1, 1993. Authorized disposal sites within the Sanctuary are described in appendix C to this subpart.

(ii) Discharging or depositing from within or into the Sanctuary any material or other matter from a cruise ship except vessel engine cooling water, vessel generator cooling water, or anchor wash.

(iii) Discharging or depositing from beyond the boundary of the Sanctuary any material or other matter that subsequently enters the Sanctuary and injures a Sanctuary resource or quality, except those listed in paragraphs (a)(2)(i)(A) through (D) of this section and dredged material deposited at the authorized disposal sites described in Appendix D to this subpart, provided that the dredged material disposal is pursuant to, and complies with the terms and conditions of, a valid Federal permit or approval.

(3) Possessing, moving, removing, or injuring, or attempting to possess, move, remove, or injure, a Sanctuary historical resource. This prohibition does not

apply to possession, moving, removing, or injury resulting incidentally from kelp harvesting, aquaculture, or traditional fishing operations.

(4) Drilling into, dredging, or otherwise altering the submerged lands of the Sanctuary; or constructing, placing, or abandoning any structure, material, or other matter on or in the submerged lands of the Sanctuary, except as incidental and necessary to:

(i) Conduct traditional fishing operations;

(ii) Anchor a vessel;

(iii) Conduct aquaculture or kelp harvesting;

(iv) Install an authorized navigational aid;

(v) Conduct harbor maintenance in an area necessarily associated with a Federal Project in existence on January 1, 1993, including dredging of entrance channels and repair, replacement, or rehabilitation of breakwaters and jetties;

(vi) Construct, repair, replace, or rehabilitate a dock or pier; or

(vii) Collect jade pursuant to paragraph (a)(1) of this section, provided that there is no constructing, placing, or abandoning any structure, material, or other matter on the submerged lands of the Sanctuary.

(viii) The exceptions listed in paragraphs (a)(4)(ii) through (a)(4)(vii) of this section do not apply within the Davidson Seamount Management Zone.

(5) Taking any marine mammal, sea turtle, or bird within or above the Sanctuary, except as expressly authorized by the Marine Mammal Protection Act, as amended, (MMPA), 16 U.S.C. 1361 *et seq.*, Endangered Species Act, as amended, (ESA), 16 U.S.C. 1531 *et seq.*, Migratory Bird Treaty Act, as amended, (MBTA), 16 U.S.C. 703 *et seq.*, or any regulation, as amended, promulgated under the MMPA, ESA, or MBTA.

(6) Flying motorized aircraft, except as necessary for valid law enforcement purposes, at less than 1,000 feet above any of the four zones within the Sanctuary described in appendix B to this subpart.

(7) Operating motorized personal watercraft within the Sanctuary except within the four designated zones and access routes within the Sanctuary described in appendix E to this subpart.

(8) Possessing within the Sanctuary (regardless of where taken, moved, or removed from), any marine mammal, sea turtle, or bird, except as authorized under the MMPA, ESA, MBTA, under any regulation, as amended, promulgated under the MMPA, ESA, or MBTA, or as necessary for valid law enforcement purposes.

(9) Deserting a vessel aground, at anchor, or adrift in the Sanctuary.

(10) Leaving harmful matter aboard a grounded or deserted vessel within the Sanctuary.

(11)(i) Moving, removing, taking, collecting, catching, harvesting, disturbing, breaking, cutting, or otherwise injuring, or attempting to move, remove, take, collect, catch, harvest, disturb, break, cut, or otherwise injure, any Sanctuary resource located more that 3,000 feet below the sea surface within the Davidson Seamount Management Zone. This prohibition does not apply to fishing below 3000 feet within the DSMZ, which is prohibited pursuant to 50 CFR part 660 (Fisheries off West Coast States and in the Western Pacific).

(ii) Possessing any Sanctuary resource the source of which is more than 3,000 feet below the sea surface within the Davidson Seamount Management Zone. This prohibition does not apply to possession of fish resulting from fishing below 3000 feet within the DSMZ, which is prohibited pursuant to 50 CFR part 660 (Fisheries off West Coast States and in the Western Pacific).

(12) Introducing or otherwise releasing from within or into the Sanctuary an introduced species, except striped bass (*Morone saxatilis*) released during catch and release fishing activity.

(13) Attracting any white shark within the Sanctuary.

(14) Interfering with, obstructing, delaying, or preventing an investigation, search, seizure, or disposition of seized property in connection with enforcement of the Act or any regulation or permit issued under the Act.

(b) The prohibitions in paragraphs (a)(2) through (11) of this section do not apply to an activity necessary to respond to an emergency threatening life, property, or the environment.

(c)(1) All Department of Defense activities must be carried out in a manner that avoids to the maximum extent practicable any adverse impacts on Sanctuary resources and qualities. The prohibitions in paragraphs (a)(2) through (12) of this section do not apply to existing military activities carried out by the Department of Defense, as specifically identified in the Final Environmental Impact Statement and Management Plan for the Proposed Monterey Bay National Marine Sanctuary (NOAA, 1992). (Copies of the FEIS/MP are available from the Monterey Bay National Marine Sanctuary, 299 Foam Street, Monterey, CA 93940.) New activities may be exempted from the prohibitions in paragraphs (a)(2) through (12) of this section by the Director after

consultation between the Director and the Department of Defense.

(2) In the event of destruction of, loss of, or injury to a Sanctuary resource or quality resulting from an incident, including but not limited to discharges, deposits, and groundings, caused by a Department of Defense activity, the Department of Defense, in coordination with the Director, must promptly prevent and mitigate further damage and must restore or replace the Sanctuary resource or quality in a manner approved by the Director.

(d) The prohibitions in paragraph (a)(1) of this section as it pertains to jade collection in the Sanctuary, and paragraphs (a)(2) through (11) and (a)(13) of this section, do not apply to any activity conducted under and in accordance with the scope, purpose, terms, and conditions of a National Marine Sanctuary permit issued pursuant to 15 CFR 922.48 and 922.133 or a Special Use permit issued pursuant to section 310 of the Act.

(e) The prohibitions in paragraphs (a)(2) through (a)(8) of this section do not apply to any activity authorized by any lease, permit, license, approval, or other authorization issued after the effective date of Sanctuary designation (January 1, 1993) and issued by any Federal, State, or local authority of competent jurisdiction, provided that the applicant complies with 15 CFR 922.49, the Director notifies the applicant and authorizing agency that he or she does not object to issuance of the authorization, and the applicant complies with any terms and conditions the Director deems necessary to protect Sanctuary resources and qualities. Amendments, renewals, and extensions of authorizations in existence on the effective date of designation constitute authorizations issued after the effective date of Sanctuary designation.

(f) Notwithstanding paragraphs (d) and (e) of this section, in no event may the Director issue a National Marine Sanctuary permit under 15 CFR 922.48 and or a Special Use permit under section 310 of the Act authorizing, or otherwise approve: the exploration for, development, or production of oil, gas, or minerals within the Sanctuary, except for the collection of jade pursuant to paragraph (a)(1) of this section; the discharge of primary-treated sewage within the Sanctuary (except by certification, pursuant to 15 CFR 922.47, of valid authorizations in existence on January 1, 1993 and issued by other authorities of competent jurisdiction); or the disposal of dredged material within the Sanctuary other than at sites authorized by EPA (in consultation with COE) prior to January 1, 1993. Any

purported authorizations issued by other authorities within the Sanctuary shall be invalid.

### § 922.133    Permit procedures and criteria.

(a) A person may conduct an activity prohibited by § 922.132(a)(1) as it pertains to jade collection in the Sanctuary and § 922.132(a)(2) through (11), or (a)(13), if such activity is specifically authorized by, and conducted in accordance with the scope, purpose, terms, and conditions of, a permit issued under this section and 15 CFR 922.48.

(b) The Director, at his or her sole discretion, may issue a permit, subject to terms and conditions as he or she deems appropriate, to conduct an activity prohibited by § 922.132(a)(1) as it pertains to jade collection in the Sanctuary and § 922.132(a)(2) through (11), or (a)(13), if the Director finds that the activity will have at most short-term and negligible adverse effects on Sanctuary resources and qualities and:

(1) Is research designed to further understanding of Sanctuary resources and qualities;

(2) Will further the educational, natural, or historical value of the Sanctuary;

(3) Will further salvage or recovery operations within or near the Sanctuary in connection with a recent air or marine casualty;

(4) Will assist in managing the Sanctuary;

(5) Will further salvage or recovery operations in connection with an abandoned shipwreck in the Sanctuary title to which is held by the State of California; or

(6) Will allow the removal, without the use of pneumatic, mechanical, electrical, hydraulic or explosive tools, of loose jade from the Jade Cove areas under § 922.132(a)(1)(iv).

(c)(1) In deciding whether to issue a permit, the Director shall consider such factors as:

(i) Will the activity be conducted by an applicant that is professionally qualified to conduct and complete the activity;

(ii) Will the activity be conducted by an applicant with adequate financial resources available to conduct and complete the activity;

(iii) Is the activity proposed for no longer than necessary to achieve its stated purpose;

(iv) Must the activity be conducted within the Sanctuary;

(v) Will the activity be conducted using methods and procedures that are appropriate to achieve the goals of the proposed activity, especially in relation to the potential effects of the proposed

activity on Sanctuary resources and qualities;

(vi) Will the activity be conducted in a manner compatible with the primary objective of protection of Sanctuary resources and qualities, considering the extent to which the conduct of the activity may diminish or enhance Sanctuary resources and qualities, any potential indirect, secondary, or cumulative effects of the activity, and the duration of such effects;

(vii) Will the activity be conducted in a manner compatible with the value of the Sanctuary as a source of recreation and as a source of educational and scientific information, considering the extent to which the conduct of the activity may result in conflicts between different users of the Sanctuary and the duration of such effects; and

(viii) Does the reasonably expected end value of the activity to the furtherance of the Sanctuary goals and objectives outweigh any potential adverse effects on Sanctuary resources and qualities from the conduct of the activity.

(2) For jade collection, preference will be given for applications proposing to collect loose pieces of jade for research or educational purposes. In addition, the Director may consider such other factors as he or she deems appropriate.

(d) *Applications.* (1) Applications for permits should be addressed to the Director, Office of National Marine Sanctuaries; ATTN: Superintendent, Monterey Bay National Marine Sanctuary, 299 Foam Street, Monterey, CA 93940.

(2) In addition to the information listed in 15 CFR 922.48(b), all applications must include information the Director needs to make the findings in paragraph (b) of this section and information to be considered by the Director pursuant to paragraph (c) of this section.

(e) In addition to any other terms and conditions that the Director deems appropriate, a permit issued pursuant to this section must require that the permittee agree to hold the United States harmless against any claims arising out of the conduct of the permitted activities.

### § 922.134    Notification and review.

(a) [Reserved]

(b)(1) NOAA has entered into a Memorandum of Agreement (MOA) with the State of California, EPA, and the Association of Monterey Bay Area Governments regarding the Sanctuary regulations relating to water quality within State waters within the Sanctuary.

With regard to permits, the MOA encompasses:

(i) National Pollutant Discharge Elimination System (NPDES) permits issued by the State of California under section 13377 of the California Water Code; and

(ii) Waste Discharge Requirements issued by the State of California under section 13263 of the California Water Code.

(2) The MOA specifies how the process of 15 CFR 922.49 will be administered within State waters within the Sanctuary in coordination with the State permit program.

## Appendix A to Subpart M of Part 922—Monterey Bay National Marine Sanctuary Boundary Coordinates

[Coordinates in this appendix are unprojected (Geographic Coordinate System) and are calculated using the North American Datum of 1983]

| Point ID Number | Latitude | Longitude |
|---|---|---|
| **Seaward Boundary** | | |
| 1 | 37.88163 | −122.62788 |
| 2 | 37.66641 | −122.75105 |
| 3 | 37.61622 | −122.76937 |
| 4 | 37.57147 | −122.80399 |
| 5 | 37.52988 | −122.85988 |
| 6 | 37.50948 | −122.90614 |
| 7 | 37.49418 | −123.00770 |
| 8 | 37.50819 | −123.09617 |
| 9 | 37.52001 | −123.12879 |
| 10 | 37.45304 | −123.14009 |
| 11 | 37.34316 | −123.13170 |
| 12 | 37.23062 | −123.10431 |
| 13 | 37.13021 | −123.02864 |
| 14 | 37.06295 | −122.91261 |
| 15 | 37.03509 | −122.77639 |
| 16 | 36.92155 | −122.80595 |
| 17 | 36.80632 | −122.81564 |
| 18 | 36.69192 | −122.80539 |
| 19 | 36.57938 | −122.77416 |
| 20 | 36.47338 | −122.72568 |
| 21 | 36.37242 | −122.65789 |
| 22 | 36.27887 | −122.57410 |
| 23 | 36.19571 | −122.47699 |
| 24 | 36.12414 | −122.36527 |
| 25 | 36.06864 | −122.24438 |
| 26 | 36.02451 | −122.11672 |
| 27 | 35.99596 | −121.98232 |
| 28 | 35.98309 | −121.84069 |
| 29 | 35.98157 | −121.75634 |
| 30 | 35.92933 | −121.71119 |
| 31 | 35.83773 | −121.71922 |
| 32 | 35.72063 | −121.71216 |
| 33 | 35.59497 | −121.69030 |
| 34 | 35.55327 | −121.63048 |
| 35 | 35.55485 | −121.09803 |
| 36 | 37.59437 | −122.52082 |
| 37 | 37.61367 | −122.61673 |
| 38 | 37.76694 | −122.65011 |
| 39 | 37.81760 | −122.53048 |
| **Harbor Exclusions** | | |
| 40 | 37.49414 | −122.48483 |
| 41 | 37.49540 | −122.48576 |
| 42 | 36.96082 | −122.00175 |
| 43 | 36.96143 | −122.00112 |
| 44 | 36.80684 | −121.79145 |
| 45 | 36.80133 | −121.79047 |
| 46 | 36.60837 | −121.88970 |
| 47 | 36.60580 | −121.88965 |

## Appendix B to Subpart M of Part 922—Zones Within the Sanctuary Where Overflights Below 1000 Feet are Prohibited

The four zones are:

(1) From mean high water out to three nautical miles (NM) between a line extending from Point Santa Cruz on a southwesterly heading of 220° and a line extending from 2.0 NM north of Pescadero Point on a southwesterly heading of 240°;

(2) From mean high water out to three NM between a line extending from the Carmel River mouth on a westerly heading of 270 and a line extending due west along latitude 35.55488° off of Cambria;

(3) From mean high water and within a five NM arc drawn from a center point at the end of Moss Landing Pier; and

(4) Over the waters of Elkhorn Slough east of the Highway On bridge to Elkhorn Road.

**Appendix C to Subpart M of Part 922—Dredged Material Disposal Sites Within the Sanctuary**

[Coordinates in this appendix are unprojected (Geographic Coordinate System)

and are calculated using the North American Datum of 1983]

| Point ID Number | Latitude | Longitude |
|---|---|---|
| **Santa Cruz Harbor/Twin Lakes Dredge Disposal Site** | | |
| 1 | 36.95750 | −122.00033 |
| 2 | 36.95750 | −121.99250 |
| 3 | 36.95683 | −121.99233 |
| 4 | 36.95683 | −122.00050 |
| **SF–12 Dredge Disposal Site** | | |
| 1 | 36.80206 | −121.79207 |
| 2 | 36.80157 | −121.79218 |
| 3 | 36.80217 | −121.79325 |
| 4 | 36.80243 | −121.79295 |
| **SF–14 Dredge Disposal Site** <br> **(circle with 500 yard radius)** | | |
| 1 | 36.77550 | −122.59083 |
| **Monterey Harbor/Wharf II Dredge Disposal Site** | | |
| 1 | 36.43630 | −121.88941 |
| 2 | 36.60283 | −121.88787 |
| 3 | 36.60091 | −121.88826 |
| 4 | 36.60120 | −121.88978 |

**Appendix D to Subpart M of Part 922—Dredged Material Disposal Sites Adjacent to the Monterey Bay National Marine Sanctuary**

[Coordinates in this appendix are unprojected (Geographic Coordinate System)

and are calculated using the North American Datum of 1983]

As of January 1, 1993, the U.S. Army Corps of Engineers operates the following dredged material disposal site adjacent to the Sanctuary off of the Golden Gate:

| Point ID Number | Latitude | Longitude |
|---|---|---|
| 1 | 37.76458 | −122.56900 |
| 2 | 37.74963 | −122.62281 |
| 3 | 37.74152 | −122.61932 |
| 4 | 37.75677 | −122.56482 |
| 5 | 37.76458 | −122.56900 |

**Appendix E to Subpart M of Part 922—Motorized Personal Watercraft Zones and Access Routes Within the Sanctuary**

[Coordinates in this appendix are unprojected (Geographic Coordinate System)

and are calculated using the North American Datum of 1983]

The four zones and access routes are:

(1) The approximately one [1.0] NM² area off Pillar Point Harbor from harbor launch ramps, through harbor entrance to the northern boundary of Zone One:

| Point ID Number | Latitude | Longitude |
|---|---|---|
| 1 (flashing 5-second breakwater entrance light and horn located at the seaward end of the outer west break-water) | 37.49333 | −122.48500 |
| 2 (bell buoy) | 37.48167 | −122.48333 |
| 3 | 37.48000 | −122.46667 |
| 4 | 37 29.6° | −122.46667 |

(2) The approximately five [5.0] NM² area off of Santa Cruz Small Craft Harbor from harbor launch ramps, through harbor

entrance, and then along a 100 yard wide access route southwest along a true bearing of approximately 196° (180° magnetic) to the

whistle buoy at 36.93833N, 122.01000 W. Zone Two is bounded by:

| Point ID Number | Latitude | Longitude |
|---|---|---|
| 1 .................................................................................................................................... | 36.91667 | − 122.03333 |
| 2 .................................................................................................................................... | 36.91667 | − 121.96667 |
| 3 .................................................................................................................................... | 36.94167 | − 121.96667 |
| 4 .................................................................................................................................... | 36.94167 | − 122.03333 |

(3) The approximately six [6.0] NM² area off of Moss Landing Harbor from harbor launch ramps, through harbor entrance, and then along a 100 yard wide access route due west to the eastern boundary of Zone Three bounded by:

| Point ID Number | Latitude | Longitude |
|---|---|---|
| 1 .................................................................................................................................... | 36.83333 ° | − 121.82167 |
| 2 .................................................................................................................................... | 36.83333 | − 121.84667 |
| 3 .................................................................................................................................... | 36.77833 | − 121.84667 |
| 4 .................................................................................................................................... | 36.77833 | − 121.81667 |
| 5 (bell buoy) ..................................................................................................................... | 36.79833 | − 121.80167 |
| 6 .................................................................................................................................... | 36.81500 | − 121.80333 |

(4) The approximately five [5.0] NM² area off of Monterey Harbor from harbor launch ramps to the seaward end of the U.S. Coast Guard Pier, and then along a 100 yard wide access route due north to the southern boundary of Zone Four bounded by:

| Point ID Number | Latitude | Longitude |
|---|---|---|
| 1 .................................................................................................................................... | 36.64500 | − 121.92333 |
| 2 .................................................................................................................................... | 36.61500 | − 121.87500 |
| 3 .................................................................................................................................... | 36.63833 | − 121.85500 |
| 4 .................................................................................................................................... | 36.66667 | − 121.90667 |

**Appendix F to Subpart M of Part 922—Davidson Seamount Management Zone**

[Coordinates in this appendix are unprojected (Geographic Coordinate System) and are calculated using the North American Datum of 1983]

| Point ID Number | Latitude | Longitude |
|---|---|---|
| 1 .................................................................................................................................... | 35.90000 | − 123.00000 |
| 2 .................................................................................................................................... | 35.90000 | − 122.50000 |
| 3 .................................................................................................................................... | 35.50000 | − 122.50000 |
| 4 .................................................................................................................................... | 35.50000 | − 123.00000 |

[FR Doc. E6–16338 Filed 10–5–06; 8:45 am]
BILLING CODE 3510–NK–P

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 721**

**[EPA–HQ–OPPT–2006–0213; FRL–7770–9]**

**RIN 2070–AB27**

**Proposed Revocation of Significant New Use Rules on Certain Chemical Substances**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** EPA is proposing to revoke significant new use rules (SNURs) promulgated under section 5(a)(2) of the Toxic Substances Control Act (TSCA) for four chemical substances. The SNUR for the chemical substance covered by premanufacture notice (PMN) P–98–475 designated certain activities as significant new uses based on concerns identified in a corresponding TSCA section 5(e) consent order for that chemical substance and pursuant to 40 CFR 721.160. For the chemical substances covered by PMNs P–98–1043, P–99–0467, and P–01–71, EPA issued non-5(e) SNURs (i.e., SNURS on substances that are not subject to TSCA section 5(e) consent orders) designating certain activities as significant new uses based on the concern criteria in 40 CFR 721.170(b). EPA has received and reviewed new information and test data for each of the chemical substances, and proposes to revoke the SNURs pursuant to 40 CFR 721.185.

**DATES:** Comments must be received on or before November 6, 2006.

**ADDRESSES:** Submit your comments, identified by docket identification (ID) number EPA–HQ–OPPT–2006–0213, by one of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the on-line instructions for submitting comments.

• *Mail:* Document Control Office (7407M), Office of Pollution Prevention and Toxics (OPPT), Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001.

• *Hand Delivery:* OPPT Document Control Office (DCO), EPA East Bldg., Rm. 6428, 1201 Constitution Ave., NW., Washington, DC. Attention: Docket ID number EPA–HQ–OPPT–2006–0213. The DCO is open from 8 a.m. to 4 p.m., Monday through Friday, excluding legal holidays. The telephone number for the DCO is (202) 564–8930. Such deliveries are only accepted during the DCO's normal hours of operation, and special arrangements should be made for deliveries of boxed information.